IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

BARRY MCMILLIAN                                             PLAINTIFF

VS.                          CIVIL ACTION NO. 1:24-CV-199-GHD-RP

CITY OF ABERDEEN                                            DEFENDANT


**************************************************************

DEPOSITION OF BARRY McMILLIAN

**************************************************************


TAKEN AT THE INSTANCE OF THE PLAINTIFF
AT THE ABERDEEN CITY HALL, 125 WEST COMMERCE STREET,
ABERDEEN, MISSISSIPPI,
ON MARCH 31, 2026, BEGINNING AT 11:09 A.M.


GENA MATTISON GLENN, MS CSR 1568, TN LCR 884
Glenn-Henry Reporting
Post Office Box 492
Amory, Mississippi  38821-0492
gena.glenn@gmail.com
(662) 315-2613

EXHIBIT A

APPEARANCES:

DEMOREO REDDICK
        P.O. Box 465
        Okolona, MS   38860
        For the Plaintiff

PHELPS DUNBAR
        P.O. Box 320159
        Flowood, MS   39232
        For the Defendant
        BY:   LODEN P. WALKER

Reported by:   GENA MATTISON GLENN,
               MS CSR 1568, TN LCR 884 4

EXHIBIT A

Mississippi 39730.

Q. Okay. Is that a home that you've lived in for the past five years?

A. Yes, sir, I own it.

Q. Okay.

A. The home, yes, sir.

Q. All right. And then what are your last four digits of your social?

A. 1641.

Q. Have you posted anything on any social media site, Facebook, Instagram, Snapchat -- I'm trying to think what other social media sites are -- about this lawsuit?

A. No, sir.

Q. No posts about the lawsuit?

A. No, sir.

Q. Have you sent any e-mails -- and I'll try and make this narrow, because I know you've got that EEOC stuff which I know you communicate with e-mail on that, and then you talked to your attorney, I'm sure, by phone and text and e-mail. But people who aren't, like, the EEOC or your attorney, have you e-mailed anybody else about this case?

A. No, sir. Just the only people was the

meeting because they lowered me down to -- from a electric to a water labor [sic].

Q. Your departments changed?

A. Yes, sir.

Q. And you -- I guess your first day was sometime in -- October 5th maybe --

A. Yes, sir, October 5th first day --

Q. -- of 2020?

A. -- of work.

Q. All right. Do you recall your rate of pay when you started?

A. I first started off at $14.50 with the Aberdeen Electric Department.

Q. But you never worked -- I mean like your first paycheck, what was your rate of pay?

A. $12 an hour.

Q. 12. Okay. And then it looks like you got a pay raise?

A. Yes, sir. They ended up giving me a dollar pay raise and raised it up to $13 an hour.

Q. All right. That was March 2023?

A. Yes, sir.

Q. Any other pay raises?

A. No, sir, not that I can recall.

A. No, sir.

Q. Or a cousin?

A. No, sir.

Q. Okay. And I ask that just because she didn't vote on your termination, and I didn't know if that was because of some sort of nepotism.

A. The reason she didn't vote, Triron Brown is her nephew by marriage.

Q. She's related to Triron.

A. She's kin to Triron by marriage.

Q. And then so starting that fall, you worked full time as a laborer I think is the --

A. A water laborer.

Q. A water laborer. And you stayed in that position until you were terminated?

A. Yes, sir, I did.

Q. And that was December 5th, 2023?

A. Yes, sir.

Q. All right. What were your job duties as a full-time laborer?

A. Go out and fix water leaks. Or if somebody didn't pay they bill, I would be on call. I would be the person that go out and cut their water off. And then they call back in

stay in the office or what did you do?

A. I -- they end up having me wiping the front door, cleaning glasses, and stuff like that. They gave me a little mop. I had to keep the side -- the lobby clean and stuff like that. Mopping the lobby and stuff like that.

Q. Okay. And what time in the morning, like, would you start? 7:00 a.m.?

A. Yes, I started 7:00 a.m.

Q. And when do y'all end?

A. At 3:30.

Q. And so -- and that's Monday through Friday?

A. Monday through Friday.

Q. Okay. And that pretty much stayed the same your entire time?

A. Yes, sir.

Q. How many hours did you typically work per week?

A. We didn't have just straight hour, 40 hours a week, but at least twice a week I would be on call and stuff like that. So I usually get, like, 8 hours in overtime like that. Because if you're on call, they give you automatic 2. So if somebody call and say, hey,

Q.   Okay.  And then I thought you didn't take call on the weekends.

A.   Who didn't take call?

Q.   You.

A.   No, whoever -- however that come up, I -- you take call on the weekends, whatever.  So it was like your name added in on a Friday, or a Saturday, that's your call.

Q.   Okay.  I was just -- I looked at your time sheets; and it's, like, every weekend you got -- you're scheduled off.

A.   No, I was on call every -- if that fall in on that, and you go back to that November, the 2023 and in there, I was on some Saturdays in November of 2023.

Q.   Okay.  Well, less than 10, like, in your career?

A.   I can't recall.

Q.   All right.  So it still would be four people rotating.  So you're about, like, three shifts a month overtime?

A.   Like that, yes, sir.

Q.   Okay.  All right.  Tell me how you recorded your work hours each day.

A.   You go inside and you clock in.  And

input.

You know, it's not just as simple as click my name and, you know, I'm in, or I scan a key fob or, you know, a card. It looks like you got to enter two things. One is your -- I'll call it an employee number. I don't know if that's typically what it's called. But the other is also your last four digits of Social. Do you agree with that?

A. I can't remember when I was there it was a time clock. Right there above, had everybody clock number. I haven't been there in three years. I don't know what happened or what. I can't recall.

Q. This was the system in at the time you were working. You don't remember having to put in two different number -- like, sets of numbers?

A. No, sir. Not that I can recall. Only thing I know, we got the -- up under there it's a chart with everybody's number on there, and you put your number. And mine was 27.

Q. Your employee number was 27?

A. Yes, sir. My number was 27.

Q. Okay. So you just can't recall

So I guess just my first question is -- or I looked at the calendar November 27th is a Monday.

A.   Yes, sir.

Q.   Or was a Monday.  Where were you?

A.   I was in Las Vegas.

Q.   Las Vegas?

A.   Las Vegas, Nevada.

Q.   I haven't been to Vegas.  I'd like to go there one day.

Was that just, like, a weekend trip you were taking?

A.   I end up going with all my family.  We were going for Thanksgiving that weekend for the -- for the Thanksgiving weekend.

Q.   Okay.  I remember -- you were sitting in here too, but during Johnny's deposition he said that you left town that Thursday or Friday.  Do you recall when you left to go?  What day?

A.   I think the city -- the city gave us that Wednesday or -- that Wednesday -- we was off that Wednesday and that Thursday.  We was off that Thursday and that Friday.  So I probably took off that Wednesday or that Thursday.  I can't recall, but I know I took off

runaround, so that morning we ended up -- had to spend the night there all night at the airport.

Q. Okay. All right. And then your Amended Complaint mentions that -- I believe it's that first sentence, that Mr. Brown -- I always mispronounce his first name -- Triron Brown clocked you in on that Monday, November 27th.

And you may recall with Mr. Brown's deposition, we were -- we were all sitting in here. He testified that he did clock you in and he clocked you out on that 27th. Do you recall him saying that?

A. Yes, sir.

Q. Okay. Do you disagree with that?

A. Do I disagree with him saying he clocked me in?

Q. Uh-huh.

A. No, sir.

Q. I'm going to hand you another --

MR. WALKER: And this is just premarked DEF 309.

MR. REDDICK: Okay.

BY MR. WALKER:

Q. As you see this is just a picture of

A.   Yes, as I can recall.

Q.   Okay.

MR. REDDICK:  I think you said Odom, him --

MR. WALKER:  Odom, Haynes, and --

MR. REDDICK:  Oh.  Odom, Haynes.

Okay.  I thought you said him, H-I-M.

Okay.

MR. WALKER:  3-1-1 vote.

MR. REDDICK:  Okay.

BY MR. WALKER:

Q.   Did you speak to Alderwoman Odom about your termination that day, like, after the board vote?

A.   No, sir, I did not speak with her.  I end up -- after they told me I was terminated -- I -- I ended up -- and then I asked Mr. Edward Haynes -- I asked him -- well, he said, Just get your attorney.  He the one that told me, when they were coming out of executive session, just said, Just get your attorney to handle it.  They ain't going to let you, speak.

Q.   Okay.  So you didn't talk to any of the board members --

A.   No, I did not.

Q.   -- after that?

A.   I didn't.  I end up leaving after that I know I was terminated.

Q.   All right.  Do you know why Alderwoman Odom voted in favor of your termination?  Like, have you personally spoken to her?  I know you have your allegations on why; but, like, have you personally spoken to Odom at any point about your termination?

A.   No, sir.  I have never spoke to Alderman -- the first time I heard why she voted against me, because I had a lot of EEOC pending allegation against the city.

Q.   So you did speak to Odom about your termination?

A.   No, sir.  I found out when she was doing her deposition.

Q.   That --

A.   Why she --

Q.   -- you -- that she testified, saying because you did your EEOC charge?

A.   Yes, sir.  That's the first time I ever -- me and her never had a conversation, but that's the first time I ever knowing of why she terminated against me, voted against me getting

termination.

Q.   And I disagree with you that that's what she said; but again, deposition is not for arguing.  But can we just agree to say that her deposition -- the reason -- your understanding of why she voted to terminate you is based on her deposition testimony?

A.   Yes, sir.

Q.   Okay.  Is that the same -- is that true for Alderman Cain as well?

A.   After his deposition.  Yeah.

Q.   Anything outside of the deposition?

A.   I never had a conversation with none -- him, Cain, or anyone after the day I got termination.

Q.   Same is for Haynes as well?

A.   Yes, sir.

Q.   Okay.  All right.

MR. REDDICK:  Let's hop off the record a second.

(Brief recess.)

BY MR. WALKER:

Q.   So we kind of -- we've talked about the termination.  I know you had your allegations about, you know, you believe it was

time you mentioned in your deposition testimony that you would, like, do stuff around the shop: Mop, and the door, and --

A.  Yes, sir.

Q.  -- whatever else?  They didn't want you out in the field?

A.  They didn't want me in the field.

Q.  Okay.  All right.

MR. WALKER:  All right.  Next is DEF 1828 and 1830.

BY MR. WALKER:

Q.  This is -- same thing, but this is the month of November.  And the schedule, you know, just looking from the time sheet, looks consistent with October.  It's, like, you worked during the week.  You got your eight-hour -- you know, over eight hours in.  And then you were scheduled off on the weekend.  You were absent one day, it looks like, or a couple days.

But is that -- is that -- is it the same story as October?

A.  Yes, sir, it is.

Q.  Okay.  I'm sorry.  I think I was looking at the wrong thing there.  DEF 1828 and 1830.  Yeah.  It's the work you worked during

the week -- you worked, yeah, some days over eight hours; but then you were either absent or you were scheduled off?

A. Yes, sir.

Q. Okay. All right.

MR. WALKER: This is 18 -- DEF 1829.

Give everybody a copy here.

BY MR. WALKER:

Q. DEF 1829 is just -- I believe this is Marcus's version of your time sheets, and it's specifically for the pay period of November 15th through November 28th.

I guess just the question I was going to ask you is: Looks like you got 10 hours of overtime during that two-week period. Is that accurate?

A. It got 11 hours there. 54 regular, 11 hour OT, 16 hour holiday, and 2 sick -- 2 off sick, the total of 83.

Q. So it would have been 10 or 11 hours of overtime?

A. Yes, sir.

Q. Okay. So you were earning overtime at the end of November?

A. Yes, sir.

up, I just can represent this to you. But it says that -- at the bottom it says it shows that the plaintiff applied for sick leave for November 27th, 2023, which was due to his gallbladder.

What does that have to do with your gallbladder? I thought it was because you missed a day at work.

A. No, sir, because I --

Q. I mean because you -- your flight was delayed that's how your Complaint starts.

A. On the Complaint it started. But the FMLA, you can miss any time of the week. You've got 12 weeks to miss. So if the FMLA had been in play, I was off for the gallbladder. So instead of -- labor and wage give you 12 weeks so you could be off.

So I could miss any time or it's an unpaid -- like Ms. Moore said, it's an unpaid. So if I wake up that morning and said, Oh, my head hurts, only thing I got to do is notify my supervisor that I'm going to be taking off. Can't get docked for it, can't get nothing about it.

So I took off this day right here for

sickness, going to use it. I could use the 12 weeks anytime I wanted to. They use it.

Q. Okay. But it wasn't because of your gallbladder? I mean, I was just asking. That's what the Complaint says. It was because your flight was delayed?

A. My flight was delayed, and I was just going to use one of my FMLAs days up.

Q. Okay.

A. Until -- with my gallbladder. I wanted to use my FMLA days.

Q. Okay. But the -- for the gallbladder from September.

A. From September. I had from September the 21st, that day with my FMLA. It would have took me all the way to -- I think the labor and wage said it would have took me all the way to January the 3rd or 4th or something, but I had 12 weeks I could miss in that time.

Q. Okay. So you're marking it as sick leave, but you weren't sick, essentially. You're saying, I have these days; I'm going to use it.

A. Yes, sir.

Q. Okay.

over to the -- Melissa and them, to the payroll people.

Q. When you say you went to your supervisor about it, what supervisor did you go to, or who did you go to?

A. Marcus Collins.

Q. Okay. All right. I'm showing you Exhibit 18. Is there anything important about Exhibit 18?

A. Yes, sir. This is City of Aberdeen Water Department Request for Leave, Barry McMillian, 11-28-2023. I filled out the -- for sickness. And disapproved, Mayor, Charles Scott, November 29, 2023.

Q. And you're reading that where on this?

A. On the bottom part of it where Mayor Scott disapproved and I followed the procedure.

Q. Okay. Is there a reason why he disapproved that leave?

A. No, sir.

Q. Okay. Did you follow the proper protocol to get that leave?

A. Yes, sir, I did follow with my supervisor.

Q. Was this in relation to your

C E R T I F I C A T E

STATE OF MISSISSIPPI )

COUNTY OF MONROE      )

RE:  ORAL DEPOSITION OF BARRY McMILLIAN

I, Gena Mattison Glenn, CSR 1568, a Notary Public within and for the aforesaid county and state, duly commissioned and acting, hereby certify that the foregoing proceedings were taken before me at the time and place set forth above; that the statements were written by me in machine shorthand; that the statements were thereafter transcribed by me, or under my direct supervision, by means of computer-aided transcription, constituting a true and correct transcription of the proceedings; and that the witness was by me duly sworn to testify to the truth and nothing but the truth in this cause.

I further certify that I am not a relative or employee of any of the parties, or of counsel, nor am I financially or otherwise interested in the outcome of this action.

Witness my hand and seal on this 13th day of April, 2026.

_____

My Commission Expires:     MS CSR 1568
July 19, 2027              Notary Public
                          TN License No. 884

EXHIBIT A          GENA MATTISON GLENN, gena.glenn@gmail.com