IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION


BARRY McMillian                                    PLAINTIFF

VS.                    CIVIL ACTION NO.: 1:24-CV-199-SA-RP

THE CITY OF ABERDEEN
AND JOHN DOES 1-20                                DEFENDANTS


*****************************************************

DEPOSITION OF EDWARD HAYNES

*****************************************************


TAKEN AT THE ABERDEEN CITY HALL BOARDROOM
125 WEST COMMERCE STREET
ABERDEEN, MISSISSIPPI 39730
ON FEBRUARY 26, 2026
BEGINNING AT APPROXIMATELY 1:29 P.M.


APPEARANCES NOTED HEREIN


Reported by:    VALERA H. KNIGHT, CCR #1039
                P.O. BOX 82
                TAYLOR, MS 38673
                (662) 816-9863
                valeraknight@gmail.com

EXHIBIT J

APPEARANCES:

Representing the Plaintiff:
DEMOREO REDDICK, ESQ.
Ms. Bar No.: 103747
P.O. Box 465
Okolona, MS 38860
Telephone:  662-436-4641
Telecopier:  662-256-3582
reddicklawfirm@yahoo.com

Also Present:  Barry McMillian, Plaintiff

Representing the Defendants:
LOGAN P. WALKER, ESQ.
PHELPS DUNBAR LLP
1905 Community Bank Way, Suite 200
Flowood, Mississippi 39232
Telephone:  601-352-2300
Telecopier:  601-360-9777
loden.walker@phelps.com

EXHIBIT J

recollection about that incident?

A. A motion came up that some impropriety was going on with a city employee being on the clock and not actually physically here, and that employee was Mr. McMillian.

Q. Okay. Was Mr. Brown also involved in that matter?

A. Mr. Brown was accused of clocking Mr. McMillian in when Mr. McMillian was not here.

Q. Okay.

A. And Mr. Brown stated that he was told -- he was asked to do so by Mr. McMillian.

Q. Okay. And did you hear that with -- I guess, verbally from Mr. Brown?

A. I did.

Q. Okay. And when did he tell you this?

A. During that board meeting.

Q. The board meeting on December 5th, 2023?

A. Uh-huh.

Q. All right. And did you talk to Mr. Barry McMillian in the board meeting?

A. Did not.

Q. Okay. I was informed that Mr. McMillian actually tried to talk to the board to plead his case and whatnot. Was there a reason why he was denied by

EXHIBIT J

the board?

A. City attorney stated that if he had gotten an attorney and he's filed a suit against the City, that we should not entertain a conversation with Mr. McMillian about the situation.

Q. And that point of reference with him being terminated from an incident happened on November 27th, 2023, on or around that time?

A. That is correct.

Q. That you say that he retained an attorney around that time, in reference to Mr. McMillian?

A. Yes.

Q. Okay. Did Mayor Charles Scott said that he actually spoke with Mr. McMillian in reference to investigating this matter prior to recommending his termination?

A. Are you asking a question?

Q. Yes. I'm saying, did Mayor Charles Scott, when he came to the board meeting, did he state that he interviewed Mr. McMillian about this matter.

A. I don't recall.

Q. Okay. And when I mean "that matter," about the time clock situation?

A. I don't recall.

Q. Okay. I guess from your own memory, do you

EXHIBIT J

know why Mr. McMillian received a different penalty from Mr. Brown?  In this situation Mr. McMillian was terminated and Mr. Brown was suspended for three days.

A.   Receiving payment for work not done is considered theft.

Q.   Okay.  And what is it called when someone assists in helping that person receive payment for money that was not earned?

A.   He assisted in the theft.

Q.   Okay.  So is there a reason why he received three days -- Mr. Brown received three days and Mr. McMillian received termination?

A.   Nope.

Q.   Okay.  So you are saying there is not any particular reason why one was terminated and the other one was suspended; is that correct?

A.   Well, one received payment and one didn't.

Q.   Okay.  But if one assisted in that, then --

A.   One received payment, one didn't.

Q.   Okay.  So that's going to be your reason, one received the payment even though they both were involved in that matter?

A.   If Mr. McMillian knew when his paycheck came out, all Mr. McMillian had to do was return the money to the City once he learned that he had got paid for

EXHIBIT J

hours that he wasn't due.

Q.    Okay.  So I guess just for the record just to clarify -- I guess you can say it's asked and answered -- but you are saying even though they both were involved in the matter, you are saying that -- initially you said no, and now you are saying that Mr. McMillian is the one that received the money, so he should get a harsher punishment than the person that assisted in helping him get the money; is that correct?

BY MR. WALKER:  Since you qualified the question with my objection, I do object.  Asked and answered.  Mr. Haynes, from time to time I may -- it's just to make a record.  You can still answer the question.

BY THE DEPONENT:  I understand.  I understand.

Q.    (Mr. Reddick continued):  So do you have an answer for that?

A.    I mean -- can you use an honor system of saying that if I received something and it wasn't due to me when I have -- if I was an honest person, would I not have said, "Hey, these hours ain't correct on my

EXHIBIT J

check.  Somebody made an error here."

Now, I couldn't hold Mr. McMillian accountable, because now he used the honor system saying, "Something was wrong and it wasn't me, cause I wasn't here."  But because he received the funds and never said a word, that tells me then that he knew.

Q.  Okay.  And so what about in reference to Mr. Brown, then?  So you are saying since he didn't receive the money that's why he got -- I mean, can you just explain it to me why he was just suspended instead of termination as well?

BY MR. WALKER:  Asked and answered.

Q.  (Mr. Reddick continued):  Just to clarify what you just stated.

A.  Asked and answered already.

Q.  Okay.  So I mean, you can still elaborate. So I'm just asking --

A.  I don't need to elaborate.  It's already there.

Q.  Okay.  And so what document did you use to come to this conclusion that Mr. McMillian was stealing time?

A.  If I'm not mistaken, I think the mayor informed us of the payroll that someone was receiving

EXHIBIT J

payment that was actually on the clock and was not here.

Q.   Okay.  But did you clarify that with Mr. McMillian?

A.   I mean, do I need to?

Q.   I'm just asking is it just a yes or no.  Did you clarify that with Mr. McMillian?

A.   Um --

Q.   No.  I'm just asking:  Did you clarify that with Mr. McMillian what you just stated?

A.   Mr. McMillian clarified it himself.

Q.   When?

A.   When he received the check.

Q.   Okay.  But I'm saying, did you have a verbal conversation with him about this?

A.   Did not have a ver -- that's not part of the Alderman's responsibility you have to go and talk to employees on things of this nature right here.  That is the mayor's responsibility.

Q.   Okay.

A.   To handle day-to-day operations.

Q.   So even though Mr. McMillian did request to speak with the board about this matter, you are saying that he's not entitled to be able speak to the board about this matter; correct?

EXHIBIT J

A.   This is a request for -- looks like leave of absence for sickness.

Q.   Okay.  Are you familiar with -- you say you've never seen that document before today; correct?

A.   Not this one, I haven't.

Q.   Okay.  All right.  I guess let me ask you this:  Are you familiar with the fact that Mr. McMillian actually tried to, I guess, get FMLA leave in reference to this matter?  That's what that document -- and I will allege to that -- well, I will state to you that's what that document shows.

BY MR. WALKER:  Object to the form of the question.

A.   Okay.  What I'm gleaming from this is that a request was made for sick leave for an illness on the 28th.  I'm assuming this was for a -- for the time that happened on the 27th.  If you are going to ask for a leave of absence, you would ask for it before, not after.

Q.   (Mr. Reddick continued):  Okay.  And let me just ask you:  Can you just state what that statement says at the very bottom?

A.   It says the same thing -- disapproved by Mayor -- looks like it says "Disapproved by Mayor Scott, November the 29th, 2023."  I can't remember --

EXHIBIT J

the only thing needed to be changed, but it never got to that -- we never got to that point. It was being -- I was actually working on it. Like I said, I got a copy of the handbook on my computer right now that I was working on.

Q. Okay.

A. I was in the process of creating a whole new handbook.

Q. I got you. I understand. So in reference to Mr. McMillian filing an EEOC charge against the City, do you know if any other board members were agitated that he actually filed that claim against the City of Aberdeen?

A. I can't speak for anybody but myself.

Q. Okay. What about yourself?

A. I had no reference of being irritated or anything else about it. I just -- it was his right as a citizen, as an employee, that was his right to the file that. There shouldn't be any backlash because he's seeking something that he thinks may be a violation of his rights.

Q. Okay. And that's in reference to the EEOC charge in 2022; correct?

A. That's correct.

Q. Okay. I'm going to show you Exhibit 3.

EXHIBIT J

about Thanksgiving and the date.)

Q. (Mr. Reddick continued): So Mr. Brown stated earlier that Mr. McMillian -- well actually Charles Scott told him to state that Mr. McMillian -- Mr. McMillian told him to clock him in. Are you aware of that statement? Did Mr. Brown ever tell you that before?

A. After the fact.

Q. So he informed you that after the fact?

A. When he talked to the board, he informed the board that he, at Barry's request, that he clocked him in.

Q. Okay. Did he ever -- I guess what I'm saying today is he said that the mayor is the one that actually told him to say that.

A. Not in front of me.

Q. Okay. And just for the record, what is the policy in reference to a person -- I guess an individual trying to talk to the board about, I guess trying to fight for their job when they're -- I guess about to get reprimanded or have -- or already -- or they already have been reprimanded in some type of way, disciplinary wise?

A. You can be given a disciplinary hearing, but if you have obtained an attorney, then your attorney

EXHIBIT J

Q.   So you would not have known that before the meeting?

A.   No.

Q.   Okay.  So I guess these are going to be my last set of questions.  We are looking at Exhibit 11. All right.  Just looking at Exhibit 11, that's the EEOC charge that Mr. McMillian filed against the City of Aberdeen in 2022?

A.   Uh-huh.

Q.   In reference to, I guess if the city board of Aberdeen terminated Mr. McMillian due to him filing that charge, what would be your, I guess, your response to that?

         BY MR. WALKER:  Objection to
         the form.

Q.   (Mr. Reddick continued):  Well, you may answer.

A.   We didn't terminate him because of the EEOC.

Q.   Okay.

A.   It was due to stealing time.

Q.   Okay.  All right.  And what about yourself individually, what would be your statement to the same question?  Did you terminate Mr. McMillian due to him filing the 2022 EEOC charge?

A.   I stated to you earlier, as a citizen, as a

EXHIBIT J

Q. Okay. And in reference to Mr. McMillian actually trying to receive his FMLA benefits, did you terminate Mr. McMillian because he actually tried to receive FMLA benefits in the past?

A. Asked and answered.

Q. Well, I guess, I'm now --

A. You just reworded the same question; asked and answered. I gave you, he's a citizen. He has a right to file the FMLA as many times as he wants to. That ain't got nothing to do with his termination. His termination was due to stealing time.

I can't count how many times I came to his job site and Barry got his feet kicked up on the table or somewhere, and standing -- laying in front of a fan, or he's outside washing his truck off when he should have been at work.

Q. Okay. But I guess just for the record, you are saying that's not why you decided to terminate him?

A. None whatsoever.

Q. Because of him trying to receive the FMLA?

A. None whatsoever.

Q. Okay. And what about the other board members?

A. You got to ask them.

EXHIBIT J

Q.   Okay.  So if another board member says something different then you --

A.   That means nothing.  I'm telling you I did not.

Q.   Okay.

A.   My decision was not based off none of that.

BY MR. REDDICK:  Okay.  I have no further questions.

EXAMINATION BY MR. WALKER:

Q.   Okay.  Mr. Haynes, I have just a couple of questions.  I'm just interested in exploring some more of the testimony you provided.

I guess we'll just start with the most recent thing you said.  I think you said, I'm paraphrasing, but you said something along the lines of you couldn't recall how many times you witnessed Barry with his feet up or washing his truck?

A.   Correct.

Q.   Could you elaborate more on that for me, please?

A.   Public works is on the other end of this street right here (indicating).  And it is, I guess, you can say sort of isolated somewhat of, and I am one of those aldermen that did drive around and engage with our employees to see how they were doing and see

EXHIBIT J

flag, something wrong here. Somebody put some time on my time sheet that didn't belong to me.

Q. Okay.

A. And that's what I was referencing to the honest system should have took over then.

Q. When Barry was hired, you were serve -- I know you testified at the time, you were serving on the board when he was hired?

A. I was. Uh-huh.

Q. Did you vote in favor of hiring him?

A. I was the reason that Barry got a job.

Q. Okay. And then last thing, if you can recall that December 5th -- December 2023 board meeting, do you recall the words "Family Medical Leave Act" ever even coming up during that board meeting?

A. No. I can't recall that ever coming up.

Q. All right. Same question. What about the acronym FMLA, do you remember hearing that?

A. No. I'm -- like I say, I've very familiar with it cause in my permanent job, that's some of the things that I did deal with, with the employees that worked for me. So I was very familiar with the FMLA.

As a matter of fact, I have even helped people fill those forms out, as well. But I would never -- I can't recall at any time that I was ever

EXHIBIT J

C E R T I F I C A T E

I, Valera Knight, Court Reporter and Notary Public within and for the State of Mississippi, do hereby certify that the above and foregoing pages contain a full, true and correct transcript of the proceedings had in the afore-named case at the time and place indicated, which proceedings were recorded by me to the best of my skill and ability.

I also certify that I placed the deponent under oath to tell the truth and that all answers were given under that oath.

I further certify that I have no interest, monetary or otherwise, in the outcome of this action.

Witness my hand and seal on this 16th day of March, 2026.

_____
Valera Knight
My Commission Expires:     CCR #1039
March 21, 2029            Notary Public

EXHIBIT J