Marcus Collins -- February 25, 2026

Exhibit B

### Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

BARRY MCMILLIAN                  PLAINTIFF
VERSUS      CIVIL ACTION NO. 1:24-CV-199-SA-RP
THE CITY OF ABERDEEN
AND JOHN DOES 1-20          DEFENDANTS

************************************************
DEPOSITION OF MARCUS COLLINS
************************************************

APPEARANCES NOTED HEREIN


DATE: FEBRUARY 25, 2026
PLACE: ABERDEEN CITY HALL BOARDROOM
125 WEST COMMERCE STREET
ABERDEEN, MISSISSIPPI
TIME: 10:07 AM


REPORTED BY: DANA GORDON
CCR #1908

REPORTING BY DANA, LLC
Post Office Box 1362
Brandon, Mississippi 39043
(601)-506-3440
DanaDMoulder@gmail.com

### Page 2

APPEARANCES:

DEMOREO J. REDDICK, ESQ.
Reddick Law Firm, PLLC
Post Office Box 465
Okolona, Mississippi 38860-0465
reddicklawfirm@yahoo.com
(662)-436-4641

COUNSEL FOR PLAINTIFF


LODEN P. WALKER, ESQ.
CHANNING J. CURTIS, ESQ.
Phelps Dunbar, LLP
1905 Community Bank Way, Suite 200
Flowood, Mississippi 39232
loden.walker@phelps.com
channing.curtis@phelps.com
(601)-352-2300
COUNSEL FOR DEFENDANTS



ALSO PRESENT: BARRY MCMILLIAN

### Page 3

INDEX

Style and Appearances....................... 1
Index........................................ 3
Examination by Mr. Reddick.................. 4
Certificate of Court Reporter............... 44
Certificate of Deponent..................... 45
Errata Sheet................................ 46

EXHIBITS

Exhibit 1: Sentencing Order.................. 8
Exhibit 2: Phone Screenshot.................. 11
Exhibit 3: Employee Disciplinary Report...... 18
Exhibit 4: 11/15-11/28 Time Sheet............ 21
Exhibit 5: 11/28/23 Donate Time Letter....... 26
Exhibit 6: 11/15-11/28 Employee Daily Time... 29
Exhibit 7: November 2023 On Call Calendar.... 30
Exhibit 8: Request for Leave................. 31
Exhibit 9: Overtime Call Out Trouble Calls... 36

### Page 4

MARCUS COLLINS,
(AFTER HAVING BEEN FIRST DULY SWORN,
TESTIFIED AS FOLLOWS:)
EXAMINATION
BY MR. REDDICK:

Q.   All right.  Mr. Marcus Collins, my name is Attorney Moreo Reddick.  I represent my client, Mr. Barry McMillian.

I just want to get some formalities out of the way.  I guess, my first question is, have you ever gave a deposition before?

A.   No, I haven't.

Q.   Okay.  All right.  So basically what it is, I'm just trying to find out information.  I'm not here to trick you.  I just want to, I guess, get as much information as I can.

If there is something that you don't know, you can just tell me that you don't know.  Or if there's a question that, I guess, you are not understanding or you're not understanding what I'm asking, you just tell me that you don't understand what I'm asking and I can rephrase the question so you can understand what I'm asking.

The court reporter is making a

1 (Pages 1 to 4)

Marcus Collins -- February 25, 2026

Page 5

record, and so it's best that we don't talk over one another. So when I ask you a question, just allow me to be able to, I guess, finish asking the question and then I'll give you a chance to respond. Is that fair?

A. (Nodding head.)

Q. All right. And I guess, just for the record, can you state your whole name for the record?

A. Marcus Collins.

Q. All right. And where do you reside?

A. 1110 Elk Circle, Aberdeen.

MR. REDDICK: And he's already been sworn in? Okay. All right.

BY MR. REDDICK:

Q. Do you have any family members in Aberdeen, Mississippi?

A. I do.

Q. Okay. Can you just give me their -- give me a second -- their last names?

A. Hoskins.

Q. Hoskins.

A. I'm kin to the McMillians, Straughters.

Q. You said Strobbers?

Page 6

A. Straughters. Straughter.

Q. Can you spell that?

A. S-T-R-A-U-G-H-T-E-R.

Q. And what was that first name you gave? I know you said the McMillians but it was something before Hoskins.

A. No, that's all.

Q. That's it. Okay.

And I guess the Collins as well?

A. Well, they're not from Aberdeen.

Q. Okay. All right. Are you on any medication that would stop your ability to give a deposition today?

A. No.

Q. Okay. And you don't have to go into what you and your attorney talked about, but how did you prepare today?

A. Just reading over the files that was sent.

Q. Okay. And for the record, can you tell me your highest level of education?

A. Some college.

Q. Where was that at?

A. Jackson State University.

Q. Do you know approximately the year?

Page 7

A. 2003 was my last year.

Q. Okay. And you said -- where do you reside; what's your address?

A. 1110 Elk Circle, Aberdeen.

Q. What is that ZIP code?

A. 39730.

Q. And are you currently married?

A. No.

Q. Okay. Do you have any kids that reside in Monroe County?

A. I do.

Q. What are their names?

A. Marcus Collins Jr., Haley Peterson, Samiya Daniels.

Q. Okay. All right. And just for the record, have you ever been convicted of any type of felony?

A. Yeah.

Q. Okay. What was that?

A. That was an embezzlement.

MR. REDDICK: I'm going to enter this exhibit as Exhibit 1.

This is a sentencing order provided in initial disclosures.

MR. WALKER: What is the relevance of

Page 8

this, Moreo?

MR. REDDICK: It would go to, I guess, the trustworthiness of the witness.

MR. WALKER: The witness didn't vote to terminate your client.

MR. REDDICK: Right, but just his testimony in general.

MR. WALKER: Okay.

(EXHIBIT NO. 1 WAS MARKED.)

BY MR. REDDICK:

Q. This is Exhibit 1. Mr. Collins, can you just tell me if that's accurate? It says that it's a sentencing order for Marcus Collins. Is that your sentencing order?

A. Yeah.

Q. Okay. And that was for embezzlement?

A. Uh-huh.

Q. Okay. And what's the -- I guess, can you just tell me what the date is on that? Should say filed --

A. Filed 18 August of 2020.

Q. Okay. All right. Did you serve any time for that?

A. No.

Q. Okay. What was your arrangement?

2 (Pages 5 to 8)

Marcus Collins -- February 25, 2026

Page 9

A. Probation.

Q. Probation?

A. Yeah.

Q. Did you have so many years of supervised supervision?

A. Five years.

Q. Okay. So you were never incarcerated with MDOC?

A. No.

Q. Okay. All right. You can give that to the court reporter.

And, Mr. Collins, I do have a question. Can you, just from your own recollection, just tell me what transpired between you and Mr. McMillian on November 27th of 2023?

A. November 27th, I don't recall what happened.

Q. Okay. So do you ever remember my client calling you and saying that he wasn't going to be in to work on November 27, 2023?

A. No, because I was out of town. I was out of town at my daughter's graduation. She graduated from the Air Force.

Q. Okay. All right. I am going to show

Page 10

exhibit -- this is going to be Exhibit 2.

MR. REDDICK: Do you want to take a look at this first?

MR. WALKER: Sure.

BY MR. REDDICK:

Q. All right. Mr Collins, I provided you a screenshot of, I guess, my client's phone. And can you just tell me what the name is on that text message?

A. Cobalt Collins.

Q. Is that who you are referred as?

A. Well, it's not spelled that way, but, yeah.

Q. Okay. And is there a phone call from my client to you on that day?

A. Yes. It says 6:24 -- canceled called at 6:24 AM.

Q. And what's the date for that call?

A. November 27th. 6:25 AM.

Q. Do you know the year that call was? Would you assume that was 2023, what we are here about today?

A. I don't know because it don't have the year on it.

Q. Okay. Do you remember getting a

Page 11

phone call on November 27th from my client --

A. If it did, it never did come through -- come through because it say canceled call.

Q. Could it be that it was -- it went through and he just canceled because he couldn't get ahold of you?

MR. WALKER: Objection to the form.

BY MR. REDDICK:

Q. You may answer.

A. Like I said, canceled call. It ain't going to come through.

Q. Okay. So that is your belief?

A. Yeah.

Q. Okay. Did you ever -- I know you're saying that it was canceled, but did you ever, I guess, return the phone call back?

A. No, because I didn't have no missed call.

MR. REDDICK: That's going to be Exhibit 2.

(EXHIBIT NO. 2 WAS MARKED.)

BY MR. REDDICK:

Q. All right. In reference to November 27th, do you know if my client called

Page 12

anybody else after he tried to contact you in reference to November 27, 2023?

A. No.

Q. You don't know or --

A. I don't -- I don't know. I don't know.

Q. Okay. So my client ended up calling Johnny McMillian after he couldn't get ahold of you. Do you know anybody about that conversation between the two?

A. Only thing I know is when I got back to work, I asked everybody had they been at work, had anybody missed any time. And the answer was no.

Q. Okay.

A. At that time.

Q. Okay. And what time was that?

A. It had to been somewhere around 7 PM on that Monday, if I remember.

Q. And is that when you came back into town?

A. Uh-huh.

Q. Okay.

A. I came back that Sunday night. Returned to work on that Monday.

3 (Pages 9 to 12)

Marcus Collins -- February 25, 2026

Page 13

Q. All right. And who is the chain of command after you; if someone needs to call in, they would call you first in your department?

A. Well, I'm just -- I'm just the lead man. We don't have an active supervisor. I'm just the lead man.

Q. Your discovery said that you are the supervisor of the water department; is that correct?

A. Lead man.

Q. Okay. So you are saying you don't have a supervisor. Are you first in charge, though?

A. Yes, I'm first in charge.

Q. Okay. All right. So when someone has to call out, I guess, to say they are not going to be in, do you know how much notice they have to give you?

A. Say that again.

Q. When someone has to call and say they're not going to show up to work, how much notice do they have to give you?

A. Supposed to be 24 hours.

Q. And that's according to the policy that was in effect in 2023?

Page 14

A. I don't -- don't quote me on that, but I know the policy is now.

Q. Okay. But you can't say what it was in 2023?

A. No.

Q. Okay. All right. In reference to, I guess, my client being clocked in, do you know who clocked him in that day?

A. Yeah, after everything went on and everything was discovered.

Q. Okay. And from your recollection, what was discovered?

A. The time clock situation, Mr. Brown clocking Mr. McMillian in and out.

Q. Okay. Can you elaborate about that Mr. Brown? Who is Mr. Brown?

A. Triron Brown. He's also a general laborer at the water department at the time.

Q. Okay. So in reference to -- I guess we'll cross that bridge when it comes. But I guess after it was investigated, do you know what the end results were of the -- after the investigations?

A. I know Mr. Brown, he was suspended without pay and Mr. McMillian, he was

Page 15

terminated.

Q. Okay. Do you know why Mr. Brown was suspended and why, I guess, Mr. McMillian was terminated?

A. No.

Q. And that is in reference to the same matter?

A. I had -- I have no control over who the board suspends or fires.

Q. Right. But I'm just saying -- but that is in reference to the same matter, about the clock-in situation?

A. I'm supposing, yeah.

Q. So the answer would be yes?

A. Yeah.

Q. Okay. So let me ask you this: Did you ever investigate this matter with Mr. McMillian after, I guess, this situation came about? Do you know -- well, strike that.

Let me ask you this: Who first made you aware of, I guess, that supposedly Mr. McMillian had been clocked in?

A. At the time, then Mayor -- Mayor Scott.

Q. And where is Mayor Charles Scott now?

Page 16

A. I don't know.

Q. And when is the last time that you've spoken with Mayor Charles Scott?

A. Before the end of his term.

Q. Do you know what year that was?

A. Twenty -- had to been '24.

Q. Okay. Do you know approximately what time of the year? You can just give an approximation. You don't have to give exact time, just what you think it may have been.

A. What, election is around March or April. Something like that.

Q. Okay. All right. And in reference to any discipline, were you ever involved in, I guess, any discipline with Mr. McMillian in reference to the -- I guess, the issue with him being clocked in or not?

A. I was. All of us was in on the meeting together, me, Mr. McMillian and, of course, City Clerk Moore. All of us was in on it, had a meeting with the mayor at the time.

Q. Okay. Was this the day after he was clocked in, or do you know what time frame?

A. It couldn't have been the day after because, like I said, I was out of town. It had

4 (Pages 13 to 16)

Marcus Collins -- February 25, 2026

Page 17

to have been probably like the week after.

Q. Okay. You said it had been a -- a full week had passed?

A. Like I said, I can't -- I can't remember back then when it happened but I -- it did happen.

Q. Okay. And did you ever give Mr. McMillian -- my client, Barry McMillian -- so when I'm referring to my client or Mr. McMillian, I'm referencing Barry McMillian.

But did you ever give him any type of disciplinary action in reference to this matter?

A. Yeah, we did.

Q. Okay. All right. I'm going to hand you --

MR. REDDICK: I think this should be Exhibit 3, correct?

BY MR. REDDICK:

Q. All right. I'm going to give you a chance to look at that. That's going to be Exhibit 3, and that's an employee disciplinary report. Can you just look over that and, I guess, refresh yourself, refresh your memory about that? And then I can ask you some

Page 18

questions after you've had a chance to look at it.

A. Okay.

Q. Okay. All right. So we are looking at Exhibit 3. That's an Employee Disciplinary Report. Can you just elaborate on what that entails?

A. It's just basically saying he was clocked in for work and was not present, and Mr. McMillian refused to sign write-up on 12-1-23.

Q. Okay. And in that -- let me look at it for a second.

MR. REDDICK: You can go ahead and mark this.

(EXHIBIT NO. 3 WAS MARKED.)

BY MR. REDDICK:

Q. All right. And just in reference to this document, Exhibit 3, it says that Mr. McMillian was warned numerous times. I think exactly it says -- or can you just read what that says for me, just for the record, on -- just right there.

A. Uh-huh.

Q. You can read it out loud just for the

Page 19

record.

A. "Mr. McMillian has been warned on numerous occasions about" -- you want me to read the whole thing?

Q. Yeah, just those three lines.

A. "Mr. McMillian was clocked in for work and was not present. Mr. McMillian has been warned on numerous occasions. Mr. McMillian refused to sign write-up on 12-1-23."

Q. All right. And in reference when -- on Exhibit 3, on this employee disciplinary report, when it says he was warned numerous times, what are you referring to?

A. By being late to work, someone clocking him in, clocking him out.

Q. Okay. And has Mr. McMillian ever been written up for any of the things that you just stated?

A. No, other than this one.

Q. Okay. So there is not going to be -- just for the record, there is not going to be anything in reference to him being late or having other people clock him in in his file, correct?

Page 20

A. No.

Q. And can you say that a little bit louder for the record?

A. No.

Q. Okay. Thank you.

And in reference to Brown, has Brown ever received any type of disciplinary action or been warned about clocking people in prior to this occasion?

A. Not to my recollection.

Q. Okay. All right. In reference to this matter, did you clock Mr. McMillian in on November 27, 2023?

A. Say what?

Q. Did you -- in reference to this situation for November 27, 2023 --

A. I wasn't in town then. I wasn't in town on November 27th.

Q. Well, did you ever -- okay. Let me ask you this: In reference to the time sheet, did you ever write Mr. McMillian in for time worked?

MR. WALKER: What time sheet?

MR. REDDICK: Well, I can refer to this right here.

5 (Pages 17 to 20)

Marcus Collins -- February 25, 2026

Page 21

BY MR. REDDICK:

Q. Well, in reference to this -- this is going to be Exhibit 4.

(EXHIBIT NO. 4 WAS MARKED.)

BY MR. REDDICK:

Q. All right. Mr. Collins, that's Exhibit 4. I'm saying that's a time sheet in reference for Mr. McMillian. Can you --

A. This is from the time clock.

Q. Okay. And who wrote that in at that time?

A. That comes off the time clock that's at the building.

Q. Okay. And who wrote that time in?

A. Who wrote the time --

Q. Put that time in for those hours right there?

A. She used to come pull the time off the clock, the week of -- pay period.

Q. Okay. But if he wasn't there, how was those hours actually, I guess, put in there?

A. Somebody clocked him in.

Q. Okay. And how many hours was that for?

A. 6.50, six and a half hours.

Page 22

Q. And so it is your testimony that you -- that you had nothing to do with the amount of hours that he had clocked in for?

A. I wasn't present at work that day.

Q. All right. And is it your testimony that you never wrote -- put in, I guess, time for Mr. McMillian -- strike that.

Have you ever wrote in on a time sheet that Mr. McMillian worked a certain amount of hours for November 27, 2023?

A. I did when I got back to work that Monday. Like I said earlier, I asked everybody had they -- did anybody miss any days, anybody leave work early, and the answer was no.

Q. Okay. So is that the amount of hours that you wrote him in for?

A. No. I want to say, I wrote him in for eight hours that day --

Q. Okay.

A. -- if I remember right.

Q. Okay. And did Mayor Charles Scott ever get on to you about giving him eight hours for that day?

A. No. He just asked me why did I write him in for eight hours, and I told him the same

Page 23

thing I just told y'all. I got back to work that Monday. I asked everybody had they been at work every day, did they work their whole total hours, anybody leave early. And everybody's answer was no. That's all I told him.

Q. Okay. Did he ever get on to you saying that you shouldn't clock people in or write people in, in reference to -- well, strike that.

Did Charles Scott, Mayor Charles Scott, ever ask you or tell you that you shouldn't have wrote, I guess, Mr. McMillian in for eight hours for November 27, 2023?

A. No.

Q. So he didn't give you any type of verbal reprimand or anything?

A. No.

Q. Okay. So he was fine with you doing that?

A. I don't know, but I can't answer that.

Q. Okay. And in reference to, I guess, you having that conversation with Mayor Charles Scott in reference to, I guess, my client being wrote in for eight hours by yourself, was

Page 24

anybody there as a witness when he had this conversation with you?

A. I want to say me, Ms. Moore and Mr. McMillian was in a meeting together.

Q. Okay. Do you know when that was?

A. I can't remember.

Q. Was Mr. Brown in that meeting as well?

A. Well, later me and Mr. Brown. They called me and Mr. Brown up there later in that meeting -- I mean to a meeting.

Q. Okay. So you had a meeting with Brown. I guess, the mayor -- I guess it would have been Mayor Charles Scott, Triron Brown, yourself and Ms. Moore in a later meeting about this matter?

A. Uh-huh.

Q. Okay.

A. If I can remember right.

Q. Okay. So there's going to be two different meetings that you were involved in in reference to Mr. McMillian and his time clock situation, correct?

A. It was either the time clock or with the -- I can't remember what it was -- the light

6 (Pages 21 to 24)

REPORTING BY DANA, LLC
DanaDMoulder@gmail.com

Marcus Collins -- February 25, 2026

## Page 25

duty situation. It was one of those. I know all of us had been in a meeting together.

Q. Was there ever a meeting where it was you, Melissa Moore, Triron Brown, Mayor Charles Scott and Mr. McMillian?

A. No.

Q. Okay. So basically there was not a meeting where, I guess, the people I just mentioned were all in a meeting together at the same time about the time clock situation, correct? Is that correct?

A. If I -- no, not about the time clock situation. Not all of us.

Q. So the answer was no, they were never in a meeting together at the same time --

A. No.

Q. -- correct?

A. Right.

Q. Okay.

A. Correct.

Q. Okay. All right. I'm going to show exhibit --

MR. REDDICK: What exhibit are we on, number 5?

THE COURT REPORTER: 5.

## Page 26

(EXHIBIT NO. 5 WAS MARKED.)

BY MR. REDDICK:

Q. All right. Mr. Collins, this is basically, I guess, a written statement by Triron Brown. This is on Exhibit 5. Can you just tell me what that entails?

A. "11-28-2023, I, Triron Brown, donate Barry McMillian 4 hours sick time. Thanks, Triron Brown."

Q. Okay. You know, I guess I'm kind of new to this. I've never worked for the City in this capacity or anything, but can you just explain to me what it means by donating time and things of that nature?

A. If an employee needs time off and they don't have any time, sick time, they -- another employee can donate their time to them to -- so they can take off and be paid for it.

Q. Okay. In this situation, do you know why Mr. Brown donated Mr. McMillian time on that day?

A. No.

Q. Okay. So that is a customary practice to donate time to one another between coworkers?

## Page 27

A. Yeah.

Q. Do the employees have to be on the same level with each other? I guess can a supervisor's -- I guess, I don't want to say subordinate, but people up under them donate the supervisor time or do the people that donate time have to be on the same level with each other?

A. I mean, I never ran into an issue like that; so I wouldn't think so.

Q. Okay. And just currently in 2023, what was your position at the time?

A. Lead man.

Q. Okay. And is that still your position with the City now?

A. Yes.

MR. REDDICK: You can hand those over to the court reporter.

BY MR. REDDICK:

Q. All right. This is going to be Exhibit 6.

All right. Now, this is Exhibit 6. Mr. Collins, is this a separate time sheet for Mr. McMillian?

A. Yes.

## Page 28

Q. Okay. Can you just tell me what happened on this time sheet?

A. He got paid for 54 regular hours. Looks like he was taking his -- he took his 10 hours -- 11 hours of overtime from him -- no. Yeah, 11 hours of overtime; 16 hours holiday pay; 2 hours sick time. Total 83 hours.

Q. Okay. And how do you know that they took away his overtime?

A. They didn't take it away. 54 and -- they didn't -- they didn't take it away.

Q. Okay. And on -- this is Exhibit 6, correct? Right here it states that -- can you read that for me?

A. "No pay per Mayor."

Q. Okay. That's for -- and what's that date for?

A. 11-20.

Q. Okay. And so he was given credit for eight hours initially for November 20th; is that correct?

A. Uh-huh.

Q. And who took this away?

A. Mayor.

Q. Okay. Well, did he give you a reason

7 (Pages 25 to 28)

Marcus Collins -- February 25, 2026

Page 29

why he did that?

A. This day he say he wasn't at work or something.

Q. And that's for November 20th?

A. Uh-huh.

Q. And from that sheet, can you tell if overtime was affected by the mayor taking away eight hours at that time frame?

A. No, because he didn't have no overtime on the 20th.

MR. REDDICK: Let's go ahead and mark this as Exhibit 6.

(EXHIBIT NO. 6 WAS MARKED.)

BY MR. REDDICK:

Q. Okay. So I guess if you are on call, you get two hours of overtime if you stay on call; is that correct?

A. On Saturdays and Sundays and holidays.

Q. Okay. And do you know if my client was on call in that time frame?

A. Well, like I said, if this was before he was put on light-duty work, he would have got his two hours. But after he was on -- they put him under light duty, the mayor stated that

Page 30

since he was on the light duty that he couldn't be on call. He could go on a call and assist but not actually be on call.

Q. Okay. All right.

MR. REDDICK: All right. This is going to be Exhibit 7. Can we go ahead and premark that?

THE COURT REPORTER: Yes.

(EXHIBIT NO. 7 WAS MARKED.)

BY MR. REDDICK:

Q. All right. Mr. Collins, that's, I guess, a calendar and whatnot that states who's able to actually get overtime or be on call for overtime and whatnot. I think this is for the month of November 2023.

Do you see Mr. McMillian's name on any of those dates 1 through 30?

A. No.

Q. Okay. And is there a reason for that?

A. The mayor stated that Mr. McMillian couldn't be on call because of the light duty.

Q. And did you ever verify that with Mr. McMillian that that actually was the case?

A. Me and him talked about it.

Page 31

Q. And what did Mr. McMillian say?

A. I can't remember.

Q. Okay. All right. And in reference to Mr. McMillian, did he ever try to request for FMLA leave in reference to November 27, 2023?

A. Not that I remember.

MR. REDDICK: Okay. This is going to be Exhibit 8.

(EXHIBIT NO. 8 WAS MARKED.)

BY MR. REDDICK:

Q. All right. Mr. Collins, have you had a chance to review this?

A. Uh-huh.

Q. All right. And what is this in reference to?

A. Mr. McMillian taking off again this -- that day, on --

Q. Okay. And did you -- go ahead.

A. -- November 28th.

Q. Can you just say that -- the last thing. We over-talked each other for a second. Can you elaborate again? I said we talked over each other, so again for the record.

A. Mr. McMillian taking off for illness for himself on November 28, 2023.

Page 32

Q. Okay. And was he awarded that time or was he given that time by the City?

A. It wasn't -- it wasn't signed by me.

Q. Okay. And who did he furnish that to then?

A. It's supposed to go to payroll.

Q. Okay.

A. Along with the time sheets.

Q. Okay. So when he applies for, I guess -- I guess saying that he was sick and whatnot, I guess, in reference to FMLA or anything, he's supposed to give that to who?

A. I'm supposed to get it and sign it and turn it in with payroll.

Q. So would that be Melissa Moore?

A. No. That would be upstairs accounting.

Q. Okay. And do you know if that was done in this case?

A. Well, it wasn't signed by me; so I'm pretty sure they don't have record of it. I don't know.

Q. Is Melissa who finally signs off on everything in reference to, I guess, sick leave and things of that nature?

REPORTING BY DANA, LLC
DanaDMoulder@gmail.com

Marcus Collins -- February 25, 2026

Page 33

A. Well, no. Whether it's approved or not approved by the supervisor, then they take your time away up here. They keep up with your time upstairs in accounting.

Q. Okay. So are you saying accounting has the final say?

A. No. Supervisor has the final say.
But in reference -- if this time was taken, it should have been signed by me. And -- well, they would have had a copy of it in -- in -- in payroll.

Q. Okay. And so say there was something from the mayor stating that it got denied, is that his call?

A. He's day-to-day operator, so he could have not approved it.

Q. Okay. So Mayor Charles Scott was the mayor at that time; so if he decided to disapprove that time, that's his call?

MR. WALKER: Objection to the form.

MR. REDDICK: You may answer.

MR. WALKER: Sorry. You can answer.

A. Like I said, he's the day-to-day operator; so he could have rejected it along with, you know . . .

Page 34

BY MR. REDDICK:

Q. So I guess just for the record, that would be a "yes"?

A. Yeah.

Q. Okay. So in reference to Mr. McMillian -- I know we were looking at the prior exhibit and it says he refused to sign, what do you mean he refused to sign his write-up?

A. He said he wasn't going to sign it.

Q. Okay. And what does the write-up look like? Is that what the disciplinary -- can we go to -- so that's Exhibit 3. Is this the -- I'm looking at Exhibit 3. Is that what the write-up looks like or there is another sheet of paper that says write-up or anything?

A. That's the disciplinary sheet.

Q. Okay. So in reference to -- on Exhibit 3, he was supposed to sign this somewhere? Is that what you are saying?

A. Signature.

Q. Okay.

A. You say you read it right here.

Q. Okay. And you are saying he didn't sign. Was there a reason why he didn't sign?

Page 35

A. I don't know why Mr. McMillian didn't sign.

Q. Okay. And prior to this disciplinary report, was he supposed to have a conversation with the mayor first about this matter in reference to November 27, 2023?

A. Yeah.

Q. Okay. Did that meeting between him and the mayor take place?

A. I don't know. Now, I don't -- no. No.

Q. So just for the record --

A. Now, I don't know in this situation. I can't remember 'cause it was multiple situations that went on. So I don't know which -- I can't remember which one it was, whether it was with the light duty or the time clock situation.

Q. Okay. So let me ask you this: Did Mayor Charles Scott tell you to write Mr. McMillian up in reference to the November 27, 2023 --

A. He told me to write both of them up, Mr. Brown and McMillian.

Q. Okay. And did you speak with them

Page 36

prior to writing them up?

A. I did.

Q. Okay. Were they together when you spoke with them or were they separate?

A. They were together. All of them was in the office together.

Q. Okay.

MR. REDDICK: I am going to make this a composite. All right. This is going to be a composite. This is Exhibit 9.

BY MR. REDDICK:

Q. All right. This is Exhibit 9. Mr. Collins, can you tell me what that is?

A. Call-out sheet after hours.

Q. All right. And so that's -- that's two different dates. Can you tell me what the date for --

MR. REDDICK: I guess, can we go ahead and mark them? We'll put this together as a composite exhibit.

THE COURT REPORTER: Yes.

(EXHIBIT NO. 9 WAS MARKED.)

A. One for 11-16-23 -- 11-6-23 and the other one for 11-7-23.

BY MR. REDDICK:

REPORTING BY DANA, LLC
DanaDMoulder@gmail.com

Marcus Collins -- February 25, 2026

Page 37

Q. Okay. Can you just tell me what that -- I guess we are looking at the first page of Exhibit 9. Can you just tell me what transpired for November 9, 2023?

A. It was a water call. It don't say the type of trouble. Barry was dispatched at 4:05.

Q. Okay.

A. Meaders from the fire department, he was the call-out guy.

Q. Okay. And do you know if he got compensated for that time or --

A. I can't recall.

Q. Okay. Did that go to you? Do these call outs for overtime go to you?

A. No. They go to the people that's on call.

Q. Okay. So -- well, I guess what I mean by -- it says City of Aberdeen Overtime Call Out Trouble Call. I'm saying does this sheet -- who does this sheet go to? Or who does this sheet go to? Just rephrase that.

MR. WALKER: Like, who writes it out?

MR. REDDICK: Yeah.

BY MR. REDDICK:

Page 38

Q. Who writes it out?

A. They write it out at the fire department or the police department after hours.

Q. Okay. So this is not something that you sign off on?

A. I collect them.

Q. And then what happens after that?

A. They go in a -- stay in the file.

Q. Okay. And just in reference to 11-6-2023, do you know -- you said that Mr. McMillian was on call for that date, on the very first page?

A. I can't recall.

Q. Okay. Let me see that sheet for a second.

A. November -- no, he couldn't have been on call 'cause he wasn't on call in November of '23.

Q. So let's look right here on Exhibit 9. It says "time dispatched" for -- I think that says "4:05."

A. Uh-huh.

Q. What does that mean?

A. That was the time he was called.

Q. Okay. Do you know if he showed up?

Page 39

A. I don't know.

Q. Okay. But that leads me, he was called?

A. Uh-huh.

Q. Okay. Is that the same for the second page, for the 11-7-2023 date?

A. I can't see the time. Well, yeah, for that -- it say McMillian.

Q. Okay. So that means that he was called for that date as well?

A. I don't know because it just say McMillian but on the call sheet it doesn't say for the other McMillian, it just say McMillian. This one say Barry McMillian; so . . .

Q. Okay. But that does mean that at least a McMillian was called?

A. Uh-huh.

Q. Okay. So if Mr. McMillian says that actually was for him, you couldn't say one way or the other whether that was for him or not in reference to Barry McMillian, correct?

A. I can't -- I can't say. Well, I can say Mr. McMillian wasn't on call in November; so . . .

Q. You saying -- telling me, he wasn't

Page 40

on call but according to the sheets it says that he was called.

A. Yeah.

Q. Okay. All right. So when the fire department put this in, does he have to contact -- do they have to contact you so Mr. McMillian can get paid for that time?

A. No.

Q. Okay. So who does that go to?

A. I go -- what I do, I go down there and check the call-out sheet. First, I asked them did anybody have overtime. And they tell me, yeah, the fire department. I check the call-out sheet from the night before and that's how that would go.

Q. Okay. So who actually writes out the time then?

A. Me.

Q. Okay. So you are the one that makes sure he gets paid for this time, correct?

A. Right.

Q. Okay. And can the -- at the time could -- I guess let me ask this: Can Mayor Charles Scott or, I guess, whoever the mayor at the time, I guess, veto? I guess if you write

10 (Pages 37 to 40)

Marcus Collins -- February 25, 2026

Page 41

the time in, he can say that, "No, I don't want to pay him for that time." Is that correct?

A.   Uh-huh.

Q.   Is that a yes or a no?

A.   Yes.

Q.   Okay.

MR. REDDICK:  That's Exhibit 9. May I have a moment with my client, a brief moment?

MR. WALKER:  Sure.

MR. REDDICK:  Okay.

(OFF THE RECORD.)

MR. REDDICK:  All right.  We're back on the record.

BY MR. REDDICK:

Q.   Okay.  All right.  Mr. Collins, I only have a couple of more questions for you. Just in reference to number 9, when someone is on call, isn't it the supervisor, the head of the department that writes in the time --

A.   Yeah.

Q.   -- to get paid?

A.   Yeah.

Q.   So that is correct?

A.   Uh-huh.

Page 42

Q.   So that would have been you for this -- for in reference to number 9 on the overtime pay?

A.   Uh-huh.

Q.   Can you just say yes or no for the record?

A.   Yes.

Q.   Okay.  So just for the record, you were the one that was responsible for making sure the overtime hours get paid in reference to Mr. McMillian, in reference to the overtime call-out sheet, correct --

A.   Yes.

Q.   -- which is Exhibit 9 for the record? Okay.  And, Mr. Collins, just for the record, looking back at Exhibit 3, that date that you actually wrote Mr. McMillian up for, that's for 12-1-2023; is that correct?

A.   That incident, 11-27-23.

Q.   Okay.  And what's the date that you actually wrote him up, in reference to November 27, 2023, that incident?

A.   It don't have a date on there.

Q.   Would it at least be right here, the 12 --

Page 43

A.   12-1, yeah.

Q.   So it would have been probably 12-1-23?

A.   Uh-huh.

Q.   All right.  Do you know why if the incident happened on November 27, 2023, it wasn't until December 1, 2023, when you wrote him up?

A.   Uh-huh.

Q.   Okay.  What was the reason?

A.   I mean, after, I guess, the mayor discovered it and he brought everybody in or whatever.  That's when they were wrote up for their actions.

Q.   Okay.

A.   And that was after, what, a holiday and all of that; so . . .

Q.   Okay.

MR. REDDICK:  I don't have any further questions for him right now.

MR. WALKER:  I don't have any questions.

You're done.

(DEPOSITION CONCLUDED AT 11:02 AM.)

Page 44

CERTIFICATE OF COURT REPORTER

I, Dana Gordon, Court Reporter and Notary Public in and for the County of Rankin, State of Mississippi, hereby certify that the foregoing pages contain a true and correct transcript of the testimony of the witness, as taken by me in the aforementioned matter at the time and place heretofore stated, as taken by stenotype and later reduced to typewritten form under my supervision to the best of my skill and ability by means of computer-aided transcription.

I further certify that under the authority vested in me by the State of Mississippi that the witness was placed under oath by me to truthfully answer all questions in this matter.

I further certify that I have no interest, monetary or otherwise, in the final outcome of this matter.

I further certify that this transcript is the work product of this court reporting agency and any unauthorized reproduction and/or transfer of it will be in violation.

_____
DANA GORDON, #1908

My Commission Expires: June 12, 2028

11 (Pages 41 to 44)

REPORTING BY DANA, LLC
DanaDMoulder@gmail.com

Marcus Collins -- February 25, 2026

Page 45

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

BARRY MCMILLIAN                    PLAINTIFF

VERSUS        CIVIL ACTION NO. 1:24-CV-199-SA-RP

THE CITY OF ABERDEEN
AND JOHN DOES 1-20                 DEFENDANTS

CERTIFICATE OF DEPONENT

I, MARCUS COLLINS, certify that I have examined the foregoing pages as to the correctness thereof, and that after reading said pages, I find them to contain a full and true transcript of the testimony as given by me on FEBRUARY 25, 2026, except for the list of corrections, if any, attached on a separate sheet with the page number, line number, and desired correction/change. Witness my hand, this the _____ day of _____, ____.

_____
MARCUS COLLINS

CERTIFICATE

Subscribed and sworn to before me, this the ____ day of _____, ____.

My Commission Expires:    _____
_____    Notary Public

Page 46

ERRATA SHEET

PAGE      LINE      CORRECTION (IF ANY)

12 (Pages 45 to 46)

REPORTING BY DANA, LLC
DanaDMoulder@gmail.com