IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION


BARRY MCMILLIAN                                          PLAINTIFF

VS.                        CIVIL ACTION NO.: 1:24-CV-199-SA-RP

THE CITY OF ABERDEEN
AND JOHN DOES 1-20                                      DEFENDANTS



**************************************************

DEPOSITION OF CAROLYN ODOM

**************************************************


TAKEN AT THE ABERDEEN CITY HALL BOARDROOM
125 WEST COMMERCE STREET
ABERDEEN, MISSISSIPPI 39730
ON FEBRUARY 26, 2026
BEGINNING AT APPROXIMATELY 11:24 A.M.




APPEARANCES NOTED HEREIN




Reported by:    VALERA H. KNIGHT, CCR #1039
                P.O. BOX 82
                TAYLOR, MS 38673
                (662) 816-9863
                valeraknight@gmail.com

APPEARANCES:

Representing the Plaintiff:
DEMOREO REDDICK, ESQ.
Ms. Bar No.: 103747
P.O. Box 465
Okolona, MS 38860
Telephone:  662-436-4641
Telecopier:  662-256-3582
reddicklawfirm@yahoo.com

Also Present:  Barry McMillian, Plaintiff

Representing the Defendants:
LOGAN P. WALKER, ESQ.
PHELPS DUNBAR LLP
1905 Community Bank Way, Suite 200
Flowood, Mississippi 39232
Telephone:  601-352-2300
Telecopier:  601-360-9777
loden.walker@phelps.com

Exhibit D

TABLE OF CONTENTS

DEPONENT:  CAROLYN ODOM                                      PAGE

Style, Cause Number............................     1

Appearances...................................     2

Table of Contents.............................     3

Examination by Mr. Reddick....................     4

Examination by Mr. Walker.....................    52

Further Examination by Mr. Reddick............    55

Deposition Concluded..........................    55

Court Reporter's Certificate..................    56

*************************************************************

EXHIBIT INDEX

Exhibits 1-22 were premarked during prior depositions. However, the ones that are listed below are the ones referred to during this deposition.

Exhibits:  1, 3, 5, 7, 10, 11, 12, 13, 15, 16, 17, 18, 19 and 20

(All exhibits were retained by Mr. Reddick and e-mailed later to the court reporter and put in one pdf folder to be used for all depositions taken on this date.)

CAROLYN ODOM,

After being duly sworn, testified as follows:

EXAMINATION BY MR. REDDICK:

Q.    All right.  Mrs. Odom, my name is Attorney DeMoreo Reddick, and I represent Mr. Barry McMillian in his lawsuit against the City of Aberdeen.  I just want to, I guess, just do some preliminary matters first.  Have you ever given a deposition before?

A.    No.

Q.    Okay.  So this is your first one?

A.    That is right.  So go light on me.

Q.    Okay.  Will do.  I guess just as a -- as I said preliminary matters, the court reporter is making a record, and so it's best that we don't talk over each other so the court reporter can make a clear record.  If I ask a question, just give me a chance to ask the question completely, and then I will give you a chance to answer the question completely.  And then -- so basically, we just don't need to talk over each other.  So -- and if there is a question that you don't understand, just say that you don't understand what I'm asking and I'll rephrase the question so that you can understand what I'm asking.

And I guess my first question is:  Are you on any medication that would affect your ability to

give a deposition today?

A.   I'm on quite a bit.

Q.   Okay.  Would it affect your ability to give a deposition today?

A.   I doubt it.

Q.   Okay.  So you are clear mind right now?

A.   I'm a little anxious if you want to know the truth.

Q.   Okay.  But nothing that could really just affect your ability to give a deposition?

A.   No.

Q.   Okay.  All right.  And can you just state your relatives that reside in Monroe County?

A.   My residence?

Q.   Well, no.  Your -- well, you can give me your residence since you said it.

A.   No.  What did you ask me?

Q.   No.  Relatives.  Do you have any relatives that reside in Monroe County?

A.   All my children and grandchildren.

Q.   Look, what -- you can just give me last names.  Like what's the last names, the surnames?

A.   Howell, Smith.

Q.   Okay.  And where do you reside?

A.   1021 Murphree Circle.

Q. All right. And so did you prepare today prior to yourself coming here?

A. Did I prepare today?

Q. Yeah, for today.

A. I read the minutes of December 5, 2023.

Q. Okay.

A. And that's all.

Q. Okay. All right. Just in reference to the -- I guess I can show you that since you started with that. Okay. And just for record, have you talked to anybody about this case?

A. Yes.

Q. Okay. And who are those people?

A. All I talked to was Shea Cain.

Q. Okay. And did -- do you two talk before coming here today or anytime this week or at all about this? I guess you said you did talk about it. Do you know when?

A. Yeah, this morning. He called me this morning, and said, "Are you ready to go?" And I said, yep.

Q. Okay. Did he talk about his deposition yesterday with you?

A. He just told me it was long.

Q. That would be accurate. That would be --

A. He said he had a lot of stuff to read, and I said, "Well, I certainly don't think I want to be able to" -- "I won't be able to read it."

Q. Okay. Let me get to the minutes. I'm going to have you read that for the record. And just without even looking at the document, do you remember the board meeting that was -- that transpired on December 5, 2023?

A. I do.

Q. Can you -- just from your own recollection of your own memory, can you tell me what transpired on that day in reference to Mr. McMillian?

A. We went into -- it was a personnel matter, so it went into executive session and discussed what had taken place.

Q. Okay. And is -- are you referring to what took -- I guess allegedly took place between Mr. Triron Brown and Mr. Barry McMillian?

A. Well, Mr. Brown was the one that helped him out, I think.

Q. Okay. Can you just elaborate what you mean by, that he helped him out?

A. Clocked him in.

Q. Okay. Do you remember what date that was in reference to?

A.    No.  I just remember the date of the meeting.

Q.    Okay.  All right.  And just in reference to that, what was Mr. Brown's punishment in regards to this?

A.    I didn't feel it necessary to punish Mr. Brown because this was the first time we had ever had a problem with him, so --

Q.    Okay.

A.    -- I did not feel that he needed to be -- well, he did get.  I take -- take that back now.  I do remember we gave him three days leave with no pay.

Q.    Okay.  And who initiated that vote for the suspension with no pay?  Do you remember?

A.    No, sir, I do not.

Q.    All right.  And in reference to Mr. McMillian, do you remember what his punishment was?  This is in reference to, I guess, a situation with the time clock.  I'm sure you are aware of that in 2023, allegedly that Triron Brown clocked in Mr. McMillian and whatnot.  But can you just state what his punishment was from that board meeting?

A.    Whose -- whose punishment?

Q.    Mr. McMillian.  What was his --

A.    He was fired.

Q.   Okay.  And can you tell me why Mr. McMillian was terminated and Mr. Brown was not?

A.   Well, I felt like that he was embezzling time from the City.

Q.   All right.  Did you look at any documents that, I guess, showed that?

A.   No, I did not.

Q.   Okay.  So prior to your determination of that, you didn't look at any documents to determine that?

A.   I don't know.  There could have been documents.  Mr. Scott or Ms. Moore might have had something, but I don't -- I don't remember.  I don't recall any of that.

Q.   Okay.  So you don't -- just from your memory, you don't recall looking at any documents to make that determination?

A.   I don't recall that.

Q.   Okay.

A.   But now this has been a long time, you know.

Q.   Yeah.

A.   For me any way.  Everybody else has a younger mind than mine.

Q.   No.  That's fine.  Like I said, I'm just here to get information.  So, just answer, if you can,

everything to the best of your ability.  So that's fine.

And so just from your own recollection of what you can remember, do you remember what the conversation was amongst the board in reference to Mr. McMillian, what was discussed?

A.    Oh, no, I don't.

Q.    Okay.

A.    I know it was enough for me to determine that he didn't need to work for the City anymore.

Q.    All right.  And so let me ask you this:  In reference to Mr. Brown, can you just let -- I think you mentioned in reference to Mr. Brown that he had never gotten in any trouble before.  Had Mr. McMillian been in any trouble before with the City?

A.    Well, I think his name come up a number of times.  I can't -- I cannot specifically tell you details on that.

Q.    Okay.  Would any of that happen to be in reference to the EEOC charge that he -- that he filed against the City in 2023?

BY MR. WALKER:  Objection.  I think '21.

Q.    (Mr. Reddick continued):  Well, 2021 -- well, we will just look at the record just to clarify.

It is actually dated 2022. So we are looking at Exhibit 11. Can you just look at that, and then after you have had a chance to look at it, just say that you actually looked at it. I'll give you a chance to look at it.

A. (Document tendered to the witness for review.) I remember -- I don't remember a lot about that. I really don't. That was '21?

Q. Yes. Well, that's when he got passed over for a position, but 2022 is when -- the date of when this EEOC Charge of Discrimination was filed against the City. Do you recall him filing that charge against the City?

A. No, I don't recall it. I don't recall it.

Q. Okay. So when you say in reference to Mr. McMillian his name came up a lot in the meetings, can you just elaborate on that at all? Do you -- can you name like one thing that his name came up for?

A. No, I can't.

Q. Okay. So let me just ask you this: Has it -- has Mr. McMillian ever been disciplined before?

A. I can't recall.

Q. Okay. So in reference to you being on the board, you can't remember, I guess, you suspending Barry McMillian or giving him any type of punishment,

I guess, in your time being a board member?

A.    Sir, I don't remember.  I don't.

BY MR. REDDICK:  Okay.  The rest of Exhibit 11, I'm just going to state for the record, Exhibit 11 was the EEOC charge that Mr. Barry McMillian filed against the City of Aberdeen with the charge number 423-2022-00047.  I'm just stating that for the record, but go ahead.

A.    I know.  But let me -- let me refresh.  I mean, I just -- I found that lawsuit in my files after I got my summons the other day.

Q.    (Mr. Reddick continued):  Okay.

A.    And I was thinking that maybe -- well, I don't know.  I didn't know what it was going to be about.  I thought this was strictly about the time clock and the whatever, but I do remember now after I read it again.

Q.    Okay.  And were you on the board in -- well, were you on the board on the date of September 28, 2021?

A.    I was.

Q.    Okay.  When did you actually become a board member for the City of Aberdeen?

A.   In '17 -- '18 really.  My husband passed away in November of '18, and he was on the board and I finished out his term.

Q.   Do you remember what your start date was?  I mean, what the month was when you started in 2018?

A.   Whatever the -- whenever the election was, the next Tuesday after that.

Q.   The election in May or in the summertime, some of the days in summer?  Do you know?

A.   I beg your pardon?

Q.   No.  When is the election?  When does that -- is that in the summer, the election held in the summer for the City of Aberdeen?

A.   I don't remember.

Q.   Okay.  At least you know you were, at some point, on the board in 2018; correct?

A.   I was.

Q.   Okay.  And what was your --

A.   I think maybe it's April.

Q.   Okay.

A.   I don't know.

Q.   Yeah.  Just like I said, just what you can answer to the best of your ability.  That's fine.

What was your last date with the board, with the City of Aberdeen?

A.    '23.

Q.    Do you remember the month?

A.    Whenever it ended.

Q.    For the term, for that time period?

A.    I didn't rerun.

Q.    Okay.

A.    I didn't run again.

Q.    Okay.  All right.  And just -- I guess I have to put that back there.  Just in reference to, I guess, one of the things, I know you said briefly that you felt Mr. McMillian was embezzling money.

In reference to Triron Brown, if he assisted in Mr. McMillian, I guess, stealing time, was there a particular reason why Mr. Brown was terminated and Mr. McMillian was not?

A.    Mr. McMillian was terminated, Mr. Brown was not.

Q.    Right.  I guess the question is:  If Mr. Brown assisted Mr. McMillian in stealing time, is there a particular reason why Mr. Brown wasn't terminated?

A.    Because he hadn't -- that was first offense, and the first time he had been brought up.

Q.    Okay.  But Mr. McMillian, you can't remember him ever being disciplined before by the city board?

A.    I can't remember the stuff.  I finally remembered that '21 lawsuit, but as far as telling you specifics, I can't.

Q.    Okay.  And just in reference to discipline, can you remember anything that Mr. McMillian was disciplined since you were a board member?

A.    I can't remember, sir.

Q.    Okay.  That's fair.  Like I said, I'm just trying to get information.  So like I said, whatever you can answer to your best knowledge is appreciated.

Well, I guess since I have this out, can you just read to me this is on Exhibit 13, because I forgot to ask you from this or state this on the record.  It's going to be page 3 and page 4 that we are looking at.  Can you just read this for the record, starting from this paragraph onto the next page.

A.    (Reading):  "A motion was made by Alderman Cain, seconded by Alderman Holliday to come out of Executive Session on a roll call vote.  Alderman Holliday, Alderman Haynes, Alderwoman Odom and Alderman Cain voted 'Aye.'  Alderwoman Garth voted "Recuse."

"A motion was made by Alderman Holliday, seconded by Alderman Haynes to suspend city employee

Triron Brown three days with no pay. The days are December the 1st through the 4th and 5th, 2023. On a roll call, Alderman Holliday, Alderman Haynes, Alderwoman Odom, Alderman Cain voted 'Aye.'

" A motion was made by Alderman Cain, seconded by Alderwoman Odom to terminate city employee Barry McMillian immediately. On a roll call vote, Alderman Haynes, Alderwoman Odom and Alderman Cain voted "Aye." Alderman Holliday voted "Nay."

"A motion was made by Alderman Cain, seconded by Alderman Holliday to adjourn until December 19, 2023 Board Meeting. On a roll call vote, Alderman Holliday, Alderwoman Odom and Alderman Cain voted "Aye." Alderman Haynes voted "Nay"."

Q. Okay. And so is that an accurate reflection of what transpired on that December 5th, 2023 Board Meeting?

A. I believe so.

Q. Okay. And that reference that Mr. McMillian was terminated and Mr. Brown was suspended for three days; is that accurate?

A. It was.

Q. Okay. All right. I will have to put this here.

All right. I'm going to -- this is

Exhibit 15.  It's already premarked.  I'm going to just give you a chance to look over that, then I'm going to ask you some questions for it -- about it.

A.    (Document tendered to the witness for review.)

Q.    All right.  Have you ever seen this exhibit? Well, have you ever seen this document, which is Exhibit 15, before?

A.    (Deponent moved head from side to side.)

Q.    Okay.  Is that a no?

A.    Yes.  That's a no.  I'm sorry.

Q.    Oh, no, you're fine.  Just got to state for the record, so it can be transcribed by the court reporter.

So on February 29, 2024, were you on the board at that time with the City of Aberdeen?

A.    Uh-huh.  Yes, sir.

Q.    Okay.  And let me have you read this just for the record.

A.    I could have had all those papers, but I don't know.  I don't remember.

Q.    Okay.  All right.  From this point on -- it starts with "an in investigation."

A.    (Reading):  "The mayor brought before..." Is that where you want me to start?

Q. Let me see. No, not right there. Right here when it says --

A. "An investigation"?

Q. An investigation, yes. Can you read that for the record?

A. (As read): "An investigation was conducted by Mayor Charles Scott. As part of the investigation, interviews were conducted with the supervisor of the department, the department employees. After this investigation, Mayor Scott prepared a presentation of record and notes for the upcoming board meeting on December 5, 2023.

"The Mayor brought before the board his findings at the December 5th, '23 board meeting. The board voted unanimously to discuss this matter during closed determination. This was announced to the public, and the board then voted to enter into executive session.

"During executive session, the Mayor and Board discussed the investigation and the Mayor's findings. After presentation of notes from the inquiry of employees and review of supervised documents, the board made a determination of the following: That Barry McMillian attempted to be paid for unearned time. That fraudulent entries were made

for Barry McMillian's employee daily time.  That Triron Brown assisted McMillian by making false entries for McMillian's daily time sheet.  That Barry McMillian's leave was not authorized.

"The City of Aberdeen believed in good faith that Mr. McMillian's termination was for cause and was not arbitrary or capricious, not a violation of a constitutional right of Mr. McMillian.

"If the City can be of further assistance with your investigation, please do not hesitate to contact me at the information provided."

Q.   All right.  And so just in reference to that, the reason why I had you look at that document it stated that Attorney Zinn -- are you familiar with who Attorney Walter Zinn is?

A.   I am.

Q.   Okay.  All right.  And just in reference, this -- it mentions that a presentation was given by the mayor and notes were provided.  Can you remember what the presentation -- anything about the presentation by Mayor Charles Scott on that day?

A.   (Deponent moved head from side to side.)

Q.   Okay.  And that's in reference to the December 5, 2023 board meeting.  You don't remember anything from the presentation at all?

A.    (Deponent moved head from side to side.)

Q.    Is that a yes or a no?

A.    Yes.  I forget she's taking it --

Q.    Okay.  I guess you are saying is that not yes, is a no.  But do you -- just for the record, do you remember any presentation by Mayor Charles Scott on December 5, 2023 at the board meeting?

A.    Just what the minutes say.

Q.    Okay.  All right.  And so in reference to the presentation of the -- in reference to the presentation, when it says records and notes for the upcoming board meeting in December 5, 2023, do you know anything about the records and notes?  Can you recall anything about the records and notes on that day?

A.    He was -- it was just explained to us what he had found from interviewing the employees and --

Q.    Okay.  Do you remember any notes being given to you?

A.    I'm sure there were.

Q.    Okay.  But can you recall for sure?

A.    For a fact?

Q.    Yes.  Notes or records.

A.    I can't recall for a fact, but I -- we -- I cannot recall for a fact.

Q. Okay. And if those records were provided by Mr. Charles Scott to the city board on December 5, 2023 or prior to that before that board meeting, who would have possession of those records and notes?

A. I would imagine -- I would think Ms. Moore might have those records.

Q. Okay. So in reference to a board meeting there's a packet; is that correct, that's given to the board members?

A. Yes. Yes.

Q. Do you remember if a packet was given prior to that December 5th -- before that December 5, 2023 board meeting?

A. We always get it on the Friday before --

Q. Okay.

A. -- the meeting on Tuesday.

Q. But those are preserved for the public to look at; correct?

A. Everything is public record.

Q. Okay. So, but Melissa Moore would be able to provide those records?

A. I'm sure she would.

Q. Okay.

A. But Mr. Scott was very thorough, so I feel sure that we got a paper, we got a written notice.

Q. Okay. All right. Are you aware that at some point after Mr. McMillian was terminated on December 5, 2023, that he, I guess, tried to receive unemployment benefits? Do you remember that?

A. No.

Q. Okay. Basically, when he, I guess, applied for his employment benefits, it went to Jackson, Mississippi to the Mississippi Department of Employment Security, and I guess they found from their a determination of a set of facts and then reached a conclusion based on those set of facts from -- I guess, from their conclusion.

I guess I'm going to show you just Exhibit 12. I'm just going to have you read it for the record. And can you just read from the Findings of Fact. This is, like I said, Exhibit 12, for the record. The Findings of Fact section, from here to here (indicating).

A. Yes.

Q. Yes. This area right here (indicating). Yes, ma'am.

A. And this? (As Read): "Based upon testimony and evidence presented, the Administrative Law Judge finds as follows:

"The claimant worked for the City of

Aberdeen beginning September 21, '21, as a labor employee with the Water Department in Aberdeen, Mississippi, ending on December 19th, 2023.

"The employee discharged the claimant for stealing time, which is grounds for termination.  The claimant was made aware of the employer's policies.

"During an investigation, it was discovered that the claimant violated timekeeping policies.  The claimant did not report to work on November 27, 2023.  However, he had a co-worker enter his time in the timekeeping system.  The co-worker admitted to entering the claimant's time at his request.

"It was determined the claimant was in violation of policy, and he was discharged on December 5, 2023 in accordance with policy.  The co-worker who violated policy received a three-day suspension, but was not discharged.  The employer has not provided a reasonable explanation for the difference in the level of discipline that was given."

Q.   All right.  So according to this administrative law judge in this MDS matter, they determined that there wasn't a reason why one should have been terminated and another individual should have been -- well, I guess, let me just strike that.

Basically from the record, what is stated on

Exhibit 12, that the administrative law judge is saying that there was no record provided, stating why one individual was suspended and the other individual was terminated. And so can you explain to me why, I guess, the administrative law judge said that there was no record saying why one individual should have been suspended and the other one should have been, I guess, terminated?

BY MR. WALKER: Mr. Reddick, let me pause for a minute. A couple of objections. One is speculation. She doesn't know what the law judge was thinking.

The other is, this is a legal term of art for misconduct -- quote/unquote "misconduct" -- that the law judge looks for when they give unemployment benefits. It's not related to any of the claims that are presently in this lawsuit. But you can answer. You can answer.

Q. (Mr. Reddick continued): Yeah, you may answer.

A. Now ask the question again.

Q.   Okay.  All right.  I guess he can state his objection, but basically, it says that?

A.   Why one was fired and the other one was not?

Q.   Right.  Well, no record showed that basically why one should have been terminated and the other one should have been suspended.  The difference between the two, basically.

A.   Why no records showed why one was -- one was and one was not?

Q.   Right.  As far as termination or being terminated.

A.   Why was it necessary?

Q.   Yes.

BY MR. WALKER:  Why the judge found that?

BY MR. REDDICK:  Yes, why the judge found that.

BY MR. WALKER:  If you know why the judge found that.

A.   He found that he couldn't -- didn't understand why one was fired and one was not.

Q.   (Mr. Reddick continued):  According to the records that were provided or not provided by the City of Aberdeen?

A.   Well, the records -- we voted -- I voted my

conscience. I felt like one needed to go, and the other one was the first offense, so --

Q. Okay. All right. I'm just reading, "the employer has not provided a reasonable explanation for the difference in the level of discipline that was given" and it's in the Findings of Fact on Exhibit 12.

So you are saying, you went with your conscience because, one, had -- I guess Mr. Brown had never been in trouble before. But just in reference to -- I guess my question would be, in reference to Mr. McMillian, were they not his first -- the first time that he had been accused of anything in reference to trouble or being in trouble?

A. No. We just went through that lawsuit that he had filed in '21.

Q. Okay. So you consider that something as far as being in trouble for -- him being in trouble for?

A. Well --

Q. Or causing trouble?

A. Uh-huh.

Q. Is that a yes or a no?

A. Yes.

Q. Okay. So that's a yes?

A. Yes.

Q. All right. So when you -- I guess when you

mean trouble, are you saying that he is --

A. I'm saying, I can't recall different specific instances, and I'm being very honest with you. I cannot recall specific instruments, but Mr. McMillian's name had come before the board a number of times.

Q. Okay. Is that in reference to litigation?

A. I don't know what it was in reference to. I just know that it's a very -- I can't recall.

Q. But you are saying at least in reference to this --

A. I know it was once in reference to a lawsuit in '21.

Q. Okay. And that's the Exhibit 11 in reference to the EEOC, correct?

A. Right.

Q. Okay. Do you know in reference to, I guess, an employee being terminated by the City of Aberdeen, whether or not there is a chain -- not a chain of command, but stuff that the City of Aberdeen is supposed to follow to their procedures, like a level 1, level 2, level 3?

A. We have a code book.

Q. Okay. You can't remember anything from -- can you remember the code book from your -- from your

own memory right now?

A.   No.

Q.   Okay.  This is going to be something that's already premarked, Exhibit 20.  I'm just going to have you -- you don't have to read it out loud just yet, but it's going to be the Progressive Disciplinary Policy for the City of Aberdeen.  And so can you just read that section.  When you've had a chance just read it.  You don't have to read it out loud just yet.

A.   Which one?  All of it?

Q.   No, ma'am.  No, ma'am.  This Disciplinary --

A.   Okay.

Q.   Well, what does it say, Progressive Disciplinary Policy.  And you can read that to yourself and then once you've had a chance to read it, just say that you've read it.  But it goes into Conflict of Interest, but you don't have to read the Conflict of Interest section.

A.   (Document tendered to the witness for review.)  This is not a very clear printout.

Q.   All right.  Ms. Odom, we are looking at Exhibit 20, just for the record, and it states the Progressive Disciplinary Policy for the City of Aberdeen.

Have you ever seen this Progressive

Disciplinary Policy before?

A. I have.

Q. Okay. And was it in effect at the time that Mr. Barry McMillian was terminated?

A. No. I have a whole -- the entire book at my house of the rules and regulations of the City of Aberdeen.

Q. Okay. But I guess I'm just asking just for the record, was this policy in place at the time that Mr. Barry McMillian was terminated by the City of Aberdeen?

A. I'm sure it was in place.

Q. Okay. Just in reference to this, it states some of the things that -- the steps that can be taken prior to someone getting terminated. Just from your -- I guess from you reading the record and what transpired with Mr. McMillian, do you believe that Mr. McMillian was terminated in accordance with the Progressive Disciplinary Policy of the City of Aberdeen?

A. I do.

Q. Okay. And is there a particular reason you have that conclusion?

A. I'm sure it was from previous actions.

Q. Okay. And that's just as you mentioned, was

like the EEOC charge that he filed against the city?

BY MR. WALKER:  Objection.

Form.

Q.    (Mr. Reddick continued):  You may answer. You may answer.  Is that correct?

A.    That, I'm sure was.

Q.    Okay.  You said that's a yes?

A.    Yes.

Q.    Okay, thank you.  So just for the record we are looking at Exhibit 20, can you just read this section right here (indicating).  For the record, it's section 4 just right there (indicating).  Just that section 4.

A.    (As read):  In cases involving serious misconduct, or any time the department head determines it is necessary, such as a major breach of policy or violation of law, the procedures contained in comment (2) above may be disregarded.  The department head should suspend the employee immediately and if appropriate, recommend termination of the employee. An investigation of the incident leading up to the suspension should be conducted to determine what future (sic) -- further action, if any, should be taken.  Employees suspended from work will not receive or accrue any employee benefits during the suspension,

unless the Board of Aldermen grants an exception.

Q. Okay. And as fas as the investigation, do you know, in reference to Mr. McMillian, who investigated the matter in reference to him being terminated?

A. Mayor Scott.

Q. Okay. Do you know anybody who assisted Mayor Scott in, I guess, his investigation of Mr. McMillian?

A. I can't recall.

Q. Okay. And what about his investigation of Mr. Brown? Who, I guess --

A. Mayor Scott.

Q. Okay. So Mayor Scott conducted the investigation in reference to Mr. Brown as well?

A. Right.

Q. Did anybody else assist the mayor? Well, I mean Mayor Scott, when -- hold on. Strike that.

Did anybody else assist Mayor Scott in his investigation of Mr. Brown?

A. I don't recall.

Q. Okay. So I'm going to show you Exhibit 1. This has already been pre-marked. And have you ever seen that document before?

A. (Document tendered to the witness for

review.) I'm sure I have.

Q. Okay. Do you know what that's in reference to?

A. Not without reading it, but it was 2020, so I'm sure it was in my -- but I don't recall, though.

Q. Okay. I'll represent to you that's a Sentencing Order for Mr. Marcus Collins in reference to him being charged and convicted of embezzlement. Are you familiar with Mr. Collins being charged and convicted of embezzlement before?

A. I don't recall.

Q. But just for the record, you do know what embezzlement is; correct?

A. I do. I wouldn't have fired Mr. McMillian if I didn't.

Q. Okay. And you can just take your time to kind of look at that. But that's just a Sentencing Order, but you said that you may have seen that before since --

A. Yes. It was in my packet before we had a board meeting, I'm sure.

Q. Okay. So this is something Mr. -- we are looking at Exhibit 3. This is something that Mr. Collins wrote up. Have you ever seen this document before?

A.      (Document tendered to the witness for review.)  I'm sure I have.

Q.      Okay.  Can you just read this section for the record, right there (indicating).

A.      (As read):  Mr. McMillian was clocked in for work and was not present.  Mr. McMillian has been warned on numerous occasions.  Mr. McMillian refused to sign write up.

Q.      Okay.

A.      February 1st, '23.

Q.      All right.  And just for the record on Exhibit 3, that's the Employee Disciplinary Report in reference to Mr. Barry McMillian prepared by Marcus Collins.  It states on this record that Mr. McMillian was warned on numerous occasions and whatnot.

Do you know what these numerous occasions were about or were there any documentation in reference to that?

A.      I'm sure there was documentation of it.  And I'm sure because that's what I've referred to in the past about his name coming up a number of times, so.

Q.      Okay.  Amongst other things?

A.      Amongst.

Q.      You are saying amongst other things as well?

A.      Well, I just -- I just remember it coming up

more than once or more than twice, so.

Q.   Okay.

A.   I think that was --

Q.   Okay.  Did you have any documentation about these numerous occasions?  You saying there is records?

A.   Yes.  Yes.

Q.   Okay.

A.   Because the --

Q.   And can you -- so would Melissa Moore have a copy of those records that these occasions are about?

A.   I'm sure.

Q.   Okay.

A.   Because we had--

Q.   So in reference to what Mr. Collins said, you are saying that Miss -- I guess Ms. Melissa -- the city clerk, Melissa Moore, would have those records; correct?

A.   Sure.  Yes.

Q.   Thank you.  Just for the record, can you state me -- state for me what the policy is for donating leave from an employee to employee or donating sick time?  Are you familiar with that?

A.   I can't.

Q.   Okay.  I'm just going to show you this

document. This is Exhibit 5. And this is a statement from Mr. Brown.

A. (Document tendered to the witness for review.) That was in my packet too.

Q. Okay. Can you just state that to me for the record.

A. (As read): I Triron Brown donate Barry McMillian four hours sick time. Thanks. Triron Brown.

Q. All right. Is that a common policy amongst, I guess, employees?

A. I don't think that's a policy.

Q. Okay. So employees can't, I guess, donate sick time to cover people's hours or anything for the City of Aberdeen?

A. I have no idea.

Q. Okay. Would you have known that at the time of Mr. Barry McMillian's termination?

A. Probably not.

Q. This is Exhibit 17. It is basically the same statement from Mr. Brown, but it actually has a statement underneath. Can you read what that states for me, on Exhibit 17?

A. Is it this?

Q. Yes, ma'am.

A.     (As read):  Disapproved.  Mayor Scott, November 29, '23.  Failure to follow procedure.

Q.     Okay.  All right.  And do you know why Mayor Scott made that determination?

A.     No, I do not.

Q.     Okay.  Did you know it at the time on December 5, 2023?

A.     Did I know then?

Q.     Yes.  Why he disapproved Mr. McMillian getting sick leave from -- sick time from Mr. Brown on that meeting -- on that meeting on December 5th, 2023?

A.     I can't recall.

Q.     Okay.  And this was to cover that November 27, 2023 date.  So -- but you are saying you don't recall why Mayor Scott -- you don't recall why Mayor Scott would have made that determination prior to that --

A.     I'm sure he --

Q.     December 5, 2023 meeting?

A.     I'm sure we were told, but I don't recall.

Q.     Okay.  But you don't know for sure if he told you or not on December 5, 2023?

A.     Yeah, he told us.

Q.     Okay.  All right.  This is going to be Exhibit 18.  Can just look at that document and just

tell me if you've ever seen that document before.

A.    (Document tendered to the witness for review.)  It was in my packet.

Q.    Okay.  So you have seen this document before?

A.    I have.

Q.    And can you just state what the -- what kind of document this is?

A.    This is a leave request, and it says illness, and it's signed by Barry McMillian.

Q.    Okay.  I'll attest to you that document shows that Mr. McMillian was actually trying to get his FMLA leave to cover his November 27, 2023 date. Do you -- can you -- just for the record, can you read the bottom part that's written at the bottom of the exhibit?

A.    It says, Disapproved by Mayor Scott, November 29, 2023.

BY MR. WALKER:  Objection, but the answer is fine.

Q.    (Mr. Reddick continued):  Okay.  All right. Do you know why the mayor disapproved Mr. McMillian's leave on that date?

A.    No, I do not.

Q.    Okay.  Who do you think would be the best

person to ask in reference to that information?

A.   Him.

Q.   Okay.  Would that be the same person --
would Mr. Charles Scott be the same person I would
need to speak with in reference to why he denied --

A.   Yes.

Q.   -- Mr. Brown to donate time to Mr.
McMillian?

A.   Yes.

Q.   Okay.  And that's in reference to the four
hours of sick time; so that's correct?

A.   That's correct.

Q.   Do you know at the time of, I guess, at the
-- let me strike that.

At the time that you were on the board, were
there ever a deficiency in the handbook or anything in
reference to FMLA being up to code in reference to the
Family Medical Leave Act?

A.   I know the handbook -- we have for the last
few years been trying to update it, and I do know that
the FMLA is there.

Q.   Okay.  Was it deficient at the time?

A.   Yes.

Q.   In 2000 -- well, let me give you a chance to
just ask.

So in the time on December 5, 2023, was the FMLA policy deficient at the time?

A.   Was it efficient?

Q.   No.  Deficient.

A.   No.

Q.   Okay.  So your testimony is that it was up to -- the FMLA was up to code at the time on December --

A.   I believe it would have been.

Q.   Okay.  And would it have been -- let me just ask the question like this.  On December 27, 2023, was the, I guess, the City of Aberdeen's FMLA code up to standards on that day?

A.   The code book?

Q.   Yes.

A.   Everything in it?

Q.   Just in reference to the FMLA.

A.   Oh, I think so.  I think that's something that should have -- would be up to par all the way through.

Q.   All right.  Do you know the last time that the FMLA was updated with the City of Aberdeen?

A.   No, sir, I do not.

Q.   Okay.  If I assert to you that the last time that was updated was 1998, would that surprise you?

A.    Yes.

Q.    Okay.  As of today, do you think -- do you know if the City of Aberdeen's FMLA policy is up to standard?

A.    No.  I've been out two years, so I don't have a clue.

Q.    Okay.  While you was on the board, did the U.S. Department of Labor and Wage ever come to -- I guess, come to the city of Aberdeen and investigate whether or not the City of Aberdeen's FMLA policy was up to standards or not or up to par?

A.    No, I don't recall it.

Q.    Okay.  So do you ever remember the FMLA -- well, the U.S. Department of Labor and Wage coming to investigate a matter in reference to Mr. Barry McMillian being improperly denied his FMLA benefits?

A.    No, I can't.  But you are asking me to remember stuff way back yonder.

Q.    Yes.  If you --

A.    No, I don't remember.

Q.    Yes.  If you can remember, that's fine.  I was just trying to figure out what you do or do not know.

This is going to be Exhibit 7.  Can you just look at that and once you've had a chance to review

that, just let me know that you've had a chance to look at it.

A.    (Document tendered to the witness for review.)

Q.    All right.  Do you know what this document is?

A.    No, I have no idea.

Q.    Okay.  So this is in reference to overtime, or I guess people trying to receive overtime.  So you are not familiar with anything in reference to employees receiving overtime?

A.    Well, I'm sure I've known employees receiving overtime.  We've paid a lot of money out on overtime, but I don't remember seeing that particular piece of paper.

Q.    So you don't think this is a document that Charles Scott provided to you on December 5th -- for the December 5th, 2023 meeting?

A.    No, I don't.

Q.    Okay.  So are you -- have you ever seen a type of calendar like this before in reference to employees receiving overtime?

A.    No.

Q.    Okay.  I'm going to show you Exhibit 10 because this has been premarked.

A.    (Document tendered to the witness for review.)

Q.    You can keep that.  I'm going to have you read it for the record.

A.    Right now?

Q.    Well, yes.  Can you just read it for the record.

A.    (As read):  I, Johnny McMillian was notified by Barry McMillian that he was taking off the 27th of November, '23.  He notified me because I was acting supervisor for the week.

Q.    Okay.  And that's -- I can attest to you that's a very -- I mean a statement that Mr. Johnny McMillian made in reference to Mr. McMillian.

Have you ever seen that document before?

A.    No.

Q.    Okay.  Did Mayor Charles Scott provide that to you for the December 5, 2023 board meeting?

A.    I don't recall.

Q.    Well, let me ask you this.  If Mr. McMillian informed the City of Aberdeen that Mr. McMillian -- that Barry McMillian was not going to be at work on November 27, 2023, how did the City of Aberdeen come to the conclusion to terminate Mr. McMillian?

A.    I have no idea.  I haven't seen that.

Didn't know it existed.

Q. I'm looking at Exhibit 16. This is something that Mr. Walter Zinn prepared. This is something that Mr. Walter to -- oh, strike that.

That is something Mr. Walter Zinn, Attorney Walter Zinn, gave to the Equal Employment Opportunity -- I mean, Opportunity -- Equal Employment Opportunity Commission or the EEOC rather in reference to some questions they asked him. And so I want you to just see if just -- you can just glance and see if you've ever seen it. This is Exhibit No. 16.

A. (Document tendered to the witness for review.)

Q. Just for the record, the EEOC is in reference to the Equal Employment Opportunity Commission.

All right. It's only one particular part I want you read for the record. So earlier I asked you about donating leave and whatnot. That when Mr. Brown after donating leave to Mr. Barry McMillian -- excuse me, and I know you gave your response earlier, but I just want you to read for the record 13 -- well, number 13 and the response to that question. And that's on page 2 of Exhibit 16. Number 13 is the question number.

BY MR. WALKER:  DeMoreo, are you still asking if she's seen that document before?

BY MR. REDDICK:  No.  I'm just asking for her to read that for the record, number 13 on page 2.  The question --

BY MR. WALKER:  You are striking the -- you did ask, "Have you seen that document before?"  She didn't answer it.

Q.   (Mr. Reddick continued):  Well, I guess, just for the record, have you seen that document before?

A.   Uh-huh.

Q.   You have seen the document before?

A.   It's in the -- most of it is in the handbook.

Q.   No.  That's after --

A.   But this is the -- okay.  I got you.

Q.   Have you seen that document before?

A.   I'm sure I got a copy of it in my -- but I can't tell you right now.

Q.   Okay.  All right.  And just now, we can go back to --

A.    Okay.  (As read):  "What is the policy on donating leave?"

Q.    Right.  We got your response earlier.  As I said, we are looking on page 2 of Exhibit 16.  And so I just need you to read for the record, I think that's number 13, the question and the response.

A.    The response is (as read):  "The City handbook does" --

Q.    Not to cut you off, but the question and then the response on number 13.  Can you read the question, then the response for the record, both.  That's what I'm trying to refer you to.

A.    (As read):  What is the policy on donating leave?

RESPONSE:  The City handbook does not prohibit employees donating leave and believes the donation of leave time amongst co-workers is also a reflection of interactive (sic) departmental relations.  While this is a relevant inquiry, the decision as to rejecting a request leave, disregarding the obvious technical error of the request, the handbook book specifically addresses the procedure for requesting the respective leave.  Generally speaking, following said procedure would not have barred the donation of leave.

Q. Okay. So just in reference to the December 5, 2023 meeting, did you know that you can -- that employees can transfer leave to other employees?

A. I did, but there was a lot of discussion during board meetings about leave time and why.

Q. And what was that -- what was that discussion?

A. I don't remember. I don't recall. I just know I remember people not getting leave and donating leave.

Q. Okay.

A. Or requesting it.

Q. I only have one last document to show you, and then some follow-up questions. This is going to be Exhibit 19. This is in reference to the Family Medical Leave Act, FMLA. Can you just -- if you can just glance at the document and see -- just tell me if you have ever seen that document before.

A. (Document tendered to the witness for review.) I have.

Q. Okay. And what is that in reference to?

A. I'm sure it was in reference to someone needing to be off for illness or family illness.

Q. Okay.

A. But I can't recall.

Q. All right. And had -- I guess just in reference to this FMLA matter, I guess -- I guess my question is, you are saying that you don't remember FMLA ever saying that your policy was deficient with the City of Aberdeen; is that correct?

A. Deficient?

BY MR. WALKER: Objection to the form. You can --

Q. (Mr. Reddick continued): You may answer.

But that's in reference to the US Department of Labor and Wage asking or stating to the City that the -- your FMLA policy was deficient. When I say you, I mean the City of Aberdeen.

A. I don't ever remember it being deficient.

Q. Okay. And are you aware that Mr. McMillian actually tried to -- I guess tried to receive his FMLA benefits before, in reference to him getting gallbladder surgery? Are you aware of that?

A. (Deponent moved head from side to side.)

Q. So that answer is no?

A. No.

Q. And you didn't know that information prior to the December 5, 2023 meeting?

A. No.

Q. When I mean meeting, I mean the board

meeting on December 5, 2023, just for the record.

BY MR. REDDICK:  Can I have my client's indulgence for a moment?

BY MR. WALKER:  Of course. Yes.

BY MR. REDDICK:  We are going off the record.

(After a break, the deposition continued as follows):

Q.  (Mr. Reddick continued):  Back on the record.  All right.  In reference to Mr. McMillian, are you aware that Mr. McMillian contacted Melissa Moore to try to receive his FMLA benefits when he -- prior to him getting his surgery --

A.  No.

Q.  -- in 2023?

A.  I'm not aware of it.

Q.  Okay.  So did Mr. Charles Scott make you aware of that in the --

A.  No.

Q.  Before the December 5, 2023 board meeting?

A.  Why would that be?

BY MR. WALKER:  Objection. You are asking the same question seven different times.

BY MR. REDDICK:  Yeah.  I just want to make sure it's on the record.

BY MR. WALKER:  It's on the record.  I assure you.

BY MR. REDDICK:  Yeah.  I just want to make sure it is.  I'm double checking.

Q.   (Mr. Reddick continued):  Say that again, ma'am.

BY MR. WALKER:  Same objection.  Asked and answered.

Q.   (Mr. Reddick continued):  But you may answer.

A.   Well, what was the question?  You've talked so much now I don't know what the question was.

Q.   Okay.  Basically prior, I guess Mr. McMillian --

A.   Didn't.

Q.   He contacted Melissa Moore trying to get his FMLA benefits for a gallbladder surgery that he had in September of 2023.  Were you aware of that information prior to your terminate -- your determination of terminating Mr. McMillian on December 5, 2023?

A.   No.

Q.   So that's a no?

A.   That's a no.

Q.   Okay.  All right.  Thank you.  So I guess my final questions are in reference to Mr. McMillian, do you -- do you think that the City of Aberdeen retaliated against Mr. McMillian for filing an EEOC charge in 2022?

A.   No.

Q.   Okay.  And what about do you think you yourself personally feel that you retaliated against Mr. Barry McMillian for filing an EEOC charge in 2022?

A.   I do not.

Q.   All right.  In reference to Mr. McMillian trying to get FMLA leave to cover his 2023 surgery in September, do you feel that the City of Aberdeen interfered with him after being -- trying to -- in reference to him actually trying to be able to obtain his FMLA benefits?

A.   Can you say that again?

Q.   Okay.  All right.  No, I guess I'm just asking, Mr. McMillian tried to obtain his FMLA benefits in 2023, in September 2023, in reference to him getting a gallbladder surgery.  Do you feel that the City of Aberdeen interfered with him trying to obtain his FMLA benefits?

A.   No.

Q.   Do you think you probably tried to interfere with him trying to obtain his FMLA benefits for September 9, 2023 -- I mean for September 2023?

A.   Did I --

Q.   Yes.

A.   -- interfere with him trying to get that?

Q.   Yes, with his FMLA benefits.

A.   No, I did not.

Q.   Okay.  And in reference to Mr. McMillian, he tried to get his FMLA leave in September to cover his surgery for September of 2023 and he also tried to use his FMLA benefits to cover his November 27, 2023 date in which he missed work.  Do you think that the City of Aberdeen retaliated against him for trying to get his FMLA benefits to cover the November 27, 2023?

A.   No.

Q.   Okay.  What about yourself?  Did you --

A.   No.

Q.   -- retaliate against him for trying to get his FMLA benefits for November 7th, 2023 --

A.   No.

Q.   -- to cover that date?  Your answer is?

A.   No.

Q.   Okay.  All right.

BY MR. REDDICK: I don't have any other questions.

EXAMINATION BY MR. WALKER:

Q. All right. Ms. Odom, I just have a couple of questions, and it's just because I probably got a little bit confused there.

A. No. I'm confused.

Q. It's okay. And so whenever I go back reading the transcript, I just want to make sure I'm clear --

A. Okay.

Q. -- on some of your testimony. Do you recall one of the first things that you testified to when you were asked, you know, "Why did you vote in favor of terminating Barry McMillian," and you answered, "Because I felt like Barry was embezzling time from the city."

A. (Deponent moved head up and down.)

Q. Is that a yes?

A. Yes.

Q. Okay. So my question to you is, is the reason you voted in favor of terminating Barry McMillian is because you felt like he was embezzling time from the city?

A. Yes.

Q.   Okay.  And then I think opposing counsel also asked you if you knew the definition of embezzlement.  I know that's a legal term of art, but also people, everyone generally knows what embezzlement means.  And I think you responded -- and I'm paraphrasing, but I believe you said, "I wouldn't have fired Mr. McMillian if I didn't know what embezzlement was"; is that right?

A.   That's correct.  It's taking something that is not yours.  He was -- he wanted to be paid for time that he weren't -- wasn't there.

Q.   And so when you said that really you're -- you are reinforcing what you said earlier when you said, "I voted in favor of terminating Barry because I felt like he was embezzling time from the city"; is that right?

A.   That's correct.

Q.   All right.  And then I'll represent to you -- I know you weren't sitting in here yesterday, and so opposing counsel may lodge an objection and that's fine.  But I'll represent to you that Alderman Cain testified yesterday during his deposition that Mr. Barry McMillian's 2022 EEOC charge wasn't even brought up or discussed during the December 5, 2023 board meeting.

BY MR. REDDICK: Objection. I'm going to say that's not going to be relevant to what she does and does not know.

Q. (Mr. Walker continued): Would you agree with him --

A. Uh-huh.

Q. -- that the 2022 charge wasn't brought up or even discussed during that meeting?

A. That's exactly right, because it was -- all we were doing in that meeting was about him not being at work and still had been clocked in for him.

Q. The embezzling time?

A. Right, that was the embezzlement. And that's what I thought this was about today.

Q. When you say "this," you mean the deposition?

A. The deposition.

Q. Okay. Do you recall the words "Family Medical Leave Act" coming up during the December 5, 2023 meeting?

A. No.

Q. Okay. What about the acronym FMLA?

A. No.

Q. Okay.

BY MR. WALKER:  I don't have any further questions.

FURTHER EXAMINATION BY MR. REDDICK:

Q.    Just in reference just to clarify, you also said that there was a number of things why he got -- Mr. McMillian was terminated on December 5, 2023, which one of the things you stated was that his name came up a lot; is that correct?

A.    It is.

Q.    All right.  And you did state for the record that one of those things was his EEOC charge, correct?

A.    I don't know.  I don't recall.

Q.    Okay.  All right.

BY MR. REDDICK:  I have no further questions.

BY MR. WALKER:  All right.

BY MR. REDDICK:  All right.

BY MR. WALKER:  That's all.

So you are done.

(Deposition concluded at 12:43 p.m.)

C E R T I F I C A T E

I, Valera Knight, Court Reporter and Notary Public within and for the State of Mississippi, do hereby certify that the above and foregoing pages contain a full, true and correct transcript of the proceedings had in the afore-named case at the time and place indicated, which proceedings were recorded by me to the best of my skill and ability.

I also certify that I placed the deponent under oath to tell the truth and that all answers were given under that oath.

I further certify that I have no interest, monetary or otherwise, in the outcome of this action.

Witness my hand and seal on this 16th day of March, 2026.

_____
Valera Knight
My Commission Expires:      CCR #1039
March 21, 2029             Notary Public

# #

**#1039** [2] - 1:22, 56:18

# '

**'17** [1] - 13:1
**'18** [2] - 13:1, 13:2
**'21** [6] - 10:23, 11:8, 15:2, 23:1, 26:15, 27:13
**'23** [5] - 14:1, 18:14, 33:10, 36:2, 42:10
**'Aye** [2] - 15:22, 16:4

# 1

**1** [4] - 3:3, 3:15, 27:22, 31:22
**1-20** [1] - 1:6
**1-22** [1] - 3:13
**10** [2] - 3:15, 41:24
**1021** [1] - 5:25
**103747** [1] - 2:3
**11** [5] - 3:15, 11:2, 12:4, 12:5, 27:14
**11:24** [1] - 1:13
**12** [5] - 3:15, 22:14, 22:16, 24:1, 26:6
**125** [1] - 1:11
**12:43** [1] - 55:20
**13** [8] - 3:15, 15:12, 43:22, 43:23, 43:24, 44:6, 45:6, 45:10
**15** [3] - 3:15, 17:1, 17:8
**16** [5] - 3:15, 43:2, 43:11, 43:24, 45:4
**16th** [1] - 56:15
**17** [3] - 3:15, 35:20, 35:23
**18** [2] - 3:15, 36:25
**19** [3] - 3:15, 16:12, 46:15
**1905** [1] - 2:9
**1998** [1] - 39:25
**19th** [1] - 23:3
**1:24-CV-199-SA-RP** [1] - 1:4
**1st** [2] - 16:2, 33:10

# 2

**2** [6] - 3:4, 27:22, 30:18, 43:24, 44:6, 45:4
**20** [4] - 3:15, 28:4, 28:22, 30:10
**200** [1] - 2:9
**2000** [1] - 38:24

**2018** [2] - 13:5, 13:16
**2020** [1] - 32:4
**2021** [2] - 10:24, 12:22
**2022** [6] - 11:1, 11:10, 50:7, 50:11, 53:23, 54:8
**2023** [48] - 6:5, 7:8, 8:19, 10:21, 16:2, 16:12, 16:16, 18:12, 19:24, 20:7, 20:12, 21:3, 21:12, 22:3, 23:3, 23:9, 23:15, 36:7, 36:11, 36:14, 36:19, 36:22, 37:13, 37:18, 39:1, 39:11, 41:18, 42:18, 42:23, 46:2, 47:23, 48:1, 48:16, 48:21, 49:22, 49:24, 50:14, 50:22, 51:4, 51:12, 51:13, 51:16, 51:21, 53:24, 54:21, 55:6
**2024** [1] - 17:15
**2026** [2] - 1:12, 56:16
**2029** [1] - 56:18
**21** [2] - 23:1, 56:18
**26** [1] - 1:12
**27** [7] - 23:9, 36:14, 37:13, 39:11, 42:23, 51:13, 51:16
**27th** [1] - 42:9
**28** [1] - 12:21
**29** [3] - 17:15, 36:2, 37:18

# 3

**3** [6] - 3:5, 3:15, 15:14, 27:22, 32:23, 33:12
**38673** [1] - 1:23
**38860** [1] - 2:4
**39232** [1] - 2:9
**39730** [1] - 1:12

# 4

**4** [4] - 3:6, 15:14, 30:12, 30:13
**423-2022-00047** [1] - 12:9
**465** [1] - 2:3
**4th** [1] - 16:2

# 5

**5** [25] - 3:15, 6:5, 7:8, 18:12, 19:24, 20:7, 20:12, 21:2, 21:12, 22:3, 23:15, 35:1, 36:7, 36:19, 36:22,

39:1, 42:18, 46:2, 47:23, 48:1, 48:21, 49:24, 53:24, 54:20, 55:6
**52** [1] - 3:7
**55** [2] - 3:8, 3:9
**56** [1] - 3:10
**5th** [7] - 16:2, 16:16, 18:14, 21:12, 36:11, 41:17, 41:18

# 6

**601-352-2300** [1] - 2:10
**601-360-9777** [1] - 2:10
**662** [1] - 1:24
**662-256-3582** [1] - 2:5
**662-436-4641** [1] - 2:4

# 7

**7** [2] - 3:15, 40:24
**7th** [1] - 51:21

# 8

**816-9863** [1] - 1:24
**82** [1] - 1:23

# 9

**9** [1] - 51:4

# A

**A.M** [1] - 1:13
**Aberdeen** [28] - 4:6, 12:8, 12:25, 13:13, 13:25, 17:16, 19:5, 23:1, 23:2, 25:24, 27:18, 27:20, 28:7, 28:24, 29:7, 29:11, 29:20, 35:15, 39:22, 40:9, 42:21, 42:23, 47:5, 47:13, 50:5, 50:15, 50:24, 51:15
**ABERDEEN** [4] - 1:2, 1:5, 1:11, 1:12
**Aberdeen's** [3] - 39:12, 40:3, 40:10
**ability** [6] - 4:25, 5:3, 5:10, 10:1, 13:23, 56:9
**able** [4] - 7:2, 7:3, 21:20, 50:17
**accordance** [2] - 23:15, 29:18
**According** [1] - 25:22

**according** [1] - 23:20
**accrue** [1] - 30:25
**accurate** [3] - 6:25, 16:15, 16:21
**accused** [1] - 26:12
**acronym** [1] - 54:23
**Act** [3] - 38:18, 46:16, 54:20
**acting** [1] - 42:10
**ACTION** [1] - 1:4
**action** [2] - 30:23, 56:14
**actions** [1] - 29:24
**addresses** [1] - 45:22
**adjourn** [1] - 16:11
**Administrative** [1] - 22:23
**administrative** [3] - 23:21, 24:1, 24:5
**admitted** [1] - 23:11
**affect** [3] - 4:25, 5:3, 5:10
**afore** [1] - 56:7
**afore-named** [1] - 56:7
**agree** [1] - 54:5
**ahead** [1] - 12:10
**Alderman** [20] - 15:18, 15:19, 15:20, 15:21, 15:22, 15:24, 15:25, 16:3, 16:4, 16:5, 16:8, 16:9, 16:10, 16:11, 16:13, 16:14, 53:21
**Aldermen** [1] - 31:1
**Alderwoman** [6] - 15:21, 15:22, 16:4, 16:6, 16:8, 16:13
**allegedly** [2] - 7:17, 8:20
**AND** [1] - 1:6
**announced** [1] - 18:16
**answer** [15] - 4:18, 9:25, 13:23, 15:10, 24:21, 24:22, 24:24, 30:4, 30:5, 37:20, 44:11, 47:9, 47:20, 49:14, 51:23
**answered** [2] - 49:12, 52:15
**answers** [1] - 56:11
**anxious** [1] - 5:7
**anytime** [1] - 6:16
**APPEARANCES** [2] - 1:16, 2:1
**Appearances............ .................... [1] - 3:4
**applied** [1] - 22:6
**appreciated** [1] - 15:10

**appropriate** [1] - 30:20
**APPROXIMATELY** [1] - 1:13
**April** [1] - 13:19
**arbitrary** [1] - 19:7
**area** [1] - 22:20
**art** [2] - 24:15, 53:3
**assert** [1] - 39:24
**assist** [2] - 31:17, 31:19
**assistance** [1] - 19:9
**assisted** [4] - 14:12, 14:19, 19:2, 31:7
**assure** [1] - 49:5
**AT** [2] - 1:11, 1:13
**attempted** [1] - 18:24
**attest** [2] - 37:11, 42:12
**Attorney** [4] - 4:4, 19:14, 19:15, 43:5
**authorized** [1] - 19:4
**aware** [9] - 8:19, 22:1, 23:6, 47:15, 47:18, 48:12, 48:17, 48:19, 49:22
**Aye** [2] - 16:9, 16:14

# B

**Bank** [1] - 2:9
**Bar** [1] - 2:3
**barred** [1] - 45:24
**Barry** [25] - 2:6, 4:5, 7:18, 11:25, 12:6, 16:7, 18:24, 19:1, 19:3, 29:4, 29:10, 33:13, 35:7, 35:18, 37:10, 40:15, 42:9, 42:22, 43:20, 50:11, 52:15, 52:16, 52:22, 53:14, 53:23
**BARRY** [1] - 1:3
**based** [1] - 22:11
**Based** [1] - 22:22
**become** [1] - 12:24
**before..** [1] - 17:24
**beg** [1] - 13:10
**BEGINNING** [1] - 1:13
**beginning** [1] - 23:1
**believes** [1] - 45:16
**below** [1] - 3:13
**benefits** [16] - 22:4, 22:7, 24:18, 30:25, 40:16, 47:17, 48:13, 49:21, 50:18, 50:22, 50:25, 51:3, 51:8, 51:13, 51:16, 51:21
**best** [6] - 4:14, 10:1, 13:23, 15:10, 37:25,

56:9

**between** [2] - 7:17, 25:7

**bit** [2] - 5:2, 52:6

**Board** [4] - 16:12, 16:16, 18:20, 31:1

**board** [37] - 7:7, 8:22, 10:5, 11:24, 12:1, 12:20, 12:21, 12:24, 13:2, 13:16, 13:24, 14:25, 15:6, 17:16, 18:11, 18:13, 18:14, 18:15, 18:17, 18:23, 19:24, 20:7, 20:12, 21:2, 21:3, 21:7, 21:9, 21:13, 27:5, 32:21, 38:15, 40:7, 42:18, 46:5, 47:25, 48:21, 53:24

**BOARDROOM** [1] - 1:11

**book** [5] - 27:23, 27:25, 29:5, 39:14, 45:22

**bottom** [2] - 37:15

**BOX** [1] - 1:23

**Box** [1] - 2:3

**breach** [1] - 30:16

**break** [1] - 48:8

**briefly** [1] - 14:10

**brought** [5] - 14:23, 17:24, 18:13, 53:23, 54:8

**Brown** [26] - 7:18, 7:19, 8:7, 8:20, 9:2, 10:12, 10:13, 14:12, 14:14, 14:16, 14:19, 14:20, 16:1, 16:20, 19:2, 26:8, 31:12, 31:15, 31:20, 35:2, 35:7, 35:9, 35:21, 36:10, 38:7, 43:19

**Brown's** [1] - 8:4

**BY** [30] - 4:3, 10:22, 12:3, 24:9, 25:14, 25:16, 25:18, 30:2, 37:19, 44:1, 44:4, 44:8, 47:7, 48:2, 48:4, 48:6, 48:23, 49:1, 49:4, 49:6, 49:11, 52:1, 52:3, 54:1, 55:1, 55:3, 55:14, 55:16, 55:17, 55:18

## C

**Cain** [9] - 6:14, 15:19, 15:22, 16:4, 16:5, 16:8, 16:10, 16:13,

53:21

**calendar** [1] - 41:21

**cannot** [3] - 10:17, 20:25, 27:4

**capricious** [1] - 19:7

**CAROLYN** [3] - 1:9, 3:2, 4:1

**case** [2] - 6:11, 56:7

**cases** [1] - 30:14

**causing** [1] - 26:19

**CCR** [2] - 1:22, 56:18

**certainly** [1] - 7:2

**Certificate................. .** [1] - 3:10

**certify** [3] - 56:5, 56:10, 56:13

**chain** [2] - 27:19

**chance** [10] - 4:16, 4:18, 11:3, 11:4, 17:2, 28:8, 28:15, 38:24, 40:25, 41:1

**Charge** [1] - 11:11

**charge** [10] - 10:20, 11:12, 12:6, 12:8, 30:1, 50:7, 50:11, 53:23, 54:8, 55:11

**charged** [2] - 32:8, 32:9

**Charles** [8] - 18:7, 19:21, 20:6, 21:2, 38:4, 41:17, 42:17, 48:18

**checking** [1] - 49:8

**children** [1] - 5:20

**Circle** [1] - 5:25

**CITY** [2] - 1:5, 1:11

**City** [39] - 4:6, 9:4, 10:10, 10:15, 10:21, 11:12, 11:13, 12:7, 12:25, 13:13, 13:25, 17:16, 19:5, 19:9, 22:25, 25:23, 27:18, 27:20, 28:7, 28:23, 29:6, 29:10, 29:19, 35:15, 39:12, 39:22, 40:3, 40:10, 42:21, 42:23, 45:7, 45:15, 47:5, 47:11, 47:13, 50:5, 50:15, 50:24, 51:14

**city** [10] - 14:25, 15:25, 16:6, 21:2, 30:1, 34:17, 40:9, 52:17, 52:24, 53:15

**CIVIL** [1] - 1:4

**claimant** [6] - 22:25, 23:4, 23:6, 23:8, 23:9, 23:13

**claimant's** [1] - 23:12

**claims** [1] - 24:19

**clarify** [2] - 10:25, 55:4

**clear** [4] - 4:15, 5:6, 28:20, 52:10

**clerk** [1] - 34:17

**client's** [1] - 48:3

**clock** [2] - 8:19, 12:18

**clocked** [4] - 7:23, 8:20, 33:5, 54:12

**closed** [1] - 18:16

**clue** [1] - 40:6

**co** [4] - 23:10, 23:11, 23:15, 45:17

**co-worker** [3] - 23:10, 23:11, 23:15

**co-workers** [1] - 45:17

**code** [6] - 27:23, 27:25, 38:17, 39:7, 39:12, 39:14

**Collins** [5] - 32:7, 32:9, 32:24, 33:14, 34:15

**coming** [6] - 6:2, 6:16, 33:21, 33:25, 40:14, 54:20

**command** [1] - 27:20

**comment** [1] - 30:17

**COMMERCE** [1] - 1:11

**Commission** [3] - 43:8, 43:16, 56:18

**common** [1] - 35:10

**Community** [1] - 2:9

**completely** [2] - 4:17, 4:18

**concluded** [1] - 55:20

**Concluded................ ..........** [1] - 3:9

**conclusion** [4] - 22:11, 22:12, 29:23, 42:24

**conducted** [4] - 18:6, 18:8, 30:22, 31:14

**Conflict** [2] - 28:17, 28:18

**confused** [2] - 52:6, 52:7

**conscience** [2] - 26:1, 26:8

**consider** [1] - 26:16

**constitutional** [1] - 19:8

**contact** [1] - 19:11

**contacted** [2] - 48:12, 49:20

**contain** [1] - 56:6

**contained** [1] - 30:17

**CONTENTS** [1] - 3:1

**Contents................... ..........** [1] - 3:5

**continued** [13] - 10:24, 12:14, 24:23,

25:22, 30:4, 37:21, 44:12, 47:9, 48:9, 48:10, 49:9, 49:13, 54:5

**conversation** [1] - 10:5

**convicted** [2] - 32:8, 32:10

**copy** [2] - 34:11, 44:22

**correct** [15] - 13:16, 21:8, 21:18, 27:15, 30:5, 32:13, 34:18, 38:11, 38:12, 47:5, 53:9, 53:17, 55:8, 55:11, 56:6

**counsel** [2] - 53:1, 53:20

**County** [2] - 5:13, 5:19

**couple** [2] - 24:11, 52:4

**course** [1] - 48:4

**COURT** [1] - 1:1

**Court** [2] - 3:10, 56:3

**court** [4] - 3:17, 4:13, 4:15, 17:13

**cover** [8] - 35:14, 36:13, 37:13, 50:14, 51:11, 51:13, 51:16, 51:23

**cut** [1] - 45:9

## D

**daily** [2] - 19:1, 19:3

**date** [12] - 3:17, 7:24, 8:1, 11:10, 12:21, 13:4, 13:24, 36:14, 37:13, 37:23, 51:13, 51:23

**dated** [1] - 11:1

**days** [5] - 8:12, 13:9, 16:1, 16:21

**December** [34] - 6:5, 7:8, 16:2, 16:12, 16:16, 18:12, 18:14, 19:24, 20:7, 20:12, 21:2, 21:12, 22:3, 23:3, 23:14, 36:7, 36:11, 36:19, 36:22, 39:1, 39:8, 39:11, 41:17, 41:18, 42:18, 46:2, 47:23, 48:1, 48:21, 49:24, 53:24, 54:20, 55:6

**decision** [1] - 45:20

**DEFENDANTS** [1] - 1:6

**Defendants** [1] - 2:7

**deficiency** [1] - 38:16

**deficient** [7] - 38:22,

39:2, 39:4, 47:4, 47:6, 47:12, 47:14

**definition** [1] - 53:2

**DeMoreo** [2] - 4:5, 44:1

**DEMOREO** [1] - 2:2

**denied** [2] - 38:5, 40:16

**Department** [5] - 22:8, 23:2, 40:8, 40:14, 47:10

**department** [4] - 18:9, 30:15, 30:18

**departmental** [1] - 45:18

**deponent** [1] - 56:10

**Deponent** [5] - 17:9, 19:22, 20:1, 47:19, 52:18

**DEPONENT** [1] - 3:2

**DEPOSITION** [1] - 1:9

**deposition** [11] - 3:14, 4:8, 5:1, 5:4, 5:10, 6:22, 48:8, 53:22, 54:17, 54:18, 55:20

**Deposition** [1] - 3:9

**depositions** [2] - 3:13, 3:17

**details** [1] - 10:18

**determination** [8] - 9:8, 9:17, 18:16, 18:23, 22:10, 36:4, 36:16, 49:23

**determine** [3] - 9:9, 10:9, 30:22

**determined** [2] - 23:13, 23:22

**determines** [1] - 30:15

**difference** [3] - 23:18, 25:6, 26:5

**different** [2] - 27:2, 48:25

**disapproved** [3] - 36:1, 36:9, 37:22

**Disapproved** [1] - 37:17

**discharged** [3] - 23:4, 23:14, 23:17

**Disciplinary** [7] - 28:6, 28:11, 28:14, 28:23, 29:1, 29:19, 33:12

**discipline** [3] - 15:4, 23:19, 26:5

**disciplined** [3] - 11:21, 14:25, 15:6

**discovered** [1] - 23:7

**Discrimination** [1] - 11:11

**discuss** [1] - 18:15

**discussed** [5] - 7:14,

10:6, 18:20, 53:24, 54:9
**discussion** [2] - 46:4, 46:7
**disregarded** [1] - 30:18
**disregarding** [1] - 45:20
**DISTRICT** [2] - 1:1, 1:1
**DIVISION** [1] - 1:2
**Document** [11] - 11:6, 17:4, 28:19, 31:25, 33:1, 35:3, 37:2, 41:3, 42:1, 43:12, 46:19
**document** [22] - 7:6, 17:7, 19:13, 31:24, 32:24, 35:1, 36:25, 37:1, 37:4, 37:8, 37:11, 41:5, 41:16, 42:15, 44:3, 44:10, 44:13, 44:16, 44:21, 46:13, 46:17, 46:18
**documentation** [3] - 33:17, 33:19, 34:4
**documents** [5] - 9:5, 9:9, 9:12, 9:16, 18:23
**DOES** [1] - 1:6
**donate** [3] - 35:7, 35:13, 38:7
**donating** [8] - 34:22, 34:23, 43:19, 43:20, 45:2, 45:13, 45:16, 46:9
**donation** [2] - 45:17, 45:25
**done** [1] - 55:19
**double** [1] - 49:8
**doubt** [1] - 5:5
**down** [1] - 52:18
**duly** [1] - 4:2
**DUNBAR** [1] - 2:8
**during** [11] - 3:13, 3:14, 18:15, 18:19, 23:7, 30:25, 46:5, 53:22, 53:24, 54:9, 54:20

## E

**e-mailed** [1] - 3:16
**EEOC** [11] - 10:20, 11:11, 12:6, 27:15, 30:1, 43:8, 43:14, 50:6, 50:11, 53:23, 55:11
**effect** [1] - 29:3
**efficient** [1] - 39:3
**elaborate** [2] - 7:21,

11:17
**election** [4] - 13:6, 13:8, 13:11, 13:12
**embezzlement** [7] - 32:8, 32:10, 32:13, 53:3, 53:5, 53:8, 54:14
**embezzling** [6] - 9:3, 14:11, 52:16, 52:23, 53:15, 54:13
**Employee** [1] - 33:12
**employee** [11] - 15:25, 16:6, 19:1, 23:2, 23:4, 27:18, 30:19, 30:20, 30:25, 34:22
**employees** [12] - 18:9, 18:22, 20:17, 30:24, 35:11, 35:13, 41:11, 41:12, 41:22, 45:16, 46:3
**employer** [2] - 23:17, 26:4
**employer's** [1] - 23:6
**employment** [1] - 22:7
**Employment** [4] - 22:9, 43:6, 43:7, 43:15
**ended** [1] - 14:3
**ending** [1] - 23:3
**enter** [2] - 18:17, 23:10
**entering** [1] - 23:12
**entire** [1] - 29:5
**entries** [2] - 18:25, 19:3
**Equal** [3] - 43:6, 43:7, 43:15
**error** [1] - 45:21
**ESQ** [2] - 2:2, 2:8
**evidence** [1] - 22:23
**exactly** [1] - 54:10
**EXAMINATION** [3] - 4:3, 52:3, 55:3
**Examination** [3] - 3:6, 3:7, 3:8
**exception** [1] - 31:1
**excuse** [1] - 43:20
**executive** [3] - 7:14, 18:18, 18:19
**Executive** [1] - 15:20
**Exhibit** [28] - 11:2, 12:4, 12:5, 15:12, 17:1, 17:8, 22:14, 22:16, 24:1, 26:6, 27:14, 28:4, 28:22, 30:10, 31:22, 32:23, 33:12, 35:1, 35:20, 35:23, 36:25, 40:24, 41:24, 43:2, 43:11, 43:24, 45:4, 46:15

**EXHIBIT** [1] - 3:12
**exhibit** [2] - 17:6, 37:16
**exhibits** [1] - 3:16
**Exhibits** [2] - 3:13, 3:15
**existed** [1] - 43:1
**Expires** [1] - 56:18
**explain** [1] - 24:4
**explained** [1] - 20:16
**explanation** [2] - 23:18, 26:4

## F

**fact** [3] - 20:22, 20:24, 20:25
**Fact** [3] - 22:16, 22:17, 26:6
**facts** [2] - 22:10, 22:11
**failure** [1] - 36:2
**fair** [1] - 15:8
**faith** [1] - 19:5
**false** [1] - 19:2
**familiar** [4] - 19:14, 32:9, 34:23, 41:10
**family** [1] - 46:23
**Family** [3] - 38:18, 46:15, 54:19
**far** [3] - 15:2, 25:10, 26:16
**fas** [1] - 31:2
**favor** [3] - 52:14, 52:22, 53:14
**FEBRUARY** [1] - 1:12
**February** [2] - 17:15, 33:10
**felt** [6] - 9:3, 14:11, 26:1, 52:16, 52:23, 53:15
**few** [1] - 38:20
**figure** [1] - 40:22
**filed** [5] - 10:20, 11:11, 12:7, 26:15, 30:1
**files** [1] - 12:12
**filing** [3] - 11:12, 50:6, 50:11
**final** [1] - 50:4
**finally** [1] - 15:1
**Findings** [3] - 22:15, 22:17, 26:6
**findings** [2] - 18:14, 18:21
**fine** [7] - 9:24, 10:2, 13:23, 17:12, 37:20, 40:21, 53:21
**finished** [1] - 13:3
**fired** [5] - 8:25, 25:3, 25:21, 32:14, 53:7
**first** [10] - 4:8, 4:10,

4:24, 8:7, 14:22, 14:23, 26:2, 26:11, 52:13
**Flowood** [1] - 2:9
**FMLA** [30] - 37:13, 38:17, 38:21, 39:2, 39:7, 39:12, 39:17, 39:22, 40:3, 40:10, 40:13, 40:16, 46:16, 47:2, 47:4, 47:12, 47:16, 48:13, 49:21, 50:14, 50:18, 50:21, 50:25, 51:3, 51:8, 51:11, 51:13, 51:16, 51:21, 54:23
**folder** [1] - 3:17
**follow** [3] - 27:21, 36:2, 46:14
**follow-up** [1] - 46:14
**following** [2] - 18:24, 45:24
**follows** [3] - 4:2, 22:24, 48:9
**FOR** [1] - 1:1
**foregoing** [1] - 56:5
**forget** [1] - 20:3
**forgot** [1] - 15:13
**form** [2] - 30:3, 47:8
**four** [2] - 35:8, 38:10
**fraudulent** [1] - 18:25
**Friday** [1] - 21:14
**full** [1] - 56:6
**FURTHER** [1] - 55:3
**future** [1] - 30:23

## G

**gallbladder** [3] - 47:18, 49:21, 50:23
**Garth** [1] - 15:22
**generally** [2] - 45:23, 53:4
**given** [8] - 4:8, 19:18, 20:18, 21:8, 21:11, 23:19, 26:6, 56:11
**glance** [2] - 43:10, 46:17
**grandchildren** [1] - 5:20
**grants** [1] - 31:1
**grounds** [1] - 23:5
**guess** [48] - 4:7, 4:12, 4:24, 6:9, 6:17, 7:17, 8:18, 9:6, 11:24, 12:1, 14:8, 14:10, 14:13, 14:18, 15:11, 20:4, 22:3, 22:6, 22:9, 22:12, 22:13, 23:24, 24:5, 24:8, 25:1, 26:8, 26:10,

26:25, 27:17, 29:8, 29:16, 31:8, 31:12, 34:16, 35:11, 35:13, 38:13, 39:12, 40:9, 41:9, 44:12, 47:1, 47:2, 47:16, 49:17, 50:3, 50:20

## H

**HALL** [1] - 1:11
**hand** [1] - 56:15
**handbook** [6] - 38:16, 38:19, 44:18, 45:8, 45:15, 45:22
**Haynes** [5] - 15:21, 15:25, 16:3, 16:8, 16:14
**head** [7] - 17:9, 19:22, 20:1, 30:15, 30:18, 47:19, 52:18
**held** [1] - 13:12
**helped** [2] - 7:19, 7:22
**hereby** [1] - 56:5
**HEREIN** [1] - 1:16
**hesitate** [1] - 19:10
**hold** [1] - 31:18
**Holliday** [7] - 15:19, 15:21, 15:24, 16:3, 16:9, 16:11, 16:13
**honest** [1] - 27:3
**hours** [3] - 35:8, 35:14, 38:11
**house** [1] - 29:6
**Howell** [1] - 5:23
**husband** [1] - 13:1

## I

**idea** [3] - 35:16, 41:7, 42:25
**illness** [3] - 37:10, 46:23
**imagine** [1] - 21:5
**immediately** [2] - 16:7, 30:19
**improperly** [1] - 40:16
**IN** [1] - 1:1
**incident** [1] - 30:21
**INDEX** [1] - 3:12
**indicated** [1] - 56:8
**indicating)** [5] - 22:18, 22:20, 30:11, 30:12, 33:4
**individual** [4] - 23:23, 24:3, 24:6
**indulgence** [1] - 48:3
**information** [6] - 9:25, 15:9, 19:11, 38:1, 47:22, 49:22

**informed** [1] - 42:21
**initiated** [1] - 8:13
**inquiry** [2] - 18:22, 45:19
**instances** [1] - 27:3
**instruments** [1] - 27:4
**interactive** [1] - 45:18
**interest** [1] - 56:13
**Interest** [2] - 28:17, 28:18
**interfere** [2] - 51:2, 51:7
**interfered** [2] - 50:16, 50:24
**interviewing** [1] - 20:17
**interviews** [1] - 18:8
**investigate** [2] - 40:9, 40:15
**investigated** [1] - 31:4
**investigation** [15] - 17:23, 18:3, 18:4, 18:6, 18:7, 18:10, 18:20, 19:10, 23:7, 30:21, 31:2, 31:8, 31:11, 31:15, 31:20
**involving** [1] - 30:14

### J

**Jackson** [1] - 22:7
**JOHN** [1] - 1:6
**Johnny** [2] - 42:8, 42:13
**Judge** [1] - 22:23
**judge** [8] - 23:21, 24:1, 24:5, 24:13, 24:17, 25:14, 25:17, 25:19

### K

**keep** [1] - 42:3
**kind** [2] - 32:17, 37:7
**KNIGHT** [1] - 1:22
**Knight** [2] - 56:3, 56:17
**knowledge** [1] - 15:10
**known** [2] - 35:17, 41:12
**knows** [1] - 53:4

### L

**labor** [1] - 23:1
**Labor** [3] - 40:8, 40:14, 47:11
**last** [7] - 5:21, 5:22, 13:24, 38:19, 39:21, 39:24, 46:13

**Law** [1] - 22:23
**law** [6] - 23:21, 24:1, 24:5, 24:13, 24:17, 30:17
**lawsuit** [6] - 4:6, 12:12, 15:2, 24:20, 26:14, 27:12
**leading** [1] - 30:21
**least** [2] - 13:15, 27:10
**leave** [22] - 8:12, 19:4, 34:22, 36:10, 37:9, 37:13, 37:23, 43:19, 43:20, 45:2, 45:14, 45:16, 45:17, 45:20, 45:23, 45:25, 46:3, 46:5, 46:9, 46:10, 50:14, 51:11
**Leave** [3] - 38:18, 46:16, 54:20
**legal** [2] - 24:14, 53:3
**level** [5] - 23:18, 26:5, 27:21, 27:22
**light** [1] - 4:11
**listed** [1] - 3:13
**litigation** [1] - 27:7
**LLP** [1] - 2:8
**loden.walker@ phelps.com** [1] - 2:11
**lodge** [1] - 53:20
**LOGAN** [1] - 2:8
**look** [13] - 9:5, 9:9, 10:25, 11:2, 11:3, 11:4, 17:2, 19:13, 21:18, 32:17, 36:25, 40:25, 41:2
**Look** [1] - 5:21
**looked** [1] - 11:4
**looking** [9] - 7:6, 9:16, 11:1, 15:15, 28:21, 30:10, 32:23, 43:2, 45:4
**looks** [1] - 24:17
**loud** [2] - 28:5, 28:9

### M

**ma'am** [5] - 22:21, 28:11, 35:25, 49:10
**mailed** [1] - 3:16
**major** [1] - 30:16
**March** [2] - 56:16, 56:18
**Marcus** [2] - 32:7, 33:13
**marked** [1] - 31:23
**matter** [6] - 7:13, 18:15, 23:21, 31:4, 40:15, 47:2
**matters** [2] - 4:7, 4:13

**mayor** [4] - 17:24, 19:19, 31:17, 37:22
**Mayor** [18] - 18:7, 18:10, 18:13, 18:19, 19:21, 20:6, 31:6, 31:8, 31:13, 31:14, 31:18, 31:19, 36:1, 36:3, 36:15, 37:17, 42:17
**Mayor's** [1] - 18:20
**MCMILLIAN** [1] - 1:3
**McMillian** [70] - 2:6, 4:5, 7:12, 7:18, 8:17, 8:20, 8:24, 9:1, 10:6, 10:14, 11:16, 11:21, 11:25, 12:7, 14:11, 14:13, 14:15, 14:16, 14:19, 14:24, 15:5, 16:7, 16:19, 18:24, 19:2, 19:8, 22:2, 26:11, 29:4, 29:10, 29:17, 29:18, 31:3, 31:9, 32:14, 33:5, 33:6, 33:7, 33:13, 33:14, 35:8, 36:9, 37:10, 37:12, 38:8, 40:16, 42:8, 42:9, 42:14, 42:20, 42:21, 42:22, 42:24, 43:20, 47:15, 48:11, 48:12, 49:18, 49:24, 50:4, 50:6, 50:11, 50:13, 50:21, 51:10, 52:15, 52:23, 53:7, 55:6
**McMillian's** [8] - 19:1, 19:3, 19:4, 19:6, 27:5, 35:18, 37:22, 53:23
**MDS** [1] - 23:21
**mean** [12] - 7:21, 12:12, 13:5, 27:1, 31:18, 42:13, 43:7, 47:13, 47:25, 51:4, 54:16
**means** [1] - 53:5
**Medical** [3] - 38:18, 46:16, 54:20
**medication** [1] - 4:25
**Meeting** [2] - 16:12, 16:17
**meeting** [27] - 7:7, 8:2, 8:22, 18:11, 18:14, 19:24, 20:7, 20:12, 21:3, 21:7, 21:13, 21:16, 32:21, 36:11, 36:19, 41:18, 42:18, 46:2, 47:23, 47:25, 48:1, 48:21, 53:25, 54:9, 54:11, 54:21
**meetings** [2] - 11:16,

46:5
**Melissa** [5] - 21:20, 34:10, 34:17, 48:12, 49:20
**melissa** [1] - 34:16
**member** [3] - 12:1, 12:25, 15:6
**members** [1] - 21:9
**memory** [3] - 7:11, 9:16, 28:1
**mentioned** [2] - 10:13, 29:25
**mentions** [1] - 19:18
**might** [2] - 9:12, 21:6
**mind** [2] - 5:6, 9:23
**mine** [1] - 9:23
**minute** [1] - 24:10
**minutes** [3] - 6:5, 7:4, 20:8
**misconduct** [3] - 24:15, 24:16, 30:15
**Miss** [1] - 34:16
**missed** [1] - 51:14
**Mississippi** [5] - 2:9, 22:8, 23:3, 56:4
**MISSISSIPPI** [2] - 1:1, 1:12
**moment** [1] - 48:3
**monetary** [1] - 56:14
**money** [2] - 14:11, 41:13
**Monroe** [2] - 5:13, 5:19
**month** [2] - 13:5, 14:2
**Moore** [7] - 9:12, 21:5, 21:20, 34:10, 34:17, 48:13, 49:20
**morning** [2] - 6:19, 6:20
**most** [1] - 44:17
**motion** [4] - 15:18, 15:24, 16:5, 16:10
**moved** [5] - 17:9, 19:22, 20:1, 47:19, 52:18
**MR** [30] - 4:3, 10:22, 12:3, 24:9, 25:14, 25:16, 25:18, 30:2, 37:19, 44:1, 44:4, 44:8, 47:7, 48:2, 48:4, 48:6, 48:23, 49:1, 49:4, 49:6, 49:11, 52:1, 52:3, 54:1, 55:1, 55:3, 55:14, 55:16, 55:17, 55:18
**MS** [2] - 1:23, 2:4
**Murphree** [1] - 5:25

### N

**name** [8] - 4:4, 10:16, 11:16, 11:18, 27:5, 33:21, 55:7
**named** [1] - 56:7
**names** [2] - 5:22
**Nay** [1] - 16:9
**Nay"** [1] - 16:14
**necessary** [3] - 8:6, 25:12, 30:16
**need** [4] - 4:19, 10:10, 38:5, 45:5
**needed** [2] - 8:10, 26:1
**needing** [1] - 46:23
**never** [2] - 10:14, 26:9
**next** [2] - 13:7, 15:16
**NO** [1] - 1:4
**NORTHERN** [1] - 1:1
**Notary** [2] - 56:3, 56:18
**NOTED** [1] - 1:16
**notes** [9] - 18:11, 18:21, 19:19, 20:11, 20:13, 20:14, 20:18, 20:23, 21:4
**nothing** [1] - 5:9
**notice** [1] - 21:25
**notified** [2] - 42:8, 42:10
**November** [11] - 13:2, 23:9, 36:2, 36:13, 37:13, 37:18, 42:10, 42:23, 51:13, 51:16, 51:21
**number** [11] - 10:16, 12:8, 27:5, 33:21, 43:23, 43:24, 43:25, 44:6, 45:6, 45:10, 55:5
**Number.................... ......** [1] - 3:3
**numerous** [4] - 33:7, 33:15, 33:16, 34:5

### O

**oath** [2] - 56:11, 56:12
**Objection** [1] - 54:1
**objection** [8] - 10:22, 25:2, 30:2, 37:19, 47:7, 48:23, 49:12, 53:20
**objections** [1] - 24:11
**obtain** [4] - 50:17, 50:21, 50:25, 51:3
**obvious** [1] - 45:21
**occasions** [5] - 33:7, 33:15, 33:16, 34:5,

34:11
**ODOM** [3] - 1:9, 3:2, 4:1
**Odom** [8] - 4:4, 15:21, 16:4, 16:6, 16:8, 16:13, 28:21, 52:4
**OF** [4] - 1:1, 1:5, 1:9, 3:1
**offense** [2] - 14:22, 26:2
**Okolona** [1] - 2:4
**ON** [1] - 1:12
**once** [4] - 27:12, 28:15, 34:1, 40:25
**one** [28] - 3:17, 4:10, 7:19, 11:18, 14:10, 23:22, 24:3, 24:6, 24:7, 24:11, 25:3, 25:5, 25:6, 25:8, 25:9, 25:21, 26:1, 26:2, 26:8, 28:10, 43:17, 46:13, 52:13, 55:7, 55:11
**ones** [2] - 3:13
**Opportunity** [4] - 43:6, 43:7, 43:15
**opposing** [2] - 53:1, 53:20
**Order** [2] - 32:7, 32:18
**otherwise** [1] - 56:14
**outcome** [1] - 56:14
**overtime** [6] - 41:8, 41:9, 41:11, 41:13, 41:14, 41:22
**own** [4] - 7:10, 7:11, 10:3, 28:1

## P

**p.m** [1] - 55:20
**P.O** [2] - 1:23, 2:3
**packet** [5] - 21:8, 21:11, 32:20, 35:4, 37:3
**PAGE** [1] - 3:2
**page** [6] - 15:14, 15:17, 43:24, 44:6, 45:4
**pages** [1] - 56:5
**paid** [3] - 18:24, 41:13, 53:10
**paper** [2] - 21:25, 41:15
**papers** [1] - 17:20
**par** [2] - 39:19, 40:11
**paragraph** [1] - 15:16
**paraphrasing** [1] - 53:6
**pardon** [1] - 13:10
**part** [3] - 18:7, 37:15,

43:17
**particular** [5] - 14:14, 14:20, 29:22, 41:14, 43:17
**passed** [2] - 11:9, 13:1
**past** [1] - 33:21
**pause** [1] - 24:10
**pay** [3] - 8:12, 8:14, 16:1
**pdf** [1] - 3:17
**people** [4] - 6:13, 41:9, 46:9, 53:4
**people's** [1] - 35:14
**period** [1] - 14:4
**person** [3] - 38:1, 38:3, 38:4
**personally** [1] - 50:10
**personnel** [1] - 7:13
**PHELPS** [1] - 2:8
**piece** [1] - 41:15
**place** [5] - 7:15, 7:17, 29:9, 29:12, 56:8
**placed** [1] - 56:10
**PLAINTIFF** [1] - 1:3
**Plaintiff** [2] - 2:2, 2:6
**point** [3] - 13:16, 17:22, 22:2
**policies** [2] - 23:6, 23:8
**Policy** [5] - 28:7, 28:14, 28:23, 29:1, 29:19
**policy** [15] - 23:14, 23:15, 23:16, 29:9, 30:16, 34:21, 35:10, 35:12, 39:2, 40:3, 40:10, 45:1, 45:13, 47:4, 47:12
**position** [1] - 11:10
**possession** [1] - 21:4
**pre** [1] - 31:23
**pre-marked** [1] - 31:23
**preliminary** [2] - 4:7, 4:13
**premarked** [4] - 3:13, 17:1, 28:4, 41:25
**prepare** [2] - 6:1, 6:3
**prepared** [3] - 18:10, 33:13, 43:3
**Present** [1] - 2:6
**present** [1] - 33:6
**presentation** [9] - 18:10, 18:21, 19:18, 19:20, 19:21, 19:25, 20:6, 20:10, 20:11
**presented** [1] - 22:23
**presently** [1] - 24:20
**preserved** [1] - 21:17
**previous** [1] - 29:24
**printout** [1] - 28:20

**problem** [1] - 8:8
**procedure** [3] - 36:2, 45:22, 45:24
**procedures** [2] - 27:21, 30:17
**proceedings** [2] - 56:7, 56:8
**Progressive** [5] - 28:6, 28:13, 28:23, 28:25, 29:19
**prohibit** [1] - 45:16
**provide** [2] - 21:21, 42:17
**provided** [9] - 19:11, 19:19, 21:1, 23:17, 24:2, 25:23, 26:4, 41:17
**Public** [2] - 56:4, 56:18
**public** [3] - 18:17, 21:17, 21:19
**punish** [1] - 8:6
**punishment** [5] - 8:4, 8:17, 8:22, 8:23, 11:25
**put** [3] - 3:17, 14:9, 16:23

## Q

**questions** [8] - 17:3, 43:9, 46:14, 50:4, 52:2, 52:5, 55:2, 55:15
**quite** [1] - 5:2
**quote/unquote** [1] - 24:16

## R

**rather** [1] - 43:8
**reached** [1] - 22:10
**read** [39] - 6:5, 7:1, 7:3, 7:5, 12:19, 15:12, 15:15, 17:18, 18:4, 18:6, 22:14, 22:15, 28:5, 28:8, 28:9, 28:14, 28:15, 28:16, 28:17, 30:10, 30:14, 33:3, 33:5, 35:7, 35:22, 36:1, 37:14, 42:4, 42:6, 42:8, 43:18, 43:22, 44:5, 45:1, 45:5, 45:7, 45:10, 45:13
**Read** [1] - 22:22
**reading** [6] - 15:18, 17:24, 26:3, 29:16, 32:4, 52:9
**ready** [1] - 6:20

**really** [4] - 5:9, 11:8, 13:1, 53:12
**reason** [6] - 14:14, 14:20, 19:13, 23:22, 29:22, 52:22
**reasonable** [2] - 23:18, 26:4
**receive** [5] - 22:3, 30:24, 41:9, 47:16, 48:13
**received** [1] - 23:16
**receiving** [3] - 41:11, 41:13, 41:22
**recollection** [2] - 7:10, 10:3
**recommend** [1] - 30:20
**record** [48] - 4:14, 4:16, 6:10, 7:5, 10:25, 12:5, 12:10, 15:14, 15:16, 17:13, 17:19, 18:5, 18:11, 20:5, 21:19, 22:15, 22:17, 23:25, 24:2, 24:6, 25:4, 28:22, 29:9, 29:16, 30:9, 30:11, 32:12, 33:4, 33:11, 33:14, 34:20, 35:6, 37:14, 42:4, 42:7, 43:14, 43:18, 43:22, 44:6, 44:13, 45:5, 45:11, 48:1, 48:7, 48:11, 49:3, 49:5, 55:10
**recorded** [1] - 56:8
**records** [14] - 20:11, 20:13, 20:14, 20:23, 21:1, 21:4, 21:6, 21:21, 25:8, 25:23, 25:25, 34:6, 34:11, 34:17
**Recuse** [1] - 15:23
**REDDICK** [14] - 2:2, 4:3, 12:3, 25:16, 44:4, 48:2, 48:6, 49:1, 49:6, 52:1, 54:1, 55:3, 55:14, 55:17
**Reddick** [14] - 3:16, 4:5, 10:24, 12:14, 24:9, 24:23, 25:22, 30:4, 37:21, 44:12, 47:9, 48:10, 49:9, 49:13
**Reddick............** [1] - 3:8
**Reddick...................** [1] - 3:6
**reddicklawfirm@ yahoo.com** [1] - 2:5

**refer** [1] - 45:12
**reference** [67] - 6:8, 7:12, 7:25, 8:3, 8:16, 8:18, 10:5, 10:12, 10:13, 10:20, 11:15, 11:23, 14:9, 14:12, 15:4, 16:19, 19:12, 19:17, 19:23, 20:9, 20:10, 21:7, 26:9, 26:10, 26:12, 27:7, 27:8, 27:10, 27:12, 27:15, 27:17, 29:13, 31:3, 31:4, 31:15, 32:2, 32:7, 33:13, 33:18, 34:15, 38:1, 38:5, 38:10, 38:17, 39:17, 40:15, 41:8, 41:10, 41:21, 42:14, 43:8, 43:15, 46:1, 46:15, 46:21, 46:22, 47:2, 47:10, 47:17, 48:11, 50:4, 50:13, 50:17, 50:22, 51:10, 55:4
**referred** [2] - 3:14, 33:20
**referring** [1] - 7:16
**reflection** [2] - 16:15, 45:18
**refresh** [1] - 12:11
**refused** [1] - 33:7
**regards** [1] - 8:4
**regulations** [1] - 29:6
**reinforcing** [1] - 53:13
**rejecting** [1] - 45:20
**related** [1] - 24:19
**relations** [1] - 45:19
**relatives** [3] - 5:13, 5:18
**relevant** [2] - 45:19, 54:3
**remember** [40] - 7:6, 7:24, 8:1, 8:12, 8:14, 8:17, 9:13, 10:4, 11:7, 11:24, 12:2, 12:18, 13:4, 13:14, 14:2, 14:24, 15:1, 15:5, 15:7, 17:21, 19:19, 19:24, 20:6, 20:18, 21:11, 22:4, 27:24, 27:25, 33:25, 40:13, 40:18, 40:20, 40:21, 41:14, 46:8, 46:9, 47:3, 47:14
**remembered** [1] - 15:2
**rephrase** [1] - 4:22
**report** [1] - 23:9
**Report** [1] - 33:12
**Reported** [1] - 1:22
**Reporter** [1] - 56:3

**reporter** [4] - 3:17, 4:13, 4:15, 17:14
**Reporter's** [1] - 3:10
**represent** [4] - 4:5, 32:6, 53:18, 53:21
**Representing** [2] - 2:2, 2:7
**request** [4] - 23:12, 37:9, 45:20, 45:21
**requesting** [2] - 45:23, 46:12
**rerun** [1] - 14:5
**reside** [3] - 5:13, 5:19, 5:24
**residence** [2] - 5:14, 5:16
**respective** [1] - 45:23
**responded** [1] - 53:5
**response** [7] - 43:21, 43:23, 45:3, 45:6, 45:7, 45:10, 45:11
**RESPONSE** [1] - 45:15
**rest** [1] - 12:4
**retained** [1] - 3:16
**retaliate** [1] - 51:20
**retaliated** [3] - 50:6, 50:10, 51:15
**review** [13] - 11:7, 17:5, 18:22, 28:20, 32:1, 33:2, 35:4, 37:3, 40:25, 41:4, 42:2, 43:13, 46:20
**roll** [4] - 15:20, 16:3, 16:7, 16:12
**rules** [1] - 29:6
**run** [1] - 14:7

## S

**Scott** [22] - 9:12, 18:7, 18:10, 19:21, 20:6, 21:2, 21:24, 31:6, 31:8, 31:13, 31:14, 31:18, 31:19, 36:1, 36:4, 36:15, 36:16, 37:17, 38:4, 41:17, 42:17, 48:18
**seal** [1] - 56:15
**seconded** [4] - 15:19, 15:25, 16:6, 16:11
**section** [7] - 22:17, 28:8, 28:18, 30:11, 30:12, 30:13, 33:3
**Security** [1] - 22:9
**see** [4] - 18:1, 43:10, 46:17
**seeing** [1] - 41:14
**Sentencing** [2] - 32:7, 32:17

**September** [9] - 12:21, 23:1, 49:22, 50:15, 50:22, 51:4, 51:11, 51:12
**serious** [1] - 30:14
**session** [3] - 7:14, 18:18, 18:19
**Session** [1] - 15:20
**set** [2] - 22:10, 22:11
**seven** [1] - 48:25
**Shea** [1] - 6:14
**sheet** [1] - 19:3
**show** [6] - 6:9, 22:13, 31:22, 34:25, 41:24, 46:13
**showed** [3] - 9:6, 25:4, 25:8
**shows** [1] - 37:12
**sic** [2] - 30:23, 45:18
**sick** [6] - 34:23, 35:8, 35:14, 36:10, 38:11
**side** [8] - 17:9, 19:22, 20:1, 47:19
**sign** [1] - 33:8
**signed** [1] - 37:10
**sitting** [1] - 53:19
**situation** [1] - 8:18
**skill** [1] - 56:9
**Smith** [1] - 5:23
**someone** [2] - 29:15, 46:22
**sorry** [1] - 17:11
**speaking** [1] - 45:23
**specific** [2] - 27:3, 27:4
**specifically** [2] - 10:17, 45:22
**specifics** [1] - 15:3
**speculation** [1] - 24:12
**standard** [1] - 40:4
**standards** [2] - 39:13, 40:11
**start** [2] - 13:4, 17:25
**started** [2] - 6:9, 13:5
**starting** [1] - 15:16
**starts** [1] - 17:23
**State** [1] - 56:4
**state** [11] - 5:12, 8:21, 12:5, 15:13, 17:12, 25:1, 34:21, 35:5, 37:7, 55:10
**statement** [4] - 35:1, 35:21, 35:22, 42:13
**STATES** [1] - 1:1
**states** [4] - 28:22, 29:13, 33:14, 35:22
**stating** [3] - 12:9, 24:2, 47:11
**stealing** [3] - 14:13,

14:19, 23:5
**steps** [1] - 29:14
**still** [2] - 44:2, 54:12
**STREET** [1] - 1:11
**strictly** [1] - 12:17
**strike** [4] - 23:24, 31:18, 38:14, 43:4
**striking** [1] - 44:9
**stuff** [4] - 7:1, 15:1, 27:20, 40:18
**Style** [1] - 3:3
**Suite** [1] - 2:9
**summer** [3] - 13:9, 13:12, 13:13
**summertime** [1] - 13:8
**summons** [1] - 12:13
**supervised** [1] - 18:22
**supervisor** [2] - 18:8, 42:11
**supposed** [1] - 27:21
**surgery** [6] - 47:18, 48:14, 49:21, 50:14, 50:23, 51:12
**surnames** [1] - 5:22
**surprise** [1] - 39:25
**suspend** [2] - 15:25, 30:19
**suspended** [5] - 16:20, 24:3, 24:7, 25:6, 30:24
**suspending** [1] - 11:24
**suspension** [4] - 8:14, 23:16, 30:22, 30:25
**sworn** [1] - 4:2
**system** [1] - 23:11

## T

**TABLE** [1] - 3:1
**Table** [1] - 3:5
**TAKEN** [1] - 1:11
**TAYLOR** [1] - 1:23
**technical** [1] - 45:21
**Telecopier** [2] - 2:5, 2:10
**Telephone** [2] - 2:4, 2:10
**tendered** [11] - 11:6, 17:4, 28:19, 31:25, 33:1, 35:3, 37:2, 41:3, 42:1, 43:12, 46:19
**term** [4] - 13:3, 14:4, 24:15, 53:3
**terminate** [3] - 16:6, 42:24, 49:23
**terminated** [18] - 9:2, 14:14, 14:16, 14:21, 16:20, 22:2, 23:23,

24:4, 24:8, 25:5, 25:11, 27:18, 29:4, 29:10, 29:15, 29:18, 31:5, 55:6
**terminating** [4] - 49:24, 52:15, 52:22, 53:14
**termination** [5] - 19:6, 23:5, 25:10, 30:20, 35:18
**testified** [3] - 4:2, 52:13, 53:22
**testimony** [3] - 22:22, 39:6, 52:12
**THE** [4] - 1:1, 1:1, 1:5, 1:11
**thinking** [2] - 12:15, 24:13
**thorough** [1] - 21:24
**three** [4] - 8:12, 16:1, 16:20, 23:16
**three-day** [1] - 23:16
**timekeeping** [2] - 23:8, 23:11
**today** [8] - 5:1, 5:4, 6:1, 6:3, 6:4, 6:16, 40:2, 54:15
**took** [2] - 7:17
**transcribed** [1] - 17:13
**transcript** [2] - 52:9, 56:6
**transfer** [1] - 46:3
**transpired** [4] - 7:7, 7:11, 16:16, 29:17
**tried** [7] - 22:3, 47:16, 50:21, 51:2, 51:11, 51:12
**Triron** [7] - 7:18, 8:20, 14:12, 16:1, 19:2, 35:7, 35:8
**trouble** [9] - 10:14, 10:15, 26:9, 26:13, 26:17, 26:19, 27:1
**true** [1] - 56:6
**truth** [2] - 5:8, 56:11
**try** [1] - 48:13
**trying** [15] - 15:9, 37:12, 38:20, 40:22, 41:9, 45:12, 49:20, 50:14, 50:16, 50:17, 50:24, 51:3, 51:7, 51:15, 51:20
**Tuesday** [2] - 13:7, 21:16
**twice** [1] - 34:1
**two** [3] - 6:15, 25:7, 40:5
**type** [2] - 11:25, 41:21

## U

**U.S** [2] - 40:8, 40:14
**unanimously** [1] - 18:15
**under** [2] - 56:10, 56:12
**underneath** [1] - 35:22
**unearned** [1] - 18:25
**unemployment** [2] - 22:4, 24:18
**UNITED** [1] - 1:1
**unless** [1] - 31:1
**up** [23] - 10:16, 11:16, 11:18, 14:23, 30:21, 32:24, 33:8, 33:21, 33:25, 38:17, 39:6, 39:7, 39:12, 39:19, 40:3, 40:11, 46:14, 52:18, 53:24, 54:8, 54:20, 55:8
**upcoming** [2] - 18:11, 20:12
**update** [1] - 38:20
**updated** [2] - 39:22, 39:25
**US** [1] - 47:10

## V

**VALERA** [1] - 1:22
**Valera** [2] - 56:3, 56:17
**valeraknight@gmail. com** [1] - 1:24
**violated** [2] - 23:8, 23:16
**violation** [3] - 19:7, 23:14, 30:17
**vote** [5] - 8:13, 15:20, 16:7, 16:12, 52:14
**voted** [13] - 15:22, 16:4, 16:9, 16:14, 18:15, 18:17, 25:25, 52:22, 53:14
**VS** [1] - 1:4

## W

**Wage** [3] - 40:8, 40:14, 47:11
**Walker** [1] - 54:5
**WALKER** [18] - 2:8, 10:22, 24:9, 25:14, 25:18, 30:2, 37:19, 44:1, 44:8, 47:7, 48:4, 48:23, 49:4, 49:11, 52:3, 55:1, 55:16, 55:18

**Walker.....................**
[1] - 3:7
**Walter** [5] - 19:15, 43:3, 43:4, 43:5, 43:6
**warned** [2] - 33:7, 33:15
**Water** [1] - 23:2
**week** [2] - 6:16, 42:11
**WEST** [1] - 1:11
**whatnot** [3] - 8:21, 33:15, 43:19
**whole** [1] - 29:5
**witness** [11] - 11:6, 17:4, 28:19, 31:25, 33:1, 35:3, 37:2, 41:3, 42:1, 43:12, 46:19
**Witness** [1] - 56:15
**words** [1] - 54:19
**worker** [3] - 23:10, 23:11, 23:15
**workers** [1] - 45:17
**write** [1] - 33:8
**written** [2] - 21:25, 37:15
**wrote** [1] - 32:24

## Y

**years** [2] - 38:20, 40:5
**yesterday** [3] - 6:23, 53:19, 53:22
**yonder** [1] - 40:18
**younger** [1] - 9:23
**yourself** [4] - 6:2, 28:15, 50:10, 51:18

## Z

**Zinn** [5] - 19:14, 19:15, 43:3, 43:5, 43:6