IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION


BARRY MCMILLIAN                                          PLAINTIFF

VS.                          CIVIL ACTION NO. 1:24-CV-199-GHD-RP

CITY OF ABERDEEN                                         DEFENDANT


*********************************************************

DEPOSITION OF BARRY McMILLIAN

*********************************************************


TAKEN AT THE INSTANCE OF THE PLAINTIFF
AT THE ABERDEEN CITY HALL, 125 WEST COMMERCE STREET,
ABERDEEN, MISSISSIPPI,
ON MARCH 31, 2026, BEGINNING AT 11:09 A.M.


GENA MATTISON GLENN, MS CSR 1568, TN LCR 884
Glenn-Henry Reporting
Post Office Box 492
Amory, Mississippi  38821-0492
gena.glenn@gmail.com
(662) 315-2613

Exhibit E

APPEARANCES:

DEMOREO REDDICK
        P.O. Box 465
        Okolona, MS  38860
        For the Plaintiff

PHELPS DUNBAR
        P.O. Box 320159
        Flowood, MS  39232
        For the Defendant
        BY:  LODEN P. WALKER

Reported by:  GENA MATTISON GLENN,
              MS CSR 1568, TN LCR 884 4

TABLE OF CONTENTS

WITNESS                                                      PAGE

BARRY McMILLIAN
Examination by Mr. Loden P. Walker                            4
Examination by Mr. Demoreo Reddick                           107


EXHIBIT
  NO.   DESCRIPTION                                          PAGE

   A    Motion to Proceed in Forma Pauperis and
        Supporting Affidavit                                 23

   B    Order Denying Motion to Vacate Judgment              24

   C    Plaintiff's Responses to Defendant's First
        Set of Interrogatories and Requests for
        Production of Documents                              28

   D    Amended Complaint                                    67

BARRY McMILLIAN,

being first duly sworn, was examined

and testified under oath as follows:


EXAMINATION

BY MR. WALKER:

Q.   Good morning.

A.   Good morning.

Q.   Is it okay if I call you Barry?

A.   Yes, sir.

Q.   And the reason I -- usually I would use your last name, but just because your brother Johnny works here, just to kind of keep it clear --

A.   Yes, sir.

Q.   -- I'm just saying Barry.

A.   Yes, sir.

Q.   As you know, I'm one of the attorneys that represents the City of Aberdeen in this case that you filed a lawsuit against, and we're here today just to talk about the facts of the case.  I'm really just trying to figure out what you agree with me on, what you disagree with me on, and where there are things that I may not know, things that you know or you don't know.

A.   Yes, sir.

Q.   It's really just a fact-finding --

A.   Okay.

Q.   -- opportunity.  And the reason these things are important for us attorneys, as you've probably picked up on now because you've been sitting in on them, this is kind of just our one shot.  You know, it's our one shot that we get to ask you questions, you know, in person before trial should this case go to trial.

A.   Uh-huh.

Q.   Other than that, it's just kind of all through the attorneys and through documents and written stuff.

A.   Uh-huh.

Q.   So it can be kind of confusing.

A.   Okay.

Q.   You'll notice -- and we'll just -- I'll just -- let me ask:  Have you been deposed before?

A.   I have.

Q.   Okay.  So I'm -- you're probably familiar with all these rules, but just so, I guess, we're clear --

A.   Yes, sir.

Q. -- I'll just briefly go over just a few instructions. And the first is, you'll know we have a court reporter.

A. Yes, sir.

Q. She's typing down everything that we say. She's got the toughest job in here --

A. Yes.

Q. -- out of everybody. And so once we get going, it's pretty normal for people in human conversations to say things like "uh-huh" or "nuh-uh" or they nod their head or not to verbally respond. If I stop you and I'm like "is that a yes" or "is that a no," it's not to make you mad.

A. No. Yes.

Q. It's not to irritate you. It's just so --

A. The court reporter.

Q. -- to help the court reporter out, and so when we go back and read the record, we understand what's going on.

At the same time, I'll try not to talk over you. I'm kind of a fast talker. It's something I try to think about and not do. And just try to give me a chance to finish a

question before you give an answer.  And, again, that's just to help out the court reporter because she can really only take down one person at a time.

A.  Yes, sir.

Q.  If at any time you want to take a break, again, we can take a bathroom break.  Or if you just want to take five minutes so you can go outside because it can be kind of hot in here --

A.  It is hot.

Q.  -- I'll give you that too.  The only thing I would ask is if there's just like a question that's been asked, I would ask that you just answer it.  But then immediately after you answer it, we can break.

A.  Okay.

Q.  I'm not trying to, like, chain you to that chair or something.

A.  Okay.

Q.  Okay?  Your attorney may at times object.  And --

MR. WALKER:  Do you want to do just object to the form of the questions?

MR. REDDICK:  Say that again?

MR. WALKER:  Do you want to stipulate to the form of the question?

MR. REDDICK:  That's usually what I say, just objection to form.

MR. WALKER:  Okay.

MR. REDDICK:  Yeah, that's what --

BY MR. WALKER:

Q.  You may hear your attorney say "object to the form" or "objection."  He's making a record so when we go back and read it he can -- he's got a note to where he objected to -- I probably asked a bad question.  You can still answer those.  The only time you don't is if Moreo says, Hey, don't answer that question, don't answer it.  Otherwise, you can -- if he objects you can still answer.

A.  Okay.

Q.  I also want you to know that none of the questions that I've prepared or have are meant to embarrass you.  They're not meant to humiliate you, to threaten you, or to scare you or anything like that.  These are really just questions that I feel like I have to ask you to represent the city.

A.  Yes, sir.

GENA MATTISON GLENN, gena.glenn@gmail.com

Q.  All right?  And if at any time, you know, you don't understand a question I'm asking, you can say, hey, you know, Loden, that's not a good question; or, I don't understand what you're saying, would you mind rephrasing it.  I'm happy to do that because that's going to happen as well.

A.  Okay.

Q.  All right.  Lastly, have you taken any drugs or alcohol or anything that would impede your ability to give truthful testimony today?

A.  No, sir.

Q.  Did you review any documents or other information to prepare for today's deposition?

A.  Yes, sir.

Q.  All right.  What kind of documents have you reviewed?

A.  Just basically what my attorney sent over to me.  Them documents.

Q.  Is it like a complaint?

A.  Yes, sir.  Basically, like, what the FMLA, labor and wage sent over and stuff like that.

Q.  Okay.

A.  And my -- I looked over my complaints

from the EEOC which I filed back in 2023.

Q.   Okay.  Anything else?

A.   No, sir.

Q.   Other than talking to your attorney, and I don't want to know what you said to your attorney, but have you talked to anybody else about preparing for today's deposition?

A.   Yes.  My fiancée, I was telling her about it, but not discussed.  She was inside the house when I was going over the documents.

Q.   Just, like, giving her a heads up that this is where you're going to be at today?

A.   Yeah.  This today, so no one try to call me or anything like that.

Q.   If she calls we can pause.  You can take it if you need to.  I know I'd probably be in hot water as well.

What's is your fiancée's name?

A.   Jennifer --

Q.   Jennifer.

A.   -- Barksdale, B-A-R-K-S-D-A-L-E.

Q.   All right.  We're going to start with just some background stuff, and once we get through the background hopefully that's about half of it, or maybe a little less than half.

GENA MATTISON GLENN, gena.glenn@gmail.com

And then we'll pivot more to the facts of the case and things like that.

Just tell me where you were born.

A.   Aberdeen, Mississippi at Monroe Region [sic] Hospital.

Q.   Okay.  Are you raised -- born and raised in Aberdeen?

A.   Born and raised in Aberdeen.  All 49 years of my life in Aberdeen.

Q.   All right.  And then you mentioned you have a fiancée.  Do you have any previous marriages?

A.   Yes.  I've been married twice.  The first marriage was Shaune Raye.

Q.   Shaune --

A.   S-H-A-U-N-E R-A-Y-E Pulliam, P-U-L-L-I-A-M.  My second marriage was Loistein -- Loistein is L-O-I-S-T-E-I-N Baker [sic], B-A-R-K-E-R.

Q.   And if you know -- you may not; you may not be in contact with them at all or know anything.  But are they still around Monroe County or north Mississippi?

A.   Yes, sir.

Q.   They are?  Okay.  Do you have any

Case: 1:24-cv-00199-GHD-RP Doc #: 114-5 Filed: 06/05/26 12 of 125 PageID #: 715

12

children?

A. Yes, sir, I have seven.

Q. Okay. Just start with -- what are their ages? And I know --

A. 28 to 12.

Q. -- it's seven, so.

A. Are you ready?

Q. I'm ready.

A. I got Lequavise, L-E-Q-U-A-V-I-S-E, McMillian.

Q. And let me interrupt. I'm sorry.

A. I'm sorry.

Q. Before you -- if they're under age, I guess, just so we don't have to go in and redact, just, the ones that are above 18, do they live in north Mississippi?

A. Yes, ma'am -- yes, sir.

Q. What are their names, the ones that are above -- 18 or above?

A. I just have two then.

Q. Okay.

A. Layken, L-A-Y-K-E-N, McMillian. The other one is Lequavise, the first one I gave, and Lakenzie, L-A-K-E-N-Z-I-E, McMillian.

Q. Okay. Now, the McMillian last name?

GENA MATTISON GLENN, gena.glenn@gmail.com

A.   Yes, ma'am -- yes, sir.  Yes, sir.

Q.   Other than your fiancée and your kids, do you have any other family members, and I'll say immediate, like, parents or siblings, brothers, sisters?  I know Johnny --

A.   Yes, sir.

Q.   -- is here.  I think your sister worked for the city.

A.   Yes.

Q.   Any other family members that live in north Mississippi?

A.   We're kin to the Strongs.

Q.   Is that S-T-R-A-W-N?

A.   S-T-R-O-N-G.

Q.   Strong, okay.

A.   Strong.

Q.   I'm sorry.  Okay.

A.   Yes, sir.

Q.   Any others?

A.   And the Walkers.

Q.   Walkers.

A.   Yes, sir.

Q.   Okay.  That's a good last name. What's your current residential address?

A.   905 High Extension, Aberdeen,

Mississippi 39730.

Q. Okay. Is that a home that you've lived in for the past five years?

A. Yes, sir, I own it.

Q. Okay.

A. The home, yes, sir.

Q. All right. And then what are your last four digits of your social?

A. 1641.

Q. Have you posted anything on any social media site, Facebook, Instagram, Snapchat -- I'm trying to think what other social media sites are -- about this lawsuit?

A. No, sir.

Q. No posts about the lawsuit?

A. No, sir.

Q. Have you sent any e-mails -- and I'll try and make this narrow, because I know you've got that EEOC stuff which I know you communicate with e-mail on that, and then you talked to your attorney, I'm sure, by phone and text and e-mail. But people who aren't, like, the EEOC or your attorney, have you e-mailed anybody else about this case?

A. No, sir. Just the only people was the

EEOC I dealt with sending e-mails out to.

Q. Okay. I know you've produced a few audio recordings. Have you produced all of them to your attorney, all the audio recordings that would relate to the facts of this case?

A. Yes, sir.

Q. There was mention about Mayor Scott -- you meeting with Mayor Scott and Melissa and Marcus Collins briefly. Do you remember Melissa saying that earlier?

A. Yes, sir. At the time when she was talking about when I met with her, that was between Charles Scott and her. Mark Collins was never in the meeting on that.

Q. The one with you?

A. Yes, sir.

Q. So it was just y'all three?

A. Just us three.

Q. Okay. Do you remember the date of that meeting?

A. It wasn't -- it wasn't even in November when that meeting was going on. When her and Mr. Scott, Charles Scott, met with me that day right there, they wanted me to -- something was going on with my daughter car.

They were saying about me stealing some gas at the time when we met.

And so Mayor Scott had told me, he said, I'm going to record you. And I'm like, Record me for what? And he said, I just want for clarity for myself, I can go back and listen to it. I said, I'm going to record myself and stuff like that. He said, No, no, it's just going to be one recording.

So I ended up calling my attorney, Mr. Reddick, and let him know what Mayor Scott doing. He said, Hey, man, if I was you I would just walk off if he won't let you record it. So that what I end up doing, walking out the meeting.

Q. Do you remember the date, though, when that meeting was? I know you said it wasn't November. Was it December?

A. Oh, it was, like -- like, early October or something. I can't really recall what date exactly. But what she was talking about right then and there, that was two different meetings.

Q. Okay. So you don't recall meeting with Mayor Scott in late November?

A.   No, sir.  I got a letter from the city, told me that Mayor Scott wanted to see me. I ended up coming to the city hall, and they end up giving me the letter telling me that I need to come to the board meeting.

And what -- I never did meet with Charles Scott dealing with this or clocking in or nothing like that.

Q.   Did you record -- did you record any of that meeting?

A.   No, sir, because they just told -- sending me up to the city hall.  When I got to the city hall they end up giving me the letter telling me that I had to come to the board meeting, which would have been December the 5th. I got the letter December the 4th of 2023.

Q.   That earlier meeting, though, did you record that one?

A.   Earlier?

Q.   The one -- the meeting you said that, like, it didn't last very long and Demoreo advised you, I'd just leave.

A.   He wouldn't let me record.

Q.   Okay.  So --

A.   So I stopped.

GENA MATTISON GLENN, gena.glenn@gmail.com

Q.   -- you didn't record?

A.   No, sir.  Charles Scott wouldn't let me record.

Q.   All right.  Do you recall -- I'll just represent to you, I guess, that Alderman Haynes -- do you know who that is?

A.   Yes, sir, I do.

Q.   He informed me that you approached him when he was at a table at a restaurant sometime after you filed this lawsuit, and that you recorded that conversation.  Do you know if you have a recording that relates to any of that?

A.   No, sir.

Q.   Okay.  Do you recall going up to him sitting at a table at a restaurant?

A.    It was his wife's birthday.  She -- me and her used to work together at Aberdeen school.  She invited me on -- to come to her birthday.  So I was there and everything like that.

So we was inside the Mexican restaurant.  All right.  It was like -- it was an area like this right here.  So I was sitting at the table right here, and what's his name was behind me at the table sitting over there,

because -- Edward Haynes was behind me at the table.

Just generally me and him just coming up striking up with a conversation, I know him. I've been down this road. I know me and him did not discuss anything about that. I did not record him or anything. It was like, I hate -- I wanted --

I got a picture and -- on my Facebook page where Edward Haynes was running for alderman. I ended up getting a rental vehicle, going around the community and people taking them to the pole. I wanted to help Mr. Haynes get in that position.

Q. My --

A. It was --

Q. I didn't mean to cut you off. You can finish.

A. No, that's it.

Q. And I guess what I gathered from some of this case is that you have a pretty good relationship with Alderman Haynes, at least -- I don't know how it is now, but whenever you started working here, y'all had a pretty good relationship?

A. We was.

Q. Did he recommend your hire? Like, when you got hired here, was he the one that was kind of, You should come work for the city?

A. Yes, sir.

Q. He was. Are y'all related?

A. No, sir, we're not.

Q. Okay. All right. Aside from this lawsuit, I know you've filed other lawsuits.

A. Yes, sir.

Q. So I'll just mention a few of them just for the record just to try to make this short. I saw that there was one -- I think this is Monroe County Circuit Court -- like, First Metropolitan Financial Services, Inc. versus McMillian, and there was, like, a February 21st, 2025, order requiring you to pay some sort of fees. Do you know anything about that?

A. Yes, sir. First Metropolitan sent a check out in the mailbox, and someone ended up cashing the check in Tupelo and everything. So it was not my handwriting. I didn't investigate it. I ended up getting Demoreo to represent me on that. I was never -- my Social was never on the back of the check, driver's license, or

anything after we did the investigation, so I ended up going to court about that issue.

Q. Okay. What is First Metropolitan? Was it like an employer?

A. No, sir. It's like a little -- how do you -- like a --

Q. Like a loan --

A. Loan department --

Q. -- officer?

A. Loan or something. They send out little checks to little moms-and-pop little places. They send out checks and you can cash them and go back and pay them.

Q. Okay. Were you -- that case, were you required to pay back that money?

A. No, sir.

Q. All right. Let me hand you a document.

A. All right.

MR. WALKER: Go ahead and mark this as an exhibit, if you don't mind.

THE REPORTER: 24? Is that --

MR. WALKER: Can we start over? Are you okay with that, if I do different exhibits? Like, do 1 just for my

deposition?

MR. REDDICK:  Well, I guess, can you name it P-1 or -- I mean, not P-1 but D-1 just -- how are you numbering, just -- use just --

MR. WALKER:  I mean, it doesn't matter to me how we do it.  We can do letters if you want.

MR. REDDICK:  Yeah, I just want to make sure because I -- since it was continuing, that -- I don't know.

Okay.  We're on what, number 24?

THE REPORTER:  24.

(Off record.)

MR. REDDICK:  I mean, you -- if you want them to start over, you can.  I just want -- I just want to keep it continuous just so we can know what everything is for all the depositions and they all stay the same.  That's what I was thinking.  But if you want them to start over, you can.

MR. WALKER:  If you don't mind.

MR. REDDICK:  Yeah, that's fine.

MR. WALKER:  Do you want me to do letters?

MR. REDDICK:  Yeah, that would be fine, to just differentiate between the two.

MR. WALKER:  All right.  Mark that one as Exhibit A.

- - - - -

(Exhibit A marked.)

BY MR. WALKER:

Q.  I'll hand it to you.  I'll just give you a second to look at it real quick.

A.  Okay.

Q.  Just tell me when you're done.

A.  (Witness reviews document.)  Yes, sir.

Q.  All right.  So just -- I guess just to represent to you, this is a Motion to Proceed in Forma Paupers that was filed in that First Metropolitan case we were talking about earlier. And I really just wanted to ask you about the court denied this, and I had written down that it was saying that the court called into question during -- your indigency, which is like a fancy word for saying, like, your lack of income, your lack of money.  It wasn't only called in question but was proven false.  I just

didn't know if you could provide any more details about what was going on there.

A.   I know we filed it in Lee County, but I cannot recall what that -- exactly what the outcome of it, but I know I didn't end up having to pay any money on it.

Q.   You don't recall -- I'm sorry, say that again?

A.   I do not recall paying any money on -- on this case right here.

Q.   Okay.  So you haven't paid any money?

A.   No, sir.

Q.   Okay.

MR. WALKER:  Let's mark this as Exhibit B real quick.  Just -- I probably should have handed this one to you first.

- - - - -

(Exhibit B marked.)

BY MR. WALKER:

Q.   All right.  And this is an order denying a motion to vacate judgment.  But really, what I was talking about earlier, I should have given this to you first.  It's on that -- on the very last page, on page 7, in

GENA MATTISON GLENN, gena.glenn@gmail.com

that first full paragraph, it just mentions that this court does hereby find that McMillian is not indigent and thus has 60 days to pay the filing fees for this matter as his affidavit of indigency was not only called into question at the hearing of this matter but was proven to be false, if that refreshes your memory about what was proven false.

A. We ended up appealing the decision on this matter. I can't recall.

Q. Okay. And I won't -- I'm not trying to hide the ball here. The reason I'm asking is just -- are there any outstanding costs related to this that haven't been paid that you know of?

A. Not that I know of.

Q. Okay. All right. Then you've got the McMillian versus City of Aberdeen and Aberdeen School District, that case.

A. Yes.

Q. And that one ended in your favor, right?

A. Yes, it did.

Q. Jury trial?

A. Yes, it did.

Q. Okay. There's another case that's

against the City and I think the school district -- correct me if I'm wrong here -- but it's about towing your vehicle?

A. Yes, sir. I was at a football game, and I had Officer Johnson end up towing my vehicle. Me and him had some run-ins, and so I ended up suing for the money for my towing and everything. And I appealed it and -- and that decision.

Q. What was the outcome of the case?

A. It's still an ongoing issue.

Q. From the appeal?

A. Yes, sir.

Q. Okay. Yeah. I do have the order. It looked -- it was dismissed, though, at the circuit court, and then y'all -- you appealed the dismissal?

A. Yes, sir.

Q. Does that sound right?

A. Yes, sir.

Q. Okay. Other than those cases and then this one and then I know you filed one about when you were hired at the city, are there any other cases that are still going on right now?

A. The one you say where I hired with the

city, would that be that 1-9 -- 1-9-8 or -- with the electric department?

Q. Yeah.

A. Yes, sir.

Q. Any other outstanding cases?

A. No, sir.

Q. Okay. Has anyone filed a legal action against you? Have you been a defendant? And I know that First Metropolitan case is one of them, but any others than that?

A. Not that I can recall.

Q. Have you ever declared bankruptcy?

A. Never.

Q. Okay. Other than those cases we just discussed, have you ever participated in a lawsuit --

A. No.

Q. -- or served on a jury?

A. No, sir, I never have. I've been summoned. But every time it's time for me to go, they always told me I didn't have to come.

Q. Or served as, like, a witness?

A. A witness. And then one time I had -- Circuit Court called me over and then I went, and they told me I wasn't going to be serving as

a jury or on the stand or anything like that.

Q. The one that you were called as a witness where you said you weren't -- ended up -- you never were actually called to the stand?

A. No. He ended up pleading guilty on the charge and did a lesser charge on it.

Q. It was criminal?

A. Yes, sir.

Q. All right. Let's switch to your employment history. And if I'll hand you your interrogatory responses, that probably will help.

Okay. All right. Give it back to me real quick. Sorry.

A. Okay. I'm sorry.

MR. WALKER: We'll mark it as an exhibit. This will be C.

BY MR. WALKER:

Q. That's not your fault; it's me.

- - - - -

(Exhibit C marked.)

BY MR. WALKER:

Q. Okay. The pages aren't numbered, but it's page 17 is the one I want to start with.

Let's see.  It's interrogatory number 17.  Or I should probably ask first:  Have you seen this document before, or is this -- does this look familiar to you?

A.   (Witness reviews document.)  Yes, sir.

Q.   Okay.  These are interrogatory responses.  An interrogatory is just a lawyer's word for written question and answer.  And so we sent on behalf of the City a bunch of written questions to Moreo for him to answer on your behalf, and this is what we received back from Moreo.

A.   Okay.

Q.   All right.  Interrogatory number 17 asked about your work history.  And so it has -- if you need to refer to this, you can.  But I really just want to go down the line here and work our way backwards.

A.   Okay.

Q.   I guess we'll start at the most recent.  It says that you're presently employed at the Columbus Municipal School District or with Columbus Municipal School District?

A.   Yes, sir, I am.

Q.   I guess you're wearing CMSD?

A. Yes, sir. Yes, sir. Yes, sir.

Q. All right. And are you a bus driver?

A. Yes, sir, a bus driver and a mechanic.

Q. Okay. What is your rate of pay?

A. Bus driver, I make 20 -- like 24.81. And a mechanic, 13.41.

Q. Okay. Are they full-time positions?

A. Both of them is full-time position.

Q. All right. Do you recall -- I know I'm testing your memory here a little bit, but do you recall when you started with the school district, the municipal school district?

A. I got terminated December the 5th of 2023. Six months later I got hired. So it would be, like, roughly June of 2024 I got hired with CMSD.

Q. Okay. And then who is your supervisor over there?

A. At the time I got hired it was Michael Love.

Q. Okay.

A. L-O-V-E.

Q. Has that changed?

A. Yes, sir. He retired back there December of 2025, and they got a new one in

there now.  Her name is Geneva Summerville.

Q.  Okay.  And then whenever you were initially brought on in June, was that for the bus driver and the mechanic position?

A.  When I originally came on, I had to go back and get an endorsement for a passer [sic].  I had a CDL.  But I didn't have the passer endorsement on that, so I had to go back and get the passer endorsement to add on.  But they hired me as a school bus driver and a mechanic.

Q.  Okay.  But you just went and got it done?

A.  Yes, sir.  They gave me 30 days to get it done.

Q.  All right.  And then before that your -- would have been the City of Aberdeen?

A.  Yes, sir.

Q.  And we'll get into that more in a minute.  But I guess just very generally, it looks like you were hired roughly in October of 2021?

A.  September.  The original, it was September the 21st.

Q.  Okay.

A.  And then I had to go back to the board

meeting because they lowered me down to -- from a electric to a water labor [sic].

Q. Your departments changed?

A. Yes, sir.

Q. And you -- I guess your first day was sometime in -- October 5th maybe --

A. Yes, sir, October 5th first day --

Q. -- of 2020?

A. -- of work.

Q. All right. Do you recall your rate of pay when you started?

A. I first started off at $14.50 with the Aberdeen Electric Department.

Q. But you never worked -- I mean like your first paycheck, what was your rate of pay?

A. $12 an hour.

Q. 12. Okay. And then it looks like you got a pay raise?

A. Yes, sir. They ended up giving me a dollar pay raise and raised it up to $13 an hour.

Q. All right. That was March 2023?

A. Yes, sir.

Q. Any other pay raises?

A. No, sir, not that I can recall.

Q. And so, I guess, just connecting the dots here, your hourly rate of pay at the time of termination was 13 bucks?

A. Yes, sir.

Q. All right. So before the City of Aberdeen where did you work?

A. I worked for the Aberdeen School District in the maintenance department.

Q. Okay. And what -- what was your role in the maintenance department for the Aberdeen School District?

A. I was in the maintenance department and I was in -- like, in the evening time, I don't know what -- I help out with buses. Like, I'll stop traffic in the evening. But I think at the time they had, like, 12 or 13 buses, I would be the person to stop the ongoing traffic to let that bus come on for it to get to the high school. So, like, a bus -- I don't know if you would say a monitor or....

Q. Do you recall when you started with the Aberdeen School District?

A. That's a good question. I want to say around 2006 or 2007, in that area right there. I can't really just recall.

Q. And then your employment ended when?

A. I got terminated August the 6th of 2021.

Q. Okay. So you were with the school district a long time?

A. Yes, sir.

Q. What about the City of Columbus; have you worked for them?

A. I ain't never worked for the City of Columbus.

Q. Okay. All right. Let's take -- go back to these interrogatory responses and flip to interrogatory number 8. I think it's on page 8 if that helps.

A. All right.

Q. Maybe it starts on 7 and your answer is on page 8?

A. It going to start on page 7?

Q. Uh-huh.

A. Okay. All right.

Q. Wait. Are you there?

A. Yes, sir.

Q. Okay. All right. So I'll just read it to be quick, but the 8th interrogatory asked you to itemize any and all damages to which you

GENA MATTISON GLENN, gena.glenn@gmail.com

contend you were entitled or that you -- you're entitled to by virtue of the allegations raised in your Complaint. And then your response is on the next page. And it -- there's a whole bunch -- there's some objections there, but then I believe your actual response begins with "approximately $20,800, which includes lost wages, which dates from the day the plaintiff was terminated by the City of Aberdeen on December 5th, 2023, until the time he gained employment with the City of Columbus." So I wasn't -- is that accurate?

A. Yes, sir.

Q. And is the City of Columbus part accurate, though, or, I mean, is that just a typo?

A. City of Aberdeen on December 5th of 2023 until that time.

Q. Oh, I'm sorry. Okay. City of Columbus is Columbus Municipal School District?

A. Yes, sir.

Q. I gotcha. All right. And then it says, The plaintiff's medical expenses he should be compensated for are $47.43. What are you -- what is that referring to?

A.   I take anxiety medicine.

Q.   Filling prescriptions?

A.   Yes, sir.

Q.   Okay.  All right.  And then it says reimbursed out-of-pocket expenses.  I'm guessing that's, like, costs filing the lawsuit and stuff and then attorney's fees.  Is that generally -- and I know it's -- generally is that about accurate, that -- this interrogatory response?

A.   The 25 and 800?

Q.   All -- yeah, I mean just the --

A.   Whole thing.

Q.   The whole thing.

A.   Yes, sir.

Q.   Okay.  All right.

A.   Hold on.  Approximately 20,000.  Okay. 15,000, wouldn't that be included with....

MR. REDDICK:  You...

A.   Okay.  Okay.

BY MR. WALKER:

Q.   I'll be honest with you, I haven't done the lost wages calculation yet.  I don't know if that 20,000 number is accurate.  But --

A.   But this --

Q.   -- I was just saying, the lost wages

and then the roughly 50 bucks or so in medical expenses, plus your cost in attorney's fees, is that the -- emotional distress damages, is that the world of damages that we're kind of living in for this case?

A. Will this include my FMLA in here, where I lost in my FMLA, or just basically where I lost -- or since I lost -- I left with the City of Aberdeen?

MR. REDDICK: It's just going to be his calculation just what he can just actually calculate, which was the out-of-pocket expenses from when -- the time he got terminated from the City of Aberdeen to the City of Columbus -- hold on -- from the time he got terminated from the City of Aberdeen till he gained employment with the City of Columbus.

A. Okay. Yes, that's accurate.

BY MR. WALKER:

Q. Okay.

MR. REDDICK: That's for that 20,000 number. That's just approximate because, like, that's approximately what we calculated.

MR. WALKER: Okay.

BY MR. WALKER:

Q. I haven't done the six-month calculations, but I'm not holding you to the number. I was just -- the types of damages you're asking for --

A. Yes, sir.

Q. -- you want lost wages; you want some medical expenses, it looks like, for the refill prescription. You're asking for out-of-pocket expenses and attorney's fees. And then was there anything else? You mentioned overtime?

A. Yes, sir, overtime.

Q. Okay. But not -- and FMLA. Those are two different things.

A. Two different things. That's what I was trying to make sure I get some clarity on that. I know they are two different things, but I'm just trying to make sure.

Q. Okay.

A. Yes, sir.

MR. REDDICK: I see where it says -- I see where it says at a minimum. At a minimum that's what he's trying to obtain. At a minimum.

MR. WALKER: Gotcha. All right.

BY MR. WALKER:

Q. Have you ever filed for unemployment benefits before?

A. Yes, I have.

Q. How many times have you done that?

A. Twice.

Q. Okay. Were you awarded benefits each time?

A. Yes, I did.

Q. Okay. Was one the Aberdeen School District?

A. And the other one was against the City of Aberdeen.

Q. Okay. Have you ever filed for workers comp?

A. I did when I was still working for the City of Aberdeen.

Q. Was it just -- you've only done it one time?

A. One time, yes, sir.

Q. All right. Tell me a little bit about the workers comp. When did you file for workers comp?

A. I filed for the workman comp in August

of 2023.  I was fixing a water hose -- a water leak.  And my supervisor was on the backhoe, and the bucket came around and hit me in the head and knocked me unconscious.

Q.   And you said that was August 2023?

A.   Yes, sir.

Q.   And you were -- you were doing what again?

A.   I was fixing a hole, putting a clamp on a pipe, a water line pipe.  And my boss man, he was on the backhoe.  And his arm swung around while I was down in the hole and hit me in the back of the head and knocked me unconscious.

Q.   Who was that?

A.   Marcus Collins.

Q.   All right.  And then were you awarded work -- were you awarded work comp, compensation?

A.   Yes, sir.

Q.   Okay.  How long did you receive compensation, or are you still are you still --

A.   I'm still up under workman comp decision from what's his name.

Q.   All right.  So from August to the current date you're still for that one thing?

A.    Yes, sir.

Q.    All right.  Is it a monthly thing that you get?

A.    Well, I -- the thing about it, once a year I got to go back into Germantown, Tennessee and see Dr. Ahmad.  And -- but that's the city doctor.  And then he said he had to come back and release me after a year to make sure everything was good on it and everything.  So it just couldn't stop the workman comp just right then and there.  I have to come back and after a year.  He have to check me out and then he can release me.

Q.    When's the last time you saw that doctor?

A.    I saw him last year, I want to say probably about August or September.

Q.    Okay.  How much roughly do you get in workers comp?

A.    I don't receive any benefit from workers comp.

Q.    I thought you -- I thought you said you got monetary, like, compensation.

A.    No, sir, I didn't get nothing behind that.  The only thing they would give me was

just like a mileage check.  That's what I told you, Talking about like mileage check going back and forth, but I never did get nothing -- anything, no compensation from the city.

Q.  So, I guess, did you file a workers comp claim and it was denied?

A.  No, sir.  I filed it and I got approved, and I'm still up under the workman comp till a year later.  The doctor got to wait a year before he can let me go from -- or let me off workman's comp.

Q.  Okay.  But you've never gotten any money?

A.  I never got a dime from them.  Only just when I went, the mileage and stuff like that.  That's the only money I ever received from workman's comp.

Q.  Okay.  All right.  Were you off work in August 2023 because of this incident?

A.  Yes, sir.  They end up taking me off for, like -- the first time they took me off for, like, four weeks, and I went and followed back up with my primary and she ended up getting me off for another four weeks.  And then she come back and put me on lower -- light-duty

work.

Q.   Okay.  So you were off all of August, off September.

A.   Yes, sir.

Q.   And then you were put on light duty in October?

A.   Yes, sir.

Q.   All right.  And that's related to the workers comp injury?

A.   Yes, sir.

Q.   All right.  How long did you remain on light duty?

A.   I think he end up taking me off in October light duty.

Q.   So he started you in October, and you were off it -- it didn't last very long?

A.   It didn't last long.

Q.   All right.  Did you ever give the city -- is that Dr. Pinson?

A.   Yes, sir.

Q.   Terry Pinson?

A.   Yes, sir.

Q.   Did you ever give the city a letter from Dr. Pinson about your light duty?

A.   I ended up giving it to the

supervisor, Dale Daniel.  At the time he was the supervisor.  And he told me to make sure I go up there to the city hall and give Ms. Moore a copy of it.

Q.  Daniel who?

A.  Dale.

Q.  Dale?

A.  Uh-huh.  D-A-L-E Daniel.

Q.  First name Dale, last name Daniel?

A.  Yes, sir.

Q.  All right.  And then did you give one to Ms. Moore?

A.  I gave -- I end up giving it to Ms. Moore, the copy of it.  And I even had the doctor, I believe, faxing stuff over to Ms. Moore that they -- to tell her to send the form.  I think they call the form a 106 something.  And to send the form over to them for they can fill it out and send it back to her, but she never did do it.  When I gave it to her --

Q.  I'm talking about your light duty.  Your light duty from Dr. Pinson, did you ever give that to Ms. Moore?

A.  I did.  I did.

Q.  I noticed that there's a letter from

Dr. Pinson that we can get -- again, I'll ask you some more questions about this later on, but from, like, the date of November 18th or November something. And it -- it's worded like, you know, Barry was on light duty but that ended in October 11th.

A. Uh-huh.

Q. And so I was just kind of curious why it was November, mid November that he was sending that letter.

A. I can't recall. I remember -- November. I know in October that he took me off the little -- what's the name. So I just have -- I went up there. I had a doctor appointment, and I think I ended up just getting some clarity from him. So I end up getting a letter from him showing to make sure that when it started, but I think the day I went up there there was a doctor appointment. That's why it had November on it.

Q. Is that -- is that what you gave the city, that November letter?

A. I can't recall. I think I gave one way before then, but I can't recall and it just be true.

Q. Can you recall if you gave them the

November letter?

A. I did. Or I did -- I think I did. I think I did. But I -- just 100 percent for sure, I can't. But I think anything dealing with the city, I know I did gave it to Ms. Moore to cover myself because I know Charles Scott didn't care for me too much.

Q. Okay. All right. And then I've just got to ask you about your prior convictions or arrests. Do you have any prior convictions?

A. I've got a couple of traffic tickets.

Q. Any -- anything other than that?

A. I had a domestic violence, but I ended up getting it expunged and stuff like that.

Q. How old is that?

A. Oh, probably about 25 years ago.

Q. Okay. Any others?

A. Not that I can recall.

Q. Have you ever been arrested for any drug-related offenses?

A. No, sir.

Q. Have you ever been arrested other than that domestic -- and I don't know if you were arrested for the domestic violence incident, but have you ever been arrested?

A.   No, sir, not that I can recall.

Q.   Barry, what is your highest level of education?

A.   Junior college at ICC.  Itaw- -- I'm sorry, Itawamba Community College.

Q.   Did you get a degree?

A.   I didn't.  I had -- you know, I had my son, had to drop out.  I was going to school for welding.  And my son ended up coming, and so I ended up dropping out and going and getting me a job.

Q.   And then you mentioned you had that CDL or the commer- -- that driver's license that you can drive the bus.

A.   I couldn't drive a bus, but I could have drove for, like, a backhoe or an 18-wheeler or truck or something like that.  I didn't have the passenger endorsement to drive a bus.

Q.   Any other special licenses like that that you have?

A.   I have air brakes.  I don't know --

Q.   Sorry?

A.   Air brakes CDL.  Air brakes.

Q.   Air brakes?

A.   Yes, sir.

Q.   Like mechanic?

A.   Work on an air -- like an air line for buses and stuff like that, or 18-wheelers, the air line to hook up to make their trailers and stuff -- you have to have air.  But -- and for me to drive and stuff, I had to -- I got an endorsement called air brakes on my license.

Q.   Any others?

A.   No, sir.

Q.   All right.  So that's all for the -- I mean, that's all for the background stuff.

It's 11:50.  Do y'all just want to keep going for a little while and see how we do or --

A.   Yes, sir.  Yes, sir.

Q.   Okay.

MR. REDDICK:  I'm good.

MR. WALKER:  Good with that?  You look like I'm boring you to death over there.

MR. REDDICK:  No, I'm good.  I'm listening.

BY MR. WALKER:

Q.   All right.  I'll put the interrogatories aside.  I may come back to it in a second.

All right.  So just kind of starting at the beginning, your employment -- I know you were initially hired in September for the electric -- the electric department but you never started.  Technically you never started, like, your first day.

A.  No, sir.

Q.  In October they switched you to the water department, and it looks like your first day of work was October 5th.  Does that sound right?

A.  Yes, sir.

Q.  All right.  How did you come to apply, like, for employment with the city?

A.  Edward Haynes, the alderman Edward Haynes, would end up telling me, he said they got a position in the electric department.  And he knew what happened to me.  I was wrongfully terminated with the Aberdeen school.  And he came up to me and told me that the city had an electric department position, and if I apply for it he'll give me one vote.  And I ended up applying for the position.  I know I had one and I needed two more on it.

Q.  Okay.  Did you do any interviews for

the job?

A. Yes, sir. The first time we did the interview with, like, three aldermens in here and everything, it had, like, five people apply for the position. And that's why two of us got hired. Greg Davis and me were the other people. And so I guess they scored us in this exact room. They scored us by rate and took the highest rate to hire us.

Q. Okay. And then Mayor Scott was the mayor at the time?

A. He was.

Q. Did you know the mayor?

A. Not just him personally, but I just know him. He was Charles Scott from around here, but I just don't know him personal.

Q. You knew -- you knew that he was the mayor?

A. Yeah, I knew he was the mayor.

Q. But didn't really have, like, a personal relationship with him?

A. No, sir.

Q. I know I'm switching gears a little bit, but you generally agree with me that it's the board of aldermen has the power to hire and

fire and kind of make pay decisions?

A. Well, the day-to-day operation, the one that making that would be the mayor. He does the day-to-day operating. And he present it to the mayor -- up to the board. Then the board the one making the decision on hire and fire.

Q. So the board has the power to hire you?

A. Yes, sir. Hire and fire.

Q. Hire and fire. Do you recall the names of the aldermen who were serving on the board when you got hired?

A. Yes. Ms. Lady B. Garth, Robert Devaull, Edward Haynes, Carolyn Odom and Shae Cain.

Q. Would you agree with me if I said John Allen instead of Shae Cain?

A. Yeah, John Allen. John Allen.

Q. John Allen?

A. Yes, sir.

Q. And you said Lady -- are you related to Lady Garth?

A. No, sir, I'm not.

Q. She's not an aunt?

A.   No, sir.

Q.   Or a cousin?

A.   No, sir.

Q.   Okay.  And I ask that just because she didn't vote on your termination, and I didn't know if that was because of some sort of nepotism.

A.   The reason she didn't vote, Triron Brown is her nephew by marriage.

Q.   She's related to Triron.

A.   She's kin to Triron by marriage.

Q.   And then so starting that fall, you worked full time as a laborer I think is the --

A.   A water laborer.

Q.   A water laborer.  And you stayed in that position until you were terminated?

A.   Yes, sir, I did.

Q.   And that was December 5th, 2023?

A.   Yes, sir.

Q.   All right.  What were your job duties as a full-time laborer?

A.   Go out and fix water leaks.  Or if somebody didn't pay they bill, I would be on call.  I would be the person that go out and cut their water off.  And then they call back in

that evening, if I was on call I would be the person go back out and cut it back on and stuff like that. Got overtime, a lot of overtime, by being on call and stuff like that.

Q. What did -- so did a typical day look like that? You would come in, you would go turn people's water on or off, and that was kind of what you did?

A. At first it wasn't. The day started off in the morning time. We'd check -- it called GLOOM. That was on -- go out there, check and make sure it got enough chlorine in there, and it feeds off the feeder and stuff like that. That way I -- we check it off. And then every month, the water and state department, water department, they'll come in there and make sure that, hey, they came in here and checked the water around here and everything on the sample was good and stuff like that. That's what we had to do every morning, check that water and make sure the sample had enough chlorine and stuff in it.

Q. All right. And what about after that?

A. After that we'll go. If we have a leak our supervisor tell us, all right, we got a

GENA MATTISON GLENN, gena.glenn@gmail.com

leak at so-and-so. And so we get everything on the truck and going to the spot and fix that leak.

Or we'll go to the electric department. They tell us they had some disconnect or somebody fixing to get a new water line that we need go out and meet the gas company and mark the -- mark the lines or something like that. But that's basically what -- how our day started.

Q. Okay. Anything else?

A. No, sir.

Q. Did your work schedule, did it remain consistent during your tenure here?

A. Yes, sir. Yes, sir.

Q. Okay. And then I guess other than you're out August and September and on light duty in October --

A. Yes, sir.

Q. -- which I guess -- how did the light duty affect you? I'm sure that was a weight-lifting restriction?

A. Yes, sir. They didn't want me to pick up nothing over 15 pounds.

Q. Okay. So what, did you just have to

stay in the office or what did you do?

A.   I -- they end up having me wiping the front door, cleaning glasses, and stuff like that.  They gave me a little mop.  I had to keep the side -- the lobby clean and stuff like that.  Mopping the lobby and stuff like that.

Q.   Okay.  And what time in the morning, like, would you start?  7:00 a.m.?

A.   Yes, I started 7:00 a.m.

Q.   And when do y'all end?

A.   At 3:30.

Q.   And so -- and that's Monday through Friday?

A.   Monday through Friday.

Q.   Okay.  And that pretty much stayed the same your entire time?

A.   Yes, sir.

Q.   How many hours did you typically work per week?

A.   We didn't have just straight hour, 40 hours a week, but at least twice a week I would be on call and stuff like that.  So I usually get, like, 8 hours in overtime like that.  Because if you're on call, they give you automatic 2.  So if somebody call and say, hey,

I paid my water bill and I need my water back on, so they'll dispatch the fire department. Then the fire department dispatch me to go out and cut on somebody's water.

Q. You said you're on call typically two days a week?

A. Yes, sir.

Q. What days?

A. It was just a calendar. The supervisor votes. They say, hey, it's April the 1st. And he starts on April 1st always till April 30th, and then he just go about it like his name, my name, Johnny McMillian name, or Greg Burton name, Triron Brown name. He just go like that.

Q. How many of y'all -- how many laborers were there in the water department? Or at least -- and I know it's for a couple of year span. What about just, like, the last six months there? June and July till December 2023.

A. It would either be, like, three and plus the supervisor. Three laborers. Because the other guys and them, they'll basically go check the other stuff, the wells and stuff like that, make sure they got enough stuff in there

and make sure everything going to the river.

Q. What were their -- can you name each person?

A. Triron Brown, he's the one that checked the wells.

Q. All right. Who else?

A. Greg Burton, he was a laborer.

Q. Greg Burnett?

A. Burton.

Q. Burton?

A. Yes, sir.

Q. All right.

A. Andre Hogan.

Q. That's Triron's cousin?

A. Yes, sir.

Q. All right. Who else?

A. And Marcus Collins. He was the supervisor. He would come by and help.

Q. What about Johnny?

A. Johnny, he checked the wells every day and kept them clean and mold around there and stuff like that. He was never out in the field with us.

Q. So he wouldn't be talking call?

A. No, sir. He was on call, yes, sir,

like that. He'll take a call. But just being out in the field, he was never out in the field unless we really, really need him.

Q. All right. Anybody else?

A. Not that I can recall.

Q. All right. So that's five people. So is it less if he -- I'm just saying -- and I don't know. But, like, if you're just doing one person per day, you can't have -- you can't -- it wouldn't fit you twice a week?

A. Nine times out of ten Johnny, my brother, he has a second job, and I was helping him with -- on his call.

Q. So Johnny wouldn't take overtime?

A. He'll take it like hisself on, like, Saturday or Sunday when he's off. Or he had a job at the Aberdeen hospital when he got off from the city. He'll go work there. So if he couldn't do that call, they'll usually call me.

Q. He would just call you?

A. Or the fire department because you had to let the fire department know who's going to be the person to call.

Q. And you got it every time?

A. Not every time but sometimes.

Q. Okay. And then I thought you didn't take call on the weekends.

A. Who didn't take call?

Q. You.

A. No, whoever -- however that come up, I -- you take call on the weekends, whatever. So it was like your name added in on a Friday, or a Saturday, that's your call.

Q. Okay. I was just -- I looked at your time sheets; and it's, like, every weekend you got -- you're scheduled off.

A. No, I was on call every -- if that fall in on that, and you go back to that November, the 2023 and in there, I was on some Saturdays in November of 2023.

Q. Okay. Well, less than 10, like, in your career?

A. I can't recall.

Q. All right. So it still would be four people rotating. So you're about, like, three shifts a month overtime?

A. Like that, yes, sir.

Q. Okay. All right. Tell me how you recorded your work hours each day.

A. You go inside and you clock in. And

then once you clock in, your supervisor, he write down -- he has a daily sheet, a spreadsheet; and he write you in and stuff like that. And get ready to leave in the evening time -- you know, you don't have to clock out for lunch, and clock out and go home.

Q. So there's two different mechanisms. One is you got to clock in using some sort of electronic device?

A. Yes, sir.

Q. What is that device called? Does it have a name?

A. Yes, it do. I never knew it.

Q. Okay. So there's, like, an electronic clock in/clock out. And then also, like, you verbally tell your supervisor, Hey, I worked five days this week and he writes it down?

A. Yes, sir.

Q. Like eight hours or whatever it may be for each day?

A. Yes, sir.

Q. Okay. I went -- I went and looked at the recording system, and that's why I was -- when I was asking Melissa, and I saw that there's, like -- there's a few things you got to

input.

You know, it's not just as simple as click my name and, you know, I'm in, or I scan a key fob or, you know, a card.  It looks like you got to enter two things.  One is your -- I'll call it an employee number.  I don't know if that's typically what it's called.  But the other is also your last four digits of Social. Do you agree with that?

A.  I can't remember when I was there it was a time clock.  Right there above, had everybody clock number.  I haven't been there in three years.  I don't know what happened or what.  I can't recall.

Q.  This was the system in at the time you were working.  You don't remember having to put in two different number -- like, sets of numbers?

A.  No, sir.  Not that I can recall.  Only thing I know, we got the -- up under there it's a chart with everybody's number on there, and you put your number.  And mine was 27.

Q.  Your employee number was 27?

A.  Yes, sir.  My number was 27.

Q.  Okay.  So you just can't recall

whether that's right or wrong, whether you had to do 27 and then the last four digits of your Social to clock in?

A. I can't recall, sir. I don't.

Q. All right. Do you recall if you had to do 27?

A. I can remember my clock number was 27.

Q. Okay. You just can't remember if you had to do the four digits of your Social?

A. The four digits of Social, I can't recall.

Q. All right. While you were working with the city and the water department, were you working anywhere else?

A. No, sir, I was not.

Q. All right. What was your chain of command?

A. It was the supervisor, Dale Daniel, and then Johnny McMillian.

Q. Who was above Dale?

A. Yes, sir.

Q. All right.

A. And that was it. That was the chain of command.

Q. What about Marcus?

A.   Marcus came in later on.  When I first started, it started the Dale Daniel.  Marcus came in later after Dale had retired.

Q.   Okay.  And so where did -- where would Marcus have fit in in the chain of command?

A.   After Dale Daniel it would be -- because he took Dale Daniel spot.

Q.   Okay.  So it would have been Marcus, and then above Marcus was Johnny?

A.   Johnny.

Q.   What about the person that Melissa mentioned earlier, Roberson?  Jase or --

A.   Jason was before.

Q.   Jason?

A.   He was before Dale.  Jason ended up leaving in December, and Dale took the position.  So Dale worked all the way up to -- I want to say June.  He ended up retiring from the city.

Q.   All right.  So Jason was --

A.   He stayed --

Q.   You said December or June?

A.   December, and --

Q.   And that would have been '22?

A.   Yes, sir.

Q.   All right.  And then Dale took the

spot and stayed there till --

A. June.

Q. -- June of '23?

A. Yes, sir.

Q. All right. And then Marcus got it, and he was in that position through December of '23?

A. Yes, sir.

Q. All right. Were there any issues with Johnny being your brother and, you know, him being your supervisor? Is that not nepotism?

A. No, sir, because my brother, he's very strict. He's old school. He's by the book. There's no favoritism or none of that in that.

Q. So the board would allow department heads to be relatives -- allow them to supervise --

A. See, he really wasn't, like -- have a title of it. It's just a job they gave to him. He didn't have no title or getting paid far as supervisor or assistant supervisor.

Q. And what made him supervisor?

A. Jason Roberson appointed him to the supervisor.

Q. But Jason was below him?

A.   No, Jason -- it was -- Jason was the water superintendent.  Then next thing was Dale Daniel when Jason was there, and next one was Johnny McMillian.  Jason really left and went to the school district.  And then next it was Dale Daniel, Johnny McMillian, then Marcus Collins.

All right.  Dale retired in June of '23 --

Q.   Uh-huh.

A.   -- and then that's when Marcus took over till then -- from then till now.

Q.   All right.  So if I'm just, like, trying to picture a hierarchy here, you know, and you got laborer at the bottom, and you got Marcus above that, Johnny is above Marcus, so Johnny can tell Marcus what to do?

A.   No, Marcus tell -- because the board appointed Marcus to that position.  So Johnny falls up under there.  It's Marcus, then Johnny, then laborer.

Q.   Okay.  And so it would have been Dale, then Johnny, then you?

A.   No.  It would have been Marcus, because March was there.

Q.   Right.  But before Dale retired or he

quit working with the city -- before Marcus became that position, it was Dale?

A.   Yes, sir.   Dale.

Q.   So it was Dale at the top?

A.   Yes, sir.

Q.   Then middle would have been Johnny?

A.   Yes, sir.

Q.   And then towards the bottom would have been you and Mr. Brown and Marcus, whoever else?

A.   Yes, sir.   See, it'll go by seniority, years and stuff, like if you were -- been here for so long, they give you a position and stuff like that, try to -- all the old head, give them an easy, laid-back job and stuff like that.

Q.   Okay.   But there's no issues with Johnny -- the board wouldn't have -- or the mayor wouldn't have had issues with Johnny being your supervisor?

A.   No, sir.

Q.   That you know of.

A.   Not that I know of.

Q.   Okay.   All right.   So outside of, you know, this chain of command -- and I know it defers depending on what month we're talking about -- did you report to anybody else?   Does

that make sense?

A.   No, I'm not --

Q.   So at -- near your termination you would have reported to Marcus, right?  Is he the top?

A.   Yes, sir.

Q.   And then before that you would have reported to Dale?

A.   Yes, sir.

Q.   And then before Dale you would have reported to Jason?

A.   Yes, sir.

Q.   Outside of that, who -- did you report to anybody else?

A.   No, sir.

Q.   Okay.  All right.  I'll hand you -- where did I put that?

MR. WALKER:  Exhibit D.

                 - - - - -

          (Exhibit D marked.)

MR. WALKER:  Are y'all still doing okay?

MR. REDDICK:  Uh-huh.  You said D?

MR. WALKER:  D.

BY MR. WALKER:

Q. And this is just your Amended Complaint. I want you to, whenever you get a chance, flip over to the third page. And we're going to look at this paragraph 6 here at the top.

A. Okay.

Q. Do you see that?

A. Yes.

Q. All right. So I'm going to skip that first sentence and then just go to the second one where it says, On November 27, 2023, the plaintiff -- do you see that?

A. On November 27, 2023, the -- he was not at work on October -- on November 27, 2023, the plaintiff was not in the state of Mississippi when he was clocked in for work --

Q. Yeah. I'll just pause you right there.

A. Okay.

Q. So second sentence just -- November 27, 2023, the plaintiff was not in the state of Mississippi when he was clocked in for work because his flight was delayed because of mechanical issues.

GENA MATTISON GLENN, gena.glenn@gmail.com

So I guess just my first question is -- or I looked at the calendar November 27th is a Monday.

A.   Yes, sir.

Q.   Or was a Monday.  Where were you?

A.   I was in Las Vegas.

Q.   Las Vegas?

A.   Las Vegas, Nevada.

Q.   I haven't been to Vegas.  I'd like to go there one day.

Was that just, like, a weekend trip you were taking?

A.   I end up going with all my family.  We were going for Thanksgiving that weekend for the -- for the Thanksgiving weekend.

Q.   Okay.  I remember -- you were sitting in here too, but during Johnny's deposition he said that you left town that Thursday or Friday.  Do you recall when you left to go?  What day?

A.   I think the city -- the city gave us that Wednesday or -- that Wednesday -- we was off that Wednesday and that Thursday.  We was off that Thursday and that Friday.  So I probably took off that Wednesday or that Thursday.  I can't recall, but I know I took off

probably Wednesday or Thursday.

Q. Okay. And that would have been -- and you just stayed -- supposed to stay -- I guess come back Sunday?

A. Yes, sir, and the flight got delayed Sunday evening.

Q. Okay. Did you get stuck in Vegas?

A. No, sir. I got stuck in Charlotte, Carolina.

Q. A connection?

A. Yes, sir. The connection.

Q. And then -- I've gotten stuck in Charlotte before. It's not great.

A. No.

Q. Flew from San Francisco too. That's the longest flight. It's horrible.

But I guess you just stayed overnight, flew back on Monday? I'm sorry, on -- no, on Monday?

A. On Monday -- I stayed -- Sunday night I stay in the airport. And Monday morning they got us -- got up and got us a flight going. They said one of the propellers on the plane had broken, and they couldn't get it till Monday morning.

Q.   Okay.  And that was -- did you fly in and out of Jackson, Memphis, New Orleans?

A.   Memphis.  I flew out of Memphis, Tennessee.

Q.   Memphis?  And you said the purpose was it was -- you were meeting some family up there in Vegas for Thanksgiving?

A.   For Thanksgiving.  We had Thanksgiving -- they were saying Thanksgiving for Vegas.

Q.   Okay.  Did you take anybody with you?

A.   Yes, sir.  Me and my fiancée flew.

Q.   Did Johnny go?

A.   No, sir, he -- no, sir.

Q.   No?  All right.  Did y'all go to, like -- did y'all go to the Strip or anything -- and by "the Strip," I mean, like, gambling or anything like that -- or was it just family stuff?

A.   Just -- we did family stuff, did a little shopping and stuff like that.

Q.   Okay.  All right.  So going back to this Amended Complaint, the next sentence says, Also on November 27, 2023, the plaintiff tried to call his supervisor, Marcus Collins, to tell him that he would not be in for work due to the

plane for his scheduled flight having mechanical issues; however, he did not pick up the phone.

Do you recall calling Marcus Collins on that Monday, November 27th?

A. Yes, sir I did.

Q. Okay. Do you recall him just not answering?

A. Like, it -- it did, like, a half a ring. Then his prompt came on, something like that. And so I was just like, Okay. Then we call the next person I know that -- let them know. And I didn't know Marcus was not going to be -- he went out of town, I think, for the holiday, Thanksgiving holiday; but I didn't know he was out of town or not.

Q. You said he heard his prompt. What do you mean by "prompt"?

A. You know, like, doo-doo, the person you're trying to call is not available. You know, like, phone prompt.

Q. Like, a voicemail?

A. Yes, sir.

Q. Okay. Had you -- did you tell Marcus before you were leaving that you were going? I guess it was a holiday, but did you tell him

that you were going to Vegas?

A. I can't recall that I tell him I was going or not or anything like that because it's a holiday and I didn't think I --

Q. You didn't have to?

A. -- have to have no time in or nothing like that.

Q. You weren't scheduled to work --

A. No, sir.

Q. -- any of those days?

A. No, sir.

Q. Okay. Marcus, I think, testified at his deposition -- I believe you were sitting in here -- that he never received a call from you that morning. Does that surprise you?

Do you remember hearing that?

A. No, sir, I did not recall hearing him tell that.

Q. Marcus saying that?

All right. Let me hand you -- I'm not going to make this an exhibit. Just do it a little quicker, maybe. But this is premarked as DEF 114. This is from your unemployment case, I think. But it's -- as you can see, it's just a picture of a phone; and it's got Kobalt Collins

on there.  Is this a picture of your phone?

A.  Yes, sir.

Q.  All right.  And that's -- is that --
and -- K-A-B-L-T [sic].  But is Kobalt
Collins --

A.  Yes, sir.

Q.  Is that Marcus?

A.  Marcus Collins.

Q.  All right.  And that's -- is that his
number, that 662-323-6660?

A.  Yes, sir.

Q.  All right.  I notice that it says --
you know, right there in the middle it says,
Today, 6:24 a.m.  And then it says, Canceled
call.

A.  (Indiscernible).  And when the prompt
came on, that was time to cancel the call; and
that 6:25, that's the time it ended.  And so
that's why it got two different things on there.
6:24 when the prompt or the voicemail picked up
and saying that, and then at 6:25.

Q.  Yeah.  That's interesting.  I guess my
understanding, iPhones, a canceled call is
different than, like, a missed call.  A canceled
call is when the caller ends the call and

cancels it.  And so you would disagree with me, that you did not cancel this call but it was his phone that missed the call?

A.  His phone missed the call.  I did not cancel the call.  I'm the one that called out, and his phone canceled the call.

Q.  I mean, do you understand what I'm saying?

A.  Yes, sir.  Yes, sir.

Q.  As, like, you can call somebody and, like, if you hear one ring, you could end it --

A.  Yes, sir.

Q.  -- and it'll say "canceled call" because you did it.

A.  Yes, sir.

Q.  And how that's different than, like, you calling somebody and it going to voicemail or it would be, like, missed call, or somebody calling you and you don't answer?

A.  Yes, sir.

Q.  But you didn't -- you didn't personally cancel that call to Marcus?

A.  I did not.

Q.  Okay.

A.  The prompt came on and I end -- the

phone call ended.

Q.   All right.  But in any event, I think you ended up calling Johnny?

A.   I did.

Q.   That morning?

A.   Yes, sir, I did.

Q.   Just to let him know that your flight was -- had been delayed?

A.   Yes, sir.

Q.   All right.  When did you find out your flight was delayed?

A.   That Sunday -- I probably end up flying out that Sunday around about 1:40 or 1:45.  And they kept saying around, like, the plane going to be here -- we're -- they're going to send another plane from Memphis to there and --

Q.   That's while y'all were stuck in Charlotte?

A.   Yes, sir.  And they never did get it.

So probably around about 7:00 o'clock that night, they never did.  Go up to the front to ask the lady when we're going to get out.  Well, we should have one here before 11:00 o'clock.  And they just kept giving us the

runaround, so that morning we ended up -- had to spend the night there all night at the airport.

Q. Okay. All right. And then your Amended Complaint mentions that -- I believe it's that first sentence, that Mr. Brown -- I always mispronounce his first name -- Triron Brown clocked you in on that Monday, November 27th.

And you may recall with Mr. Brown's deposition, we were -- we were all sitting in here. He testified that he did clock you in and he clocked you out on that 27th. Do you recall him saying that?

A. Yes, sir.

Q. Okay. Do you disagree with that?

A. Do I disagree with him saying he clocked me in?

Q. Uh-huh.

A. No, sir.

Q. I'm going to hand you another --

MR. WALKER: And this is just premarked DEF 309.

MR. REDDICK: Okay.

BY MR. WALKER:

Q. As you see this is just a picture of

text messages that looks like zoomed in.

A. Uh-huh.

Q. And this is from your EEOC file, I'm pretty sure.

I asked Mr. Brown if these text messages were between you and him. So let me ask: Are these text messages -- is this your phone? Is this Mr. Brown's phone? Are these text messages between you and him?

A. No, sir, I cannot recall that this my phone.

Q. You cannot recall if this is your phone?

A. No, sir.

Q. So are you -- this could be your phone?

A. Could not -- I cannot recall that this is my phone or who phone. I don't see no number on here.

Q. Okay. Would it refresh your memory if I directed you to that top text message where it says, Brown, can you clock me in 27, forward slash, and then it's -- it's --

A. November 7 -- 27 --

Q. 27, I take it, is your employee

number.  And then you got the forward slash, and that would be the last four digits of your Social that's covered up by the EEOC.  But you don't think that's accurate?

A.  I can't recall.  See, like, Monday, November 27, at 7:55, so....

Q.  But you see the 27 right here.

A.  Yeah, I see the 27.

Q.  And that would be your digits to clock you in.

A.  It could be November 27th.

Q.  It could be.  But if this is your Social that's behind that, then we're -- then we would know this is you telling Mr. Brown to clock you in, would we not?

A.  I can't recall.

Q.  Okay.  All right.  Anyways, it says, Bet, I got you.  Somebody says, Thanks.  And he says, Any time.  And then there's another text message, like, Clock me out right now if you can.

Mr. Brown responds, We're over here fixing this leak, but okay.  Bet.  And then he eventually clocks out whoever.  And you were the one who he clocked out?

A.    Mr. Walker, at 11:50 I was inside the air -- leaving Charlotte.  I wasn't -- the phone was not on.  It was on airplane mode.  I was inside the air.  That -- at 7:55 I was getting -- boarding -- boarding -- boarding the plane. I think my plane ended up leaving, like, at 7:00 -- or, like, something to 6:00.  I can't recall. But I know we left early that morning.

Q.    Do you still have your text messages from Mr. Brown?

A.    No, sir.  I have a new phone and everything in my --

Q.    What about on iCloud?

A.    I have iCloud, and it stay stored for seven years.

Q.    So if you have that backup, you could produce that with your text messages on it?

A.    I -- how you do it, I can -- I don't know.  I can't recall saying I can or I can't. I ain't never did it.

Q.    So they potentially could be on your iCloud?

A.    It could.

Q.    You haven't deleted anything?

A.    I never deleted nothing -- none of

GENA MATTISON GLENN, gena.glenn@gmail.com

this and -- be on my phone.

Q. Okay. All right. And then you were ultimately paid for that November 27th, right? I mean, at least it was -- it was clocked in on the electronic system, and then Marcus also did the eight hours or six hours, whatever, because there's two different mechanisms. And you were paid for those hours, or you were not paid?

A. I was not paid.

Q. Okay.

A. They had a board meeting December 5, 2023. Every board meeting before you get paid, the board approves the minutes and agenda. They had a discussion, a closed discussion. Mayor Scott disapproved that time. Once they disapproved it, it didn't get paid.

When they were sitting here during the deposition talking about embezzlement and everything, they the one knew that I didn't get paid because they the one dealing with Charles Scott. Mayor Charles Scott disapprove it. I didn't get paid.

Q. Okay. But you were written up for clocking in and clocking out by Marcus?

A. Marcus never did give me a write-up or

anything.

Q. I have a write-up.

A. He have it, but he -- where does he got me signed in? He told -- well, he told me and Brown that the mayor wanted us to write you up. That's it right there. He never did give it to me or anything.

Q. All right. Just for the record, we're looking at DEF 313.

A. Uh-huh.

Q. This is a write-up that -- from Marcus, and it's you. He's writing you up. And it's for clocking in for work when he was not present. McMillian has been warned on numerous occasions. Mr. McMillian refused to sign the write-up on December 1st.

Why did you refuse to sign the write-up?

A. Marcus never give me this paper right here. I never did refuse. He told me, he said, Mayor wanted me to write you up. That's exact word, what he told me. And you see what date. It's 12-1-2023?

Q. Uh-huh.

A. And the incident happened 11-27 --

Q.   Uh-huh.

A.   -- of 2023?  Marcus never did -- on the 27th, 28th, 29th, the 30th.  None of them days Marcus gave me a paper saying that he'll write that was 12-1 of 2023.

Q.   So you never refused to sign any write-up?

A.   No, sir, I never did refuse.

Q.   Okay.  And then what about the -- his statement, Mr. McMillian has been warned on numerous occasions about clocking in?  Has this been a problem?

A.   It's never been a problem.  This has never happened.  I ain't never had no problem with clocking in or clocking out.  Never have.  And he know it.

Q.   Okay.  All right.  Were you at the December 5th, 2023, meeting?

A.   I was.

Q.   Okay.  At this time had you hired an attorney?

A.   No, sir.  I had not.

Q.   Okay.  Had you informed the board you were going to sue?

A.   No, the board was informed because I

had did an EEOC, and I had a pending allegation with the EEOC.

Q. Okay. So you had an attorney, but you didn't have an attorney for the termination yet. You had an attorney for a previous EEOC charge that was ongoing?

A. I couldn't even have no attorney for the ongoing EEOC because once you file -- say you have an attorney, they automatically shut down the EEOC. So I didn't even have nairn for the EEOC.

Q. So you didn't have an attorney.

A. No. Lot of it, they was just seeing where Mr. Reddick was writing on behalf of my thing, but I didn't have no attorney representing me the day I got terminated.

Q. Okay. Were you -- were you present in the board room, like, during the closed executive session?

A. No, sir.

Q. Or did they ask you to step out?

A. They asked me to step out --

Q. Okay.

A. -- and told Mr. Brown to stay in.

Q. So you didn't hear Mr. Brown -- what

Mr. Brown told the board?

A. No, sir.

Q. Okay. Did you talk to the board at all on December 5th?

A. No, sir. They would not let me speak. They subpoenaed me to come to -- when I came to the mayor on December 4th, 2023, the mayor told me I must be there at this board meeting. So I was subpoenaed there, came there with my paper showing that I could speak. After then, they would not let me speak. They let Brown speak and would not let me speak.

Q. All right. Were you -- like, were you -- when they -- did they open back up and then they voted for the termination or was all that done in closed session?

A. Closed session. They opened it back up --

Q. So you -- you found -- I didn't mean to cut you off.

A. I'm sorry.

Q. I keep doing that.

You found out about the termination after they voted?

A. When they came out of executive

session, they opened back up to the public. Everybody came back in from the outside and everything. Next thing I know -- I was the first one. They said, The City of Aberdeen is going to terminate Barry McMillian. I was sitting in the corner right over there. That's when I found out I was terminated.

Q. Okay.

A. And then next thing they said, We're going to suspend Brown for three days for his action and stuff like that. I got up and walked off.

Q. Okay. Do you recall how each board member voted?

A. I know Ms. Garth, she recused herself. I think Mr. Holliday in Ward 1, I think he recused hisself. And the rest of it was Carolyn Odom, Shae Cain, and Edward Haynes.

Q. Okay. I think that's right. I think Holliday -- Holliday might have voted against it, but then Garth did not vote. But I believe Alderman Odom made the motion, so he voted in favor. And then Alderman Haynes voted in favor, and Alderman Cain voted in favor. Does that sound right?

A.   Yes, as I can recall.

Q.   Okay.

MR. REDDICK:  I think you said Odom, him --

MR. WALKER:  Odom, Haynes, and --

MR. REDDICK:  Oh.  Odom, Haynes.

Okay.  I thought you said him, H-I-M.

Okay.

MR. WALKER:  3-1-1 vote.

MR. REDDICK:  Okay.

BY MR. WALKER:

Q.   Did you speak to Alderwoman Odom about your termination that day, like, after the board vote?

A.   No, sir, I did not speak with her.  I end up -- after they told me I was terminated -- I -- I ended up -- and then I asked Mr. Edward Haynes -- I asked him -- well, he said, Just get your attorney.  He the one that told me, when they were coming out of executive session, just said, Just get your attorney to handle it.  They ain't going to let you, speak.

Q.   Okay.  So you didn't talk to any of the board members --

A.   No, I did not.

GENA MATTISON GLENN, gena.glenn@gmail.com

Q.   -- after that?

A.   I didn't.  I end up leaving after that I know I was terminated.

Q.   All right.  Do you know why Alderwoman Odom voted in favor of your termination?  Like, have you personally spoken to her?  I know you have your allegations on why; but, like, have you personally spoken to Odom at any point about your termination?

A.   No, sir.  I have never spoke to Alderman -- the first time I heard why she voted against me, because I had a lot of EEOC pending allegation against the city.

Q.   So you did speak to Odom about your termination?

A.   No, sir.  I found out when she was doing her deposition.

Q.   That --

A.   Why she --

Q.   -- you -- that she testified, saying because you did your EEOC charge?

A.   Yes, sir.  That's the first time I ever -- me and her never had a conversation, but that's the first time I ever knowing of why she terminated against me, voted against me getting

termination.

Q. And I disagree with you that that's what she said; but again, deposition is not for arguing. But can we just agree to say that her deposition -- the reason -- your understanding of why she voted to terminate you is based on her deposition testimony?

A. Yes, sir.

Q. Okay. Is that the same -- is that true for Alderman Cain as well?

A. After his deposition. Yeah.

Q. Anything outside of the deposition?

A. I never had a conversation with none -- him, Cain, or anyone after the day I got termination.

Q. Same is for Haynes as well?

A. Yes, sir.

Q. Okay. All right.

MR. REDDICK: Let's hop off the record a second.

(Brief recess.)

BY MR. WALKER:

Q. So we kind of -- we've talked about the termination. I know you had your allegations about, you know, you believe it was

because you were retaliated against for filing the previous EEOC charge.

But you also have some claims that are based off FMLA, and I was just going to ask you a few things which is going to require getting into your disability or your surgeries and things like that. And I just want to ask you first about the gallbladder surgery.

So my understanding is that you had a gallbladder surgery -- or you had gallbladder surgery on September 21st, 2023?

A. Yes, sir, I did.

Q. That's correct?

A. Yes, sir.

Q. And that you stayed overnight in the hospital that night?

A. Yes, sir. I did.

Q. Okay. And you were released on the 22nd?

A. Yes, sir, I did, because I stayed the night in northeast medical center in the short-stay unit.

Q. Okay. It was my understanding, until we started talking about the workers comp thing, that you were put on light duty because of that

gallbladder surgery.

A. Yes, sir.

Q. Not because of the workers comp thing.

A. Both of them -- Selena Robinson at Verona Family Medical, she had put me on light duty when I first had the incident with the workmans comp because I had to go back and follow up with my primary. The city sent me to Dr. Brown here in Aberdeen; and then he told me to follow up with my primary doctor Selena Armstrong from Verona Family Medical.

Q. Okay. And that's regarding your gallbladder?

A. No, sir, that's workman comp. She put me on -- when I first had the incident with workman comp, she put me on light duty too. And then --

Q. Okay. That was in August?

A. August, yes, sir.

Q. Right. Okay. Well, you -- yeah. You took time off August, September.

A. Yes, sir. And I had -- September the 21st I had the gallbladder. When I came back Dr. Terry Pinson put me on light duty.

Q. All right. Let me hand you -- just do

this one at a time, actually.  It might be easier.

MR. WALKER:  This is premarked as DEF 1822.

BY MR. WALKER:

Q.   You would agree with me, Barry, that this is your time sheet from the electronic, like, clock in/clock out system?

A.   Yes, sir.

Q.   And it's for the month of September. Right?

A.   Yes, sir.

Q.   All right.  And it says that you were absent and scheduled off for that, like, last -- September 20th to the -- October 1st and you went back to work on October 2nd?  Is that -- is that accurate?

A.   Yes, sir.

Q.   Okay.  Is this relating -- the reason you weren't working is because you were on -- you were off work because of that workers comp incident?

A.   No, sir.  I was off for then, I had gallbladder surgery, on 9-20.

Q.   On 9-21?

A.   Yeah, 2023.

Q.   And you didn't go back in to work from that gallbladder surgery till October?

A.   Yes, sir.

Q.   Okay.

MR. WALKER:   Okay.   This is DEF 1824 and 1826.

BY MR. WALKER:

Q.   So 1824 and 1826, as you can see, Barry, are just your remaining October -- or I'm sorry -- like, your clock in/clock out time sheets for the month of October.   And it's got you scheduled off on Saturday and Sunday.   The whole month.

A.   Yes.   At this point right here, Mayor Charles Scott would not let me work any overtime or put me on any call in the month of October, 2023, because of the gallbladder surgery.

Q.   Okay.   So this is when you were on light duty because of the gallbladder surgery?

A.   Yes, sir.

Q.   Okay.   And they didn't want -- and that's the weight restriction thing?

A.   Yes, sir.

Q.   Okay.   And so was it -- during this

time you mentioned in your deposition testimony that you would, like, do stuff around the shop: Mop, and the door, and --

A.   Yes, sir.

Q.   -- whatever else?  They didn't want you out in the field?

A.   They didn't want me in the field.

Q.   Okay.  All right.

MR. WALKER:  All right.  Next is DEF 1828 and 1830.

BY MR. WALKER:

Q.   This is -- same thing, but this is the month of November.  And the schedule, you know, just looking from the time sheet, looks consistent with October.  It's, like, you worked during the week.  You got your eight-hour -- you know, over eight hours in.  And then you were scheduled off on the weekend.  You were absent one day, it looks like, or a couple days.

But is that -- is that -- is it the same story as October?

A.   Yes, sir, it is.

Q.   Okay.  I'm sorry.  I think I was looking at the wrong thing there.  DEF 1828 and 1830.  Yeah.  It's the work you worked during

the week -- you worked, yeah, some days over eight hours; but then you were either absent or you were scheduled off?

A.   Yes, sir.

Q.   Okay.  All right.

MR. WALKER:  This is 18 -- DEF 1829.

Give everybody a copy here.

BY MR. WALKER:

Q.   DEF 1829 is just -- I believe this is Marcus's version of your time sheets, and it's specifically for the pay period of November 15th through November 28th.

I guess just the question I was going to ask you is:  Looks like you got 10 hours of overtime during that two-week period.  Is that accurate?

A.   It got 11 hours there.  54 regular, 11 hour OT, 16 hour holiday, and 2 sick -- 2 off sick, the total of 83.

Q.   So it would have been 10 or 11 hours of overtime?

A.   Yes, sir.

Q.   Okay.  So you were earning overtime at the end of November?

A.   Yes, sir.

Q.   Okay.  Did you have -- other than the gallbladder surgery, did you have any other surgeries after that until the time of termination?

A.   I had my esophagus wrapped because I kept having heartburn; but that was, like, in 2021 or '22 with Dr. Pinson.

Q.   So not a -- not in 2023?

A.   No, sir.  Nothing in -- not in '23.

Q.   All right.  Any other, like, hospital visits during that -- you know, during -- really that last six months.  So I'll ask July 2023 to December.  I know you did the gallbladder surgery.  Any other major hospital visits that you can recall?

A.   One time I want -- I can't recall, but I remember one time I went to the emergency room down at Columbus.  My -- they ended up giving me a steroid shot because of my sinus.  Uh-huh.

Q.   Yeah.

A.   But just having surgery, I haven't had no major surgery.  I just went to the emergency room because of sinus drainage.

Q.   Okay.  This document's not premarked, but it was -- it's Exhibit B attached to

something.  You've produced this to us.  But we're looking at a -- it's a City of Aberdeen Water Department Request for Leave form --

A.  Yes, sir.

Q.  -- that's handwritten, dated November 29th, 2023.  And it's in the federal docket as Document 13-2 on December 25th.

From looking at your Complaint, it says that this is your request for FMLA leave?  Is that right?

A.  No, sir.  This is right here just for the day of leave, 11-27 of 2023.

Q.  So this isn't your request for FMLA leave?

A.  No, sir.

Q.  Okay.  And what is -- this is for the Monday, November 27th, date that you were out?

A.  Yes, sir.  We filled it out the next day when Marcus was doing time.  I filled it out on 11-28-2023.  Charles Scott disapproved it on November the 29th, 2023.

Q.  Okay.  All right.

Just a few more things about the Complaint.  Your Complaint says on page 10 -- and just -- if you don't want to pull it back

up, I just can represent this to you. But it says that -- at the bottom it says it shows that the plaintiff applied for sick leave for November 27th, 2023, which was due to his gallbladder.

What does that have to do with your gallbladder? I thought it was because you missed a day at work.

A. No, sir, because I --

Q. I mean because you -- your flight was delayed that's how your Complaint starts.

A. On the Complaint it started. But the FMLA, you can miss any time of the week. You've got 12 weeks to miss. So if the FMLA had been in play, I was off for the gallbladder. So instead of -- labor and wage give you 12 weeks so you could be off.

So I could miss any time or it's an unpaid -- like Ms. Moore said, it's an unpaid. So if I wake up that morning and said, Oh, my head hurts, only thing I got to do is notify my supervisor that I'm going to be taking off. Can't get docked for it, can't get nothing about it.

So I took off this day right here for

sickness, going to use it. I could use the 12 weeks anytime I wanted to. They use it.

Q. Okay. But it wasn't because of your gallbladder? I mean, I was just asking. That's what the Complaint says. It was because your flight was delayed?

A. My flight was delayed, and I was just going to use one of my FMLAs days up.

Q. Okay.

A. Until -- with my gallbladder. I wanted to use my FMLA days.

Q. Okay. But the -- for the gallbladder from September.

A. From September. I had from September the 21st, that day with my FMLA. It would have took me all the way to -- I think the labor and wage said it would have took me all the way to January the 3rd or 4th or something, but I had 12 weeks I could miss in that time.

Q. Okay. So you're marking it as sick leave, but you weren't sick, essentially. You're saying, I have these days; I'm going to use it.

A. Yes, sir.

Q. Okay.

GENA MATTISON GLENN, gena.glenn@gmail.com

All right. And then I think you've answered this, but your complaint also says, Plaintiff was an eligible employee because he had gallbladder surgery and other procedures.

Were there -- I was just going to ask if -- other procedures, if you knew what that -- you know, knew what that was referring to.

A. Other procedures, I had workman comp, and that's the only procedure, like....

Q. Let me ask a better question. There was no other procedures that required you to stay overnight in the hospital, though. It was just the gallbladder surgery?

A. That's it.

Q. All right. I need to ask you about damages. But that's it, and then we'll be done.

A. Uh-huh.

Q. Okay? And it's because....

Your Complaint asks for actual damages, compensatory damages, and punitive damages, including -- that's what we call emotional distress, which is just, like, garden variety emotional, you know, damages. So I got to ask you about your emotional distress. Okay?

A. I'm on Xanax right now because of this

right here done played a -- a big part of me.

Q. And I'll ask you, just so we can kind of do it just one by one. Okay?

A. Okay. Okay.

Q. So you don't just have to, like, go --

A. Okay. I'm sorry.

Q. But I guess just first question is: When did your emotional distress start?

A. I was already on an emotion -- taking a pill for -- Xanax and stuff like that for that --

Q. You mean at the time of termination?

A. Yes, sir.

Q. Okay.

A. Yes, sir. And then because of this problem right here kept going on, I'm still on it to this day right now.

Q. Okay. When did you -- if you recall, when did you start taking the Xanax or the anxiety med?

A. August the 6th of 2021.

Q. August 6, 2021. And then is that, like, a two-milligram prescription? Do you know the milligram?

A. It's a 10-milligram.

Q.   For the month?

A.   They give me 60, but it's 10 milligrams.  60 tablets.

Q.   Is it ten per day?

A.   No.  I think it's two per day.

Q.   Two per day.  But they give you about 60 a month?

A.   Yes.

Q.   So about two a day?

A.   Two a day.

Q.   Okay.  And then -- so I'm guessing -- did your emotional distress start in 2021?  And I guess that's when the school district terminated you, Aberdeen School District terminated you?

A.   Yes, sir.

Q.   All right.  Has your distress ended whatsoever as we sit here today?

A.   It was getting a little better.  Then after I ended up losing my job, she kept it going with the strong -- with the 10-milligram.

Q.   So it was getting better with the -- like, when you were working with the city?

A.   Yes, sir.

Q.   And then it flared back up after

termination?

A. Yes, sir.

Q. What about now? Has it gotten -- I guess just because some time has passed, has any of it gotten better now?

A. No, sir, it have not. I'm still on them and she's still recording it and everything in my file.

Q. All right. Can you just tell me, like, what -- are there any physical manifestations from your distress?

A. Yes, sir. I -- a lot of, like, stressed out over everything going on. My foreman was being -- doing stuff around the house. I'm always lonely and just want to be to myself. The only time I feel happy is when, like, I'm on, as my fiancée call it, my happy pill and stuff like that.

Q. Okay. Anything else? I like the "happy pill." Sorry. Didn't mean to laugh at your distress.

A. No, sir. No, sir.

Q. Okay. Who is the medical professional that you saw that prescribed you the anxiety med?

A.   The first one or now?

Q.   Let's start with the first one.

A.   The first one was so Selena Armstrong -- Armstrong.  Family -- Verona Family Medical.

Q.   Verona Medical?

A.   Yes, sir.

Q.   All right.  And then that's changed?

A.   It went to Char Easton [sic] at Monroe Region in Aberdeen.

Q.   Monroe Regional?

A.   Regional.

Q.   Is there a reason for the change?  Did you just start seeing a new doctor?

A.   Well, no, sir.  Instead of me going back and forth to Verona, and at the time that's when COVID had hit, so I just started going to the one in Aberdeen and see them quicker.

Q.   And just started seeing Dr. Easton?

A.   Yes, sir.

Q.   And then that's who you're currently at?

A.   No, sir.  I work in Columbus.  I'm up under Kim -- what's Kim last name?  Monroe Region -- the doctor named Kim.  I don't know her last name, but she's with the Monroe Region.

Q.   Same --

A.   Facility.

Q.   Maybe different -- same facility?

A.   Yes, sir.

Q.   Okay.  Both of those are in Columbus?

A.   One in Aberdeen, one at Columbus, but they up under the same name called Monroe Region.

Q.   I gotcha.  Any others?

A.   No, sir.

Q.   Okay.  Have you ever seen a -- like, a therapist?

A.   I talked to the -- just not seeing nobody.  I've just talked to my pastor and stuff like that in confidence.  Then we got a school nurse that, you know, I speak with her on behalf of it.  But just going to a therapist and sit down, I just talk to my pastor.

Q.   Okay.  Has any of the -- any of these medical professionals ever diagnosed you with any sort of disorder or disability or anything of that nature?

A.   The new one, she's saying that she think I had -- she ain't got -- put it in the notes or anything, but -- diagnosed me and

everything, but we just talking and everything. She ain't diagnosed me. She just saying that my anxiety real bad, hate to be around a loud crowd of people or a lot of noise and stuff, just like to stay to myself and stuff like that.

Q. Okay. And then you had Ozempic listed, but that's -- I'm assuming that's not related to the case?

A. Well, the Ozempic -- they were giving me medicine and it kept running my -- steroid shot, and it kept running my sugar up. And so they gave me Ozempic to bring down my diabetes because it kept running my diabetes up.

Q. Okay. But the diabetes isn't related to your termination from the city.

A. No, sir.

Q. The Ozempic is not related to all that?

A. But she was saying that it might could have did because of stress and everything like that.

Q. All right. Are there any other meds you're taking, or is it just -- it's just that one pill, and then you see currently a Kim somebody at Monroe Regional?

GENA MATTISON GLENN, gena.glenn@gmail.com

A.  Yes, sir.

Q.  Since you started taking it in 2021 to current date, has your -- like, the milligrams that you're prescribed, has it just remained the same the whole time?

A.  I think they first started me off with 5, and then end up going to 10 milligrams.

Q.  Do you remember when -- I'm sure it's in your medical records, but do you remember when they upped you to 10?

A.  I can't recall.

MR. WALKER:  All right.  I think that's all I have, Moreo.

MR. REDDICK:  Okay.  We'll go off the record.

(Brief recess.)

EXAMINATION

BY MR. REDDICK:

Q.  Mr. McMillian, I'm showing you -- this is Exhibit 4.  Can you just tell me what this entails?

A.  Yes, sir.  It shows that it's my time -- time sheet for November -- November -- for the month of November.

Q. Okay. Is there anything important about this document?

A. Yes, sir. 11-27, Monday, at 7:00 a.m., the 1300, 30.

Q. Okay. Did you clock yourself in on that day?

A. No, sir. I was not in the state of Mississippi on that day.

Q. All right. Did you ask anybody to clock you in for that date?

A. No, sir, I never did.

Q. Okay. So in reference to Mr. Brown, did you ever tell Mr. Brown to clock you in on November 27th --

A. No, sir.

Q. -- of 2023?

A. No, sir, I did not.

Q. Okay. All right. I'm going to show you Exhibit 6. This is a time sheet. Can you just tell me -- this is -- we're looking at Exhibit 6. Can you just tell me anything important about the document?

A. Yes, sir. It's employee daily time sheet from November 13th to 11-28 of 2023.

Q. All right. Can you tell me anything

GENA MATTISON GLENN, gena.glenn@gmail.com

important about this exhibit?

A. Yes. Mr. Collins wrote in on 11-27 -- it look like it was eight hours at first and then came back and marked through it and then put 6, and then indicated on four hours of sick time and put two down here. And I was not in the state of Mississippi on that day.

Q. Did you ask Mr. Collins to clock you in or anything for that day?

A. I never did.

Q. Okay. And that's for November 27, 2023?

A. Yes, sir.

Q. Okay. All right.

Okay. I'm going to show you Exhibit 5. Can you just tell me what Exhibit 5 shows?

A. Yes. On 11-28 of 2023, Triron Brown, I asked him to donate me time. And he donated me four hours of sick time on 11 -- 11-27-2023.

Q. Okay. Did you -- did the mayor -- well, at the time it would have been Mayor Charles Scott. Did he approve those hours to be transferred to you?

A. No, sir. He disapproved the hours.

Q. Is there a reason why for that?

A.   No, sir, it never did.  He just wrote on the paper and sent back to me saying that it's disapproved.

Q.   Okay.  I'm going to show you Exhibit 7.  Can you just tell me what this exhibit shows?

A.   Yes.  November 2023 on call, the water -- water department.  It's the call-out list, and it shows everybody who's on call for the month of November.

Q.   Are you on that list?

A.   No, sir, I'm not.

Q.   Is there a reason for that?

A.   Yes.  Charles Scott -- Mayor Charles Scott took me off the call list.

Q.   Why did he do that?

A.   I don't have any clue at all.  After -- my doctor ended up sending him a thing showing that I was back cleared for work and all.

Q.   Okay.  Did Mayor Scott have a problem with you or anything?

A.   Yes, sir, he did.

Q.   And why do you state that?

A.   I guess because the previous charges I

GENA MATTISON GLENN, gena.glenn@gmail.com

had filed with the EEOC; and ever since he know I filed that charge -- charge against the city, he just kept targeting me and going after me.

Q. Okay. Speaking of which, this is Exhibit 11. Is this the charge that you're talking about?

A. Yes, sir, this the one.

Q. Okay. What were the details about that one, that charge, EEOC charge?

A. The 423-2022-00047, that charge right here, I filed against the city of Aberdeen for discrimination, for -- I had got hired for the electric department as a ground meter and I never did get a chance to get the job, and they ended up giving it to three more Caucasian and never did give it to me.

Q. Okay. You said that Mayor -- well, then-Mayor -- we're talking about Charles Scott. Is -- we're looking at Exhibit 17. I guess it's the same -- I guess the same note or the -- I guess it's from Mr. Brown. You said something about the mayor disapproved it. Is this what you're referring to?

A. Yes, sir. Mr. Triron Brown, that Tuesday 11-28 of 2023, he donated me four hours.

It had never been a problem if other city employees donated and everything; but the former mayor, Scott, Charles Scott, disapproved my sick hours that Triron Brown gave me.

Q. All right.

MR. REDDICK: And we're looking, just for the record, at Exhibit 17. I just wanted to make sure that that's on the record.

BY MR. REDDICK:

Q. Can you read to me what that statement states?

A. Disapprove --

Q. Or says? I'm sorry.

A. Disapproved, Mayor Scott, November 29, 2023. Failed to follow proceeds.

Q. Is that proceeds or procedure?

A. Procedure.

Q. Okay. Did you follow the proper procedure when you applied for the -- or tried to get the sick leave -- sick hours from Mr. Brown?

A. Yes, sir. I ended up talking with my supervisor. My supervisor ended up approving it and wrote it up and sent it over -- sending it

113

over to the -- Melissa and them, to the payroll people.

Q. When you say you went to your supervisor about it, what supervisor did you go to, or who did you go to?

A. Marcus Collins.

Q. Okay. All right. I'm showing you Exhibit 18. Is there anything important about Exhibit 18?

A. Yes, sir. This is City of Aberdeen Water Department Request for Leave, Barry McMillian, 11-28-2023. I filled out the -- for sickness. And disapproved, Mayor, Charles Scott, November 29, 2023.

Q. And you're reading that where on this?

A. On the bottom part of it where Mayor Scott disapproved and I followed the procedure.

Q. Okay. Is there a reason why he disapproved that leave?

A. No, sir.

Q. Okay. Did you follow the proper protocol to get that leave?

A. Yes, sir, I did follow with my supervisor.

Q. Was this in relation to your

GENA MATTISON GLENN, gena.glenn@gmail.com

gallbladder surgery that you were talking about earlier?

A. Yes. I was still up under FMLA, up under -- at this time right here.

Q. Okay. So were you trying to report FMLA leave in reference to this?

A. Yes, sir.

Q. Okay. And this is a -- is this an illness -- is this a formal FMLA sheet, or what is this right here?

A. This a sheet that you fill out with your supervisor. He filled -- when you fill it out, he get it, he approve it and everything like that and they let you be off work, or whoever will donate you sick time or whatever. But you had to fill that request out with your supervisor.

Q. Did the City of Aberdeen, at the time that you filled this form out, have an FMLA policy in place?

A. No, sir, they did not. I had spoken with Ms. Moore about the FMLA, and she said they did not have nothing in place.

Q. Okay. So you tried to request your FMLA from Ms. Moore before?

A.   Yes, sir.

Q.   Okay.  And you said that she said it wasn't in place.  What do you mean by that?

A.   The city do not have it.  They have it in the handbook, but they do not have the form to give me to fill out for my doctor office to fill out to file for FMLA.

Q.   Did your doctor try to reach out to Ms. Moore to try to get the proper forms to Ms. Moore or for them to fill out the forms?  Can you just elaborate on that --

A.   Yeah --

Q.   -- what your doctor tried to do in reference to Ms. Moore?

A.   My doctor was trying to get Ms. Moore to send over the 106 form where they can fill it out where I can get my FMLA started; and Ms. Moore never did -- from back then to now, never filled out my FMLA paper.

Q.   And how do you know?

A.   I ended up speaking with my doctor, and they wrote me a letter on my behalf.

Q.   Okay.  Looking at Exhibit 19, can you just tell me what Exhibit 19 shows?

A.   It's referencing FMLA policy code

37-307-2005, the new update for the FMLA policy.

Q. Okay. Is this document show- -- is it of any importance?

A. Yes, sir. It's showing that the new policy been updated in 2005 by FMLA.

Q. Okay. To the best of your recollection, has the City of Aberdeen updated their FMLA policy? And what I mean FMLA policy, I mean the Family Medical Leave Act. Have they updated that policy?

A. No, sir. The last time the city had updated their policy was in 1998.

Q. And how do you know that?

A. Because of the handbook.

Q. Okay.

BY MR. REDDICK: Can I see Exhibit 23?

BY MR. REDDICK:

Q. All right. I'm going to show you Exhibit 23. This is the Compliance Action Report. Have you had a chance to look at this document before?

A. Yes, I have.

Q. All right. Was the city -- looking at Exhibit 23 was the city in violation of anything, according to this report?

GENA MATTISON GLENN, gena.glenn@gmail.com

A.   Yes, sir, they -- one violation.

Q.   And what was that violation?

A.   FMLA.   Total, FMLA.

Q.   Okay.   Just on this document, can you just read the conclusions and recommendations just for the record?

A.   Okay.   The conclusion:  84 hours, 203 (s)(x).  FC hd on 5-7-2024, W -- with Walter Zinn, city attorney, discussed the violation found in Section 25 -- I'm sorry -- 825.220(c) ee was terminated while on FMLA.  The er did not have any FMLA policy -- or policy for ees to follow.  Therefore, the ee was termed -- termed for employ [sic].  The ee equal from [sic} family -- FMLA for self.  FMLA provide explore (sic).  Attorney was presented with represent -- represent (sic) to resolve this case.  No adm settle (sic) was agreed to the ee notified of the 107(a) parentheses right by I-T-R -- I-T-R peer R adm clg w F -- NFA.  P: HRG 825 516 541 787 [sic] 778 FSs number sign 28D and number sign 44 WH-1421 parentheses P, another parentheses FLSA, parentheses FMLA, parentheses EPPA.  Valtressia Austin.

Q.   Okay.  All right.  You have a claim

for F -- well, I guess a retaliation charge for making a -- making an EEOC complaint against the city. Is there a reason why you think that the city retaliated against you --

A. Yes, sir.

Q. -- related to filing the EEOC charge?

A. Yes. I had filed an EEOC against -- for discrimination, and my case number was 198. And ever since I filed that charge I've been getting retaliation against them -- against me.

Q. Like what? Can you elaborate?

A. Mayor Charles Scott, the former mayor, Charles Scott, disapproved me being on overtime, disapproved my sick time, disapproved me for hours that I worked.

Q. Okay. What about the termination. Was the termination retaliation as well?

A. Yes, sir. The termination was retaliation because I had that -- the FMLA in place, and I was wrongfully terminated behind that.

Q. Okay. And what about the -- just in reference to your FMLA, did the City of Aberdeen interfere with your claim for your FMLA leave?

A. Yes, sir. They never did fill out my

paper or did anything for me to get my FMLA. And moving forward they didn't do it -- didn't have it in place at the time of my termination.

Q. Okay. Did they retaliate -- did the City of Aberdeen or the mayor retaliate against you for trying to claim your FMLA leave?

A. Yes, sir. They ended up terminating me.

Q. Okay. And so that's your main gripe with them, that they retaliated against you by terminating you for trying to claim your FMLA leave?

A. Yes, sir.

Q. What about the overtime? Is the overtime related to your FMLA?

A. Yes, sir, because he was -- Mayor -- former mayor Scott would not let me get overtime or anything like that.

Q. Okay.

MR. REDDICK: All right. I don't have any further questions for Mr. McMillian.

MR. WALKER: I don't have any questions. I do want to ask you for something, though.

MR. REDDICK: Okay.

GENA MATTISON GLENN, gena.glenn@gmail.com

MR. WALKER:  That copy of the -- this -- you produced this.  This is what Barry gave --

MR. REDDICK:  Yeah, that came from the EEOC.

MR. WALKER:  He produced this to the EEOC.  He produced this to the EEOC.  He has this document but it's not redacted.

MR. REDDICK:  Okay.

MR. WALKER:  And I would like it to be not redacted if it hasn't been produced.

MR. REDDICK:  Okay.  Yeah, I can ask him, but I want to -- is this a -- we can put this on the record.  Is this on the record?

Yeah, I'll see if he has it --

MR. WALKER:  I know this is from the EEOC, but this is what he gave to the EEOC as, like, his evidence.

MR. REDDICK:  Okay.

Do you have that?

THE WITNESS:  I can get it.  I don't -- can't recall do I have it.

MR. WALKER:  Or just confirm --

MR. REDDICK:  Yeah.

GENA MATTISON GLENN, gena.glenn@gmail.com

MR. WALKER: -- if he does not have it --

MR. REDDICK: Yeah, I'll do that. Yeah.

MR. WALKER: (Inaudible) like a spoliation.

MR. REDDICK: Yeah. Yeah, that's fine. I mean -- yeah. That's fine.

MR. WALKER: Okay.

MR. REDDICK: I want to say that --

THE WITNESS: Brown.

MR. REDDICK: Brown. Yeah.

But yeah, I'll -- I'll get that to you. I'm going to try to give you some --

MR. WALKER: Probably in e-mails from EEOC.

MR. REDDICK: Yeah. I get those.

MR. WALKER: You can have this if you want it.

MR. REDDICK: Yeah, just to make sure so I can make -- so I may have to take a picture of it so I can make sure.

MR. WALKER: And I'll check with Melissa on the memo that she said she might have had.

MR. REDDICK:  All right.  I'll try to keep it less cluttered as possible.  So I'll confirm that with him and just see can he -- I'm going to send that to him so he can give me that.

(Deposition concluded at 1:11 p.m.)

C E R T I F I C A T E

STATE OF MISSISSIPPI )

COUNTY OF MONROE      )

RE:  ORAL DEPOSITION OF BARRY McMILLIAN

I, Gena Mattison Glenn, CSR 1568, a Notary Public within and for the aforesaid county and state, duly commissioned and acting, hereby certify that the foregoing proceedings were taken before me at the time and place set forth above; that the statements were written by me in machine shorthand; that the statements were thereafter transcribed by me, or under my direct supervision, by means of computer-aided transcription, constituting a true and correct transcription of the proceedings; and that the witness was by me duly sworn to testify to the truth and nothing but the truth in this cause.

I further certify that I am not a relative or employee of any of the parties, or of counsel, nor am I financially or otherwise interested in the outcome of this action.

Witness my hand and seal on this 13th day of April, 2026.

_____
My Commission Expires:      MS CSR 1568
July 19, 2027               Notary Public
                           TN License No. 884

GENA MATTISON GLENN, gena.glenn@gmail.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**ABERDEEN DIVISION**


**BARRY MCMILLIAN**                       **PLAINTIFF**

**VS.**         **CIVIL ACTION NO. 1:24-CV-199-GHD-RP**

**CITY OF ABERDEEN**                 **DEFENDANT**


CERTIFICATE

    I, Barry McMillian, have read the foregoing pages, 1-123, of the transcript of my deposition given on March 31, 2026, and it is true, correct and complete to the best of my knowledge, recollection and belief except for the list of corrections, if any, attached on a separate sheet herewith.  Witness my hand, this the _____ day of _____, 2026.


                              _____
                              Barry McMillian



CERTIFICATE

    Subscribed and sworn to before me, this the _____ day of _____, 2026.



_____
Notary Public in and for the
County of _____
State of Mississippi
My Commission Expires:  _____

GLENN REPORTING
P.O. BOX 492
AMORY, MISSISSIPPI 38821-0492


CORRECTION LIST
Barry McMillian vs. City of Aberdeen
No. 1:24-CV-199-GHD-RP

CAPTION

March 31, 2026                    Barry McMillian

DATE OF DEPOSITION                DEPONENT'S NAME


PAGE   LINE    CORRECTION                    REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

                        _____
                        Barry McMillian

GENA MATTISON GLENN, gena.glenn@gmail.com