IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

BARRY MCMILLIAN                                    PLAINTIFF

VS.                    CIVIL ACTION NO. 1:24-CV-199-GHD-RP

CITY OF ABERDEEN                                   DEFENDANT

*************************************************************

DEPOSITION OF MELISSA MOORE

*************************************************************

TAKEN AT THE INSTANCE OF THE PLAINTIFF
AT THE ABERDEEN CITY HALL, 125 WEST COMMERCE STREET,
ABERDEEN, MISSISSIPPI,
ON MARCH 31, 2026, BEGINNING AT 10:23 A.M.

GENA MATTISON GLENN, MS CSR 1568, TN LCR 884
Glenn-Henry Reporting
Post Office Box 492
Amory, Mississippi  38821-0492
gena.glenn@gmail.com
(662) 315-2613

Exhibit F

APPEARANCES:

DEMOREO REDDICK
          P.O. Box 465
          Okolona, MS   38860
          For the Plaintiff

PHELPS DUNBAR
          P.O. Box 320159
          Flowood, MS   39232
          For the Defendant
          BY:   LODEN P. WALKER

ALSO PRESENT:   BARRY McMILLIAN

Reported by:   GENA MATTISON GLENN,
               MS CSR 1568, TN LCR 884

TABLE OF CONTENTS

WITNESS                                                    PAGE

MELISSA MOORE
Examination by Mr. Demoreo Reddick                          4
Examination by Mr. Loden P. Walker                         37
Examination by Mr. Demoreo Reddick                         45



EXHIBIT
  NO.   DESCRIPTION                                        PAGE

1-22   ** Previously Marked Exhibits in Preceding
        Depositions


  23    U.S. Department of Labor
        Compliance Action Report                            31

MELISSA MOORE,

being first duly sworn, was examined

and testified under oath as follows:


EXAMINATION

BY MR. REDDICK:

Q.    All right.  Ms. Moore, my name is Attorney Reddick.  I represent Mr. McMillian on this case.  Basically he has a lawsuit against the City of Aberdeen and whatnot.

I'm not here to trick you.  I'm just here to get information.

A.    Uh-huh.

Q.    If you don't know something -- if I ask you a question and you don't know the answer, just say "I don't know."  If I ask you a bad question, just say that "I don't understand what you're asking"; and I'll try to rephrase it and ask a better question.

A.    Okay.

Q.    I guess my first question is:  Are you on any medication that would affect your ability to give a deposition today?

A.    No.

Q.    Okay.  All right.  Have you ever gave

a deposition before?

A. Yes.

Q. Okay. All right. So basically the court reporter's making a record. It's best that we don't talk over each other.

A. Uh-huh.

Q. If I ask a question, just allow me to ask the question in full; and then when you -- you know, I guess when you give your response, I'll let you, you know, give your full response.

A. Okay.

Q. And so basically, like I said, we just don't need to talk over each other.

A. Okay.

Q. Is that fair?

A. That's fair.

Q. Okay.

All right. Can you just state your name for the record?

A. Melissa Moore.

Q. Okay. All right. And where do you reside?

A. Here in Aberdeen, Mississippi.

Q. Okay. Do you have any family in Monroe County?

A. Yes.

Q. What are their last names?

A. Moore. Oh, my God. The basis is Moore, Clay, Buckinghams. Gosh. Hodges. Ealy. I'm trying to think. I got all kind of family. I'm -- the Moores, Clay, Ealy, Buckingham. I'm thinking that's it.

Q. Okay.

A. I'm thinking I might have left one, but I'm thinking that's kind of the base of the family.

Q. Okay. Are you married?

A. No. Single.

Q. Okay. Do you have any kids?

A. One daughter.

Q. How old is she?

A. 33.

Q. What's her name?

A. Shanice Fears.

Q. Can you spell that for me?

A. S-H-A-N-I-C-E F-E-A-R-S.

Q. Okay. All right. And what was your address that you had -- did you state your -- where you reside? I know you said in Monroe County, but what's your address?

A. 606 Boundary Street, B-O-U-N-D-A-R-Y, Aberdeen, Mississippi 39730.

Q. All right. And I don't want to know what you and your attorney talked about, but how did you prepare today?

A. I kind of went back and looked over some information that we shared as it relates to this case.

Q. Okay. All right. And so I'm just here to ask questions. So I guess just -- my first question is: Are you familiar with Mr. McMillian?

A. Yes. I know Mr. Barry McMillian.

Q. Okay. All right. And one other question I should have asked you first. You're the city clerk for the City of Aberdeen?

A. That is correct.

Q. Okay. And how long have you had that position?

A. Since August 12, 2020.

Q. Is that an elected position or does the mayor?

A. It's an appointed position.

Q. Okay. And so by "appointed" you mean the mayor is the one that assigned that --

A.    No, the board.

Q.    -- you to that -- the board?

A.    Yeah.

Q.    Okay.  How many times have you been elected for that position -- or selected?

A.    I got hired in 2020.  I want to say in -- my parents -- I want to say in July of 2022. July 2023.  July 2024.  July 2025 -- because they started -- they started -- when I first started here, I thought it was like a four-year, every --

Q.    That's what I was going to --

A.    Every administration.  But when the previous mayor came in, Charles Scott, he started doing it -- he said that it should be done every year.  So I want to say -- I want to say January 2022 was the first because I'm trying to think if they did it in '21, because he came into office in '21.  And it may have been -- I have to look at -- but it -- they -- he made it -- they made it annually, so it comes before the board, and then the board has to motion, second, and then get three votes to reappoint me for another year.

Q.    Okay.  All right.  Now -- and what's

your highest level of education?

A. B.S. degree in psychology.

Q. And where did you get that degree from?

A. Colorado Technical University.

Q. What year was that?

A. 2016, if I'm not mistaken. I want to say March or April of 2016. I think that's the date, if I'm not mistaken.

Q. Okay. All right. I guess, like I said -- I'm sure you know why you're here today. Just to give your testimony and whatnot --

A. Okay.

Q. -- of what you do or do not know.

Just in reference to Mr. McMillian -- well, let me ask you this: Charles Scott. How long was he your boss?

A. Charles Scott was elected in March -- because, see, the position came available in February '21. The election -- March 2021. Yeah. March 2021, if I'm not mistaken. Yeah, because he came in after the other mayor --

Q. Okay.

A. -- was dismissed from office. I want to say it was March. March 2021.

Q.   Okay.

A.   I want to say.  But I know it was '21.

Q.   All right.  Just in reference to Mr. -- well, Charles Scott, who was the then-mayor, did you ever notice any interaction between him and Mr. McMillian?

A.   Only interaction is just when they had a meeting in the mayor's office that I witnessed.

Q.   And what meeting was that?

A.   There was a meeting called with the previous mayor, Charles Scott, Mr. McMillian, Barry McMillian, and I think -- yeah, I think Marcus Collins was in there as well as myself. And it was to discuss what was said and what was told to have happened that involved Mr. Brown, Triron Brown.

And so Mayor Scott stated before we start this meeting, Mr. McMillian, I know you're recording the meeting.  So if you're going to record the meeting, I'm going to record the meeting as well.

So Charles Scott got his phone and just made it known to everybody that this meeting is being recorded, and he set the phone

on the desk.

Mr. McMillian, Barry McMillian, didn't agree to that. And he got up, stormed out, and just said, I'm not going to be a part of this. And he walked out. And that ended that.

Q. Okay. Did the meeting continue?

A. No. That was it.

Q. Okay. So I guess after Mr. McMillian left, Mr. Scott, did he continue to have a conversation with Marcus Collins or Mr. Brown?

A. See, Mr. Brown wasn't in on that meeting.

Q. Okay.

A. No. After that I just got up and I left out. If Marcus Collins remained in there -- he may have. I can't remember, so -- but I got up and left and just went back to my office.

Q. Okay. So there was never a meeting where Mr. Brown, Mr. McMillian, and Mr. Collins all were sitting down with Mayor Scott or the then-mayor?

A. Yeah. There was a meeting held with them. That was on November the 30th, 2023.

Q. Is that the one you're saying that Mr. McMillian -- he left?

A. No, this is a different -- because, see, this one Barry wasn't in on this meeting. On this particular meeting it was me, Charles Scott, Triron Brown, and Marcus Collins.

Q. And what about Mr. McMillian?

A. He wasn't in on that meeting.

Q. Okay. What date was that meeting?

A. Of which one?

Q. The one you just said it was you Charles, Collins, and Brown.

A. That's the November 30th, 2023.

Q. Okay. Was that meeting recorded?

A. I do not believe so. I don't remember the previous mayor, Charles Scott, saying that that meeting was recorded. He just stated that once the meeting was ended, just do a memorandum of record about what had happened.

Q. Did you write a memorandum for that meeting?

A. Yes, sir.

Q. Okay. And just to make sure -- because you said -- you have the November 30th, 2022. What about the --

A. '23.

Q. '23?

A.    Yeah.

Q.    And what about the one that you said Mr. McMillian stormed out of?  Do you have -- is there any record of that one, that meeting?

A.    I don't believe so.  I can go back and recheck to double check -- because that was one thing that the previous mayor would always ask any time there was a meeting that would go on in his office that I played a part of.

Q.    Uh-huh.

A.    He would just say, Just do a memorandum of record because you never know when this may come up.

I can go back and check it and see.  I don't recollect doing one, but it could be and I could have just overlooked it.

Q.    Okay.

A.    Yes, sir.

Q.    We had a deposition of Mr. Brown.  He said that he had a meeting with Mr. Scott.  Were you -- I don't know if it was -- the meeting was with him and Collins and yourself.  But do you remember a meeting with -- you and Mr. Brown, Triron Brown?

A.    The only meeting I had is the one with

Charles Scott, myself, Triron Brown, and Marcus Collins.

Q. And just to make sure for the record, was that meeting recorded?

A. Not sure if that meeting was recorded or not.

Q. Okay. If it was recorded who would -- who would have been the person to record that meeting?

A. If it was recorded it would have been Charles Scott.

Q. Okay. Let me ask you this: When is the last time you've had a conversation with Mr. Scott?

A. I talked to Mayor Scott last week, and it was regarding some grant opportunities in the city.

Q. Okay. Is he -- does he stay in Aberdeen?

A. No. He don't live -- he live out of state.

Q. Okay. Where does he live?

A. What is his -- I want to say Nebraska, and I might be wrong. Yeah, because that's where his -- he does have a home here.

Q. Okay.

A. But he lives out of state, him and his wife. I want to say Nebraska -- because he never changed his tag. I might be wrong on that, but it's out at (indiscernible), Mississippi.

Q. Is he still considered a resident of Monroe County?

A. That's a good question.

Q. Okay. I'm just asking do you know.

A. I don't know because, see, I don't handle registration and stuff like that.

Q. Okay.

A. That's done on a county level.

Q. Okay.

A. Yes, sir.

Q. So you don't know if he's going to rerun for mayor or anything?

A. I have no idea.

Q. Okay. So just going back to Mayor Scott, you say you know they had an interaction with each other that -- my client and Mr. Scott. Have you ever seen them interact with each other outside of that meeting, the meeting that you mentioned about where Mr. McMillian -- you said

he left the meeting?

A. Okay.

Q. Have you ever noticed their interaction with each other outside of that meeting?

A. Who are the "each other" you reference?

Q. Mr. Scott and Mr. McMillian, my client.

A. Not that I recall.

Q. Okay. Do you know at -- let me ask you this: Had Charles Scott ever made any comments to you about Mr. McMillian that you can recall?

A. None that I can recall.

Q. Okay. Are you familiar if Mr. McMillian ever filed an EEOC charge against the City of Aberdeen?

A. Yes.

Q. Okay. How are you familiar with that?

A. I'm familiar with it because whenever any city employee files an EEOC, it comes to my e-mail.

Q. Okay.

A. And then I just direct it straight to

GENA MATTISON GLENN, gena.glenn@gmail.com

the city attorney. And then they will open it up, look at it, address the concern of it, bring it before the board to kind of let the board know that this is an EEOC complaint from a city employee.

Q. Okay. And so he has two EEOC charges. Were you the city clerk for both of those charges?

A. Yes.

Q. Okay. And who was the city attorney for his first charge? Do you remember?

A. If my memory serves me correct, it would have to be Walter Howard Zinn, Jr.

Q. Okay. There was another attorney here at some point, Faulks. When did he leave?

A. He didn't get reappointed. When I started here -- well, in 2020 he was -- okay. In 2020 he was here. But Attorney Zinn got reappointed.

I can't recollect the correct date, because at one time I did sit up under the administration of the city attorney, Robert Faulks.

Q. Okay.

A. I can't remember when did the board --

I can't give you a definite date and year exactly when the board decided to not -- to kind of dismiss him, I guess --

Q. Uh-huh.

A. -- to no longer needed his services. But I know I did work up under him some because me and Attorney Faulks used to talk a lot as far as board-related items --

Q. Okay.

A. -- and city items, but I can't give you a definite date exactly when his -- when he ended and Attorney Zinn started.

Q. Okay.

A. Yeah.

Q. All right. And I guess just going back to -- let me ask you, when I'm referencing Mr. Scott, I guess as far as Mr. McMillian's employment with the city, you're saying you didn't really get to see their interaction with each other, like, while Mr. McMillian was working or anything?

A. And that's between --

Q. Yeah. Mr. McMillian -- say, like, if Mr. McMillian is working, you know, fixing a leak or something like that, did you ever get to

see anything with -- any interaction with Mr. Scott and Mr. McMillian?

A. No.

Q. Okay. So most of your interaction that you saw with Mr. McMillian and Mayor Scott -- well, Charles Scott would have been in this facility, in this building?

A. Yes, sir.

Q. And this building is the --

A. City Hall.

Q. City Hall. Okay.

So you yourself, you really don't go anywhere outside of City Hall?

A. Every now and then, if I get a call of concern from a supervisor, no matter what department it may be, that I need to come and look at something, I will. But other than that, we leave that up to the day-to-day operator, which is the mayor.

Q. Okay. And let me ask you this: Are you over payroll or anything?

A. No, sir.

Q. Okay. If someone punches in and out of work, you're not over that?

A. No.

Q. Okay. Who's over that?

A. That's Ms. Karen Crump's office, and then the people in her office.

Q. So that's with the time cards?

A. No, we got a time clock. I've never had a time card since I've been here.

Q. Okay. So who's over that?

A. Karen Crump.

Q. Okay.

A. Yeah. Her office is over all of that.

Q. What's her official -- what's the name of her official position?

A. Comptroller.

Q. How long has she had that position?

A. Ms. Crump was here when I started in 2020. So I'm -- I know she's been here at least 25 years.

Q. Okay. So just in reference to checks and balances, your department -- does your department have a human resources department?

A. The city don't have a human resources department.

Q. Okay. I've been told that. I'm just trying to -- I thought that had got rectified. So is that still the case?

A. That's still the case.

Q. Okay.

A. We just make it work.

Q. Okay.

A. Yeah.

Q. So at the time that Mr. McMillian -- this lawsuit was filed in '24, but in '23 there was no human resources department?

A. Huh-uh.

Q. So has the City of Aberdeen never had a human resources department, ever?

A. Never had a human resources department. When I started here that was one of my questions, like, where is the human resources department here? And they would say, Well, the clerk have always just done it, or they just made it work.

Q. Uh-huh.

A. So there was never a designated department where you could say human resources.

Q. Okay. And let me ask one more question about Charles Scott. Have you ever seen Mr. Mayor Scott make any type of negative comments about Mr. McMillian?

A. No, sir.

GENA MATTISON GLENN, gena.glenn@gmail.com

Q.   What about Mr. Brown?  Has he ever made any, I guess, disparaging remarks about Mr. Brown?

A.   No, sir.

Q.   Okay.  And that's just to your knowledge?

A.   To my knowledge.

Q.   Okay.

A.   Yes, sir.

Q.   On the board meeting that Mr. McMillian was terminated, do you know what was talked about in executive session?

A.   Now, executive session -- because you're looking at, what, 2023 if I'm not mistaken?

Q.   Yes.

A.   To recollect exactly verbatim word for word, I couldn't give it to you.  And normally with closed determination in executive session, that's information that's -- we don't share --

Q.   Uh-huh.

A.   -- outside because we have to have everybody to step out of the room.  And that's when the board and the mayor and myself -- because the board is the person who ask -- who

gives the permission as who could stay.

Q. Okay.

A. And then they always ask me to stay. But to be able to tell you exactly conversation that took on that day, I couldn't give you that.

Q. Okay. I had talked to Mr. Cain. He said there may have been some packets and whatnot that's in relation to Mr. McMillian. He said if that was the case, you would have that packet?

A. Now, if anything was provided by Mr. McMillian on that particular day when he attended that board meeting, then I would have something in that particular board meeting case file.

Q. Okay. So that -- there may be something in a -- how do you store that? Where is that information?

A. I have a filing system in my office. And then depending on how far back, it may be boxed up and placed in storage.

Q. Is that attached to the minutes for -- I think it was December 6th or something like that. It was in December '23. So you have it filed in chronological order with dates?

A. Uh-huh.

Q. Okay.

A. Yes, sir.

Q. All right. But you -- do you know if there's a file that exists for Mr. McMillian from that board meeting?

A. I can't recollect that and tell you that it is or that it's not.

Q. Okay.

A. No, sir.

Q. Now, just in reference to FMLA, can you just tell me what the -- what the City of Aberdeen's -- how can I say -- how can I say it? Strike that.

In reference to FMLA can you just tell me what the City of Aberdeen does in relation to that?

A. Well, FMLA is just -- it's just approved leave. There are qualifications that, you know, an employee has to meet to even qualify for FMLA. Once information is presented to the person that should have it that handles FMLA, and we go through the necessary steps of doing it and see if that person meets the criteria for that type of leave --

Q.   Okay.

A.   And it's nonpaid leave, so....

Q.   Okay.

A.   Uh-huh.

Q.   In reference to I guess this situation at hand, did Mr. McMillian ever come to you to tell you that he needed to take FMLA leave?

A.   No, sir.

Q.   Okay.  So did you ever receive anything from his doctor stating that Mr. McMillian needed to take FMLA leave?

A.   There was some information shared, but it would more than likely have probably came from the lady that was handling the workers comp on his case.

Q.   Can you elaborate on that?

A.   Yeah.  Because he had a workers comp case --

Q.   Okay.

A.   -- is what I'm saying and then after his workers comp case, if anything changes the workers comp coordinator at that time, which was Ms. Janet Parks -- you know, normally whatever information she have she'll share.  Whatever she don't have she can't share.  So that

information.

Q. Okay. And just in reference to Mr. --

A. Excuse me.

Q. You're all right. Just in reference to Mr. McMillian, did you ever make the comment to him that we don't have FMLA in place?

A. Not that I recollect saying that, sir.

Q. Okay. But you say you're not sure one way or the other?

A. That's correct.

Q. Okay. Did you ever give Mr. McMillian any forms to fill out in reference to him trying to take FMLA leave?

A. Not that I can recollect at this -- I don't -- I don't recall. I don't recall that.

Q. Okay. At the time in 2023 did the City of Aberdeen have any FMLA forms for their employees?

A. There were some FMLA forms in a filing cabinet.

Q. Do you know if those forms were ever given to Mr. McMillian?

A. I can't recall if they were given to him or not.

Q. All right. Okay.

Did the U.S. department of labor and wage ever come to the City of Aberdeen and investigate, I guess, Mr. McMillian's situation? Do you recall anything like that?

A.   Yes, sir.

Q.   Can you just tell me what -- what came about, what -- what that investigation -- what did the U.S. department of labor and wage -- what was that conversation like?  Did you get to speak to them?

A.   Yeah.  Their -- Mr. Edward Houston, he was a private -- an investigator.  I think that was his title.  He came in because of the information that they had received from Mr. McMillian.  So there was a case started.

So he came in, had a conversation with myself.  He had a conversation with Ms. Crump. Yeah, because there were dates of time, payroll style [sic], that she had to provide; and I think he wanted back, like, two -- two years.

But him and I, we had a conversation. He was letting me know that there was a case filed for Mr. McMillian.  And they were just -- had to investigate it to see whatever information shared was true or not.

Q. Did Mr. Houston ever -- or anybody from the U.S. department of labor and wage make a citation toward the City of Aberdeen?

A. Not that I'm aware of.

Q. Okay. Do you know if the City of Aberdeen got fined by the U.S. department of labor and wage?

A. Not that I'm aware of.

Q. Okay. Did Mr. -- was Mr. -- well, Attorney Zinn involved with the investigation with the department of U.S. labor and wage?

A. He knew that they were present because anytime something I feel like that falls within the legal realm, I always contact the city attorney. But as far as him sitting in on a conversation, he never sat in person; and I don't recollect him ever being, like, over the phone or anything.

Q. Okay. Did the U.S. department of labor and wage ever state to you that the City of Aberdeen needed to update their policy in reference to FMLA leave?

A. Yes.

Q. What was that -- can you elaborate on that conversation?

A. And that conversation didn't come from Mr. Houston because Mr. Houston passed the case over to a female, a lady. I cannot think of her name for nothing. But she did ask me to let her see the forms that was in the office, and I did, and she was just saying that they just needed to update.

So what they did, they just shared the website of everything where you can go and print out forms; and she was just saying, For future references, these are the forms you need to use.

Q. Okay. And when I say FMLA, just for the record I'm saying the Family Medical Leave Act.

A. Uh-huh.

Q. But did they ever -- did the U.S. department of labor and wage ever state to you that your handbook was out of date in reference to FMLA?

A. No, they never said that. Or I don't recollect them saying that.

Q. Okay.

A. Yeah.

Q. Did the U.S. department of labor and wage ever tell you that -- that in reference to

FMLA, the employees weren't notified of their rights for FMLA leave?

A.    Are you asking if she shared that with me that employees was not?

Q.    Yes.  Were not.  Yes.  Correct.

A.    Nothing -- I don't recollect that.

Q.    Okay.

A.    I don't recall that.

Q.    Do you know if the U.S. department of labor and wage informed you that there wasn't signs or anything for employees to see what their rights were in reference to FMLA, like, posted or anything?

A.    They did mention that to me.  We do have signs up and -- but they asked me to go in and just print out the signs that they have on their website and that's what I did and posted up.

Q.    Okay.  Did the U.S. department of labor and wage ever tell you that your, I guess, FMLA policy was not up to par?

A.    I don't recollect them ever saying that.

Q.    Okay.  Do you know if the U.S. department of labor and wage gave you a

violation or cited you for a violation in reference to FMLA?

A. I don't recollect that either.

Q. Okay. I think this is going to be exhibit -- if I'm not mistaken -- Exhibit 23. I think that should be 23.

- - - - -

(Exhibit Number 23 marked.)

MR. REDDICK: Thank you.

BY MR. REDDICK:

Q. Before I show you this, did -- do you know if Mr. -- Attorney Zinn was ever contacted by the U.S. department of labor and wage to fix the City of Aberdeen's FMLA policy?

A. Yes. As a matter of fact, the board voted for whatever changes to update the FMLA policy.

Q. Has that policy been fixed yet?

A. Yes.

Q. When was it fixed?

A. I can't give you a definite date. I don't know if that was in -- because it was during the time that the U.S. department of wage and labor was here. That was one of the things

that they asked us to do, just to make sure that everything was current policywise as it relates to FMLA.

I can't give you a defendant in the definite date on when that was, but the board did vote in an updated, amended FMLA policy.

Q. Okay. Do you have a copy of that, of the updated policy?

A. Yeah. It's in the handbook.

Q. Okay. Do you know who prepared that handbook with those corrections?

A. Well, the handbook itself was prepared when I got here. It was already -- that handbook. All they did is update that insertion of the FMLA, because FMLA was in the handbook; it just needed to be revised. And Attorney Zinn revised that and got the board's approval to accept the revisement.

Q. Okay. But you're not sure what the date is for that revision?

A. No, sir.

Q. Okay. All right. This is -- Exhibit 23 is a compliance action report from the U.S. department of labor and wage.

MR. REDDICK: Do you want to --

MR. WALKER:  That's fine.

BY MR. REDDICK:

Q.   This is going to be page 2. Ms. Moore, can you just -- well, I'm going to let you look at this document, just flip through it, and then --

A.   Okay.

Q.   -- when you have a chance to just glance at it, to let me know that you looked at it.

A.   (Witness reviews document.)

Q.   All right.  Ms. Moore, you've had a chance to look at Exhibit 23.  Have you ever seen this document before?

A.   Yes, I've seen it.

Q.   Okay.  Just in reference to this, now that you had a chance to, I guess, look at this exhibit, do you know if the City of Aberdeen was ever given a violation or cited for a violation by the U.S. department of labor and wage?

A.   From looking at that and just to say a violation, I still can't tell you exactly there was a violation.

Q.   Okay.  Can you -- we're looking at page 2, Exhibit 23.  Can you just read -- I'm

GENA MATTISON GLENN, gena.glenn@gmail.com

pointing to it right here.

A.   Right here?

Q.   Yes.  Can you read what that says?

A.   Discrimination, parenthesis, e dot g dot disciplinary action, forward slash, refusal to remedy, forward slash, resolve RTR, end parenthesis.

Q.   What's that number right there?

A.   Number 1.

Q.   All right.  Is that citing the City of Aberdeen for a violation?

A.   It's saying Violation 1.

Q.   Okay.  All right.

Can you read where it says Conclusion and Recommendations on Exhibit -- on Exhibit 23, page 2?

A.   Here?

Q.   Yes.  Yes, ma'am.

A.   84 hours, 203, s in parentheses, x in parentheses, upper case F upper case C h-d on 5/7/2024 with Walter Zinn, City Attorney to discuss -- I guess that's violations, v-i-o-l-s f-n-d in Section 825.220, c in parentheses, e-e was terminated while on FMLA leave.  The e-e did not have an FMLA policy for e-e-s to follow;

therefore, the e-e was termed from employment. E-e equal for -- no, e-e q-u-a-l for FMLA for self. FMLA p-r-o-v-s e-x-p-i-d [sic]. Attorney was represented -- was presented with resolutions to resolve the case. No a-d-m settlement was agreed to. E-e n-o-t-i-f of 107, a in parentheses, rights by I-t-r [sic], upper case R, a-d-m, lower case c-l-g with -- w forward slash, upper case N-F-A, P dot H-R-G, 825,516, 541, 785, 778 F-S-s, pound key 2-8-D and pound key 44 W-H dash 1421, p F-L-S-A comma F-M-L-A comma E-P-P-A, parenthesis. Ms. Valtressia Austin.

Q. Okay.

A. Edward Houston.

Q. All right. And so what does that conclusion report tell you after reading it?

A. That's a lot. That's a lot. And that's something that have to really be read again because of the abbreviations to get the clear understanding exactly as what Ms. Allison is trying to say.

Q. Okay. So if I told you that basically it found the city was in violation in reference to Mr. McMillian's FMLA rights, would that sound

correct?

A. Somewhat.

Q. Okay. So let me ask you this: So it went to the U.S. department of labor and wage investigating Mr. McMillian's matter -- hold on. Strike that.

So after the U.S. department of labor and wage investigated Mr. McMillian's matter, that's when the City of Aberdeen corrected their handbook, is that accurate, in reference to FMLA?

A. After having the conversation with Mr. Houston as well as Ms. Austin when she did take over the case, and she looked at the forms that we do have, she was just saying the forms just -- the forms need to be updated. And they also had read over the handbook that had the FMLA policy in it, that it just needed to be updated.

Q. Okay.

MR. REDDICK: Can I have a few minutes with my client for a second? Take -- I guess take this off the record.

MR. WALKER: Off the record.

(Off record.)

BY MR. REDDICK:

Q.   Ms. Moore, I have one more question.

A.   Yes, sir.

Q.   When Mr. McMillian was terminated in December of 2023, do you know if the board was aware that he was on workman's comp at the time of his termination?

A.   If he was on workers comp?

Q.   Yes, ma'am.

A.   I believe the board was aware of that.

Q.   Okay.  All right.

MR. REDDICK:  I don't have any further questions for Ms. Moore.

MR. WALKER:  Okay.  I just have just a couple of follow-up questions.  Not many.

                    EXAMINATION

BY MR. WALKER:

Q.   The first are -- I just wanted to ask you about the time clock system.

A.   Okay.

Q.   Mr. Brown -- he alleges that he was falsely accused of -- of clocking in on -- somebody clocked him in on a day that he wasn't here?

A.    Uh-huh.

Q.    Are you familiar with the time clocking system in the water department?

A.    Yes, sir.

Q.    Okay.  How -- just walk me through briefly just what the process is of clocking in and clocking out.

A.    The process of all city employees clocking in and out, you have to -- the comptroller gave everybody, like, an assigned ID number.  Just like a two --

Q.    Like, an employee number?

A.    Like, an employee ID number.  And then you have to know the -- it's the last four numbers of your Social.  And that's the only way you can clock in.  You have to do the employee ID number, and then you have to use the last four of your Social.

Q.    So it's not as similar as just clicking somebody's name?

A.    No, sir.

Q.    You have to know their employee number, which is two digits, and then also the last four of their Social?

A.    Of their Social.

GENA MATTISON GLENN, gena.glenn@gmail.com

Q. Okay. All right. Jump forward to --
you mentioned the November 30, 2023, meeting --

A. Yes, sir.

Q. -- that you were there with
Mr. Brown --

A. Yes, sir.

Q. -- as well as Mr. Scott?

A. Yes, sir.

Q. And Mr. Collins?

A. Yes, sir.

Q. But Barry was not there?

A. No, Barry was not in that one. No,
sir.

Q. Okay. What do you recall Mr. Brown,
if anything, saying during that meeting?

A. In that meeting Mayor Scott --
previous mayor, Charles Scott, asked Triron
Brown if he was willing to share information as
to what happened on the date of November 27th,
2023. And Triron Brown told him that he had
clocked in Barry McMillian that day. He said
but that was the only time that he had ever done
it.

And so Triron said, Well, if we're
going to talk about this, we might as well just

bring everybody in because a lot of people are clocking other people in. But the previous mayor, Charles Scott, said, We're -- the concern now is of you, not anybody else.

And so Marcus Collins would tell him, Just tell the truth. You need to tell the truth. And so he told that he did clock him in.

Mayor Scott -- previous mayor, Charles Scott, asked him if he wanted to do a written statement. Mr. Brown said, No, I don't want to do a written statement. He said, But I am admitting to you that I did clock him in that day, but I've only clocked him in that one time.

So Mayor Scott was telling him, said, Well, more than likely you're going to have to come to the board meeting because you're going to be asked -- this is going to come up at the board meeting I have in closed determination of our executive session.

So Triron Brown said, Well, I -- I don't -- I -- I don't want -- I don't want to do that because I know how the city is. I know how -- I already know that more than likely they're just going to fire me anyway, so what's the purpose of me coming to the meeting? I might as

well just turn my stuff in now.

And then the previous mayor said, Well, no, don't do that. He said, I'm just going to have a talk with the board and see. You know, maybe they'll just suspend you. He said, But we just need you to show up.

And then Marcus Collins was saying, You know, you're a really good worker, Triron. We really don't want to lose you as a city employee because you're -- you know, you just -- just did something wrong that day.

And so then he agreed. Triron Brown agreed, I'll -- you know, that he'll come to the meeting and tell the board what happened.

Q. Okay. Do you -- did Mr. Brown go to the December 5th board meeting?

A. He was at that next board meeting after that meeting.

Q. Okay.

A. Yes, sir.

Q. Do you recall if Mr. Brown said anything during that meeting?

A. Like I said, he went into closed determination. Closed determination --

Q. The board did?

A.    Yeah.    You go into -- when it -- when it's a personnel matter, personnel matters cannot be discussed publicly because you have to protect the rights of that individual.    And like I said, during that kind of session of time, you have everybody to be excused from the room except the board members, the mayor, myself.

And there were -- like, closed determination, the board will say, Okay, this is the matter at hand.    And then they'll say, Well, let's call in and talk to whomever we need to talk to.

And then the board did call -- when they went into executive session, they called Mr. Brown in and had a conversation with him. Now, am I privy to share that information?    I have to be real careful, once again, because that's closed determination.

Q.    Right.    Do you -- we can keep it brief if you want, but do you recall, did Mr. Brown just reiterate or repeat what he told Mayor Scott during the November 30th meeting?    Did he just tell the board that during that --

A.    He did.    He shared with the board that he had clocked Mr. McMillian in.

Q. Okay. And then lastly, regarding the FMLA stuff, you mentioned -- and I just wanted to make sure I was clear -- that Barry never came to you about any sort of disability or injury or anything like that?

A. I never received anything because normally it's going to come from the supervisor.

Q. Uh-huh.

A. During that time Jason Roberson might have been gone, because Jason Roberson was his supervisor up until December of 2022. So --

Q. Was Barry's supervisor?

A. Yeah. He was Barry's supervisor up until -- so as far as a lot of appointments or workers comp issues, that supervisor would know.

Now, if that supervisor doesn't come to me or have that employee come to me, then I have no way of knowing --

Q. Uh-huh.

A. -- to do an FMLA or to do anything. And there were a lot of times when even the supervisor himself didn't have knowledge that Mr. McMillian even had a doctor's appointment because, like I said, at the time the workers comp coordinator was Ms. Janet Parks. And I

always used to ask them to do a report weekly to kind of keep me updated so that I can address -- you know, let the board know, let the city attorney know that these are the people on workers comp.

But a lot of information -- if I went to Mr. Roberson, I used to tell him it's up to you as the supervisor to know at all times when your -- the guys that you manage, and in this case Mr. McMillian, you have to know when his doctors' appointments are because he's supposed to bring back a doctor's excuse so that we would know what the next step is or if he's dismissed off of this, if he's dismissed off of this. And then that information has to be shared with the workers comp coordinator at the time, which was Ms. Janet Parks.

So if the information -- and it was not shared with me, I can't produce paperwork that I have no knowledge to produce.

Q. Right. But Barry himself didn't come to you and speak to you verbally?

A. No, sir. I don't recollect that at all. No, sir.

MR. WALKER: All right. I don't have

any further questions.

MR. REDDICK: I just have one follow-up.


FURTHER EXAMINATION

BY MR. REDDICK:

Q. Just in reference to the meeting with Mr. Brown, do you know if Mayor Scott ever threatened Mr. Brown that if he didn't state that Mr. McMillian told him to clock him in, that he would lose his job?

A. I have no knowledge of that, sir.

MR. REDDICK: Okay. That's the only question I had for her.

MR. WALKER: You're done.

(Deposition concluded at 11:08 a.m.)

C E R T I F I C A T E

STATE OF MISSISSIPPI )

COUNTY OF MONROE )

RE:  ORAL DEPOSITION OF MELISSA MOORE

I, Gena Mattison Glenn, CSR 1568, a Notary Public within and for the aforesaid county and state, duly commissioned and acting, hereby certify that the foregoing proceedings were taken before me at the time and place set forth above; that the statements were written by me in machine shorthand; that the statements were thereafter transcribed by me, or under my direct supervision, by means of computer-aided transcription, constituting a true and correct transcription of the proceedings; and that the witness was by me duly sworn to testify to the truth and nothing but the truth in this cause.

I further certify that I am not a relative or employee of any of the parties, or of counsel, nor am I financially or otherwise interested in the outcome of this action.

Witness my hand and seal on this 13th day of April, 2026.

_____

My Commission Expires:          MS CSR 1568
July 19, 2027                    Notary Public
                                TN License No. 884

GENA MATTISON GLENN, gena.glenn@gmail.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**ABERDEEN DIVISION**


**BARRY MCMILLIAN**                            **PLAINTIFF**

**VS.**            **CIVIL ACTION NO. 1:24-CV-199-GHD-RP**

**CITY OF ABERDEEN**                     **DEFENDANT**


CERTIFICATE

I, Melissa Moore, have read the foregoing pages, 1-46, of the transcript of my deposition given on March 31, 2026, and it is true, correct and complete to the best of my knowledge, recollection and belief except for the list of corrections, if any, attached on a separate sheet herewith.  Witness my hand, this the _____ day of _____, 2026.


                        _____
                        Melissa Moore


CERTIFICATE

Subscribed and sworn to before me, this the _____ day of _____, 2026.



_____
Notary Public in and for the
County of _____
State of Mississippi
My Commission Expires: _____

GLENN REPORTING
P.O. BOX 492
AMORY, MISSISSIPPI 38821-0492


CORRECTION LIST
Barry McMillian vs. City of Aberdeen
No. 1:24-CV-199-GHD-RP

CAPTION

March 31, 2026                    Melissa Moore

DATE OF DEPOSITION                DEPONENT'S NAME


PAGE   LINE   CORRECTION                     REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____


                              _____
                              Melissa Moore

GENA MATTISON GLENN, gena.glenn@gmail.com

GLENN-HENRY REPORTING
P.O. BOX 492
AMORY, MS 38821-0492

April 13, 2026

Honorable Loden P. Walker
Phelps Dunbar
P.O. Box 320159
Flowood, MS   39232

RE:  Barry McMillian vs. City of Aberdeen
No. 1:24-CV-199-GHD-RP

Dear Mr. Walker:

Enclosed is your copy of the transcript of the deposition of Melissa Moore, taken in the above entitled and numbered cause on March 31, 2026.

Also enclosed is the signature page and corrections page to be used by the deponent when reading your copy of the deposition.

After the signature page and corrections page have been completed by the deponent, and properly signed by a Notary, please return these forms to Mr. Demoreo Reddick so that they may be attached to the original transcript.

If the completed signature page and corrections sheet have not been received by Mr. Demoreo Reddick on or before May 18, 2026, (30 days), reading and signing will be waived.

Thank you for your cooperation.

Sincerely,


Gena Mattison Glenn
CSR 1568
Enclosures
cc:  Mr. Demoreo Reddick