Shea Cain -- February 25, 2026

Exhibit G

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

BARRY MCMILLIAN                    PLAINTIFF

VERSUS      CIVIL ACTION NO. 1:24-CV-199-SA-RP

THE CITY OF ABERDEEN
AND JOHN DOES 1-20          DEFENDANTS

**********************************************
DEPOSITION OF SHEA CAIN
**********************************************

APPEARANCES NOTED HEREIN

DATE: FEBRUARY 25, 2026
PLACE: ABERDEEN CITY HALL BOARDROOM
125 WEST COMMERCE STREET
ABERDEEN, MISSISSIPPI
TIME: 1:32 PM

REPORTED BY: DANA GORDON
CCR #1908

REPORTING BY DANA, LLC
Post Office Box 1362
Brandon, Mississippi 39043
(601)-506-3440
DanaDMoulder@gmail.com

## Page 2

APPEARANCES:

DEMOREO J. REDDICK, ESQ.
Reddick Law Firm, PLLC
Post Office Box 465
Okolona, Mississippi 38860-0465
reddicklawfirm@yahoo.com
(662)-436-4641

COUNSEL FOR PLAINTIFF

LODEN P. WALKER, ESQ.
CHANNING J. CURTIS, ESQ.
Phelps Dunbar, LLP
1905 Community Bank Way, Suite 200
Flowood, Mississippi 39232
loden.walker@phelps.com
channing.curtis@phelps.com
(601)-352-2300
COUNSEL FOR DEFENDANTS

ALSO PRESENT: BARRY MCMILLIAN

## Page 3

INDEX

Style and Appearances........................ 1
Index........................................ 3
Examination by Mr. Reddick................... 4
Certificate of Court Reporter................134
Certificate of Deponent......................135
Errata Sheet.................................136

EXHIBITS

Exhibit 11: EEOC Charge...................... 9
Exhibit 12: Administrative Law Judge Decision 20
Exhibit 13: 12/5/23 Board Minutes............ 38
Exhibit 14: Board of Review Decision......... 54
Exhibit 15: 2/29/24 Letter from Zinn......... 57
Exhibit 16: Charge Responses from City....... 62
Exhibit 17: 11/28/23 Donate Time Letter...... 75
Exhibit 18: Request for Leave................ 80
Exhibit 19: FMLA Code........................ 90
Exhibit 20: Progressive Disciplinary Policy..117

## Page 4

SHEA CAIN,
(AFTER HAVING BEEN FIRST DULY SWORN,
TESTIFIED AS FOLLOWS:)
EXAMINATION
BY MR. REDDICK:

Q. All right. Mr. Cain, my name is Attorney Moreo Reddick and I represent my client, Mr. Barry McMillian. And I guess I can start off with some formalities.

A. Sure.

Q. I just want to know, have you ever given a deposition before?

A. I have.

Q. Okay. All right. And so basically you know that when I ask you a question, just allow me time to ask the question and then I'll give you time to answer the question. That's fair?

A. Absolutely, yes, sir.

Q. Okay. All right. Are you on any medication that can affect your ability to give a deposition today?

A. No.

Q. Okay. All right. And let me ask you this: Can you just state, for the record, your

Shea Cain -- February 25, 2026

Page 5

full name?

A. John Shea, S-H-E-A, Cain, C-A-I-N.

Q. And where do you reside?

A. 108 Woodland Heights Road here in Aberdeen.

Q. And what's that address?

A. I'm sorry?

Q. No, not the address but the ZIP code?

A. 39730.

Q. And do you have any family in Aberdeen?

A. I do, my mother. My mother lives with me and my sister part time. We have her house here on -- for sale. My dad died and I have some cousins, distant cousins that live here.

Q. Okay. Can you just give me their last names?

A. As far as my cousins?

Q. Yes.

A. Rollins.

Q. All right. What else?

A. I'm pretty sure that's probably it but -- yeah.

Q. Okay. And that would be in Monroe

Page 6

County?

A. It would be, yes.

Q. Okay. And your immediate family was -- your mother was --

A. My mother is Phyllis, P-H-Y-L-L-I-S, middle initial M, Cain, C-A-I-N.

Q. And you said you got a daughter?

A. I have a sister.

Q. Oh, sister.

A. She lives in Hamilton, Mississippi, which is about ten miles down the road. It's in Monroe County.

Q. And what's her name?

A. Dawn, D-A-W-N, Cain, C-A-I-N, last name Davis, D-A-V-I-S.

Q. And do you have any children?

A. No, sir, do not --

Q. Okay.

A. -- that I'm aware of.

Q. Okay. And what is your current position right now?

A. I am a field right-of-way agent for Vortex, V-O-R-T-E-X, Land Resources out of Midland, Texas.

Q. And so you go back and forth --

Page 7

A. No, sir. I haven't been to Midland, Texas -- I left there on March the 9th of 2020 and I have not been back, thank Jesus.

Q. Okay. And what's your current -- are you -- still have a position with the City?

A. I do.

Q. And what's your position --

A. I am a city alderman.
Sir?

Q. No. What's that position?

A. I am an alderman for Ward 5.

Q. And in 2003 [sci], were you the ward alderman for Ward 5?

A. I was. I was elected May the 2nd for a one-year special election due to the fact that John Allen, the incumbent, was sick and his doctor told him to get out and I came in.

Q. Well, now, what was that date?

A. I was elected May the 2nd --

Q. May 2nd.

A. -- 2023 in a special election, yes, sir.

Q. Okay. And you've held the position ever since?

A. I have. Well, I had to rerun in '24

Page 8

and I won, yes, sir. So I'm in a four-year term. We just started our third year or we will be starting our third year in May, yes, sir.

Q. Okay. All right.
Well, like I said, I'm not here to trick you. I'm just here to ask questions --

A. Sure. Absolutely.

Q. -- and see what you do or don't know.
So I guess with that being said -- can I see the records?

THE COURT REPORTER: Yeah, these are the exhibits.

MR. REDDICK: Oh, yeah, I mean the exhibits, yes.

BY MR. REDDICK:

Q. All right. And just before we started, do you know -- well, you don't have to tell me what you and your attorney talked about, but how did you prepare today?

A. I didn't talk to our attorney.

Q. Okay. All right.

A. I don't have to talk to an attorney because I've been deposed many times. I've been in the legal field. Jeff Navarro, Mike Mills who is a judge now, and Ms. Davis --

2 (Pages 5 to 8)

Shea Cain -- February 25, 2026

Page 9

Q. Yes.

A. -- Magistrate Davis, I used to work right across the street over here in their law office.

Q. Okay. All right. That's fair. All right. And with that being said, can you just -- well, let me ask you this: Are you aware that -- well, let me just give you this first.

MR. REDDICK: It's going to be what exhibit?

THE COURT REPORTER: 11.

MR. REDDICK: Exhibit 11.

(EXHIBIT NO. 11 WAS MARKED.)

THE WITNESS: Can I ask a question?

BY MR. REDDICK:

Q. Well, no, actually I'm just going to let you look at it and --

A. Well, I wasn't employed by the City at this time, but I'm very familiar with the situation.

Q. Okay. And so you say you were not --

A. This is the discrimination lawsuit against LaMarcus Thompson at the electric department when he first came on?

Page 10

Q. Yes.

A. Yes, I'm very well aware of it. I was not here at that time.

Q. Okay. All right.

A. And the reason I'm aware of it is because when I became a board member in March of 2023, during our closed determination, the things of personnel matter, I was made privy to it because it was a pending suit.

Q. Okay. And what you mean by, I guess, a pending suit, you were -- it was --

A. I was told that Mr. McMillian was suing the City of Aberdeen for discrimination and named Mr. LaMarcus Thompson, individually, if I'm not mistaken.

I could be wrong there but I knew there was a pending lawsuit at that time of Mr. McMillian. He was still on the payroll with the City at that time as well.

Q. Okay. Do you know if it was under investigation with the EEOC or was -- are you saying --

A. I think there was an additional EEOC claim filed in addition to this, if I'm not mistaken. And, like I said, I'm sorry I didn't

Page 11

bring that information. I still have it at home.

Q. Okay.

A. But as I understand it, while Mr. McMillian was employed with the City, there was a lawsuit for discrimination and possibly an EEOC claim.

Q. Okay.

A. I believe the EEOC claim has been dismissed but I could be wrong.

Q. Okay. I guess, just in reference to that, can you just read me what the allegations of that charge are?

A. Yeah, I sure can. Who's got cheaters? Anybody got any cheaters? I tell you what I can do. Am I allowed to take a picture of it and swell it up?

MR. WALKER: That's fine with me.

BY MR. REDDICK:

Q. Yeah, I don't have a problem with that.

A. I mean, I'll delete it in front of y'all. I mean, I --

Q. Yeah, I don't have a problem with it.

A. -- I just can't -- I didn't bring my

Page 12

briefcase. I've been -- yeah. But I'll be glad to if I -- as soon as I can read it.

You ready?

Q. Yeah.

A. "I was approved by the Board of Aldermen to be hired by the city as a Groundmen/Meter Reader in the Electric Department with a starting pay of $14.50, and a start date of September the 28th of 2021. On September the 27th, I was contacted by the Manager, that I had passed a mandatory drug test. Later the same -- that same day, the manager notified me that he had spoken to the Comptroller and was informed that due to budget constraints, I could not start on the date that I was originally given, however, that I would be granted the next available position in the Electric Department. I believe that I have been discriminated against because of my race (African American) in violation of Title VII of the Civil Rights Act of 1964, as amended. The Respondent has yet to contact me regarding my start date but has since hired 3 white males to work in that department."

Q. Okay. All right. Can you just state

3 (Pages 9 to 12)

REPORTING BY DANA, LLC
DanaDMoulder@gmail.com

Shea Cain -- February 25, 2026

## Page 13

for me -- state for the record the year of that charge?

A. I'm sorry?

Q. Can you state for the record the year of that charge?

A. Well, this date is three -- March the 7th of 2022, signed by Barry McMillian.

Q. And you said the day that you officially came on with the City was what date?

A. I'm pretty sure my first -- well, I was elected on May the 2nd.

Q. Okay.

A. I don't remember if I -- that was a Tuesday and it was probably the first Tuesday of the month. I don't -- maybe my first official meeting wasn't until the 16th, but I can tell you when I was elected.

Q. Okay. The 16th of what month?

A. Of May.

Q. The 16th of May.

A. 2023.

Q. Okay. And you say you became aware of Mr. McMillian's --

A. I would have to -- I would have to imagine during a work session where we went into

## Page 14

closed determination to discuss legal matters. We ask the city attorney to keep us firmly apprised of this because it's kind of important.

Q. Okay.

A. So it was early in my career here that I was made aware of Mr. McMillian's accusations.

Q. Okay. And that would have been in 2023?

A. Correct.

Q. About what month do you think probably you probably would have been told that?

A. I'm going to think May.

Q. May. Okay.

A. I mean, like I said, I mean, I could be wrong. That's been almost three years ago, but I can tell you that I was made privy to it at this board table, and our attorney Mr. Zinn sits where you are sitting now.

Q. Okay. All right. Thank you.

And so in reference to Mr. McMillian, he was terminated by the City of Aberdeen. Do you remember when he was terminated?

A. Do I remember?

Q. Yes.

## Page 15

A. I don't know the exact date. I'm pretty sure I made the motion, though.

Q. Okay. And do you remember there being another individual --

A. I do.

Q. -- involved?

Do you know the individual's name?

A. I do. Triron Brown.

Q. Okay. And were you given any documentation as far as before you made the decision to terminate Mr. McMillian?

A. I'll tell you what I remember about it. And, like I said, we could go back to the minutes. I didn't bother pulling the minutes because I can tell you pretty much what happened. If there's anything to refute that, I will stand corrected.

It was reported to us -- and by whom I don't remember; it certainly wasn't me. But it was reported to us that Mr. McMillian had been out of town. During the time he was out of town -- I've heard several different locations. But at this point in time, I don't think that's germane to the situation.

He was out of town. It was work

## Page 16

time, and he had given his last four digits of his Social Security number to Mr. Triron Brown to clock him in at work while his was not there. That's the information that was provided to me at this board table in an executive session.

Q. Okay. And in reference to those documents -- do you have a copy of those documents? The documents that you were given to --

A. I wasn't given any documents. I mean, the only documents that would be prevailing in that situation would have been the time card.

Q. Okay. Are you saying that you were given the time card?

A. What was passed around this table that night, sir, I do not recall. That's been quite some time ago.

Q. Okay.

A. But I can assure you that was the report I got.

Q. Okay. And what was the report that you got about Triron Brown on that day?

A. We suspended him for three days without pay.

4 (Pages 13 to 16)

Shea Cain -- February 25, 2026

Page 17

Q. Okay. Do you remember what information you were given in reference to him?

A. That he was the one that clocked Mr. McMillian in using Mr. McMillian's last four of his Social Security number. And that's how he accessed the time clock to, in fact, clock Mr. McMillian in when he was out of town and not at duty.

Q. Okay. And in reference to the work file, do you remember what Mr. McMillian's work file was; had he ever been disciplined before at the time of his termination?

A. I don't -- I -- I can't recall. I apologize. I mean, we could get that information. It's easily readily available but I don't remember a write-up -- I don't remember a write-up from the time I came home until the day he was terminated. It could be -- or come on rather, and the date he was terminated. I don't know.

Q. Okay. And what about the same for Mr. Triron Brown and his work file? Has he ever been disciplined through --

A. I do not remember. I do not recall whether Mr. Brown had been formally written up

Page 18

for anything or not. That would be a question for Mr. Richard Boone, his -- I mean, I'm sorry -- Mr. Marcus Collins, his direct supervisor.

Q. Okay.

A. And if that information is available, I'm -- the City of Aberdeen will be glad to provide it.

Q. Okay. Let me ask you this: If Mr. Brown, I guess -- I guess my question is: From your recollection, why was Mr. Brown terminated and why wasn't -- well, why was Mr. Brown suspended and why was Mr. McMillian terminated instead?

MR. WALKER: I'm going to object. We can go off the record. I just want to clarify that.

(OFF THE RECORD.)

BY MR. REDDICK:

Q. Yes, I can clarify that for the record.

In reference to your vote, why did you choose to suspend Triron Brown and terminate Mr. McMillian?

A. Because that was my decision. That's

Page 19

the decision I made and I stand by it.

Q. Based on what documentation?

A. Based on the reports I was given here at this table that night.

Q. Okay. So why would one get -- I guess, I'm trying to understand. Can you elaborate why one would get suspended --

A. Because as an alderman, a sitting alderman in a at-will state, I don't have to fire anybody -- or I can fire people. I've fired a bunch of people from this table.

Q. Okay. But can you elaborate on why --

A. No, I can't elaborate on it. It's just as simple as that. I felt as though Mr. McMillian needed to be fired.

Q. Okay. So if one -- I guess Mr. Brown was engaged -- I guess this is an allegation in reference to Mr. McMillian asking, I guess, or have him do that, I guess, punch him in. But I guess I just -- I know you said, I guess, you can come to whatever conclusion you want. But I am just trying to understand why -- if they both were allegedly involved in this matter, why Triron Brown would be suspended and

Page 20

Mr. McMillian would instead be fired?

A. Counselor, this is what I'll tell you. That night when we went into closed determination with my city attorney, who I have to rely on, we chose to go into executive because this was a personnel matter and this was a serious infraction.

And we went into closed determination, then came out and went into executive session. And once I talked with my attorney -- that's the person I have to listen to, now. These are tough decisions. I don't take any pride in it but guess what? That's what I decided to do and I wasn't the only alderperson that did that that night.

MR. REDDICK: Okay. I'm gonna -- that's going to be my next exhibit.

(EXHIBIT NO. 12 WAS MARKED.)

THE WITNESS: Is that something I am going to have to read?

MR. REDDICK: Yes, sir.

THE WITNESS: Okay. And I'm not recording anything by the way. I'm just taking pictures.

BY MR. REDDICK:

5 (Pages 17 to 20)

Shea Cain -- February 25, 2026

Page 21

Q. I'll just let you have a chance to read that.

A. Okay.

Q. And then we'll elaborate on that.

Well, I'll ask you questions. I'll say that.

A. Sure.

I apologize for not bringing my eyes.

Q. You're fine.

A. Okay. Is this -- that's just verification?

Q. Yes.

A. Okay. All right. So I've read these two pages, yes, sir. This is just verification.

Q. Yes.

A. Okay.

Q. All right. In reference to this -- so you had a chance to read this document, correct?

A. I did, yes.

Q. Have you ever seen this document before --

A. Not that I recall.

Q. Okay. Did your attorney ever make you aware of the said document?

Page 22

A. He may have read that document to us.

Q. And not -- by "your attorney," I mean Attorney Zinn.

A. You're talking about Mr. Zinn?

Q. Yes.

A. That may have been read aloud at some point in time. And if it was in the packet, unfortunately I had water damage, so all of my actual hard files were destroyed in some of these cases, not all of them.

But, however, I go back to the minutes of the board meeting, and that's what I have to rely on. But I -- I do remember this situation that you are speaking of.

Q. All right. And in reference, this is my client actually trying to receive unemployment benefits. Just for the record, can you just read out loud the findings of fact? That section.

A. Is this different than what you just --

Q. No, it's the same.

A. This is the same? Okay.

Q. Yes.

Just the findings of fact section.

Page 23

A. Yeah. Okay. Yes, sir.

"Based upon testimony and evidence presented, the Administrative Law Judge finds as follows:

"The claimant worked for the City of Aberdeen (herein, employer) beginning September 21, 2021, as a labor employee with the Water Department in Aberdeen, Mississippi, ending on December 19, 2023.

"The employer discharged the claimant for stealing time which is grounds for termination. The claimant was made aware of the employer's policies.

"During an investigation, it was discovered that the claimant violated time keeping policies. The claimant did not report to work on November 27, 2023. However, he had a co-worker enter his time in the timekeeping system. The co-worker admitted to entering the claimant's time at his request.

"It was determined the claimant was in violation of policy and he was discharged on December 5, 2023, in accordance with policy. The co-worker who violated policy received a three day suspension but was not discharged.

Page 24

The employer has not provided a reasonable explanation for the difference in the level of discipline that was given."

Q. Okay. So would that be accurate that the statement that -- that you -- I guess, the City never gave a description on why one was terminated and the other employee was -- well, why one employee was suspended and the other employee was terminated?

MR. WALKER: Object to the form.

But when I object, I'm just making a record.

THE WITNESS: Oh, yeah. Well, I was going to tell him what I said in that meeting. I can't speak for the rest of the people that were around this table.

A. You want to know why there was no explanation.

BY MR. REDDICK:

Q. Well, this is what the administrative judge said in reference to the --

A. I understand that --

Q. -- unemployment benefits that --

A. -- but you're asking me now?

Q. Yes.

REPORTING BY DANA, LLC
DanaDMoulder@gmail.com

Shea Cain -- February 25, 2026

Page 25

A.   And I'm not that judge --
Q.   Yes, sir.
A.   -- so I am going to tell you as an alderman in Ward 5 at that time why I chose to terminate his employment.
Q.   Okay.
A.   Because he embezzled money from this city, and I used the word embezzled.
Q.   Okay.
A.   Now, if you want me to say stole or whatever -- now, you can say allegedly.  Okay.  But we have records to prove otherwise.
Q.   Okay.  And what records do you have that can show that?
A.   Well, I don't have those records with me at this time.  But I can tell you what, if you need them, we will get them.
Q.   Okay.  I think I will need those records.
A.   I was not asked to provide any records.
Q.   Yeah, the records were asked through your counsel.
A.   So I --
Q.   Well, I don't know --

Page 26

A.   But I was not personally and I am not an attorney, but I am telling you what I did from this board --
Q.   Uh-huh.
A.   -- and if I had to do it again tomorrow, I would.
Q.   Okay.  So you're saying I need to go through your attorney to get these records that you are talking about?
A.   I'm not the record keeper, sir.  I'm a sitting alderman.
Q.   But you --
A.   We have -- we have -- we have all kinds of people around here to -- the city clerk --
Q.   Right.
A.   -- the city attorney.  I don't keep records, sir.  I make votes.  I make good decisions for the City.
Q.   Okay.  But you'll be able to identify the record that you used?
A.   Oh, we will be able -- well, there's -- there were a lot of people in this room when this went down, sir.
Q.   Well, it was in executive session;

Page 27

so . . .
       These are yes-or-no questions first.  Let's just get --
A.   Okay.  Okay.  I -- that's fine.
Q.   -- these are just yes-or-no questions.
A.   Okay.  Okay.
Q.   All right.  So you said that there were records that you used to make your determination that my client embezzled money, correct?
A.   The mere fact that he was clocked in --
Q.   Hold on.  Hold on.  I'm not trying to talk over you, but can you just give me a "yes" or "no" and then I'll allow you a chance to elaborate?
A.   Okay.
Q.   Can you, just for the record, say a yes or a no and then you can elaborate?
A.   What was the question?
Q.   The question was:  As far as the records concerned, you are saying that you went over records that show that my client allegedly embezzled money, correct?

Page 28

A.   I'm going to tell you --
Q.   Hold on.  Yes or no first.  Can we --
A.   It's not a yes-or-no question.
Q.   Okay.
A.   You're asking me to be definitive about something that happened quite some time ago.
Q.   Okay.
A.   We have thousands of documents per meeting.  I can show you right in this lady's office the stack of stuff we have to go through.
Q.   Okay.
A.   So I will tell you once again, sir.  I was given information about what happened.
Q.   Okay.
A.   It went into closed determination.  We deemed it necessary for executive session.
Q.   Okay.
A.   We came out of closed determination; we went into executive session.  The decision to terminate Mr. McMillian was made in executive session.  We can vote in executive session but we choose not to in the City of Aberdeen for these reasons.
       So we came out of executive session,

7 (Pages 25 to 28)

REPORTING BY DANA, LLC
DanaDMoulder@gmail.com

Shea Cain -- February 25, 2026

Page 29

and I'm pretty sure I made the motion. If you'll pull those records from that night, I'm pretty sure I'm the one that made the motion to terminate him. And I -- and I got at least three to two if it wasn't unanimous. May have been one that abstained or didn't vote. So I'm telling you that I had basis.

You're asking me to pinpoint something that happened on December 5th of 2023?

Q. Yes, I am.

A. Sir, I work in a multibillion dollar business and I don't have all that in my mind. How would you expect me to compute that and keep that in my mind? I -- we can get you the information you need.

Q. I think we're getting on a tangent. I am just asking if the -- if you --

A. Okay. So you're -- let me -- all right. Go back and ask me that again, the yes-and-no stuff. Because I'm going to have to answer no because you're asking me to go back and have a photographic memory and/or a file in front of me that tells you what I saw that night.

I am telling you, we had testimony in

Page 30

this room that reflected on Mr. McMillian. It was my judiciary responsibility at that time to make a decision. Now, I understand what's going on here, Counselor. I've been to court a bunch, so I can see the forest while standing in the trees. But I want to cooperate with you, sir, because if this man has been wronged in any way, shape, form, or fashion, whatever happens, happens.

I made a decision based on what I had been told by my people, that this man stole time. He had someone else clock him in while he wasn't even in the county of Monroe. I've heard two different locations. I didn't go out and ask.

He lives in my ward, or did at one time. When I got elected, he did. I don't know if he still lives there or not. I knew who he was. I knew who his brother was. I know his family, but I made my decision as a board member who is responsible for protecting the City. That's what I was elected by about 800 people to do. Now, that's my -- that's my point.

Q. Well, I guess, I'm going to still --

A. If you have pointed specific

Page 31

questions about what documents I saw that night, then I will have to tell you, sir, I don't recall.

Q. Okay.

A. I will tell you that I made an informed decision to terminate Mr. McMillian based on what I was told in this boardroom by the people that reported it and by the city attorney, and we collectively as a board decided to terminate Mr. McMillian that night.

Q. All right. Did you read any documents that night?

A. I don't recall.

Q. Okay. So you just stated that you looked over documents and things of that nature to make a conclusion --

A. Oh, I've seen --

Q. -- just in general to make your decision.

A. Oh, no, I've seen -- I've seen lots of documents concerning him. You know --

Q. You're on a tangent.

A. But what I'm telling you --

Q. Hold on. Hold on.

THE COURT REPORTER: Y'all got to --

Page 32

THE WITNESS: I'm sorry.

THE COURT REPORTER: You've got to let him finish.

THE WITNESS: I'm sorry. I apologize. Go ahead.

BY MR. REDDICK:

Q. Yes. I guess I'm just trying to get some yes-or-no answers, and I'm not trying to drag this out.

But in reference, did you look at any documents to make an informed decision in --

A. I can't recall.

Q. Okay. All right. So earlier you mentioned something about, you looked at a time sheet. So now you're saying that you don't recall looking at a time sheet or anything like that?

MR. WALKER: Objection to the form. You can answer --

BY MR. REDDICK:

Q. You may answer.

A. I would like her to read that back to me.

MR. WALKER: Or just re-ask your question.

8 (Pages 29 to 32)

REPORTING BY DANA, LLC
DanaDMoulder@gmail.com

Shea Cain -- February 25, 2026

Page 33

BY MR. REDDICK:

Q. Did you -- earlier you stated that you looked at my client's time sheet to make the determination that he embezzled money.

A. Yeah.

Q. Yes?

MR. WALKER: He didn't state that.

THE WITNESS: No, I didn't state that.

MR. REDDICK: I'm saying that he did.

THE WITNESS: No, I didn't.

MR. REDDICK: So --

THE WITNESS: Have her read it back.

BY MR. REDDICK:

Q. So in any event --

A. Yeah.

Q. -- did you look at any documentation --

A. I do not -- I do not recall.

Q. Okay. So you're saying you just went off of oral testimony to make a decision to --

A. I'll state for the record once again that when my city attorney, the comptroller, the keeper of the time, after they've been here -- the comptroller 27 years, my attorney has several years of municipal law. If you're

Page 34

telling me I cannot go by that and as I told you, you're asking me for testimony about paperwork from -- how long ago? how many months? -- 30 months ago? -- 28, 27 months ago? And you expect for me to tell you the exact documents.

As I told you, we'll present a picture for the Court of the number of papers we have each week up here. It's impossible. I -- we just had a board meeting the other night. I can't tell you what we did then if I don't go back to the minutes and look at my notes. So I'm just being honest with you, Counselor.

Q. Okay. But if you did use documents, you're saying the court clerk would be able to identify those documents; is that correct?

A. I would think in my heart of hearts that between our comptroller and our city attorney, and then director, I would think -- of public works -- would be able to provide anything if not already in a file. And it may, in fact, be in City Clerk Melissa Moore's office right now.

If I had known I needed to bring

Page 35

documents, I could have compiled them all before we got here today.

Q. Okay. And just for reference, we are looking at -- still at Exhibit 12. Can you just read what the decision states?

A. Is that on the back page or --

Q. No, second page.

A. Is that the front page? I got them right here, Counselor. You talking about the decision wherein they grant Mr. McMillian the --

Q. Well, let's just start with the paragraph above the decision.

A. Okay.

Q. Well, I'll say two -- the two paragraphs from right above the decision, throughout the decision.

A. Okay.

Q. So start with "The employer discharged."

A. Okay. Yes, sir. Yes, sir. I see it. All right.

Q. Can you read that for the record?

A. "The employee [sic] discharged the claimant for theft of company time. The claimant was aware of the employer's policy

Page 36

regarding this violation. There was another employee involved in this violation. However, this employee was reprimanded, but not discharged."

Q. You can keep reading.

A. Yes, sir.

"The employer's right to terminate an employee is not being questioned. However, the employer has not provided sufficient evidence proving the policy was fairly enforced in this case. The employer has not failed to provide substantial, clear, and convincing evidence proving the claimant was discharged for misconduct at that time as" -- I think -- it says is defined. It should be as defined. "The decision rendered by the Department is not in order."

The Decision. "The department of the Mississippi" -- I'm sorry. "The determination of the Mississippi Department of Employment Security is reversed. If otherwise eligible, the claimant is entitled to the receipt of benefits. The employer is a reimbursable employer."

Q. Okay.

9 (Pages 33 to 36)

REPORTING BY DANA, LLC
DanaDMoulder@gmail.com

Shea Cain -- February 25, 2026

Page 37

A. And that's signed by Loventrice Walker, the administrative law judge.

Q. All right. And so just from reading that -- so you're aware that the judge, the administrative judge in this situation stated that even within your own policy that you didn't enact it fairly between Triron Brown and Mr. McMillian?

A. I understand --

MR. WALKER: One second. Moreo, one second. Just objection to -- unemployment compensation goes with misconduct and that's a legal term of art. That is not the same as the claims brought in this case.

BY MR. REDDICK:

Q. You may answer.

A. I understand what the judge wrote, yes.

Q. Okay.

A. Do I agree with it? No.

Q. Okay. But you are aware that that's --

A. I read it. Yes, sir, I'm very well aware of it.

Q. Okay. All right.

Page 38

A. I may have forgotten it until you brought it to my attention.

Q. All right.

A. But as I recall, I think I remember back. You know, we do a lot down here. You know, six and a half million dollars is not a big budget, but it's a lot when you're trying to heard cats.

MR. REDDICK: This is going to be the next exhibit. What exhibit number are we on?

THE COURT REPORTER: 13.

(EXHIBIT NO. 13 WAS MARKED.)

(OFF THE RECORD.)

MR. REDDICK: Back on the record. He already has that document?

THE WITNESS: I've got it, yes, sir. And I've also taken pictures of it, so I'm ready for you to -- yeah, you can have it back. I just -- that's the board minutes, yes, sir. I've got it here if you'll just tell me where you want me to read. I'll be glad to do so.

BY MR. REDDICK:

Q. All right. And before we start to

Page 39

elaborate on Mr. McMillian, I know that you said that my client allegedly embezzled funds. What about Mr. Brown, would you consider that Mr. Brown allegedly embezzled funds as well?

A. No, I would not.

Q. Okay. And why is that?

A. Because Mr. Brown was at work. Mr. Brown did something his BFF asked him to do. And you're basically insinuating earlier today, or I think the whole purpose of this is and maybe I shouldn't think out loud, but reading the documents that you've provided for me, what you're saying is that we should have fired both of them.

Q. All I'm asking is just a question --

A. Yeah, I fired -- and let me -- let me answer your question. I voted to fire or terminate Mr. McMillian based solely on the fact that, as you say, allegedly he stole time.

Q. Okay.

A. Now, I just read a document that doesn't say allegedly. And I've also read a document that stated that we don't have a problem with him being fired; we're mad 'cause Triron didn't get fired too.

Page 40

So here's my answer to that. I'm going to tell you. I made an informed decision that night based on what I was told in this boardroom. I don't regret it. I fire a bunch of people up here for wrongdoing. Okay.

Now, the assertion that I or anybody else at this board should have fired Triron as well -- it's just that. It's an opinion. I don't even see it written in that opinion. I see it written that Mr. McMillian was fired but Mr. Brown wasn't fired.

So I respect the fact that, you know, Mr. McMillian feels as though we slighted him and we didn't -- we didn't do the same thing to Mr. Brown. But this is the way I see it. When we make a determination at this table, it's a hard decision, sir.

I don't know if you've ever had to fire anybody, but I've fired a bunch of people in my lifetime and it's not easy. Because you know why? I'll tell you why. Because they may have a wife and children at home. And even if they don't, they have to have food and water, and I'm also one of those people.

So -- no, no, let me finish,

REPORTING BY DANA, LLC
DanaDMoulder@gmail.com

Shea Cain -- February 25, 2026

Page 41

Counselor. I'm just telling you, I made an informed decision to terminate your client based on what happened in this boardroom.

Q.   But, see, that's not the question. I'm asking you, from your understanding, if Mr. Brown punched Mr. McMillian in and you're saying Mr. McMillian allegedly stole time, is Triron Brown not, I guess, being, I guess, involved in that as well as a form of embezzlement, if that's the case?

MR. WALKER:  Objection to the form. You can answer.

A.   No, I don't.  I -- I think a friend did something for a friend.  And, you know, are we -- would you like -- can I elaborate further?

MR. WALKER:  You can answer however you want.

A.   I can answer however I want to. Okay.  So let me inform you of this, Counselor. I've been on this board since May of 2023, as I told you.

MR. WALKER:  Sorry.  I'm sorry.  I would say to one thing, is any attorney-client privilege stuff, I would ask you not to --

Page 42

THE WITNESS:  Okay.

MR. WALKER:  I'm not saying you are going to, but, otherwise, answer as you would like.

A.   Well, then I would refrain from making the statement that I'm making.  I'll go back to my original statement and if I misspoke at any point in time, I will correct myself. We'll go back to the transcription of this, but I will say this:  Once again, you asked me if Mr. Triron Brown should have been terminated.

BY MR. REDDICK:

Q.   No, that's not what I asked.  I said is that a form of embezzlement.  You said --

A.   Not in my opinion, no.

Q.   Okay.  So what's your definition of embezzlement?

A.   Mr. McMillian being out of the state, getting one of his BFFs that he works with -- see --

Q.   Hold on.

A.   Yeah.  Yeah.

Q.   Hold on.  Like -- no, I'm asking, what is your definition of embezzlement in general, not with just --

Page 43

A.   Embezzlement?  Well, there's many different forms.

Q.   Well, you name a couple.

A.   Well, I will name a couple.

MR. WALKER:  He just -- asked and answered but --

A.   You get a till, a cash register, somebody goes over there and takes a hundred dollars out, that's theft or whatever you want to call it.  When it goes to employee -- employer, and the City is as far as I'm concerned a major corporation, and that's how we want to run it, and we have five elected officials up here that are fiduciaries for this city, we're bound -- well, I took an oath.  And when I get a report such as the one I got, you know -- so I did what I thought was necessary. I terminated the man who stole the time.

Now, if I'm wrong, then I guess we'll find out later.  I did what I felt I should do. And I don't know how many more people voted.  As I said, I didn't read that.  I didn't read it yet, but I don't know if it was four to one or three to two or if it was unanimous.  I don't remember.

Page 44

I just know that I'm pretty sure I'm the one that made the motion.  And as I stated and will, I would do it 100 percent again.

BY MR. REDDICK:

Q.   So the one that -- I guess the person that helped a person steal money is not liable for anything?

A.   Am I allowed to speak on the things that surrounded this situation, the conversations that I didn't hear that was presented or not presented or are we best just to leave -- just stick with the facts?

MR. WALKER:  You can answer the question however you feel --

A.   Well, I'm going to do this:  I'm going to stick with the facts and we'll see where it goes.  I made my decision based on what happened in this room that night and that's what I'm going to say about it.

BY MR. REDDICK:

Q.   So -- but that still doesn't answer the question.  I'm just asking --

A.   Okay.  Is this a yes or no?

Q.   Yes.

A.   Okay.  All right.

11 (Pages 41 to 44)

Shea Cain -- February 25, 2026

Page 45

Q. If a person helped somebody steal money, is that person also doing embezzlement? That's my first question. Also, committing to -- I guess, committing a crime of embezzlement?

MR. WALKER: Objection to speculation.

BY MR. REDDICK:

Q. But you may answer.

A. I mean, I would call that person an accomplice, maybe.

Q. Okay. So you're saying accomplice shouldn't get fired but the person that, I guess, received the benefit should get fired?

A. Counselor, let me just tell you, you weren't here that night. And I apologize to you not being in the room, but there was so much going on that night in all the evidence that pointed -- and if, you know, you're insinuating that -- or if you're asking me why I didn't -- oh, I've got that right here.

Q. Okay. All right. Go ahead. You can --

A. No, I just voted the way I voted and I can't go back and change the hands of time. And if I could, I wouldn't vote any different.

Page 46

Q. Okay. And in reference to that that the administrative law judge said that you didn't follow your own policy making that vote, what policy does the board go by in referencing to make a decision to terminate somebody?

A. We go by our policy.

Q. And what is that policy called?

A. Oh, it's in the handbook, sir. I've never read it.

Q. You've never read the policy but --

A. No, I've never read it. Yeah, of course, I've read it. You're asking me to quote directly --

Q. I mean --

A. You're asking me to quote directly from the policy book?

Q. That's not what I asked you. I said have you read the policy. You said no. You said, of course, I've read it.

A. I mean, we're getting into the territory now, see, where I'm becoming offended by your questions. But --

Q. I'm getting offended how you're answering the questions.

A. Oh, I'm sure you're offended. I have

Page 47

no doubt.

Q. Yeah.

A. But as far as the policy handbook, yes, sir, I have a copy of it in my file cabinet behind my desk. I read it. I had to sign it when I started here.

But I guess I would say that at any given night, we make a determination such as this, my city attorney is sitting where you are with his laptop open in front of him. I have my city clerk, maybe the deputy clerk. I've got the comptroller sitting behind me, and I've got a full complement of board members.

So I'm going to say this: You want specifics from something that happened over two years ago. I'm going to tell you this: You want me to quote the handbook. And when --

Q. No, I didn't ask you to quote the handbook. I asked you can you identify --

A. We follow rules and regulations.

MR. WALKER: Hang on a minute. Let him ask his question.

BY MR. REDDICK:

Q. Yeah, I'm asking are there specific -- like, it says holidays, things in

Page 48

reference to vacation time, FMLA rights. I'm just asking, is there a section in the handbook that's in relevance to hiring and firing or hiring somebody and terminating somebody?

A. There are sections in the handbook to that degree, yes.

Q. Okay. And if you don't know the answer to the question, you just don't know the answer to the question. But do you know the name of that section? We have a table of contents saying these are the sections that are laid out on page -- on this page and that page. Do you know what the section would be called? You don't have to give me a page number but do you know the section?

A. Unfortunately, sir, I don't.

Q. Okay.

A. I cannot answer that question. It's been almost three years since I read that book.

Q. All right. You said you already read --

A. Yes, sir. Well, no, I didn't read it. I've just got it here where I could see it 'cause it's so small.

Q. Okay. So we're looking at

12 (Pages 45 to 48)

Page 49

Exhibit 13.

A. All right.

Q. All right. And it should be -- all right. It should be -- it's the fourth -- I mean -- yeah, the third page --

A. Third page. Okay.

Q. -- of Exhibit 13.

A. Yes, sir.

Q. It's going to be -- start with the last paragraph and it should go into the next page which is the last page on page 4.

A. Okay. So start on the second paragraph from the bottom, correct?

Q. Yeah. Can you read that out loud for me?

A. Oh, absolutely, I can. Yes, sir. Let me get it -- let me -- yeah.

Q. And just for the record, this is in reference to the regular board meeting at city hall that was conducted on December 5, 2023, and I assume started at 5:00 PM.

A. You ready?

Q. Yes.

A. Okay.

"A motion was made by Alderman Cain

Page 50

seconded by Alderman Holliday to come out of Executive Session. On a roll call vote, Alderman Holliday, Alderman Haynes, Alderwoman Odom and Alderman Cain voted "Aye," Alderwoman Garth voted 'Recuse.'"

Q. I was just going to tell you, all the way to the next page.

A. Yes, sir, I'm going to keep going. "A motion was made by Alderman Holliday, seconded by Alderman Haynes to suspend City employee Triron Brown three days with no pay. The days are December 1st, 4th and 5th, 2023. On a role call vote, Alderman Holliday, Alderman Haynes, Alderwoman Odom and Alderman Cain voted 'Aye.'

"A motion was made by Alderman Cain, seconded by Alderwoman Odom to terminate City employee Barry McMillian immediately. On a roll call vote, Alderman Haynes, Alderwoman Odom and Alderman Cain voted 'Aye.' Alderwoman" -- I'm sorry -- "Alderman Holliday voted 'Nay.'

Did I read that correctly? Let me -- can I reread that, please?

Q. Sure.

A. Okay.

Page 51

"A motion was made by Alderman Cain, seconded by Alderwoman Odom to terminate City employee Barry McMillian immediately. On a roll call vote, Alderman Haynes, Alderwoman Odom and Alderman Cain voted 'Aye.' Alderman Holliday voted 'Nay.'

"A motion was made by Alderman Cain, seconded by Alderman Holliday to adjourn until the December 19, 2023, Board Meeting. On a roll call vote, Alderman Holliday, Alderwoman Odom and Alderman Cain voted 'Aye.' Alderman Haynes voted 'Nay.'

Q. All right. So in reference to that, meeting that was conducted on December -- the board meeting conducted on December 5, 2023, did Triron Brown get to speak to the board at all that night?

A. I can't remember.

Q. Okay.

A. I can't remember.

Q. Okay. Now, in reference to this, I was informed by my client that he was not allowed to speak at that board meeting. Is there a reason why behind that?

A. I'm pretty sure while we were in

Page 52

executive session, we deemed it not necessary.

Q. And from my understanding, Triron Brown actually did get to speak with the board on -- in fact, Attorney Zinn actually wrote something that that -- actually stated that Zinn did -- not Zinn but Triron Brown did get to speak with the board.

Is there a reason why Mr. Brown would get to speak to the board about this matter and Mr. McMillian would not be able to speak to the board about this matter?

A. I'm pretty sure, Counselor, that it's probably just a situation where we didn't need to hear anything from Mr. McMillian. I think -- that's what I remember happening. And as I told you, sir, I don't recall Mr. Brown. Like I said, that's quite possibly -- if Mr. Zinn presented that information, then I would certainly agree with Mr. Zinn.

Q. Okay.

A. I've never caught Mr. Zinn ever give any erred information so I would have to trust his judgment on that.

Q. Okay.

A. And I probably have notes on that.

13 (Pages 49 to 52)

Shea Cain -- February 25, 2026

Page 53

Some -- like I told you, I had an unfortunate water damage incident and I had to throw away, like, tons of paperwork.

Q. Is it possible you could get in contact with your attorney just to see if you have those notes from the board meeting from that day?

A. I can research that myself.

Q. Okay.

A. But I'm pretty clear on the reason I fired Mr. McMillian.

Q. Right. But we have something called discovery so if there's some information --

A. Oh, I understand.

Q. -- in the case --

A. Oh, absolutely.

Q. -- if you can get it to opposing counsel --

A. Oh, yes, sir. Absolutely.

Like I said, sir, I apologize for over-talking you. That's just my nature. It's no disrespect or none meant. I just -- you know, like I told you, I, you know -- and I'm not trying to, by any way thwart any evidence. I'm here to help.

Page 54

Q. Yeah, I'm not accusing anybody. I'm --

A. No, no, I understand.

Q. -- just trying to get stuff on the record.

A. Oh, sure. Absolutely.

Q. All right. So can you read this for me?

A. Sure.

MR. WALKER: That's Exhibit 14?

MR. REDDICK: Yes.

MR. WALKER: You want me to mark it?

MR. REDDICK: Yes, you can mark it.

(EXHIBIT NO. 14 WAS MARKED.)

THE WITNESS: And what is this document, Counselor?

MR. REDDICK: It's going to be an administrative decision from the MDES, Mississippi Department of Employment Security.

THE WITNESS: Okay. Would you like for me to read starting with Case History or you just want --

BY MR. REDDICK:

Q. Well, I was just going to ask if

Page 55

you've had a chance to read Document 14, correct?

A. I'm going to look at it. Hang on just a minute.

Okay.

Q. Are you ready?

A. Oh, yes, sir. Yes, sir.

Q. All right. So just for the record, I am going to have you read this. This is Exhibit 14. It's a Board of Review Decision in reference to my -- Mr. Barry McMillian, I guess, trying to receive unemployment benefits.

Mr. Cain, can you just read from Case History all the way down to, I guess -- I guess just to the end of the decision section?

A. Yes, sir. Yes, sir, I will. This is under Case History:

"This matter came before the Board of Review for consideration of an appeal filed on February 27, 2024, regarding the decision of February 20, 2024, by an Administrative Law Judge of the Mississippi Department of Employment Security."

This is under the Decision area:

"On March 8, 2024, after careful

Page 56

review and consideration of all the evidence, the Board of Review adopts the Findings of Fact and Opinion of the Administrative Law Judge and hereby affirms the decision. SO ORDERED AND ADJUDGED, THIS THE 8TH DAY OF MARCH, 2024."

Q. Okay. And just in reference to this, did you -- were you ever introduced to this document by your counsel or Mr. Zinn?

A. Sir, I would -- I would tell you that I don't have a direct recollection of that. But Mr. Zinn, in his reports to us about our lawsuits and where we stand with them, would have read that information to us probably at a board meeting. It could have, in fact, been in a packet.

Q. Uh-huh.

A. But, sir, once again, I mean, there's been a lot of water under the bridge at that time. But I was made aware of the fact that -- yes.

Q. Okay. So you are aware that the administrative -- I guess the city appealed the decision that was upheld by the Court --

A. I was --

Q. -- in reference to the unemployment

14 (Pages 53 to 56)

Shea Cain -- February 25, 2026

Page 57

benefits?

A. Yes, sir, as I read it. Yes, sir. And I would have to say, sir, that more than likely we discussed that about the appeal or possibly Zinn just did it on his own. I mean, he's our attorney. And, naturally, we're going to appeal something we don't feel is just and correct.

Q. Okay.

MR. REDDICK: All right. This is going to be -- what is this one?

THE COURT REPORTER: 15.

MR. REDDICK: 15.

(EXHIBIT NO. 15 WAS MARKED.)

THE WITNESS: I couldn't agree more.

BY MR. REDDICK:

Q. Okay. So in this -- can you just read this for the record?

A. Sure.

Q. So -- hold on a second. So read that for the record.

A. Right here?

Q. Yes, sir. Read that for the record.

A. Absolutely.

Q. After investigating.

Page 58

A. Absolutely. I will.

"An investigation was conducted by Mayor Charles Scott. As a part of the investigation, interviews were conducted with the Supervisor of the Department and department employees. After his investigation, Mayor Scott prepared a presentation of records and notes for the upcoming board meeting on December 5, 2023.

"The Mayor brought before the board his findings at the December 5, 2023, board meeting. The board voted unanimously to discuss this matter during closed determination. This was announced to the public and the board then voted to enter into executive session.

"During executive session, the Mayor and Board discussed the investigation and the Mayor's findings. After presentation of notes from the inquiry of employees and review of supportive documents, the Board made a decision to be" -- I'm sorry -- "the Board made a determination of the following findings:

"Number 1, that Barry McMillian attempted to be paid for unearned time.

"Number 2, that fraudulent entries were made by Barry McMillian's employee daily

Page 59

time." I'm sorry. Let me rephrase that.

"Number 2, that fraudulent entries were made for Barry McMillian's employee daily time.

"Number 3, that Triron Brown assisted McMillian by making false entries for McMillian's daily time sheets.

"Number 4, that Barry McMillian's leave was not authorized.

"The City of Aberdeen believed in good faith that Mr. McMillian's termination was for cause and was not arbitrary or capricious, nor in violation of a constitutional right of Mr. McMillian.

"If the City can be of any further assistance to you during this investigation, please do not hesitate to call. Respectfully, Walter Howard Zinn."

Q. Okay. And who was that letter written out to?

A. Oh, I'm sorry.

Q. Or addressed to?

A. February 29, 2024. That letter was written to the United States Equal Employment Opportunity Commission Jackson Area Office.

Page 60

Dr. A, as in Adam, H, as in Harry, McCoy Federal Building, 100 West Capital Street, Suite 338, Jackson, Mississippi 39269.

Q. All right. And just for the record, after reading that, you do see that -- or I guess you can't recall that this states that notes were observed by the board --

A. And as I told you, sir, that probably was the case. But once again, I'm going to go back to my original statement. You're asking for stuff that happened how many months ago?

Q. Right. But my question would be in reference to these notes and presentation, who would have the copy of that presentation?

A. Oh, they're -- they -- oh, yes, sir, there would be -- we -- they're -- they're here somewhere.

Q. Okay.

A. If you --

Q. I guess my question is: Who would I go to to get those records or who would --

MR. WALKER: It'd be me.

MR. REDDICK: Okay.

A. Yeah, but, like I said, whatever the -- I'll let counsel speak because that's my

15 (Pages 57 to 60)

REPORTING BY DANA, LLC
DanaDMoulder@gmail.com

Shea Cain -- February 25, 2026

Page 61

counsel. But anything that we have that you need as far as discovery information -- ain't nobody trying to hide nothing.

BY MR. REDDICK:

Q. Okay. So -- but I guess just for my own recollection, would it be Melissa Moore, the city clerk or --

A. It could be possibly Ms. Melissa Moore or it could possibly be the city comptroller, Karen Crump who is right here, former Mayor Charles Scott.

And as I told you, Counselor, I've got some files, but, unfortunately, most of them were black and wet like an old nasty dog. And I had to throw them in the garbage can. That was a long time ago.

Q. Okay.

A. So -- but I will promise you that we will provide what we can. I mean, like I said, we're from the government; we're here to help.

Q. Okay. And in reference to the investigation, was there a video presentation or audio presentation? If you can't recall, then you just can't recall.

A. No, sir. I'm pretty sure there was

Page 62

no -- nothing of that sort.

Q. So no audio or video presentation to the board on --

A. Well, I will say this, Counselor, if there are cameras at public works --

Q. No, not that. I'm saying --

A. That night at the board meeting?

Q. No. In reference to Triron Brown, like, his testimony --

A. Oh, I'm not aware of any videos or nothing, no.

Q. Okay. So just as far as being -- I'm saying as far as any evidence being presented in audio or video format, was that presented to the board that day?

A. I don't recall, sir. I don't believe so but I'm being honest as I can be. I don't recall but I don't remember any of that.

Q. Okay. That's fair.

A. Yeah.

(EXHIBIT NO. 16 WAS MARKED.)

BY MR. REDDICK:

Q. All right. You can just have a chance to look at that because --

A. Sure. You just want me to read it

Page 63

and you're going to --

Q. No, you don't have to read this out loud just yet. You can kind of look at it and just let your attorney see it.

A. Okay. Yes, sir.

Q. Gave to the EEOC on behalf of the City.

A. Yes, sir.

MR. WALKER: Which charge is that?

MR. REDDICK: That's this one.

MR. WALKER: The termination one?

MR. REDDICK: Uh-huh. Yeah, the termination in reference to Mr. Brown and Mr. McMillian.

THE WITNESS: Okay, Counselor. All right. I pretty much sort of get the general gest of what this says.

BY MR. REDDICK:

Q. Okay. All right. Just for --

A. Sure.

Q. On number 11 right here --

A. Yes.

Q. Can you just read that?

A. Read the number 11 and then the response?

Page 64

Q. Yes, just 11.

A. Okay. Just 11. Okay.

"Number 11, Does the City have a Progressive Discipline Policy in place.

"RESPONSE: The City of Aberdeen handbook references different aspects of 'progressive disciplinary' procedures throughout the employee handbook. More specifically, the City of Aberdeen has an adopted Progressive Discipline policy found on pages 39 through 40 of the handbook."

BY MR. REDDICK:

Q. Okay.

A. Yes, sir.

MR. REDDICK: And this is -- he's reading -- Mr. Cain is reading that from Exhibit 16.

THE WITNESS: Right.

BY MR. REDDICK:

Q. All right. This is -- can you read -- this is still on Exhibit 16. This is 13, and can you just read the question and response?

A. On number 13?

Q. Yes, sir.

16 (Pages 61 to 64)

REPORTING BY DANA, LLC
DanaDMoulder@gmail.com

Shea Cain -- February 25, 2026

Page 65

A.   Yes, sir.

"Number 13, What is the policy of donating leave?

"RESPONSE:  The City handbook does not prohibit employees donating leave and believes the donation of leave time amongst co-workers is also a reflection of intra-departmental relations.  While this is a relevant injury" -- I'm sorry -- "while this is a relevant inquiry, the decision as to rejecting a request leave, disregarding the obvious technical errors of the request, the handbook specifically addresses the procedure for requesting the respective leave.  Generally speaking, following said procedure would not have had the donation of leave."

Q.   Okay.

A.   I'm sorry.  Let me rephrase that.

"Following said procedure would not have barred the donation of leave."  Uh-huh.

Q.   All right.  I guess I'll have you going back --

A.   Uh-huh.

Q.   I'm not going to have you read per se, just the number 3.  I'm going to have you

Page 66

just -- we're looking at paragraph 3 on page [sic] 16.  And it's just basically saying, "List all the employees who received disciplinary action during the relevant period in the charging party's job classification or department.  Include employee's name, (enter relevant basis); position, date of hire, whether probationary or not.  For each person listed, describe each disciplinary action by" -- and so I just need you to read for the record --

A.   Sure.  Starting with A?

Q.   Yes, A through this response.

A.   Yes, sir.  All right.

So item Number A, "Date of the disciplinary action(s):  December 5, '23.

"Reason for disciplinary action(s): Mr. Brown was suspended for his role in misconduct recording" -- I'm sorry -- "regarding the charging party."

Item C, "type of disciplinary action(s) taken:  Mr. Brown was suspended for three days without pay."

Number D, "disciplinary record of employee prior to the instant issue:  Mr. Brown did not have any disciplinary measure in."

Page 67

Item E, "person imposing the penalty; including name, position title:  The penalty was imposed by the Board of Alderpersons.  The minutes have been provided with the RFI response."

Do you want me to complete that where it says "submit"?

Q.   Yeah.

A.   Okay.

Q.   All the way through that.

A.   Okay.  Sure.

"Submit all documents which relate to any and all of the above disciplinary actions taken against the individuals listed above.

"RESPONSE:  The only identified employee disciplined in the charging party's job classification or department has been Mr. Triron Brown."

Q.   All right.  So this is still on Exhibit 16.  I guess you just -- "Issue: Discharge."  Can you just read 1 through, I guess, this end right here?

A.   Just right here where it ends with "party"?

Q.   Yeah.

Page 68

A.   Yes, sir.  Okay.

Q.   Hold on one second.  Your attorney asked what number.

MR. REDDICK:  We're looking at issue on discharge.  This is one, two, three -- page 5 on Exhibit 16.

A.   Under "Issue:  DISCHARGE.  Number 1, if the charging party was discharged, submit the following:

"a.  date of discharge:"
Answer -- I'm sorry.  Well, I'm just going to read it.
BY MR. REDDICK:

Q.   Okay.

A.   "Vote to terminate occurred at the December 5, 2023, regular board meeting."

Number B, "reason(s) for discharge: Charging Party was discharged by misconduct, including but not limited to fraudulent entries on timecard and failure to follow procedures on leave and absences.

Number C, "statement of whether the charging party had any right of appeal, and whether the charging party made use of any appeal rights:  Yes, under Mississippi Uniform

17 (Pages 65 to 68)

Shea Cain -- February 25, 2026

Page 69

Civil Rules of Circuit and County Court practices; and Mississippi Code Annotated 11-51-75. An appeal has been filed, and the charging party currently has retained an attorney. The cause number for the matter is 2023-395 before Monroe County Circuit Court."

Number D, "person recommending the discharge, including name, (enter relevant basis) and position: Charles Scott, Mayor made the recommendations for discharge after suspending the charging party with pay."

Number E, "person making final decision to discharge the charging party, including name (enter relevant basis) and position. According to the Special Charter of Aberdeen, Mississippi, the City Counsel (which includes the Board of Alderpersons and the Mayor, if a tie), makes a final decision to discharge a party."

Q. Okay. So in reference to Mr. McMillian, it was the board that voted by majority to terminate Mr. McMillian?

A. That's correct. The only one, Mr. Scott, would have been able to vote due to our special charter or maybe in every situation

Page 70

as in a tie.

Q. Okay.

A. And I -- I -- yes, sir.

Q. Okay.

A. In our special charter, I might add that the mayor -- this is a weak mayor, strong board situation that the mayor is, in fact, a superintendent and/or -- I don't like to use this but he's the day-to-day operator.

Q. Okay.

A. The board has the power and I -- you know, unfortunate that they refer to that as weak mayor, strong board. But that's just what our charter -- our charter is awful. It is so -- it is so terrible. It needs to be rewritten but that's another story.

Q. So just for the record, the mayor completes the day-to-day operations --

A. That's correct.

Q. -- for the city and the board has -- has the majority can vote to terminate somebody, correct?

A. We can vote to terminate anybody on the board and with a four to one vote for the same cause for two meetings in a row including

Page 71

the mayor.

Q. All right.

A. So the mayor's job in our city is to be the head honcho. He goes to the departments, he takes care of the nitpicking. He takes care of the -- you know, whatever. And if it goes beyond his realm, it comes to the board. All department heads are supposed to report to the mayor. That's how it's supposed to go. Now, is that -- you know, that's just the way our charter speaks.

Q. All right. But the board is the, unless --

A. Ultimately, the board -- it's us.

Q. That make the determination --

A. That's correct. He could recommend stuff all day long. Any mayor can recommend as to what he wants or what -- you know, whatever. If we don't want to do it, we don't -- I mean, there could be a motion brought up, it dies or we can vote three to two or unanimously. But if the mayor comes in and says, "Hey, we want you to do this," we can tell him to go fly a kite somewhere.

Q. Right. Unless it's a tie between the

Page 72

board, then he gets --

A. Well, it has to come to vote first.

Q. Right.

A. Yes, sir. But if it's a tie -- if it's two to two, then that is the vote maker. That's --

Q. Okay.

A. -- it's either whatever -- he's going with us or them.

Q. Right.

A. That's the way it is.

Q. So he gets to --

A. He would in that type --

Q. I mean, break the tie basically?

A. Correct.

Q. Okay.

A. And he can make recommendations to the board. He's the mayor.

Q. Okay. Got you.

All right. I guess I'm going to have you read one last thing on page --

A. Okay.

Q. -- all right. This is just number 4 -- I can read this part and you just read the subsections.

18 (Pages 69 to 72)

Shea Cain -- February 25, 2026

Page 73

A. Okay.

Q. Number 4 on -- this is for the record. I think this is page 6. Let me make sure. Yeah, this is page 6 on Exhibit 16. Looking at number 4, it says, "List all employees who committed the same or substantially similar offense(s) that the charging party committed. For each person include the following."

Can you just read the subsection for me?

A. Okay. So under number 4:

"A. name and (enter all relevant basis): Triron Brown.

"Number B, position: Laborer.

"Number C, date of hire:" -- no answer.

"Date of offense: On or about November 27, 2023.

"Number C [sic], explanation of offense: At the request of the charging party, Brown clocked the charging party in for work, fraudulently entering unearned time.

"F, action taken as a result of offense or" -- blank.

Page 74

"G, if no action was taken, explanation of no action: Employee was suspended for three days.

"H, name, (enter relevant basis), position of all decision-makers. See December 5, 2024 minutes."

That's -- there's -- that's a scrivener's error. That should say '23. Yes.

Q. Yes. Yes, that's correct.

A. "Submit all documents that state, describe, reference or relate to the requested information."

Just four? That's it?

Q. No. Well --

A. You want me to finish up?

Q. Yes, just go ahead.

A. Okay. "Number 5, list all employees discharged within the relevant period. For each employee, include employees name (enter relevant basis) position, reason for and date of discharge, and a copy of the separation notice.

"RESPONSE: This question appears to have been asked before. Is this request for all discharged or terminated employees? Can you clarify the time period in question?"

Page 75

Q. All right. Now, this is going to be a different exhibit.

MR. REDDICK: I need to show this to you. This is from Triron Brown. This is going to be Exhibit 17.

(EXHIBIT NO. 17 WAS MARKED.)

THE WITNESS: Okay. You want me to read it or you just want --

BY MR. REDDICK:

Q. Okay. You just look at it first --

A. Okay.

Q. -- and then I'll just ask you if that's the first time you've ever seen that document?

A. Oh, yeah, I can -- I've never seen this document.

Q. Okay. So you've never seen that document on -- this is Exhibit --

A. Let me rephrase. Let me rephrase, please. I don't recall ever seeing this document.

Q. Okay.

A. I do not.

Q. And just for the record, can you just state what that states?

Page 76

A. Yeah. This is dated November 28, 2023, and it says, "I, Triron Brown donate Barry McMillian 4 hours sick time. Thanks, Triron."

Q. And that's the mayor's note --

A. And this is -- does that --

Q. From Mayor Charles Scott.

A. -- does it say disappointed? Or is that -- I can't read it. It's disappointed or disapproved.

Q. I'll let you make the --

A. Okay. So I think it says, "disapproved, Mayor Scott, November 29, 2023, failure to follow procedure."

Q. Okay. All right. And before I ask a question about this, what's the policy in reference to, I guess, people donating leave? Is that something that's standard in the City of Aberdeen?

A. To my knowledge, Counselor, that has been a long-standing tradition when people are sick. If I'm not mistaken, when we lost our fire chief, Mr. Fred Hodges -- I think, he was in the hospital with cancer for an extended period of time, and maybe some guys and ladies, maybe.

19 (Pages 73 to 76)

Shea Cain -- February 25, 2026

Page 77

You know, I can't recall with specificity any names, but I know that it is a long standing -- and in industry as whole, I was shocked that the City -- but it's just -- most of the people around here are -- despite nepotism laws, you know when you live in a city under 5,000 people, you can't always -- so I think it's a good policy.

But, now, I don't recall anybody. Maybe Fred Hodges when he had cancer. But, now, if the mayor presented this to anybody, I don't recall ever seeing that.

Q. Okay. All right.

A. I will confirm for you that that appears to be Charles Scott's handwriting. I have no idea about Mr. Brown's handwriting. I've never seen anything that he's penned.

Q. Okay. And so this is in reference to the day that Triron Brown clocked in. It says this day 11-22-2023 but it's in reference to 11-27-2023 in reference to, I guess, my client getting donated time from Triron Brown. And so -- but you say --

MR. WALKER: Are you just referencing --

Page 78

BY MR. REDDICK:

Q. Yes, I'm just representing that so -- but -- so my question is -- but you are saying that you are not aware of this or anything?

A. No, sir. Like I said, if that was in a packet or in an illustration provided to us by Charles Scott -- I'll refrain from my personal opinion.

Q. Okay. So when it was disapproved, do you know why he would have disapproved it, the time Mr. McMillian was donated --

A. Well, it clearly states there for failure to follow protocol at the bottom, doesn't it?

Q. Okay. So that would -- you would attest that would be the reason?

A. Mr. Scott is the one who needs to answer that. I mean, that's just what he wrote on there. I'd have to believe him. I mean, I don't have any problem with Mr. Scott.

Q. Okay.

A. Yeah, I mean, I have no reason to believe Mr. Scott would do this in some kind of ulterior-motive type situation. I mean, he was the mayor. He was a good mayor.

Page 79

We got ten million dollars' worth of grants under him, so that's all I can say about him. I don't know him to be a liar. He's a military man, served with distinguished -- he's a distinguished young man; so . . .

Q. But you're saying the best person to ask this information about would be Mayor Charles Scott?

A. Oh, absolutely. I can't -- I cannot expand further on that. I mean, I can read you what he said.

Q. Okay.

A. But I've never seen that document, to my recollection.

Q. All right. Let me ask you this: In reference to -- I guess strike that.

In reference to getting donated time, who makes that decision, the mayor or the board?

A. Well, to be frank with you, Counselor, as I told you, I don't remember whether Mr. Fred Hodges, our now deceased fire chief, got it.

Let me -- let me give you a little background. Tom Elmore and I are friends. You talk construction and I spent a lot of time

Page 80

there and still do. So sometimes in my mind in my business and this all starts, you know, kind of doing this.

But if it's a policy in our book, the way the policy needs to be handled is the laborer in Mr. Brown's case would go to then Director Richard Boone --

Q. Okay.

A. -- who recently retired. Mr. Boone would then grant that, but I can't specifically tell you that since I have been an alderman that we have discussed anything of that nature at this board table. So I would have to refer back to the employee handbook and the specificities in how it's handled.

Q. Okay.

A. I -- I -- yeah, that's the only answer I've got.

Q. Okay. All right.

MR. REDDICK: This is Exhibit 18.

(EXHIBIT NO. 18 WAS MARKED.)

BY MR. REDDICK:

Q. Can you just read that --

A. Yes, sir. Yes sir.

Q. -- just let me know when you're done.

20 (Pages 77 to 80)

Shea Cain -- February 25, 2026

Page 81

A. Uh-huh. Yes, sir.

Yes, sir.

Q. Okay. All right. And just for the record, we are looking at Exhibit 18. It's just one page. And I guess, can you just state for the record, when it says "Type of Leave Requested" -- I guess, the employee's name is Barry L McMillian; is that correct?

A. That's correct. Yes, sir.

Q. You can elaborate.

A. Oh, sure. Oh, I'm just going to tell y'all what this is. This is a City of Aberdeen Water Department request for leave. Employee name, Barry L McMillian. It asks for the type of leave requested and it says illness for self. This would be for Mr. McMillian.

Barry signed this. I'm assuming this is Barry's signature. I'm not that familiar with it. The date was November 28, 2023, is the date it was executed if that is, in fact, Mr. Barry McMillian's handwriting.

And, once again, I recognize Mayor Scott's handwriting. And it says, "Disapproved, Mayor Scott, November 29, 2023, failure to follow procedure."

Page 82

Q. Okay. And in reference to Exhibit 18, I can represent to you that this is my client actually trying to take his FMLA leave for November -- to cover the November 27, 2023, date.

Let me ask you this: If this is in reference to FMLA, who makes the decision to admit or deny FMLA requests?

A. Counselor, in my experience anything to do with FMLA comes out of the city clerk's office. The mayor -- I'll, if I can, speak on the mayor. Mayor Charles Scott was a very hands-on, in-your-face type -- he's a military man. Some say it's good; some say it's not.

But the proper procedure would be -- unless it was not followed properly -- is he would go to see the -- Madame Clerk, Ms. Melissa Moore, our city clerk and --

Q. And I'll cut in. Who was the person that goes --

A. Mr. McMillian.

Q. Okay.

A. Mr. -- well, to be frank with you, the way it should really work, now, if you want to follow what we call "procedure," Mr. Boone

Page 83

should have been involved in this. And then either himself or Mr. McMillian -- you know, the mayor could have called him in or whatever.

Now, let me state for the record, I had no idea Mr. McMillian had ever tried to file for FMLA. I don't recall any of that. I'm sorry. But you're telling me that he was actually requesting time off through the Family Medical Leave Act?

Q. That's what I'm attesting to, yes.

A. Okay. Well, I -- you're telling me something new.

Q. Okay.

A. 'Cause I -- I mean, I'm just being frank with you. I don't recall FMLA ever being a part of this.

Q. Okay.

A. Not with this gentleman.

Q. Okay. All right. And let me ask you this: Can you just elaborate about the procedures, though, on the FMLA request --

A. I -- I -- I feel -- I feel -- I feel confident in the fact that if Mr. McMillian had been ill or needed to be off for an extended period of time -- we all know you get 12 weeks

Page 84

and, I think, maybe can go even further than that.

Now, I'm not that familiar with the FMLA laws or anything, HIPAA and stuff like that, but he would have needed to report to his boss. And I keep saying Richard Boone. I apologize to y'all. I will have to strike all of that.

I'm talking about Marcus Collins. I don't know why I got Richard Boone -- well, I don't know why but I apologize. It's not Richard Boone. His direct supervisor was Marcus Collins. Marcus is the lead man. He's not the superintendent. He's the lead man but I call him the guy in charge. He would have gone to him. They would have gone together, or, at that point, he should have gone to see the city clerk.

Q. Okay.

A. That's where the procedures start. That's just like car wrecks, she handles the insurance. She is the most important person in this building as everybody knows, other than the comptroller, in my opinion. The mayor don't count.

21 (Pages 81 to 84)

REPORTING BY DANA, LLC
DanaDMoulder@gmail.com

Shea Cain -- February 25, 2026

Page 85

That's the way, in my understanding, it should have happened. He should have talked it over with his superintendent or his lead man, boss, whatever you want to call him. 'Cause he's going to be down an employee.

Then he would have gone and filed his paperwork. Now -- well, I'm not even going to -- I'm not asking questions, you are. But I -- I'm -- this is something completely -- you're asserting to me that Mr. McMillian has been denied his FMLA claim? Is that where we are going now?

Q. Yes. I can tell you that frankly, yes.

A. Okay.

Okay. But I'm sorry, but that's news to me.

Q. Okay.

MR. WALKER: That's a claim in the lawsuit.

MR. REDDICK: Yes.

THE WITNESS: Oh, okay. Well, I haven't read the suit. So I'm sorry. I apologize.

BY MR. REDDICK:

Page 86

Q. Okay. Now, let me ask you this: In reference to that -- I'm still trying to get that information.

A. Sure.

Q. Does the board ever make a decision on FMLA benefits? Does it ever come to the board? And this would have been in 2023.

A. Counselor, I can safely tell you that I have no recollection of any FMLA claims by employees that has come across this board.

Now -- well, I will have to say, I've not -- I've only missed one board meeting. And it was a special called meeting just recently during Mardi Gras. And I could have cared less what was going on up here, frankly. Quote me. Because it was a bunch of hot mess.

But I don't recall anything. Now, like I said, I'm telling you if I need it -- but I don't -- I don't -- I don't remember any of that ever. I don't remember anybody going -- I don't know how many people we've ever had on FMLA --

Q. Okay.

A. -- if any.

Q. All right. And let me ask you this

Page 87

question: Because, I guess, U.S. Department of Labor Wage came and made a visit. Do you know what their findings were when they came and visited --

A. The --

Q. -- in reference to the --

A. -- I -- I can say with certainty --

Q. -- in good standing, in that nature?

A. Correct. I can say what I recall about that is our -- we did have, I guess, components of FMLA. Were they the latest and greatest? I don't think so because I distinctly remember the city attorney, the city clerk and a representative talking about we needed to beef up our FMLA.

And I -- I'm telling you what I remember. There are other people that can tell you he's crazy or not, but I know for a fact there were components in our handbook of FMLA. But I think -- and I'll -- maybe it was due to Mr. McMillian. I don't know, but I distinctly remember discussions at this board table with a representative here discussing FMLA. Now, I was not a part of those talks.

Q. Okay.

Page 88

A. So I can't -- I can't expand on what happened at that time. I am not aware of the City being cited.

Q. Okay.

A. I'm not saying that we got a -- you know, we got a nasty gram, I never got a copy of it. That's all I can tell you.

Q. Okay. So you would say you are not aware if the City got fined for not having --

A. Oh, no, sir, I'm not -- I'm not aware of that. Now, let me -- let me -- let me state for the record, I would believe that I would know if the City had been fined.

I will report to you in good faith that the comptroller puts out a docket of claims every two weeks. And it's a list of the hundreds of thousands of dollars that we have to pay. If we were fined, I don't recall the city attorney or the city -- or the city clerk or the mayor ever saying it to me. I'm just saying. But I do remember a visit from them. I do, in fact.

Q. Okay. Do --

A. But I can't speak to exactly what happened because I didn't -- like I told you, I

22 (Pages 85 to 88)

Shea Cain -- February 25, 2026

Page 89

don't remember it being admonished or written up or fined. You know, maybe there's a strong letter to follow that somebody's got in a folder, but I can't say anything else about that.

Q. Okay. Do you know when the last time the FMLA was updated by the City --

A. Oh, I would assume within the last couple of years.

Q. Okay.

A. I've been here for almost three. So, I mean, I'm pretty sure it was within my time here. Oh, I know it was.

Q. Okay.

A. Yeah, it had to be. And like I'm telling you, Counselor, I'm going by what I remember from, you know . . .

Q. Okay. Yeah, like I said, just trying to get the stuff to the best of your recollection and whatnot. So if it was stated that, I guess, from the last time that the FMLA policy was updated by the City would have been 1998, you would say that would be accurate or inaccurate?

Page 90

A. I can tell you with complete honesty that our handbook, in fact, may have been written maybe -- I can tell you that our handbook is antiquated. I can tell you that there's been discussions at this table about updating our handbook for many reasons. If you're going to tell me that you have a document from the United States of America or from wherever that states that we have a delinquent policy on FMLA -- I mean, I can't refute what it says. But I will tell you that it is my understanding, that during my time on this board, there has been amendments to and/or additions to a rather weak possibly FMLA system that we had or policy in this city.

Q. Okay.

A. Now, that's -- that's the best of my recollection.

Q. Okay. I am just going to show you this document. It's just --

MR. WALKER: Not an exhibit?

MR. REDDICK: Yeah, I'm going to make that an exhibit.

(EXHIBIT NO. 19 WAS MARKED.)

Page 91

BY MR. REDDICK:

Q. All right. You can just look at that briefly.

A. Sure. Sure. Sure. Sure.

Q. And I'm just going to ask you a general question. Nothing too specific.

A. Sure. Uh-huh. Okay. Yeah. Yes, sir. Yes, sir.

Q. All right. Just some general questions about this. This is Exhibit 19, the Family and Medical Leave Act, Employee Rights and Responsibilities Under the Family and Medical Leave Act. Have you ever been given a document like this by the U.S. Department of Labor Wage or attorneys to get you in compliance, I guess, with the handbook or anything?

A. No. I'll restate what I previously stated. I do specifically remember talks at this table in this room, and Mr. Walter Zinn, our city attorney and our clerk, Ms. Melissa Moore -- I hate to say dealing with, but we had been contacted. And, I mean, you're asking me and I wish I could provide you with a yes or no, but I

Page 92

will tell you that I believe in my heart, at the time we were notified and we discovered that our -- not to make a pun about it, but our case was weak in this department, we took measures at that time. Now, exactly what date was that, Ms. Moore can help our with that, our city clerk.

Q. Okay.

A. And she will be more than glad. 'Cause she and Mr. Zinn and possibly one of the mayors -- I would say that -- I'm thinking it would have been Mayor Scott. It wasn't Mayor Stevens.

Q. Okay.

A. I think it's been too long ago to be Mayor Stevens; so . . . But I do remember and I wish I could supply you with more definitive -- but I do remember. In fact, whether it was a hard one or a loud one, we weren't -- I don't know if it was the specific language or there wasn't enough paragraphs or there wasn't enough -- I don't know, but I just remember there was something. I mean, I do.

But now -- and I'll state again for the record, you're telling me that this all goes

23 (Pages 89 to 92)

REPORTING BY DANA, LLC
DanaDMoulder@gmail.com

Page 93

back to Barry McMillian was denied FMLA. I will tell you firmly that will be answered by Melissa Moore. That's the only person that can tell you because I don't -- to my knowledge -- and, like I said, I'm telling you what I remember. It ain't never been in this boardroom before.

Q. Okay. And so what about Mayor Charles Scott, would he know that as well, do you think?

A. Mr. Scott, certainly during his time, should be able to allude to whether or not Mr. McMillian -- I -- I'm not trying to make light of it because FMLA is serious. But you hit me with and I apologize -- I have talked to my counselor but we didn't have a significant discussion, and I have not read the complaint or the suit, rather.

But you're telling me stuff today that I don't think anybody that's been deposed would say that they heard that. And if they did, I'd like to know when they heard it 'cause I hadn't heard it.

Q. Okay. All right. I mean, that's just like --

A. That's right. I mean -- oh, yeah,

Page 94

that's exactly right. I mean, some things stick and some things don't. But I'm telling you, to my knowledge, this -- this FMLA situation and this being named in the case -- I thought this was a wrongful termination case. But -- and maybe I misunderstood Mr. Zinn. We do have quite a few lawsuits.

But I'm telling you today, I believe in my heart and I believe that these people in this building, if not spread across the minutes, I hadn't -- like I said, I didn't review the minutes. I apologize. We definitely had a visit from somebody. I don't know if it's U.S. Department of Labor. I don't know what department it falls under, maybe the Interior. I don't know.

Q. Okay.

A. But I know for a fact that we did receive and we did have -- it was -- I think I even -- anyway, I'm just telling you what I remember.

Q. Right. So just to verify, the best person to talk to whether or not, I guess, the City is in, I guess, good standing with -- I guess, in reference to having FMLA in good

Page 95

standing, would it be Melissa Moore or Charles Scott?

A. Well, Charles Scott as former mayor could probably tell you. He's very sharp, but I can tell you if you need an immediate answer, Ms. Melissa Moore needs to answer questions.

Q. Okay. Would that be the same person, I guess, we would -- I guess, opposing counsel would have to contact in reference to whether or not it was in good standing in 2023 when my client was terminated?

A. We don't -- we don't have a human resources department and we had just added a city manager. The city manager has only been here for, I don't know, now maybe seven months.

Q. Okay.

A. I don't know that she's acclimated herself to any of that area, but I can -- with -- with -- I can tell you that Melissa Moore is our city clerk. And she handles drug screens, she handles money, she handles the minutes, that she is the clerk of the board. She handles a magnitude.

She's -- like I told you, she and this lady next door -- it's the comptroller --

Page 96

the two most important people in this -- actually, the city clerk is the most important but she can answer questions in relation to that.

Q. Okay. And you say you just -- the City of Aberdeen just, I guess, retained a human resources person?

A. We -- we retained a city manager --

Q. Okay.

A. -- in -- I think it was October of 2025.

Q. Okay.

A. Her name is Teresa Baker-Young. I've known her for my whole life. She works kind of part-time but --

Q. Well, I need to state for the record, that's actually a former client of mine. So let that be known.

A. Okay.

Q. Yes, she's originally from Aberdeen but she resides --

A. She is.

Q. -- in Tupelo. She's married to a barber that --

A. Yes.

24 (Pages 93 to 96)

Shea Cain -- February 25, 2026

Page 97

Q. -- yeah. I actually know her husband as well; so . . . Yeah.

A. Yeah. Yeah, I've known her for -- I've known her for a long time and when she was brought to me, I was excited to hear -- I didn't know what she was doing. I just --

Q. Yeah, she owns some property around here.

A. Yeah, she has the old Big Star building over here and stuff like that.

Q. Okay. All right. Let's see.

A. And then, like I said, I'm not -- I don't know what she has familiarized herself with since she's been here.

Q. Okay. All right. That's fair. I'm probably just going to have a couple more questions, some follow-up, and I'll be done.

All right. I'm looking at Exhibit 4. All right. So this is just Mr. McMillian right here on the 27th. You can look at this and just see if you have ever seen this document before?

A. Counselor, like I told you, it may have been -- it may have been in a presentation

Page 98

that Charles Scott made that night. But once again, sir, I -- you know, did I look at that document and can -- is it -- I mean, I'm just telling you, I'm -- I'm trying to tell you specifics of what happened. Have I seen this document before? Possibly, but I don't -- I don't have any recollection.

Q. Okay. Well, I guess, I can attest to you that this is a time sheet and Mr. McMillian clocked in or I guess -- I guess, how can I say it? Marcus Collins, I guess, wrote his time in for eight hours and whatnot.

A. Uh-huh. Uh-huh.

Q. And I'm just trying to understand, was there any discipline for Mr. Collins in reference to him writing in time for Mr. McMillian in reference to this situation?

MR. WALKER: Objection to the form.

BY MR. REDDICK:

Q. You may answer.

A. No, there was no disciplinary action for Mr. Collins. I hate to answer a question with a question. Why would Marcus Collins be in trouble, just because he's the lead?

Q. No, I am just asking the question.

Page 99

I --

A. No, sir. I don't recall any disciplinary action taken on Mr. Collins.

Q. Okay. All right. Well, I guess, do you -- we are looking at Exhibit 4. Do you know why he would have wrote in Mr. McMillian for eight hours on that day, for November 27, 2023?

A. Well, Counselor, I may be mistaken, but I thought that all came off the clock. And it may be -- let me -- let me explain something to you. We got clocks in some places and at some places, we don't.

I will also state for the record that we are in the process of trying to install new clocks across the city, which are the clocks that we now have at the Aberdeen public utilities under the direction of Mr. LaMarcus Thompson.

Q. Okay.

A. So Ms. Young, Ms. Teresa Young and our city clerk, Melissa Moore have been ranting and raving about what he has down there. And I may be totally -- I have a lot of business with time clocks all over the place, okay?

Q. Okay.

Page 100

A. So, you know, I will say that we do have some in place in this town. Possibly this is not even a situation where there is a time clock. I believe there is a time clock in the office. We can go down there and look. I mean, I've only been in there a handful of times during my three years 'cause they call me and I go where they are. I don't go out there.

So -- but in answer to your question, Marcus Collins has worked for the City of Aberdeen, I believe, sir, 15 or 16 years. I have no reason to believe Mr. Collins would do anything unethical. I've never caught him doing anything unethical, and I'm pretty -- I'm pretty known around the city and I get out and do a lot of stuff. So that's all I can say about that.

Q. All right. Are you aware that he's ever been convicted for embezzlement before with a felony? Are you aware of that?

A. Who?

Q. Mr. Collins.

A. No, I've never done a background check on him, sir. He was here when I got here.

Q. Okay. Yes -- I mean -- well, hold on one second.

25 (Pages 97 to 100)

REPORTING BY DANA, LLC
DanaDMoulder@gmail.com

Shea Cain -- February 25, 2026

Page 101

MR. REDDICK: Exhibit 1.

BY MR. REDDICK:

Q. This is from the deposition that we had today earlier --

A. Uh-huh.

Q. -- of Mr. Collins.

A. Uh-huh.

Q. I can attest to you that's of him being convicted of embezzlement. And so I was just saying were you aware of that or anything?

A. No, sir. This happened before my time. I have known Mr. Collins through the water department. I know his mother. I mean, that's all I can tell you. But, now, I'm not going to read it, but, I mean, I'm not going to -- I mean, you've got the document here, filed in 2020.

Oh, wait a minute. Oh, the case was filed in just -- no, it was adjudicated on him in '23? Why is there two stamps here?

Q. They're probably --

A. This was when Dana got the file? Why -- why is it -- why is there two stamps? I'm just asking the question. Oh, it's in a different county. Dana is out of Monroe County.

Page 102

Where is this?

Q. It's probably --

A. Okay. So in other words, I'm not going to read it. So you're telling me -- I mean, I'm not going to --

Q. Yes, he admitted to that. He was convicted of embezzlement.

A. Okay. Well, no, sir, I don't -- let me tell you something. I worked with Mr. Collins. He's one of my employees, okay?

Q. Okay.

A. We don't -- we don't go out and eat dinner and things of that nature. The NAACP has a hamburger cooking every year over in General Young Park and I take all of Mr. Manning's tickets and sell them and then we go over there and get our plates and talk with everybody and everything. That's the extent.

I mean, I call him a friend. I always tell him if he needs somewhere to live, I've got a bed and I've got towels and food because he does a great job for the City. He's a hard worker.

I'm not aware of his criminal past. That happened prior to me getting here, and I

Page 103

did not know that until today. I don't do -- I don't go out and go over there and search for judgments and liens and lis pendens and stuff on people. And that's just -- that's not me.

Q. Okay.

A. But I believe you. I see what you presented to me.

Q. Okay. All right. Yeah, like I said, I'm just asking questions about it. Do you know what the policy is? Can you, I guess, be over, I guess, the time clocks or anything of that nature if you have a felony? In the City of Aberdeen, is there a policy behind that or anything? Do you know -- that you are aware of?

A. As far as felony, we had less than one thousand dollars, nine hundred and something dollars stolen in the city clerk's office. The board was livid. The lady that allegedly took the money quit. She walked out that day.

And I -- there was an investigation opened by this board and by the chief of police, the comptroller, everybody. Of course, I wanted her at least arrested, you know. But you got to be careful about arresting people, you know.

And the cameras, in my opinion, were

Page 104

not sufficient at that time. We have since upgraded the cameras. It was not reported to the state auditor's office. I called Tom Chain myself and asked Tom Chain should it have been reported. Because if it had been reported, Ms. Moore would have been --

(BRIEF INTERRUPTION.)

THE WITNESS: Anyway -- but if I had found out that the clerk had failed to respond -- now, here's the response from the auditor's office. They would have liked to have been notified but it's not mandatory. Okay.

BY MR. REDDICK:

Q. Okay.

A. So as far as you're talking about felonious or felonies committed, I'm not aware. We've fired several. Let's see. We fired one of the board members' nephew or somebody kin to him for stealing 38 gallons of gas on our Fuelman card. We had video of that, the chief of police, the comptroller. We had a video of it and he got fired.

I think I made the motion. Pretty sure I did. I don't put up with crap. I don't.

26 (Pages 101 to 104)

REPORTING BY DANA, LLC
DanaDMoulder@gmail.com

Shea Cain -- February 25, 2026

Page 105

Q. Okay.
A. So as far as anything -- as far as felonies since I've been here, I don't -- I don't recall.
Q. Right. Just felony cases. You have had a felony -- have had a felony and still work in the City of Aberdeen --
A. To my knowledge, the handbook does not say if you are an employee of the City and you are convicted of a felony, you have to be terminated.
Q. Say that one more time.
A. Is that even legal?
Q. I am just asking questions.
A. No. No. No. I'm not aware of anything in our handbook that says if you are a City employee and you have been here a minute or ten years, if you're convicted of a felony, I'm not aware that it's mandatory or any laws in the State of Mississippi that would mandate that the board fire that person.
Now, let me ask you this question, Counselor, who did he steal the money from?
Q. Talking about who?
A. Mr. Collins.

Page 106

Q. Oh, I'm not saying he stole money. I'm just saying he --
A. No. No. You showed me a document indicating that he was a felon.
Q. Oh, that's --
A. Yeah, so where was the money stolen from? Was it stolen from the City of Aberdeen? Wasn't stolen from the City of Aberdeen?
Q. No, I don't know who it was. I just know --
A. Now, let me -- let me go back and say this --
Q. Yeah.
A. I've fired people for far less than a felony.
Q. Okay.
A. Now, I have.
Q. Yeah.
A. Now, some of my board members, they don't like it. You know, there's a lot of stuff that goes on in this city that they don't vote with me on for whatever reason.
Q. Okay.
A. But, see, where I come from, you don't let felons come to work. If he had been a

Page 107

felon prior to coming to work, I would have voted no 'cause I don't need anymore problems up here. You understand?
Q. I understand.
A. But if he stole from the City and was indicted and there was a trial and he was convicted, he would be terminated immediately.
Q. Okay.
A. If not sooner.
Q. All right. I understand that. As I --
A. I think that's fair.
Q. Yeah, I'm just going to ask questions.
A. That's correct. I understand, but, you know, you're hitting me with a lot of stuff today that I need to know for future reference. Because I can assure you, sir, had he been a felon and I was trying to hire him, he would have never made it past the process.
Q. Right.
A. I don't deal in felons.
Q. All right. This 6 and 7. Okay.
A. Uh-huh. Uh-huh.
Q. So this is just in reference to my

Page 108

client and --
A. This is Marcus, uh-huh.
Q. Yes. And so this is Exhibit 6. We had this with Mr. Collins earlier in his deposition.
A. Uh-huh.
Q. But on here is the date of October -- I mean, not October -- November 20th.
A. Yes, sir.
Q. And it was eight hours written in. And then can you just read what this says right here?
A. It says, "no pay per Mayor."
Q. Okay. You know whether --
A. Yes, sir. I do not.
Q. Okay.
A. I do not.
And, you know, Counselor, as I told you, you know, the mayor is the day-to-day operator.
Q. Okay.
A. You know, if -- if -- this is what I would think would have happened. Now, this is Mr. McMillian's pay card, and it was signed off on by Marcus. I don't remember Mr. McMillian

27 (Pages 105 to 108)

Shea Cain -- February 25, 2026

Page 109

being in a board meeting asking to go into closed determination and/or executive session to question that eight hours. Now, this is not the date in question.

Q. No, we just --

A. This is prior to.

Q. Yes.

A. So, no, sir, I have no knowledge of why Mayor Scott did that. That would have to be for him to decide.

Q. Okay. And what about here, there's --

A. It looks like there was a strike and then there was a six. And then four over here, sick leave supposedly. So there was two hours paid, I guess.

Is this the four hours in question that supposedly Mr. Brown or whomever gave him that we talked about and the mayor said no? That's what it looks like to me.

It looks like somebody reported eight hours, looks like somebody scratched through there and put six. And then over here it looks like somebody said "sick leave, four" which I think should have been donated to him over there

Page 110

or something.

And then maybe he got paid for two and Charles Scott indicated over there failure to follow procedures. Is that -- is that where that came from?

Q. Okay. I'm just basically -- yeah, I'm just asking --

A. I think those two documents are synonymous with one another.

Q. Okay. And this is in reference to what we just --

A. Sure.

Q. -- reference to November 27th --

A. Yes, sir.

Q. -- of 2023?

A. Yes, sir. Well, the first thing you ask for was November the 20th.

Q. Right.

A. And no pay, I have no idea what that was about.

Q. Okay. And just to clarify, is it okay if you just say for November 27th again?

A. Well, what I can tell you that I see here on November 27th, which is the date I believe in question, it appears that there was

Page 111

eight hours written down. Somebody put a slash through it and put a six. There's no markings, so I don't know who did it. It could have been Collins; it could have been the mayor.

And then over here sick leave, it shows four hours of sick leave which would have given him ten hours that day, which is kind of -- that's very strange. And then the four is slashed through and there's a two there. I have no idea what it means.

Q. Okay.

A. That's no code I'm familiar with.

Q. Okay. All right.

A. I would think that would indicate hours, but it's very confusing.

Q. Okay.

A. That it appears to me that he should have been paid for ten hours that day if that sheet is correct.

Q. Okay. All right.

A. Uh-huh. Okay.

Q. All right. And just on this, this is an on-call report --

A. Correct.

Q. -- for the City of Aberdeen. And can

Page 112

you state -- does it state Mr. McMillian was on call for overtime in this? Are you ever -- have you ever -- familiar with this type of document?

A. This is an in-house document that they use.

Q. Okay.

A. So here's -- here's how it goes. Each department head -- and as I stated for the record, he doesn't have the title of superintendent or manager. He's a lead man.

Q. Okay. When you say "he" --

A. I'm talking about Mr. Marcus Collins.

Q. Okay.

A. He is the -- if I'm going to call somebody -- I can show you tens of hundreds of texts between him in my three years. Marcus Collins is the man.

Now, Mr. Brown worked here. Mr. McMillian's brother, Johnny, I know. And, yes, this would say or this would be for the month of -- or I'm sorry -- yes, for the month of November 2023. This is on call from Wednesday the 1st until Thursday the 30th of November 2023. So I don't know who prepared this --

28 (Pages 109 to 112)

Shea Cain -- February 25, 2026

Page 113

Q. Okay.

A. -- for Mr. Collins.

But I would say that this is a statement of fact of who was on call. And it states on here also "no reconnects after 5 PM," because of the money, the fact that they can't take money.

Q. Okay.

A. And the money has to go through certain departments. In this case, it would be the Aberdeen public utilities. And all other money in the city, it would be the city clerk's office. Because if you're not bonded, you don't need to have your hands on money.

Q. Right.

All right. But Barry McMillian would have been on call; is that correct --

A. It -- it -- according to this piece of paper, Marcus Collins, Triron Brown, Greg Burton, Barry McMillian and his brother, Johnny McMillian were on call for the month of November in the City of Aberdeen, 2023.

Q. All right. And so he's on call.

Are there any -- do you see him on any of these days 1 through 30?

Page 114

A. I don't see the word McMillian, nor do I see the word Barry in dates 1 through 30 anywhere that --

Q. Well, just for the record, I think Johnny is the name, Johnny McMillian --

A. Oh, I understand that but it's where it says Johnny.

Q. Okay.

A. What I'm saying is I don't see McMillian anywhere. These are all first names and I don't see McMillian, nor do I see Barry.

Q. Okay.

A. So I would say that his name is not on there. It is down here.

Q. Okay.

A. But I don't see it up here.

Q. Do you know any reason why that's the case?

A. Absolutely not. That's a question for Mr. Collins.

Q. Or would that be a question for Charles Scott as well?

A. No, I believe -- well, let me say this now. I don't know who created that document.

Page 115

Q. Okay.

A. I can tell you Marcus Collins didn't do it.

Q. Okay.

A. 'Cause I don't know that he's that computer proficient. I'm not myself. So I'm just -- I don't even know how to use this properly.

Q. Right.

A. So I don't know who created that document. It was made by somebody. I don't know if the mayor did it. I don't know if he had Melissa Moore do it. Mr. Collins in his managerial status -- 'cause that's what I call him -- had somebody do it, or, I don't know, maybe the secretary did it. I wasn't down there. I don't know. But, yeah -- and, no, I would have no reason why Mr. Marcus Collins would be discriminatory towards Mr. Barry McMillian.

Q. Okay.

A. I mean, I never knew that they had an issue. If you're telling me they do, it's news to me.

Q. Okay. But as far as overtime, can

Page 116

the mayor make that decision, Mayor Charles Scott, to who gets overtime and whatnot?

A. Let me tell you how overtime works, Counselor. It's a crime around here.

Q. Okay.

A. And I use that in a joking way. We have a tremendous amount of overtime, but I'll tell you why. We don't have enough people at the water department that know what they're doing.

Q. Okay.

A. And we have a real old girl here. Aberdeen's old, 1800s old. We got lead pipes, we got clay pipes. It's a sad situation, and I'm sure it's the State of Mississippi and other states. So we have a major issue with overtime to the tune of about four hundred grand a year in overtime, and I'm talking about all departments. But that's a lot of money.

So Mr. Collins, as I stated, he's the superintendent for all intents and purposes. He doesn't share that title. He doesn't share the pay scale, but he has to run it because I don't have anybody else to run it. I begged people to run it. I begged the former manager to come

29 (Pages 113 to 116)

REPORTING BY DANA, LLC
DanaDMoulder@gmail.com

Shea Cain -- February 25, 2026

Page 117

back.

That document was prepared by somebody. I don't know who. I have no reason to believe that Marcus Collins would have a -- if he had an issue with Barry, I think I would have known about it. As I tell you, I have to call him all the time.

Q. Okay.

A. And if he's got a problem, a major problem with an employee or things of that nature -- I've met him at city hall down here. I've never heard him say a disparaging comment about Barry McMillian. I'm just going to tell you.

Q. Okay.

A. And, you know, I'm not around him all of the time. He may cuss him like a dog in private, but he's never done it to me. And he's been very frank with me in many situations.

(EXHIBIT NO. 20 WAS MARKED.)

BY MR. REDDICK:

Q. All right. I think -- this is going to be, I think, the last thing I'm going to introduce today.

A. Okay.

Page 118

Q. This is a snippet from the employee handbook.

A. Uh-huh.

Q. It's progressive disciplinary action.

A. Okay. Hang on just a minute, Counselor. Let me just take a couple of pictures of them, and I'll delete all these pictures out of this phone before we leave here.

Q. Okay.

A. It's bad to get old. And they don't -- God ain't got no -- ain't no Lasik going to take care of this bad sight; so . . .

All right. And that's Exhibit 20, correct?

Q. Yes.

A. Yes, sir. Okay. On what specific area? You know, we got Uniforms, Financial, Interdepartmental Relations. Which area --

Q. Progressive Disciplinary Policy --

A. Okay. At the bottom. Okay. All right. Yes, sir, I'm ready.

Q. -- Progressive Disciplinary Policy to Conflict of Interest.

A. Do you want me to read this, sir?

Q. Snippets.

Page 119

A. Okay.

Q. Just let me know when you've read it.

A. Okay. I'm ready. I got it.

Q. All right. Just can you read from -- give me one second.

A. Uh-huh. And we're on page 39, sir; is that correct?

Q. Yes.

A. Okay.

Q. So I guess let me just ask you this, better to ask this --

A. Okay.

Q. -- instead of putting all this on the record.

A. Okay.

Q. After you had a chance to read that policy, can you just state to me if you believe this policy was followed or not?

A. Correct. So you want me to read Progressive Disciplinary Policy?

Q. Right.

A. Yes, sir.

I get the gist of it, Counselor.

Q. Okay.

A. You want -- okay. So I'm going to

Page 120

let you ask the question.

Q. Okay. All right. So let me just ask you this: In reference to this, it says -- I'm looking at subsection (2), "the normal application of progressive discipline should be."

First the subsection says, "if an employee is not meeting City standards of behavior or performance, the employee's Department Head should take the following action."

The first one under, I guess, subsection A --

A. Uh-huh.

Q. -- on page 39. It says, "Meet with the employee to discuss the matter."

In reference to Mr. Barry McMillian, do you know if he was met about this matter?

A. No, sir, I do not know if he was met about it. No, sir, I do not.

Q. Okay. What about this, it says -- the next following says, "Inform the employee of the nature of the problem and the action necessary to correct it."

Do you know anything about that?

30 (Pages 117 to 120)

Shea Cain -- February 25, 2026

Page 121

A.   No, sir, I'm not aware if he had discussion with anyone concerning this matter.

Q.   Okay.  And just from your knowledge, what are the types of things that can get you automatically terminated with the City of Aberdeen?

A.   Stealing money.

Q.   Okay.

A.   Embezzlement, stealing gas, stealing a gas can, stealing a paint brush, a garbage bag.  That's citizens' money.  That's my money.  I'm a taxpayer here.

Q.   So basically anything regarding to any type of theft is --

A.   Absolutely.  One hundred percent.

Now, you may define theft different than I do, but I've got a distinct difference in it.  And I'm going to also point out to you in this, if you'll read on the second page there's -- when severe incidences happen, you omit the other numbers and go with the one that would be -- which was termination automatically.

Q.   And can you just read that subsection --

A.   I'll be glad to.  I sure will.  Yes,

Page 122

sir, let me read that for the record.  If I can get this phone to do right.  I apologize.

Q.   Are you referencing subsection 4?  Or I guess that's section 4.

A.   Section 4.  This is on the second page of this exhibit.

"In cases involving serious misconduct, or any time the Department Head determines it is necessary, such as a major breach of policy or violation of law, the procedures contained in Comment (2) above may be disregarded.  The Department Head should suspend the employee immediately and, if appropriate, recommend termination of the employee.  An investigation of the incidents leading up to the suspension should be conducted to determine further action, if any, should be taken."

Mr. Scott, in his capacity of day-to-day operator of this city performed just those tasks; so . . .

Q.   Okay.

A.   Yeah, that's -- and that's -- like I said, that's straight out of the handbook; so . . .

Your client wasn't fired for any

Page 123

other reason than he stole, Counselor.

Q.   All right.  Well, I guess I still have to ask the questions for the record.  I know that's what you're stating but I have to ask the question.

A.   I would hope it came out of everybody that voted yes that night.

Q.   Yes, I guess I'm going to get -- try to depose everybody.

A.   Sure.  I think there may be a few more that may need to be deposed, but I guess that will be my attorneys that do that.

MR. REDDICK:  Let's see.  I'm looking for the -- just lost my train of thought.

Okay.  All right.  Never mind.  I think I got it.  So -- I know what it is.  The EEOC charge.

THE COURT REPORTER:  That's 11.

MR. REDDICK:  11.

THE COURT REPORTER:  I think that was one of them.  There might have been another one.

BY MR. REDDICK:

Q.   So we're looking at Exhibit 11.

A.   Yes, sir.

Page 124

Q.   Okay.  I think we went over this document earlier.

A.   We did.  Yes, sir, we did.  Uh-huh.

Q.   All right.  Just to -- from your stance, do you believe the City of Aberdeen retaliated against Mr. McMillian by terminating him for him filing this charge right here, this EEOC charge 423-2022-00047 on Exhibit 11?

A.   Is this the situation with Mr. LaMarcus Thompson and the racism?

Q.   Yes.  In the electric department, yes.

A.   Oh, no, absolutely not.

Q.   Okay.  So your position for the record is that you don't -- I guess just you can put it in your own words.

Do you think the City of Aberdeen retaliated against Mr. McMillian in reference to him filing that EEOC charge that I just mentioned?

A.   Well, if we were going to retaliate --

Q.   By terminating him?

A.   -- if we were going to terminate him for that reason, being malicious and vicious and

31 (Pages 121 to 124)

REPORTING BY DANA, LLC
DanaDMoulder@gmail.com

Shea Cain -- February 25, 2026

Page 125

vindictive, it would have happened way before I ever got to this board. I know the director of Aberdeen public utilities. He runs a lot of millions through that place down there. He's never received any charges for anything.

And it's two black men, okay, and I understand racism, and I understand how racism works. I'm a white man.

Q. Uh-huh.

A. I've been called everything in the book. But if you're asking me if you think anything LaMarcus Thompson and/or that board at that time did with Mr. McMillian was racist or undermining or anything of that nature, I'm going to tell you you're wrong, sir.

Q. Okay. I'm --

A. You're never get -- no. Ask it again and I'll answer yes or no.

Q. All right. And that's in reference to him being terminated on December 5, 2023 --

A. That has zero to do -- this claim has zero to do with that man, as you say, allegedly stealing time. He didn't allegedly steal time. He stole time.

Q. Okay. But I guess I'm going to say

Page 126

allegedly.

A. Okay.

Q. But just -- so just for the record, so in reference to my client getting terminated on December 5, 2023, it is your contention that it had nothing to do with him filing this EEOC lawsuit from --

MR. WALKER: I guess this will be the third time he answers this.

A. Absolutely, not. That right there is malicious prosecution, is what that is. Quote me.

BY MR. REDDICK:

Q. Okay.

A. That's what that is.

Q. All right. And what about --

A. And like I told you, I wasn't here when it happened, but I was made privy to it as a member of this board. 'Cause I knew I was the one who was going to have to defend it.

Q. Okay. And what about the FMLA, do you know why the mayor refused my client --

A. I have no knowledge of Barry L McMillian requesting FMLA. I've already stated that for the record today.

Page 127

Q. All right. I'm just getting --

A. No, you -- no. No. No. I'm not hating, Counsel. We're friends.

Q. Yeah.

A. I'm telling you the truth like God likes. I don't remember that. You told me something today -- you told me two things today for sure.

Q. Okay.

A. That Mr. Collins is a felon, admittedly.

Q. Yep.

A. And that Barry McMillian was denied FMLA.

Q. Okay.

A. I wouldn't bet my momma's heart on it and I love my momma. I'm just telling you.

Q. Okay. But in reference to -- well, I'm just saying in reference to Charles Scott --

A. Right.

Q. -- and him denying my client his FMLA benefits, you have no recollection --

A. Absolutely not.

Q. Okay.

A. And furthermore that process, FMLA

Page 128

would have had to gone through the city clerk's office.

Q. Okay.

MR. WALKER: And just tack on the objection, it's an argumentive question.

MR. REDDICK: No, it's just a question. I'm not arguing.

MR. WALKER: It's presupposing that FMLA was denied which is your entire claim.

MR. REDDICK: Okay. Well, that's your objection.

A. Well, I mean -- well, I'm just telling you, and I'm telling you the truth.

BY MR. REDDICK:

Q. Okay.

A. So -- and you ain't never going to find me in the records nowhere other than former mayor had me arrested up here because I called him a boy.

Q. Uh-huh.

A. I should have called him what he really was that day.

Q. Okay.

A. But I went to trial right down here and I won. And I won because they didn't have

32 (Pages 125 to 128)

REPORTING BY DANA, LLC
DanaDMoulder@gmail.com

Shea Cain -- February 25, 2026

Page 129

nothing but trying to accuse me -- I use the word "boy" to everybody. I'm not racist.

Q. Well, you're talking about --

A. I use --

Q. -- Charles Scott?

A. No, I'm not. I'm referencing the man in prison, Maurice Howard.

Q. Okay. Okay.

A. That's who I'm referencing. I just want you to know who I am. 'Cause, see, I don't play that.

Q. Okay.

A. I graduated in '87 out here at Aberdeen High School. A hundred and twenty something people. About 15 white folk.

Q. Okay.

A. Okay. I've been here my whole life.

Q. Okay.

A. I don't do things based on color. I do things based on character.

Q. Okay.

A. And I've been here long enough to know -- I'm 56 years old -- who's what and who they are and what they are, okay?

Q. Right.

Page 130

A. So you told me two things today, sir. You told me that my department manager for the time is a felon, and you informed me that Barry was denied FMLA.

Now, I will tell you this: You ain't looking at an attorney.

Q. Uh-huh.

A. I don't have a law degree. I don't have a bar number and I try not to practice law. But I've worked in multimillion and billion dollar industries and I know how it works. I'm proud to be in Mississippi.

But, see, what this is all is, is this is a bunch of lies that your client has told you.

Q. All right. So just for the record, just in reference to the -- Mr. Charles Scott interfering with my client being able to claim FMLA, you're saying you don't have any --

A. Absolutely not, sir.

Q. Hold on. Let me just finish.

A. I'm sorry.

Q. You don't have any recollection about that?

A. I have no recollection or knowledge

Page 131

of Mr. Scott even having a conversation with Mr. McMillian about FMLA. And I'll further go on to say, I have no recollection of our city clerk having an FMLA conversation with Mr. McMillian.

Q. Okay. And let me ask you this: Do you know if that was originally because the policy wasn't up to code?

A. No, sir. I don't believe that would have anything to do with it. I mean, you don't have to be a rocket scientist to know about FMLA.

And as I stated previously, and I will stand corrected if I have to, our city handbook had certain aspects or certain language in there. The language was antiquated as I understand.

But I'm not aware of anyone -- let me just say this: If my city clerk and/or the mayor or the city attorney denies an employee FMLA, they will be fired from here, even though my board members hate me. You know why? Because that's against the law.

Q. I understand.

A. In the highest regard.

Page 132

Q. And I guess this is my last question.

A. Yes, sir.

Q. We've talked about EEOC --

A. Sure.

Q. -- well, Title VII retaliation --

A. Uh-huh.

Q. -- talking about him filing that charge with the EEOC?

A. Right.

Q. And we've talked about FMLA interfering. But what about FMLA retaliation? Is the reason why Mr. McMillian was terminated by the City of Aberdeen because he filed a claim for FMLA?

A. Counselor, I'll say it for the 17th time, I had no indication -- I've had no stroke, I don't have early onset of Alzheimer's, I don't have dementia. If that claim came up, it was discussed other than in this boardroom. I had no idea that this case was about FMLA. I thought this was wrongful termination because we didn't fire his BFF too.

Q. Okay.

A. That's what I thought it was about, and I'm not blaming counsel. We hadn't -- I

REPORTING BY DANA, LLC
DanaDMoulder@gmail.com

Shea Cain -- February 25, 2026

## Page 133

hadn't read this. I was just told I was going to be deposed. And I said, "Well, of course, I'll be deposed." This is not the only deposition I'm going to have to give. His sister is suing us too. I made the motion to fire her.

Q. Okay. I just found out about that today myself.

A. That's correct. Yeah, I made the motion to fire her. Sure did.

MR. REDDICK: I don't have any other questions for Mr. Cain.

THE WITNESS: Okay. All right.

MR. WALKER: I don't have any questions.

(DEPOSITION CONCLUDED AT 3:48 PM.)

## Page 134

CERTIFICATE OF COURT REPORTER

I, Dana Gordon, Court Reporter and Notary Public in and for the County of Rankin, State of Mississippi, hereby certify that the foregoing pages contain a true and correct transcript of the testimony of the witness, as taken by me in the aforementioned matter at the time and place heretofore stated, as taken by stenotype and later reduced to typewritten form under my supervision to the best of my skill and ability by means of computer-aided transcription.

I further certify that under the authority vested in me by the State of Mississippi that the witness was placed under oath by me to truthfully answer all questions in this matter.

I further certify that I have no interest, monetary or otherwise, in the final outcome of this matter.

I further certify that this transcript is the work product of this court reporting agency and any unauthorized reproduction and/or transfer of it will be in violation.

_____
DANA GORDON, #1908
My Commission Expires: June 12, 2028

## Page 135

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

BARRY MCMILLIAN                    PLAINTIFF

VERSUS        CIVIL ACTION NO. 1:24-CV-199-SA-RP

THE CITY OF ABERDEEN
AND JOHN DOES 1-20             DEFENDANTS

CERTIFICATE OF DEPONENT

I, SHEA CAIN, certify that I have examined the foregoing pages as to the correctness thereof, and that after reading said pages, I find them to contain a full and true transcript of the testimony as given by me on FEBRUARY 25, 2026, except for the list of corrections, if any, attached on a separate sheet with the page number, line number, and desired correction/change.
Witness my hand, this the _____ day of _____, ____.

_____
SHEA CAIN

CERTIFICATE

Subscribed and sworn to before me, this the ____ day of _____, ____.

My Commission Expires:    _____
_____    Notary Public

## Page 136

ERRATA SHEET

PAGE        LINE        CORRECTION (IF ANY)

34 (Pages 133 to 136)