IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

BARRY McMillian                                    PLAINTIFF

VS.                        CIVIL ACTION NO.: 1:24-CV-199-SA-RP

THE CITY OF ABERDEEN
AND JOHN DOES 1-20                                 DEFENDANTS

*****************************************************

DEPOSITION OF EDWARD HAYNES

*****************************************************

TAKEN AT THE ABERDEEN CITY HALL BOARDROOM
125 WEST COMMERCE STREET
ABERDEEN, MISSISSIPPI 39730
ON FEBRUARY 26, 2026
BEGINNING AT APPROXIMATELY 1:29 P.M.

APPEARANCES NOTED HEREIN

Reported by:     VALERA H. KNIGHT, CCR #1039
                 P.O. BOX 82
                 TAYLOR, MS 38673
                 (662) 816-9863
                 valeraknight@gmail.com

APPEARANCES:

Representing the Plaintiff:
DEMOREO REDDICK, ESQ.
Ms. Bar No.: 103747
P.O. Box 465
Okolona, MS 38860
Telephone:  662-436-4641
Telecopier:  662-256-3582
reddicklawfirm@yahoo.com

Also Present:  Barry McMillian, Plaintiff

Representing the Defendants:
LOGAN P. WALKER, ESQ.
PHELPS DUNBAR LLP
1905 Community Bank Way, Suite 200
Flowood, Mississippi 39232
Telephone:  601-352-2300
Telecopier:  601-360-9777
loden.walker@phelps.com

TABLE OF CONTENTS

DEPONENT:   EDWARD HAYNES                              PAGE

Style, Cause Number...........................     1

Appearances...................................     2

Table of Contents.............................     3

Examination by Mr. Reddick....................     5

Examination by Mr. Walker.....................    64

Deposition Concluded..........................    69

Court Reporter's Certificate..................    70


EXHIBIT INDEX

Exhibit H

Exhibits 1-22 were premarked during prior depositions.
However, the ones that are listed below are the ones
referred to during this deposition.

Exhibits:  2, 3, 6, 7, 10, 11, 12, 13, 15, 17, 18, 19
and 20

(All exhibits were retained by Mr. Reddick and e-mailed
later to the court reporter and put in one pdf folder to
be used for all depositions taken on this date.)

EDWARD HAYNES,

After being duly sworn, testified as follows:

EXAMINATION BY MR. REDDICK:

Q.    Mr. Haynes, my name is Attorney DeMoreo Reddick.  I represent my client, Mr. Barry McMillian, in a lawsuit that he has against the City of Aberdeen. Can you just -- I guess, have you ever given a deposition before?

A.    Yes.

Q.    Okay.  How many depositions have you done before?

A.    Didn't count them.

Q.    Okay.  All right.  And just in reference to a deposition, I guess some preliminary matters.  Well, let me address the preliminary matters.  So the court reporter is making a record.  So when I ask you a question, just allow me a chance to ask a question completely, and then I'll give you a chance to answer the question completely.  Like I said, the court reporter is making a record, so it's best that we don't talk over each other.

So if there is a question that you don't understand, just tell me that you don't understand the question I'm asking, and then I'll rephrase it so that you can understand it.  Is that fair?

A.    Yes.

Q.    Okay.  And, Mr. Haynes, are you currently on any medication that would affect your ability to give a deposition today?

A.    No.

Q.    Okay.  And where do you reside?

A.    Aberdeen.

Q.    Can you give me the address?

A.    Can I ask a question, what my address got to do with this deposition?  I live in Aberdeen.

Q.    Okay.  In case I have to serve you a subpoena to attend trial.

A.    You sent this subpoena to my address, so you knew my address already.

Q.    I don't know if you've changed addresses or you've got any other addresses that you have?

A.    Only address I got, 707 West Vine Street. I'm trying to figure out what the purpose of asking me my address for something you already know.

Q.    Well, I mean, you may have more than one -- you could have one principle place --

A.    If that was the case, I never would have got your subpoena, would I?

Q.    I mean, I'm just answering your question. You asked me --

A.   Well, Number 1, my lawyer explained to me, well, this subpoena should have been signed.  It is not.

Q.   It is signed.

A.   It's not signed.  Where is your signature on here?  Where is --

Q.   The electronic signature right there, sir.

A.   There is no signature.

Q.   That's --

A.   That's a typed.

Q.   That's called an electronic signature.  We are allowed to do that in federal court.  Well, we are actually allowed to do that in court in general, so that's going to be a signature.

A.   You might want to -- could have checked with people to find out what their schedule looked like.  I was supposed to be in New Orleans this morning.  You know why I'm not in New Orleans?

Q.   I don't.

A.   Because of you.

Q.   Okay.  I mean that's an order from the court -- I mean, it's a subpoena.  I gave it to you in the right amount of time.

So, Mr. Haynes, can you just state your whole name?

A.    Edward Haynes, Jr.

Q.    Okay.  Mr. Haynes, I'm going to show you a document and just you can tell me if you've seen it before.  This is Exhibit 13.

A.    (Document tendered to the witness for review.)  What it looks like is a copy of the minutes from a board meeting.

Q.    Okay.  Now, let me ask you this before we start:  Have you talked to anybody about this deposition prior to coming here?

A.    Other than my attorney, no.

Q.    Okay.  And I'm not asking for what you talked about between you and your attorney.  But did you look at any documents to prepare today?

A.    I don't have any documents to look at before today.

Q.    Okay.  All right.  I'm going to show you a particular section in this -- on this board meeting -- from this board meeting.  This board meeting was on December 5th, 2023.  Do you remember the board meeting from December 5th, 2023?

A.    I do not.

Q.    All right.  I'm going to have you -- if you can read this for the record, it's on page -- starts on page 3 and ends on page 4.  It's from this

(indicating) point on where it says, "a motion," and can you read that to the next page, to page 4?

A. (As read): A motion was made by Alderman Holliday, seconded by Alderman Haynes to suspend city employee Triron Brown three days with no pay. The days are December the 1st, 4th and the 5th, 2023. On a call vote, Alderman Holliday, Alderman Haynes, Alderwoman Odom, and Alderman Cain voted "Aye."

A motion was made by Alderman Cain, seconded by Alderwoman Odom to terminate city employee Barry McMillian immediately. On a call vote, Alderman Haynes, Alderwoman Odom, and Alderman Cain voted "Aye". Alderman Holliday voted "No" (sic).

A motion was made by Alderman Cain and seconded the motion (sic) Alderman Holliday to adjourn until the December 19th board meeting.

Q. Okay. And that's just -- thank you. That's the board meeting from December 5, 2023 which is Exhibit 13.

Now that you've had a chance to, I guess, read those written statements, do you remember that board meeting now?

A. I don't remember the board meeting, but I remember the incident.

Q. Okay. Can you just tell me from your own

recollection about that incident?

A. A motion came up that some impropriety was going on with a city employee being on the clock and not actually physically here, and that employee was Mr. McMillian.

Q. Okay. Was Mr. Brown also involved in that matter?

A. Mr. Brown was accused of clocking Mr. McMillian in when Mr. McMillian was not here.

Q. Okay.

A. And Mr. Brown stated that he was told -- he was asked to do so by Mr. McMillian.

Q. Okay. And did you hear that with -- I guess, verbally from Mr. Brown?

A. I did.

Q. Okay. And when did he tell you this?

A. During that board meeting.

Q. The board meeting on December 5th, 2023?

A. Uh-huh.

Q. All right. And did you talk to Mr. Barry McMillian in the board meeting?

A. Did not.

Q. Okay. I was informed that Mr. McMillian actually tried to talk to the board to plead his case and whatnot. Was there a reason why he was denied by

the board?

A.    City attorney stated that if he had gotten an attorney and he's filed a suit against the City, that we should not entertain a conversation with Mr. McMillian about the situation.

Q.    And that point of reference with him being terminated from an incident happened on November 27th, 2023, on or around that time?

A.    That is correct.

Q.    That you say that he retained an attorney around that time, in reference to Mr. McMillian?

A.    Yes.

Q.    Okay.  Did Mayor Charles Scott said that he actually spoke with Mr. McMillian in reference to investigating this matter prior to recommending his termination?

A.    Are you asking a question?

Q.    Yes.  I'm saying, did Mayor Charles Scott, when he came to the board meeting, did he state that he interviewed Mr. McMillian about this matter.

A.    I don't recall.

Q.    Okay.  And when I mean "that matter," about the time clock situation?

A.    I don't recall.

Q.    Okay.  I guess from your own memory, do you

know why Mr. McMillian received a different penalty from Mr. Brown?  In this situation Mr. McMillian was terminated and Mr. Brown was suspended for three days.

A.    Receiving payment for work not done is considered theft.

Q.    Okay.  And what is it called when someone assists in helping that person receive payment for money that was not earned?

A.    He assisted in the theft.

Q.    Okay.  So is there a reason why he received three days -- Mr. Brown received three days and Mr. McMillian received termination?

A.    Nope.

Q.    Okay.  So you are saying there is not any particular reason why one was terminated and the other one was suspended; is that correct?

A.    Well, one received payment and one didn't.

Q.    Okay.  But if one assisted in that, then --

A.    One received payment, one didn't.

Q.    Okay.  So that's going to be your reason, one received the payment even though they both were involved in that matter?

A.    If Mr. McMillian knew when his paycheck came out, all Mr. McMillian had to do was return the money to the City once he learned that he had got paid for

hours that he wasn't due.

Q. Okay. So I guess just for the record just to clarify -- I guess you can say it's asked and answered -- but you are saying even though they both were involved in the matter, you are saying that -- initially you said no, and now you are saying that Mr. McMillian is the one that received the money, so he should get a harsher punishment than the person that assisted in helping him get the money; is that correct?

BY MR. WALKER: Since you qualified the question with my objection, I do object. Asked and answered. Mr. Haynes, from time to time I may -- it's just to make a record. You can still answer the question.

BY THE DEPONENT: I understand. I understand.

Q. (Mr. Reddick continued): So do you have an answer for that?

A. I mean -- can you use an honor system of saying that if I received something and it wasn't due to me when I have -- if I was an honest person, would I not have said, "Hey, these hours ain't correct on my

check.  Somebody made an error here."

Now, I couldn't hold Mr. McMillian accountable, because now he used the honor system saying, "Something was wrong and it wasn't me, cause I wasn't here."  But because he received the funds and never said a word, that tells me then that he knew.

Q.  Okay.  And so what about in reference to Mr. Brown, then?  So you are saying since he didn't receive the money that's why he got -- I mean, can you just explain it to me why he was just suspended instead of termination as well?

BY MR. WALKER:  Asked and answered.

Q.  (Mr. Reddick continued):  Just to clarify what you just stated.

A.  Asked and answered already.

Q.  Okay.  So I mean, you can still elaborate.  So I'm just asking --

A.  I don't need to elaborate.  It's already there.

Q.  Okay.  And so what document did you use to come to this conclusion that Mr. McMillian was stealing time?

A.  If I'm not mistaken, I think the mayor informed us of the payroll that someone was receiving

payment that was actually on the clock and was not here.

Q. Okay. But did you clarify that with Mr. McMillian?

A. I mean, do I need to?

Q. I'm just asking is it just a yes or no. Did you clarify that with Mr. McMillian?

A. Um --

Q. No. I'm just asking: Did you clarify that with Mr. McMillian what you just stated?

A. Mr. McMillian clarified it himself.

Q. When?

A. When he received the check.

Q. Okay. But I'm saying, did you have a verbal conversation with him about this?

A. Did not have a ver -- that's not part of the Alderman's responsibility you have to go and talk to employees on things of this nature right here. That is the mayor's responsibility.

Q. Okay.

A. To handle day-to-day operations.

Q. So even though Mr. McMillian did request to speak with the board about this matter, you are saying that he's not entitled to be able speak to the board about this matter; correct?

BY MR. WALKER: He's already said that the attorney instructed them not to allow him to.

BY MR. REDDICK: Well, I'm just -- what he just said, he stated something else. He said that that's the mayor's responsibility.

BY MR. WALKER: To conduct an investigation. Now you are asking about the board meeting, which you asked earlier.

Q. (Mr. Reddick continued): But you may answer.

A. And I may not.

Q. I mean, you are here. You have to answer the questions that I'm asking, so I'm asking you a question.

BY MR. WALKER: Just restate the question for him.

Q. (Mr. Reddick continued): Okay. You stated that earlier that the attorney, I guess, advised you that you didn't have to entertain Mr. McMillian speaking with the board. Now, you just stated that the mayor is the one that handles that. So which one

is it?

BY MR. WALKER:  Objection.

A.    You are talking about the investigation, that is the mayor's responsibility to handle that.

Q.    (Mr. Reddick continued):  Okay.

A.    Unless we'll have six different investigations, so we are not.  Is that what you're asking?

Q.    No.  I'm just asking my question.  Like I say, I'm not looking for a certain answer.  I'm just asking the questions.

A.    There's only one investigation.

Q.    Okay.  And that is the one conducted by the mayor; correct?

A.    That is correct.

Q.    And in 2023, that would have been Mayor Charles Scott?

A.    Correct.

Q.    Okay.  And just to go over, you said that -- was documents provided to you?  I know you said Mayor Scott spoke about the matter, but were documents provided to you in that meeting in reference to Mr. McMillian's being terminated?

A.    I do not recall any documents being passed to us, but the conversation went into executive

session, whereas we had a discussion behind closed doors that day as a matter of personnel that an employee was not physically here but physically clocked in.

Q. Okay. I'm going to show you Exhibit 15, and this is from Attorney Zinn. You can just glance over it and just see if you remember anything about this letter. The letter he wrote to the EEOC.

A. (Document tendered to the witness for review.) I'm sort of confused now.

Q. No. I'm just showing you a letter that Attorney Zinn sent to the EEOC in reference to Mr. McMillian about this matter. And so I'm just seeing if you ever seen that document before that Mr. Zinn wrote?

A. I have not.

Q. Okay. All right. I'm going to have you read something for the record. Like I said, this is something Attorney Zinn wrote on February 29, 2024, and this is on Exhibit 10 -- I mean, Exhibit 15. Can you read for me "An investigation was brought" all the way to the last sentence on the second page?

A. (As read): An investigation was conducted by Mayor Charles Scott. As a part of the investigation, interviews were conducted with the

supervisor of the department, and the department employees. After his investigation, Mayor Scott prepared a presentation of records and notes for the upcoming board meeting on December the 5th, 2023.

The mayor brought before the board his findings at the December 5th board hearing (sic). The board voted unanimously to discuss this matter during closed determination. This was announced to the public and the board then voted to enter into executive session.

During executive session, the mayor and the board discussed the investigation and the mayor's findings. After presentation of notes from the inquiry of employees and the review of the supportive documents, the board made a determination of the following findings:

Barry McMillian attempted to be paid for unearned time.

The fraudulent entry was made by Barry McMillian's employee daily time.

That Triron Brown assisted Mr. McMillian by making the false entry from Mr. McMillian's daily time sheet.

That Barry McMillian's leave was not authorized.

The City of Aberdeen believed in good faith that Mr. McMillian's termination was for the (sic) cause and was not attributed (sic) or capacitated (sic), or nor a (sic) violation of the (sic) constitutional rights of Mr. McMillian.

If the City can be of any further assistance with this (sic) investigation, please do not hesitate to contact me for more (sic) information.

Q. Okay. And in that -- this is like I said a letter that Mr. Zinn gave to the Equal Employment Opportunity Commission in Jackson, Mississippi. In that letter he states that the board looked at notes and records. Do you remember any of those notes and records?

A. Not that I can recall.

Q. Okay. Do you remember being presented those notes and records that he's referring to?

A. Not that I can recall, Lawyer.

Q. Okay. If notes and records were given to the board, who would have possession of those records?

A. That would be the city clerk.

Q. And what is her name?

A. Miss Melissa Moore.

Q. All right. And just in reference to -- how long -- when did you get elected to the board and when

was the last time you served on the board for the City of Aberdeen?

A.    I was elected in 2020, and I served to 2024.

Q.    Would that have been -- I think this letter states February 29th, 2024, were you still on the board at that time?

A.    Yes.

Q.    Okay.

A.    I came off the board in May -- May of 2024.

Q.    All right.  This is something that came from -- this is going to be Exhibit 12.  This came from the Mississippi Department of Employment Security.  Can you just -- you can just glance at that real quick just to see if you've seen that document and then I'll ask you a question about it.

A.    (Document tendered to the witness for review.)  I'm done.

Q.    All right.  And just for the record, can you read this Findings of Fact section, just that section for the record out loud.  Just start with "Based upon testimony."  Just that section.

A.    (As read):  Based upon testimony and evidence presented, the Administrative Law Judge finds as follows:

The claimant worked for the City of Aberdeen

(herein, employer) beginning September 21, 2021, as labor employee with the Water Department in the Aberdeen, Mississippi ending December the 19, 2023.

The employer discharged the claimant for stealing time which is grounds for termination. The claimant was made aware of the employer's policies.

During an investigation it was discovered that the claimant violated time keeping policies. The claimant did not report to work on November the 27th, 2023. However, he had a co-worker enter his time in the timekeeping system. The co-worker admitted to entering the claimant's time at his request.

It was determined that the claimant was in violation of policy and he was discharged on December 5th, 2023 in accordance with the policy. The co-worker who violated policy received a 3-day suspension but was not discharged. The employer has not provided a reasonable explanation for the differences in the level of discipline that was given.

Q. All right. Now, after reading that, this was in reference to Mr. McMillian receiving unemployment benefits with the Mississippi Department of Employment Security, and we are looking at Exhibit 12 just for the record. Do you know why the judge in this case stated that they couldn't find a

reasonable explanation for the different level of discipline between Mr. Brown and Mr. McMillian?

A.   You want me to tell you why the judge ruled?

Q.   Yes.

BY MR. WALKER:  I'll just lodge the same two objections just real quick.  One for speculation. Two for the ALJ decision in reference to the legal term of art called misconduct, that's how unemployment benefits and comp are awarded to terminated employees. And so we object just to the extent that it's not related to the current claims in the lawsuit.  Mr. Haynes, you can --

A.   Can we get the judge on so we can call him and ask what his thought was because I don't know.  I wasn't even there.

Q.   (Mr. Reddick continued):  Okay.

A.   I'll be speculating then, wouldn't I?

Q.   Yeah.  I know.  I'm just asking a question. I said, if you don't know the answer that's fine.  I'm just asking the questions just to see, you know, what you do or do not know.

So let me ask you this: In reference to the policy, is there a possibly in levels of discipline for employees -- so let me further ask, had Mr. McMillian been -- had Mr. McMillian ever been disciplined by the board before?

A. I can't recall.

Q. Okay. I'm asking reference prior to December 5th, 2023?

A. Yeah. I can't recall whether he had or not.

Q. Okay. And what about Mr. Brown, had he ever received any type of punishment prior to December 5th, 2023?

A. I can't recall.

Q. Okay. In reference to, I guess, the policies and whatnot, do you know what the City of Aberdeen's policy is in reference to people receiving punishment in reference to discipline for disciplinary matters?

A. I would only assume that it is in a City handbook, which all employees receive.

Q. Okay. This is in reference to the -- City handbook. I'm looking at Exhibit 20 and whatnot. Can you just -- you don't have to read this out loud at the moment. It's just in reference to the progressive disciplinary policy. Like I said, for the record,

this is Exhibit 20.  You can just read it to yourself and then I will just ask you a question from it.

A.    (Document tendered to the witness for review.)  Okay.

Q.    Have you ever seen that policy before?

A.    Yes.  I have.

Q.    All right.  And was that in effect on the day of December 5th, 2023?

A.    No.  I saw it before then.

Q.    Okay.  Well, I guess when I say was "in effect," was this the policy on December 5th, 2023?

A.    Yes.

Q.    Okay.  All right.  Just on Section 4 on page 40 of Exhibit 20 -- at the bottom it's Exhibit 20, can you just read this out loud for the record?  It's Section 4 on the disciplinary section.

A.    (As read):  In cases involving serious misconduct, or any time the Department Head determined it is necessary, such as a major breach of policy or violation of law, the procedures contained in Comment (2) above may be discharged (sic).  The Department Head should suspend employee immediately and, if appropriate, recommend termination for the employee. An investigation into (sic) the incident leading up to the suspension should be conducted to determine what

the future (sic) action is (sic), if any, should be taken. See comments.

Q. Okay. So this is in reference to who does that investigation in reference to this policy?

A. Should have been the mayor.

Q. Okay. And that would have been Mayor Charles Scott at the time --

A. Uh-huh.

Q. -- of the incident? Is that correct?

A. That's correct.

Q. Okay. And so prior to the termination of the board -- prior to the decision of the board to terminate Mr. McMillian, are you -- would it be your contention that a proper investigation was done or was not done in reference to this matter?

A. I'm going to say yes, was done.

Q. Okay. Is there a particular reason why?

A. It's not hard to check a time sheet.

Q. Okay.

A. And that time sheet can tell you everything you want to know. In this particular situation, the time sheet is a tell-all.

Q. All right. And in this reference to time sheets, do you remember Mr. McMillian's was -- time was written in or was it clocked in?

A.    Didn't look at the time sheet.   That was the mayor looking, not me.

Q.    Okay.   What about a video?   Did the mayor ever present a video or audio --

A.    No.

Q.    -- evidence?

A.    Nope.

Q.    Okay.   Any evidence in relation to this Melissa Moore would have that; correct?

A.    If there was any presented, she would have a copy of it.

Q.    Okay.   And prior to that determination, had Mr. McMillian ever -- do you remember him ever filing anything against the City of Aberdeen before?

A.    Yes.

Q.    Okay.   Do you remember what that was?

A.    I believe he done a EEOC on the job that he originally started out with the electric department.

Q.    Okay.   And were you on the board at that time?

A.    Yes.

Q.    I'm going to show, Mr. Haynes, Exhibit 11. You can just kind of look through that and then when you have a chance to look at that, you can just tell me you've had a chance to become abreast of that

document.

A.    (Document tendered to the witness for review.)  Yes.

Q.    Is that the EEOC charge that you were referring to?

A.    That's the one I was talking about.

Q.    Okay.  All right.  You said you knew about this prior to his termination on December 5th, 2023?

A.    Yes.  I did.

Q.    All right.  Were you on the board on September 20th, 2021?

A.    Yes.

Q.    Okay.

A.    For the record, I was elected July the 7th, 2020, and my time ran out May 1st, 2024.

Q.    Okay.  Is there any reason why you remember this particular charge?

A.    We had a lot of discussions around it.

Q.    Okay.

A.    And I also helped orchestrate another job opening for Barry since there wasn't one available for the one he originally had.

Q.    Okay.  All right.  In reference to Mr. McMillian stealing time, are you aware if he called anybody prior to -- on November -- well, strike that.

In reference to Mr. McMillian, are you aware if he contacted anybody to let them know that he wasn't going to be -- that he wasn't going to be in town on November 27th, 2023?

A. No.

Q. Okay. Did Mr. Collins ever inform you that if he received a phone call from Mr. McMillian on November 27th, 2023 --

A. No.

Q. -- in reference to him -- in reference to Mr. McMillian -- that he was not going to be in town on that day?

A. No.

Q. All right. I'm going to show you Exhibit 2.

A. (Document tendered to the witness for review.) All right. What this supposed to be?

Q. I will allege that it is supposed to be a phone call from -- well, a screen shot of Mr. McMillian calling Kabalt Collins, what I think is that's the nickname of Marcus Collins?

A. Okay. Marcus Collins, I remember.

Q. Okay. Have you ever seen that document before?

A. No. I hadn't.

Q. Okay. Are you aware if Mr. McMillian

called --

A.    No.

Q.    -- Mr. Marcus Collins on November 27th, 2023, to let him know that he wasn't going to be at work on that day?

A.    And neither does that prove that he made a phone call about that conversation, because you don't have the conversation, all you got is a screen shot of a phone call.

Q.    Okay.  I'm just asking you about what you do know.

A.    No.

Q.    Okay.  I guess before we go any further, do you know what the policy is in reference to employees transferring sick leave to another employee to cover time for another employee?

A.    It has been done in the past.

Q.    Is that a standard policy for the City of Aberdeen?

A.    I don't think the City has objected to it because it has happened more than one or two times.  I recall of another person who was in the hospital with cancer and ran out of sick leave and someone gave them -- donated their sick time to them to cover the time, so that they could continue to be able to support

they're families.  So it's happened more than once.

Q.  Is that reference to an individual that worked at the fire department?

A.  I don't remember what department it was, but it was somewhere.

Q.  All right.  I'm about to show Mr. Haynes Exhibit 17.  Can you just look at that document and just read for the record what it states once you've had a chance to kind of review it?

A.  (Document tendered to the witness for review.)  Okay.

Q.  All right.  Can you just read that for the record?

A.  (As read):  Mr. Triron Brown donated Barry McMillian four hours of sick time.  Thank you.  And it is signed by himself.

Q.  Okay.  Can you read that statement underneath that?

A.  I can't read the handwriting, no.  The date is only thing I can make out is the date.

Q.  Okay.

A.  November 27th, 2023, the rest of it I can't.

Q.  Okay.  Can you make out to the best of your ability what it states?  And not that I can read it word for word --

A.    It looks like it saying disapproved by Mayor Scott.

Q.    Okay.  That is what I think it states as well.

A.    That's what it looks like now.

Q.    Okay.  Can you make out -- I guess that's what you're saying that looks like it disapproves the --

A.    The transfer.

Q.    -- transfer of sick time?

A.    Uh-huh.

Q.    Okay.

A.    The mayor also did have the authority on day-to-day operations of something of this right here nature if it needed to be approved, he can disapprove approve it.

Q.    Okay.  I'm going to show you, Mr. Haynes, Exhibit 18.  And can you just tell me if you've ever seen this document before?

A.    (Document tendered to the witness for review.)  I have not.

Q.    All right.  Are you familiar with those type of forms?

A.    I am.

Q.    Okay.  What type of form is that?

A.     This is a request for -- looks like leave of absence for sickness.

Q.     Okay.  Are you familiar with -- you say you've never seen that document before today; correct?

A.     Not this one, I haven't.

Q.     Okay.  All right.  I guess let me ask you this:  Are you familiar with the fact that Mr. McMillian actually tried to, I guess, get FMLA leave in reference to this matter?  That's what that document -- and I will allege to that -- well, I will state to you that's what that document shows.

BY MR. WALKER:  Object to the form of the question.

A.     Okay.  What I'm gleaming from this is that a request was made for sick leave for an illness on the 28th.  I'm assuming this was for a -- for the time that happened on the 27th.  If you are going to ask for a leave of absence, you would ask for it before, not after.

Q.     (Mr. Reddick continued):  Okay.  And let me just ask you:  Can you just state what that statement says at the very bottom?

A.     It says the same thing -- disapproved by Mayor -- looks like it says "Disapproved by Mayor Scott, November the 29th, 2023."  I can't remember --

I can't make the rest of it out down here.

Q.    Okay.

A.    "Failure to follow procedure."  That's what that is.  Looks like it says, "Failure to follow procedure."  And that's what I was mentioning too, is the procedure would have been if you want to transfer some sick leave to somebody, it needed to be done before they take the sick leave not after.

Q.    Okay.  Let me ask you this:  Who makes that decision in reference to denying -- excuse me, leave and whatnot in reference to FMLA?

A.    It's real clear right here.

Q.    Sorry.  Can you just answer for the record?

A.    Mayor Scott.  Mayor Scott, he had the day-to-day operations.

Q.    Okay.

A.    He had the authority to approve or disapprove vacation, as well as sick leave.  He don't get to approve FMLA.  That goes through an insurance company, he don't get to approve that.

Q.    Okay.  So when you say in reference -- like I say, this was in reference to FMLA, so you're saying that the insurance would have made that decision to admit or deny Mr. McMillian's FMLA request?

A.    Well, that's where it's got to be sent to if

it's going to get approved or disapproved.  It doesn't get approved here at city hall.

Q.   Okay.  Who would Mr. McMillian ask or get the request for leave to initially?

A.   What are we talking about?  Are you asking for sick leave on four-hour sick leave something?

Q.   No.  This is in reference to FMLA.  I'm just asking who would he make that request to?

A.   His request is made to his immediate supervisor.

BY MR. WALKER:  Objection.

Clarifying my objection real quick.

He's representing it's based on

FMLA.  You can answer the question

now.

A.   The chain -- the procedure would have been is to file with your supervisor, and your supervisor then turns it over to the mayor, and the mayor then sends it up the chain.  It goes up the chain to where it be sent to the proper channel.

Q.   (Mr. Reddick continued):  Okay.  But does it ever come before the board?

A.   No.  Only way it come before us it becomes a major issue and then they can't resolve it, then we -- the mayor has no authority to give nor take away pay.

Q. And that's reference to FMLA or sick time?

A. No. That's work time.

Q. Okay. But what about in reference to FMLA, trying to get FMLA?

A. We don't have nothing -- it has never come before where somebody needed to be off for FMLA or not. That doesn't come before us.

Q. Okay.

A. The board doesn't decide that.

Q. But you are saying the mayor has no say over FMLA benefits?

A. My assumption would be the FMLA is determined by the people who are asked to have to pay it. They pay the FMLA insurance, so it's up to them to determine whether he meets the criteria to afford to be approved.

Q. Right. So that would mean that the mayor has no authority over FMLA benefits; correct?

A. If you say so.

Q. Well no, I'm just asking you -- I'm just asking. Would that mean that the mayor doesn't have any authority over FMLA benefits?

A. We're going in circles.

Q. I'm just asking.

A. I'm just telling you, we are going in

circles.

Q. Okay. Well, can you just answer the question?

A. We are going in circles.

Q. Okay.

A. Asked and answered already.

Q. Well, I'm just trying to clarify. Cause you said -- so you are saying it's FMLA -- it's strictly FMLA is the one that makes the decision for FMLA leave; correct? The insurance company. So it would be the insurance company; correct?

A. Sick leave and FMLA is two different things.

Q. Okay. Sick leave is determined by who?

A. Sick leave is determined here.

Q. By the city board?

A. Not by the board.

Q. By the mayor?

A. By supervisor and the mayor.

Q. Okay. And then FMLA leave is determined by the insurance, which is what you're stating?

A. You only get to submit and then they will be the one to tell you whether yes or no we're going to pay for it or we're not going to pay for it.

Q. Okay. I understand now. So at the time that, I guess, you were serving as the city board

member for the -- was serving as a board member for the City of Aberdeen, was the policy up to date in reference to FMLA benefits?

A.    I never got a chance to actually go through there and read that, so I couldn't say one way or the other.

Q.    Okay.  Did the U.S. Department of Labor And Wage ever come down to investigate, I guess, the sufficiency of the FMLA policy?  And by "FMLA," I mean the Family and Medical Leave Act.

A.    Not that I'm aware of.  It could have been either that.  I don't recall.

Q.    Okay.  And you are familiar with what FMLA means?

A.    I am.

Q.    Does the board get trained on what FMLA benefits are or anything?

A.    Vaguely.  When we go to MML training on the coast, they do discuss it, but it's not what you call a formal training, but it does get discussed.

Q.    Okay.  And let me just ask you this:  Do you know when's the last time the -- I guess, the City of Aberdeen updated their FMLA policy?

A.    I do not.

Q.    If I was to tell you that the last time that

the policy was updated was 1998, would you be surprised?

A.    Yeah, I would be, because I thought it was further back than that.

Q.    Why do you state that?

A.    I was in the process of rewriting the handbook and bringing the handbook up to speed.  And the last time it was done was also had a lapse of time.  And it was -- as a matter of fact, I've still got it on my computer right now.

Q.    Okay.

A.    And I never did get a chance to finish it.

Q.    All right.  So let me ask you this:  Would you be surprised if the U.S. Department of Labor and Wage has stated that the City of Aberdeen is still not -- I guess the FMLA policy is still not up to par?

A.    I wouldn't be surprised.

Q.    Okay.  Is there any reason why the City of Aberdeen FMLA policy would be lacking any way?

A.    That's an administrative duty, not an executive.

Q.    All right.  And let me ask you this:  When you mean "administrative" is that the human resources office?

A.    We don't have a human resources so that

falls to the city clerk and comptroller.

Q. Okay. Is there a reason why the City of Aberdeen, I guess, didn't have a human resources office?

A. Would you believe me if I told you I tried to get one?

Q. Yeah. I'm listening.

A. But I only got one vote.

Q. Yes.

A. Mines.

Q. Has that not changed? I was informed something about a Teresa Baker.

A. That's not human resource.

Q. Okay. What would that be called, then?

A. I have no idea. I'm not on the board right now.

Q. Okay. So you are not actively attending board meetings right now?

A. I have no reason to.

Q. Okay. I'm going to show you Exhibit 19. And just see -- you can look through this and see if you've ever seen that document before?

A. I have not seen this document even from the headlines, so.

Q. Okay. All right. And that's just

sustaining about in reference to FMLA -- I guess in reference to FMLA policies and whatnot.

A.    I am familiar with FMLA policies because where I worked in my permanent job, I did have to deal with it.

Q.    Okay.  All right.  And let me ask you this: Do you know if the City of Aberdeen was -- I guess since 19 -- well, let's just say 2001, were they -- was the City of Aberdeen making sure that the employees signed the handbook every year in reference to knowing what their FMLA benefits were?

A.    Off the top of my head right now, I'm looking at some of these right here, these are in the handbook.  They are in the handbook itself.  Cause I have seen these when I had to rewrite some of this, but I didn't never get a chance to complete that handbook that I was working on.

But when you're first hired, you are given that handbook.  And there's a page in there that you have to sign.  It has to be returned, and it should be in the personnel file.

Q.    All right.  But does it have to be signed every year in reference to --

A.    Only if it changed.

Q.    Okay.

A.    Once you signed it one time and you got hired, and then that handbook never changed, like you said, 1995 --

Q.    Okay.

A.    I don't see the purpose of you got ten years, you're going to sign ten times, you sign the same thing ten times, it doesn't change.  If there was a change in there, then you would be asked -- that change would be highlighted, and that is what you would be asked to actually sign and initial that portion of it saying that you received the information.

Q.    Okay.  But in reference to FMLA if it wasn't up to par, so would that mean, I guess the handbook would have needed to be changed every year until that was fixed?

A.    Needed to be and actually changing is two different things.

Q.    Okay.  Did it need it?  I guess, say that, what you just said again.

A.    Needing to be and actually changing is two different things.

Q.    Okay.  So you're saying that it actually did need to be changed?

A.    You know, just my observation, that ain't

the only thing needed to be changed, but it never got to that -- we never got to that point. It was being -- I was actually working on it. Like I said, I got a copy of the handbook on my computer right now that I was working on.

Q. Okay.

A. I was in the process of creating a whole new handbook.

Q. I got you. I understand. So in reference to Mr. McMillian filing an EEOC charge against the City, do you know if any other board members were agitated that he actually filed that claim against the City of Aberdeen?

A. I can't speak for anybody but myself.

Q. Okay. What about yourself?

A. I had no reference of being irritated or anything else about it. I just -- it was his right as a citizen, as an employee, that was his right to the file that. There shouldn't be any backlash because he's seeking something that he thinks may be a violation of his rights.

Q. Okay. And that's in reference to the EEOC charge in 2022; correct?

A. That's correct.

Q. Okay. I'm going to show you Exhibit 3.

A.    (Document tendered to the witness for review.)

Q.    After you've had a chance to review it, you can just tell me that you've had a chance to review it.

A.    Do I need to read this out loud for you?

Q.    Not the whole thing.  I'm just going to ask --

A.    Well, actually, the only thing in here to read is what his statement -- the supervisor's statement.

Q.    Well, I won't have you read that.  But I'm just going to state for the record that's the Employee Disciplinary Report on Exhibit -- we are looking at the Employee Disciplinary Report on -- I mean, Exhibit No. 3.  But, yes, you can read that section what Marcus Collins wrote.

A.    (As read):  "Supervisor's Remarks."  Mr. McMillian was clocked in for work and was not present. Mr. McMillian has been warned on numerous occasions. Mr. McMillian refused to sign the write up 12-1-23.

Q.    Okay.  In reference to Mr. Collins states that he was warned on numerous occasions, are there any documents in reference to that or records in reference to these warnings?

A. Not that I'm aware of and it should have been.

Q. Okay. But just for record, they are not any records or documents in reference to any warning for Mr. McMillian; correct?

A. Not that I'm aware of.

Q. Okay. So in reference to this matter, Mr. Collins stated that he did write Mr. McMillian in for eight hours for November 27, 2023. Are you aware of that?

A. Who did now?

Q. Mr. Marcus Collins stated that he wrote in time for Mr. McMillian for November 27th, 2023, are you aware of that?

A. Mr. Collins wrote in --

Q. Eight hours for Mr. McMillian for November 27th, 2023.

A. But he was not here?

Q. No. He was not here. So I'm just asking do you know anything about that?

A. No. I'm not aware of that.

Q. Okay. I think he did state that that was the case, that he did write him in and that the reason why I guess he didn't write him in was because he was told that he was here or something like that.

But I'm just seeing what you do or do not know about that statement.

I'm going to show Mr. Haynes Exhibit 6.

A.    Okay.  I see on 11/20, he got an X on the eight hours and said, "No pay per mayor."  Is that right?

Q.    Yes.  Reading just from that line was there a reason for that?

A.    You'd have to ask the mayor.  The mayor wrote it.  I mean, I didn't write it.

Q.    Okay.

A.    I don't do time sheets.

Q.    Okay.  And in reference to November 27th on Exhibit -- we're looking on the date of November 27th on Exhibit 6 --

A.    All right.

Q.    -- can you just tell me what the hours look like on that?

A.    Well, November 27th, has got an eight with a slash through it.  Then it's got a six right next to it.  And then you come all the way out to the outside, it got a four with a slash up under sick leave and got a two beside it.

Q.    Okay.  Do you know who wrote those numbers?

A.    Like I said, I don't deal with time sheets.

Q.    If I tell you that Mr. Collins wrote those hours, would you be surprised?

A.    No.  I wouldn't.

Q.    Okay.  Just in reference to Exhibit 6, have you seen this document before?

A.    No.  I have not until just then.

Q.    Okay.  So did Mayor Scott provide this to you prior to Mr. McMillian being terminated?

A.    No.

Q.    Okay.

A.    Not that I'm aware of.  Let me put it that way.

Q.    Okay.  So prior to today, you did know that Mr. Collins wrote Mr. McMillian in for eight hours on November 27th, 2023?

A.    Not that I'm aware of.

Q.    Okay.  This is going to be Exhibit 7.

A.    (Document tendered to the witness for review.)

Q.    It's already premarked.

A.    Okay.

Q.    All right.  Just let me know when you've had a chance to look at that before.

A.    I'm assuming that this is a call-out sheet.

Q.    Yes, sir.  I would assume the same thing.

A.    Okay.

Q.    Have you ever seen this document before?

A.    I have not, but I knew there was one existing.

Q.    Okay.  In reference -- are you saying in general you know there's a call-out sheet?

A.    All departments that have employees that work hours that are not considered to be daily, like the water department, electric department, where they get called out to go and do something, then there's a call-out list right there that also helps to determine how many hours they actually put in.

Q.    Okay.  And just in reference to Exhibit 7, who are the individuals' names for the call-out period?

A.    Marcus Collins, got his phone number; Triron Brown, phone number; Greg Burton, phone number; Barry McMillian, phone number; Johnny McMillian, phone number.

Q.    All right.  And just on that calendar, do you see Barry McMillian's name on any of those dates --

A.    I did not.  And I did look it over when you first handed it to me.  His name is nowhere up there.

Q.    Do you know why that's the case?

A.    I can only assume if I tell you anything.

Q.    Okay.  So you're saying you wouldn't know with any certainty what the reason was?

A.    He didn't work any overtime.

Q.    Okay.  Well, wouldn't that mean that you are supposed to be call for possible overtime or how did that work?  I'm not from the City of Aberdeen.  How would that work?

A.    Ms. Mary had a water leak, and she can't get the water to turn off.  And she calls after hours, she's going to call the fire department, that's where the first call goes to.  The fire department then calls the supervisor from that department.  Somebody is on call.  They may have that list as well.  And when they look down that list and they see whose name's on it, they're going to call somebody and say, "Hey, I've a water leak at 719 Hill Crest."

Q.    Okay.

A.    They're going to log in what time that was.  When that guy goes and fixes that leak, when he returns, he's supposed to call back and say the job is complete.  They log in the time that he completes, so they got a start time and they got an ending time.  So when this sheet is picked up on Monday morning, then somebody can say, "I know how many hours you worked.

I also know where you was and what did you do."

Q. Okay.

A. That eliminates a lot of questions. Now whether somebody called Barry or not, I don't know. I don't know whether they skipped his name or not. I don't know. But I do know this, Barry didn't do a lot of overtime. And the reason I know that is because I tracked overtime. And I was tracking overtime because overtime pay was way over the hill. When I first came on the board, we were paying out about $15,000 per month and I was trying to say we need to get this down. How do I get this down? Find out why we steady got this overtime. Is this overtime necessary? And I went from 15,000 to 6,000.

Q. Okay.

A. Guess whose name never showed up on overtime? Mr. McMillian.

Q. When you mean "Mr. McMillian," which one are you referring to?

A. Barry. His brother, the other guy Johnny, Johnny was a seasoned veteran. Johnny knew what he was doing. He's going to get a -- Johnny is going to get a call.

Q. All right. So -- but I guess my question will be, you've still got to be an option for a call;

is that correct?

A.   Say that again.

Q.   In you're eligible for overtime, you still would be on the calendar?

A.   Yeah.

Q.   You just -- if you don't want to do it, you just turn it down?

A.   Correct.

Q.   Okay.  And then --

A.   Or not answer.

Q.   Okay.  Then who would be the next one in line to get that call.

A.   Whoever name comes up next.

Q.   Okay.  Is it random, or is it just like it says?

A.   There is no order right there from what you can see.

Q.   Okay.

A.   So if it happened on Wednesday, how do you know who you call?  All you got is a list of all the employees.

Q.   Okay.

A.   And basically what you do is, you can just pick a name and say, "Hey, I know Johnny can do this job, so let me call Johnny."

Q.    Okay.

A.    Or whoever is doing phone calling might be directing overtime to certain people, I don't know.

Q.    Okay.

A.    That's an assumption now.

Q.    That's a what?

A.    That's an assumption.

Q.    Okay, I understand.

A.    I'm not in his head, I don't know.

Q.    Okay, I understand.  All right.  I'm going to show Mr. Haynes Exhibit 10.

A.    (Document tendered to the witness for review.)

Q.    And whenever you've had a chance to review that, I'll ask you one question about that.

A.    Okay.

Q.    Have you ever seen that document before?

A.    I have not.

Q.    Did Mayor Charles Scott ever provide that to you prior to the November 5th --

A.    Not that I'm aware of.

Q.    -- 2023 meeting?

A.    Not that I'm aware.

Q.    Did he provide that to you on the 4th of November 5th -- I mean, before the of December 5th,

2023 meeting?

A. Not that I can recall, Lawyer.

Q. Okay. And can you just state what that states for the record?

A. This is a letter typed out.

(As read): I, Johnny McMillian was notified by Barry McMillian that he was taking off on the 27th of November 2023. He notified me because I am the acting supervisor for the week.

Q. Okay. Did you know that Mr. Barry McMillian called Johnny McMillian in reference to this matter?

A. Did not.

Q. Okay. And you're saying that the Mayor Charles Scott never gave this to you prior to the City of Aberdeen terminating Mr. McMillian; correct?

A. Did not.

Q. Okay. Is there any reason why the mayor would not have provided you that information?

A. You have to ask him that one, I don't know. But if you look at those last names, those last names may tell you a little something. We didn't also allow family to supervise family.

Q. Okay. So I guess -- well, I guess the question is, if Mr. Barry called Mr. Collins first, and the next supervisor in line was Mr. McMillian, I

guess wouldn't Mr. Barry then have to call Johnny if he was next in line?

A.   If he couldn't get no reply from the -- his actual supervisor, I'm going to assume -- you can assume that you.

Q.   Okay.  So that would be correct?

A.   Yeah.

Q.   Okay.  So if you have -- what would be the scenario if Mr. Collins didn't pick up, and Johnny McMillian didn't pick up, I guess pick up the phone, who would the third person that you would call; do you know?

A.   There is no documentation to tell you what order to call anybody in.

Q.   Okay.

A.   But the idea of it is that you do want to make somebody aware of it.

Q.   Okay.

A.   I'm trying to -- in my mind, I'm trying to go back -- November 27th sounds like a Thanksgiving weekend.  That's what it sounds like to me.

Q.   Yeah.  It's going to be right after Thanksgiving, it on a Monday.

A.   That's what I'm thinking too.

          (Discussion off the record

about Thanksgiving and the date.)

Q. (Mr. Reddick continued): So Mr. Brown stated earlier that Mr. McMillian -- well actually Charles Scott told him to state that Mr. McMillian -- Mr. McMillian told him to clock him in. Are you aware of that statement? Did Mr. Brown ever tell you that before?

A. After the fact.

Q. So he informed you that after the fact?

A. When he talked to the board, he informed the board that he, at Barry's request, that he clocked him in.

Q. Okay. Did he ever -- I guess what I'm saying today is he said that the mayor is the one that actually told him to say that.

A. Not in front of me.

Q. Okay. And just for the record, what is the policy in reference to a person -- I guess an individual trying to talk to the board about, I guess trying to fight for their job when they're -- I guess about to get reprimanded or have -- or already -- or they already have been reprimanded in some type of way, disciplinary wise?

A. You can be given a disciplinary hearing, but if you have obtained an attorney, then your attorney

need to be present.  We are not going to talk to you without that attorney present.

Q.  Okay.  And did you inform Mr. McMillian of that -- that he could not --

A.  That is correct.

Q.  -- be at the board meeting without an attorney?

A.  That is correct.

Q.  Was that in writing?

A.  No.  Verbal.

Q.  And when did y'all tell him -- when did the City -- the aldermen for the City of Aberdeen tell him that?

A.  I told him that that same night he stood up.

Q.  Okay.  So if he would have told you that I'll bring my attorney to the next meeting, would that have stopped anything?

A.  No.

Q.  So the decision was going to be made regardless whether he brought his attorney or not?

A.  I mean, what you going to do?

Q.  Yeah.  I'm just asking.  So it wouldn't have changed anything if he would have brought his attorney just for the record?

A.  No.

Q. Okay. So I guess in reference to Mr. McMillian, he actually tried to fill out the FMLA form to request the FMLA in reference to this -- to him getting surgery in September and whatnot, and he was informed by Melissa Moore that no forms were available and whatnot for him to fill out in order to receive FMLA. Would that surprise you?

BY MR. WALKER: Object to the form. You can answer.

A. No comment.

Q. (Mr. Reddick continued): Okay.

A. I don't have any reference to that whatsoever. I was not privy to that conversation.

Q. Okay.

A. So I don't know. I don't have no idea.

Q. So I guess what my client was informed that FMLA was not in place and we don't have any document for you to fill out. So your answer would remain the same in reference to that? You weren't privy to that conversation?

A. No. I'm not privy to that conversation. I wasn't there.

Q. Okay. So what about in reference to Mr. McMillian in reference to the people that did his -- performed his surgery, when they actually tried to

give Ms. Melissa Moore the forms to -- I guess try to inform Ms. Melissa Moore that we need to fill out the form for FMLA.

I guess my question would be:  If they were told that by Melissa Moore that we don't have any documents to fill out, would that surprise you, in reference to FMLA?

A.   You are asking me to comment on something, again, that I don't know nothing about.

Q.   Okay.  So Melissa Moore would be the one to talk to about that?

A.   If that's who he told you told him that, then that's who you need to talk to.

Q.   Okay.  Do you know if the City of Aberdeen actually has FMLA form for individuals to fill out?

A.   That is not my department to keep track of.

Q.   So that would be Melissa Moore as well?

A.   That's who it should be.

Q.   Okay.  Does Melissa Moore also keep up with sick leave?  Is she the one that keeps track of that as well?

A.   Sick leave is kept with the comptroller.

Q.   For each department, or just --

A.   She fills the pay out.  So, therefore, she needs to know how to actually pay.

Q. For sick leave?

A. For sick leave, correct. But it is filed downstairs as well to go in your jacket.

Q. Is there only one comptroller for the City of Aberdeen or each department has a comptroller?

A. No, no. Only one.

Q. Okay. Do you remember that individual's name at the time?

A. Kerri Crump. And also Ms. Melissa does keep records of -- the supervisor should be keeping record of when a person called in sick, when a person is on vacation, how many vacation days -- when they want to know how many vacation days they got left, they don't go to Ms. Melissa, they go up to the comptroller. They want to know how many sick days they got left, they don't go to Ms. Melissa, they come see the comptroller.

Q. Okay. But strictly on the record, FMLA that's strictly Melissa?

A. I'm assuming that because I don't -- I really don't know. That's not -- that's nothing that I had a discussion about.

BY MR. REDDICK: A quick indulgence off the record for a minute.

(After a break, the deposition continued as follows):

Q. (Mr. Reddick continued): I still have a couple of questions. I have a couple of follow-up questions. Just in reference to Mr. McMillian, I know you said that one of the reasons why you terminated him was because he actually received payment, had he, I guess, given the money back, he would not have been terminated. But isn't it true that Mr. Charles Scott stopped the payment prior to him being terminated?

A. I wouldn't know.

Q. Okay. So that's not something that you would be privy to?

A. No.

Q. Would Mayor Charles Scott be the best person to talk about that?

A. Him and the comptroller, that's who writes the check.

Q. Okay. But to your understanding, you are stating that to the best of your knowledge, Mr. McMillian actually did receive that payment for the amount of hours you're saying that he embezzled?

A. An assumption.

Q. Okay. So you're assuming?

A. Uh-huh.

Q. Okay. But are you saying you terminated him off of an assumption?

A. Huh?

Q. Are you saying you terminated him off an assumption that he stole -- I guess embezzled the money?

A. I terminated him on stealing time.

Q. Okay.

BY MR. WALKER: Objection. I was confused, I'm sorry. About -- I wasn't sure if it was the payment of the money or the stealing of time.

BY THE DEPONENT: Stealing time.

Q. (Mr. Reddick continued): But as far as you know whether or not the mayor stopped the payment to Mr. McMillian in reference to November 27th, 2023, you wouldn't know one way or the other if he actually received the money in hand?

A. No. I do not.

Q. Okay. You would not have known that at the December -- before the December 5th, 2023 board meeting; correct?

A. No.

Q.    So you would not have known that before the meeting?

A.    No.

Q.    Okay.  So I guess these are going to be my last set of questions.  We are looking at Exhibit 11. All right.  Just looking at Exhibit 11, that's the EEOC charge that Mr. McMillian filed against the City of Aberdeen in 2022?

A.    Uh-huh.

Q.    In reference to, I guess if the city board of Aberdeen terminated Mr. McMillian due to him filing that charge, what would be your, I guess, your response to that?

BY MR. WALKER:  Objection to the form.

Q.    (Mr. Reddick continued):  Well, you may answer.

A.    We didn't terminate him because of the EEOC.

Q.    Okay.

A.    It was due to stealing time.

Q.    Okay.  All right.  And what about yourself individually, what would be your statement to the same question?  Did you terminate Mr. McMillian due to him filing the 2022 EEOC charge?

A.    I stated to you earlier, as a citizen, as a

taxpayer, as a human being, he has rights. And he has a right to file a EEOC whether I thought it was good or bad. It doesn't weigh any bearing whatsoever. He has a right to that. So, therefore, he's entitled to follow those steps the best of his ability.

Q. Okay. In reference to, I guess, the City board. In reference to, I guess, the City of Aberdeen not having a proper FMLA policy in place, do you feel that interfered with Mr. McMillian actually being able to receive his FMLA benefits?

A. I'm trying to figure out where we were going with that. The idea is he was terminated for stealing time, not his FMLA.

Q. Right. This is strictly for FMLA interference. I haven't asked anything about FMLA retaliation just yet. Even though, that is one of the claims in his -- I can tell you that is one of the claims in his lawsuit. But I'm just asking just a question.

In reference to him trying to -- Mr. McMillian trying to receive his FMLA benefits, do you feel that the City of Aberdeen by them not having a proper FMLA policy in place, that they interfered with Mr. McMillian trying to receive his FMLA benefits?

A. No.

Q.   Okay.  And in reference to Mr. McMillian actually trying to receive his FMLA benefits, did you terminate Mr. McMillian because he actually tried to receive FMLA benefits in the past?

A.   Asked and answered.

Q.   Well, I guess, I'm now --

A.   You just reworded the same question; asked and answered.  I gave you, he's a citizen.  He has a right to file the FMLA as many times as he wants to.  That ain't got nothing to do with his termination.  His termination was due to stealing time.

I can't count how many times I came to his job site and Barry got his feet kicked up on the table or somewhere, and standing -- laying in front of a fan, or he's outside washing his truck off when he should have been at work.

Q.   Okay.  But I guess just for the record, you are saying that's not why you decided to terminate him?

A.   None whatsoever.

Q.   Because of him trying to receive the FMLA?

A.   None whatsoever.

Q.   Okay.  And what about the other board members?

A.   You got to ask them.

Q.   Okay.  So if another board member says something different then you --

A.   That means nothing.  I'm telling you I did not.

Q.   Okay.

A.   My decision was not based off none of that.

BY MR. REDDICK:  Okay.  I have no further questions.

EXAMINATION BY MR. WALKER:

Q.   Okay.  Mr. Haynes, I have just a couple of questions.  I'm just interested in exploring some more of the testimony you provided.

I guess we'll just start with the most recent thing you said.  I think you said, I'm paraphrasing, but you said something along the lines of you couldn't recall how many times you witnessed Barry with his feet up or washing his truck?

A.   Correct.

Q.   Could you elaborate more on that for me, please?

A.   Public works is on the other end of this street right here (indicating).  And it is, I guess, you can say sort of isolated somewhat of, and I am one of those aldermen that did drive around and engage with our employees to see how they were doing and see

if there's anything they needed. And there's times when he was, I guess, on his -- what they call light duty. He didn't get to go out and do the work, so he stayed at the warehouse. And there was several times that I walked through that door, (demonstrating with his feet on the table) and the fan blowing.

BY MR. WALKER: Okay. Let the record reflect that Mr. Haynes has his feet on the table.

Q. (Mr. Walker continued): Could you guesstimate how many times you witnessed him doing that?

A. Three.

Q. Three. Were they roughly around the same period of time, was it spread out, or...

A. It wasn't in the same day.

Q. Would that have been leading up to his termination?

A. No. Because I never mentioned that during Barry's termination or Barry's disciplinary action. I never even brought that forth.

Q. Did you ever tell any other alder persons about that?

A. No.

Q. About what you saw?

A.   No.

Q.   What about Marcus?

A.   No.

Q.   Okay.  So it's just something you witnessed yourself?

A.   I think they knew it already.  I think Marcus knew it too.

Q.   Okay.  What makes you say that?  What makes you say that the alder people, the alder persons --

A.   I ain't going to say the aldermen knew.  But I do know that his supervisor had to know because when they drive up, he didn't move.

Q.   Then you mentioned that Barry was on -- you recall Barry being on light duty?

A.   Correct.

Q.   Can you -- I know I'm testing your memory here a little bit, but can you recall when he was on light duty?

A.   I can't -- I can't put a date to you, but it's something about -- I'm assuming he had some kind of procedure done; and before he was released to come back to work fully, he came back on a light duty and they didn't really have in his job had nothing he could do other than stay at the warehouse.

Q.   It's difficult to accommodate with light

duty?

A. That's correct.

Q. Okay. Then I think you cleared this up, but just so I'm clear, you were asked some questions about the difference of why Mr. Brown, Triron Brown, was disciplined with three years --

A. Three days.

Q. Three days without pay, and Barry McMillian was terminated. I think you said something along the lines of one received payment, the other didn't. Barry was aware that he had stolen that time?

A. Correct.

Q. Okay. So there's a difference between almost being like the principal of somebody whose asking someone to do something on his behalf and then the person who --

A. There's a time sheet right there by that clock. Those guys hit it everyday when they come in, put that time in there and it punches a time when they start time. When they get ready to leave, it also punches another time.

If I know I wasn't here Monday, when I looked at my time Tuesday, "Hey, wait a minute, here now. Somebody done punched me in yesterday and I wasn't here," that would have been the time to raise a

flag, something wrong here. Somebody put some time on my time sheet that didn't belong to me.

Q. Okay.

A. And that's what I was referencing to the honest system should have took over then.

Q. When Barry was hired, you were serve -- I know you testified at the time, you were serving on the board when he was hired?

A. I was. Uh-huh.

Q. Did you vote in favor of hiring him?

A. I was the reason that Barry got a job.

Q. Okay. And then last thing, if you can recall that December 5th -- December 2023 board meeting, do you recall the words "Family Medical Leave Act" ever even coming up during that board meeting?

A. No. I can't recall that ever coming up.

Q. All right. Same question. What about the acronym FMLA, do you remember hearing that?

A. No. I'm -- like I say, I've very familiar with it cause in my permanent job, that's some of the things that I did deal with, with the employees that worked for me. So I was very familiar with the FMLA.

As a matter of fact, I have even helped people fill those forms out, as well. But I would never -- I can't recall at any time that I was ever

asked anything about the FMLA concerning Barry McMillian.

BY MR. WALKER:  Okay.  Thank you, Mr. Haynes.  That's all I have.

BY MR. REDDICK:  I don't have any follow-up questions for Mr. Haynes.

(Deposition concluded at 2:52 p.m.)

C E R T I F I C A T E

I, Valera Knight, Court Reporter and Notary Public within and for the State of Mississippi, do hereby certify that the above and foregoing pages contain a full, true and correct transcript of the proceedings had in the afore-named case at the time and place indicated, which proceedings were recorded by me to the best of my skill and ability.

I also certify that I placed the deponent under oath to tell the truth and that all answers were given under that oath.

I further certify that I have no interest, monetary or otherwise, in the outcome of this action.

Witness my hand and seal on this 16th day of March, 2026.

_____
Valera Knight
My Commission Expires:    CCR #1039
March 21, 2029           Notary Public