IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

BARRY MCMILLIAN                                    PLAINTIFF

VS.                    CIVIL ACTION NO.: 1:24-CV-199-SA-RP

THE CITY OF ABERDEEN
AND JOHN DOES 1-20                                 DEFENDANTS

*******************************************************

DEPOSITION OF TRIRON BROWN

*******************************************************

TAKEN AT THE ABERDEEN CITY HALL BOARDROOM
125 WEST COMMERCE STREET
ABERDEEN, MISSISSIPPI 39730
ON FEBRUARY 26, 2026
BEGINNING AT APPROXIMATELY 10:10 A.M.

APPEARANCES NOTED HEREIN

Reported by:     VALERA H. KNIGHT, CCR #1039
                 P.O. BOX 82
                 TAYLOR, MS 38673
                 (662) 816-9863
                 valeraknight@gmail.com

---

TABLE OF CONTENTS
DEPONENT:  TRIRON BROWN                    PAGE
Style, Cause Number.......................... 1
Appearances.................................. 2
Table of Contents............................ 3
Examination by Mr. Reddick................... 4
Examination by Mr. Walker.................... 22
Further Examination by Mr. Reddick............ 46,55
Further Examination by Mr. Walker............. 54
Deposition Concluded......................... 56
Court Reporter's Certificate................. 57
*******************************************************
EXHIBIT INDEX
                          Marked
Exhibit 21     Statement by Triron Brown......    8

Exhibit 22     Copy of Text Messages.........    46

(Exhibits 1-20 were premarked during other depositions.
However, the ones that are listed below are the ones
referred to during this deposition.)

Exhibits:  5, 13, 17

Exhibits DEF-118 and DEF-309 were shown to Mr. Brown on
Mr. Walker's computer.

(All exhibits, except the ones on Mr. Walker's computer,
were retained by Mr. Reddick and e-mailed later to the
court reporter and put in one pdf folder to be used for
all depositions taken on this date.)

---

APPEARANCES:

Representing the Plaintiff:
DEMOREO REDDICK, ESQ.
Ms Bar No.:  103747
P.O. Box 465
Okolona, MS 38860
Telephone: 662-436-4641
Telecopier: 662-256-3582
reddicklawfirm@yahoo.com

Also Present:  Barry McMillian, Plaintiff

Representing the Defendants:
LOGAN P. WALKER, ESQ.
PHELPS DUNBAR LLP
1905 Community Bank Way, Suite 200
Flowood, Mississippi 39232
Telephone: 601-352-2300
Telecopier: 601-360-9777
loden.walker@phelps.com

Exhibit I

---

TRIRON BROWN,

After being duly sworn, testified as follows:

EXAMINATION BY MR. REDDICK:

Q. Now, Mr. Brown, can you just state your name, how to pronounce it. I don't want to mispronounce your name.

A. Triron Brown.

Q. Triron Brown?

A. Yes, sir.

Q. I'm just going to call you Mr. Brown, cause I don't want to mispronounce it.

A. Okay.

Q. So throughout the day, I'll call you Mr. Brown.

A. Yes, sir.

Q. All right. Have you ever given a deposition before?

A. (Deponent moved head from side to side.)

Q. Okay. So let me, I guess, clarify some things.

A. Okay.

Q. I see you just nodded "no," so the court reporter is making a record, and so it's best that you give a verbal response.

A. Yes, sir. Okay, I got you.

Q. Yes. So when I ask you a question, give me a chance to ask it and then I'll give you the chance to give a complete answer. If there's something that you don't understand, just say that you don't understand what I'm asking and I'll rephrase the question and whatnot.

A. Okay.

Q. Is that fair?

A. Yes, sir.

Q. All right. Are you on any medications that would affect your ability to give a deposition today?

A. No, sir.

Q. Okay. And where do you reside? Where do you stay?

A. Aberdeen.

Q. Okay. Can you give me an address?

A. 410 Burnett Street.

Q. What's that zip code?

A. 39730.

Q. All right. And what's your highest level of education?

A. High school diploma.

Q. Okay. Was that at Aberdeen?

A. Yes, sir.

Q. All right. Do you have any children or anything?

A. Yes, sir.

Q. What's the oldest child that you have?

A. Five months.

Q. All right. What's your -- do you have any relatives in Monroe County?

A. A lot of them.

Q. Okay. Can you just give me their last names?

A. Browns and Garths.

Q. So the one that they call somebody named "Pooh Bear," you know who that is?

A. Yes, sir.

Q. Okay. So Garfield Garth, do you know who that is?

A. Garth -- yes, sir.

Q. Okay. So the Browns, the Garths, and what's the other last names?

A. Everett.

Q. How do you spell that?

A. E-V, I mean, yeah, E-R-R-E-T, I think.

Q. Would it be E-V-E-R-E-T-T-E?

A. Yes, sir. Yes, sir.

Q. Okay. Is that it?

A. Yes, sir.

Q. Okay. All right. So basically, I'm just here to ask you questions in reference to a matter that happened with the City of Aberdeen around November 27, 2023.

A. Uh-huh.

Q. I don't if I said this for the record, but I represent Mr. Barry McMillian in his lawsuit against the City of Aberdeen.

A. Yes, sir.

Q. And so I'm just, like I say, here to ask you questions. I'm not here to trick you. I'm just trying to get information and whatnot.

A. Okay.

Q. I guess -- I know you got a subpoena and whatnot, but did you prepare today by looking at any documents or anything?

A. No, sir.

Q. Okay. All right. And just for the record, do you remember November 27, 2023, on what transpired on that day?

A. Not that I recall.

Q. Okay. All right. There was an issue as to whether or not my client was clocked in. It was a clock-in situation. Do you remember anything about that?

A. Yes, sir. Hold on. You said who?

Q. A clock-in situation where, I guess, that they said that you clocked in my client. Are you aware of anything like that?

A. No, sir, not that I recall.

Q. Okay.

A. No, sir.

Q. All right. This is Exhibit 21.

(Statement by Triron Brown was marked as Exhibit No. 21.)

Q. All right. It was premarked 21. Mr. Brown, can you just look at that statement right there?

A. (Document tendered to the witness for review.) Uh-huh. I remember signing this letter. I was forced to sign that letter.

Q. Okay. Who forced you to sign that letter?

A. He was the mayor at the time, Charles Scott.

Q. Okay. And can you just read what that statement says that you said that Mayor Charles Scott forced you to sign?

A. (As read): "Triron Brown's Statement of emetion [sic]: I clocked Mr. Barry McMillian in and out 7:00, 1:30."

Q. Okay. And can you elaborate when you said Mr. Scott forced you to sign that? I guess, did he

9

threaten your job or anything --

A.   Yes, sir.

Q.   -- if you didn't sign it?

A.   Yes, sir.

Q.   Can you elaborate on that?

A.   Well, he was like, you know, we got this -- you got to sign this paper or whatever, or we's gonna do -- we gonna get rid of you or whatever.

In which I did get suspended at the time. So after that -- after that, it took a minute for them to even want to let me come back. So I had to go through everything. I probably stayed off probably like a -- probably about two or three weeks before I even had got a call back. So that's when I had just started looking for another job.

Q.   Okay. I guess in the report -- can I see that? (Document passed back to Mr. Reddick.) So just to ask you one more follow-up question to that, is there a reason why Mayor Charles Scott forced you to sign that statement? Did he give a reason?

A.   No, sir. I just know he just kept threatening me my job.

Q.   Okay. Now, usually, I read in the policy that when you, I guess, he interviewed you; is that correct?

10

A.   Yes, sir.

Q.   Is there anything in the policy with the City of Aberdeen that you have the right to have someone, another employee, a co-worker with you when you get, I guess, interviewed by the mayor for a reprimand situation?

A.   Uh-huh, I think so. Yes, sir.

Q.   Okay. Did you ask for that, to have someone else in the room?

A.   No, sir. I had just got called from doing my job, and I know that I was just sitting in the front -- sitting in the office.

Q.   Okay. Give me one second. All right. In reference to -- I'm looking at, this is Exhibit 13, it's already premarked.

So I'm looking at Exhibit 13, page 3. It says (reading): "A motion was made by Alderman Holliday, seconded by Alderman Haynes to suspend City employee Mr." -- I guess say your name again.

A.   Triron Brown.

Q.   "Triron Brown three days with no pay. The days are December 1st, 4th, and 5th of 2023. On a roll call vote, Alderman Holliday, Alderman Haynes, Alderwoman Odom and Alderman Cain voted 'Aye'."

And, so is that the suspension that you are

11

referring to?

A.   Yes, sir.

Q.   Okay. Can you explain, I guess, after you were only supposed to be suspended three days by the City, how you, I guess, were off for another two to three weeks?

A.   Yes, sir. Cause, like, they was trying to like -- what did he try to do. I don't know, cause it's something like they was trying to, like, push the days back, them days that I was suspended. And when I had questions about the pay and stuff like, why was this, why was this and that or whatever, so they didn't give me a answer -- I mean, a definite answer, you know, when I can come back or not, you know, so.

Q.   So that's when you started looking for another job?

A.   Yes, sir.

Q.   All right. Let me ask you this: In reference to I know you said Mayor Charles Scott forced you to sign that document, was Melissa Moore the city clerk in there as well when you signed that statement?

A.   No, sir.

Q.   Was she in there when you gave your statement --

12

A.   No, sir.

Q.   -- initial statement to Charles Scott?

A.   No, sir.

Q.   All right. What about Marcus Collins, did he ever speak with you about this matter?

A.   He had ended up coming in like a day or two -- because they brought me in. He brought -- Charles Scott brought me in myself.

Q.   Okay.

A.   By myself and then he ended up bringing Marcus Collins in the second day.

Q.   Okay. Let me ask you this: Was the reason -- well, let me ask you this question first: Did you ever donate time to Mr. McMillian for that November 27, 2023 date?

A.   Yes, sir.

Q.   Okay. Why did you donate him four hours?

A.   Cause he was out of town on a vacation.

Q.   Okay. In reference to this, I guess, Mayor Charles Scott brought it to the board that he tried to allege that Mr. McMillian tried to -- well, told you to clock him in on that day. Is that accurate or inaccurate?

A.   Inaccurate.

Q.   So Mr. McMillian didn't force you to clock

13

him in on that day?

A. No, sir.

Q. Okay. Is that a statement that the mayor forced you to state as well?

A. No, sir. He just stated me with this right here.

Q. Okay. So who told you to tell -- I guess tell the board or anything that Mr. McMillian told you to clock him in on November 27, 2023?

A. Charles Scott.

Q. Okay. That's what I was trying to ask.

A. Yes, sir.

Q. Is there a specific reason why Charles Scott told you to say that?

A. From my understanding, it was like a conflict, you know -- I don't know what he had against Mr. Barry or whatever; and, you know, I don't know the conflict or whatever. And then I know he always, you know, had his ways or whatever, so and it just -- I don't know if it was work related or what, so. And I noticed he had been picking at Mr. McMillian for the longest, so I don't know.

Q. And what do you mean by he had his way, you are saying Charles Scott had his way?

A. Yes, sir.

14

Q. And what about you are saying he would pick on Mr. McMillian, can you name some things in reference to that.

A. Okay. Like when we'll be at a job site and when Mr. McMillian had time off with the time that I donated and stuff to him, he always was like, where is Mr. McMillian at and, you know, different stuff like that. Just asking why McMillian ain't down in the hole and different stuff like that when he did come back to work, asking different questions like that. But there was also other workers, so you know, it didn't have to have that many people in one hole at one time.

Q. Okay. All right. I'm going to show you, I guess, in reference to that lead that you were referring to --

A. Okay.

Q. -- give me one second. With that matter to the hours, give me one second.

A. Okay.

Q. This has already been premarked. This is Exhibit 5. Can you just read that statement out loud for me? Well, can you just read that first and then tell me, did you write that statement?

A. (Document tendered to the witness for

15

review.) (As read): "I Triron Brown donate Barry McMillian 4 hours sick time. Thanks." Yes, sir.

Q. Okay. And did you write that statement?

A. Yes, sir.

Q. Okay. Did anybody ask you to write that statement?

A. No, sir.

Q. Okay. So what made you write that statement?

A. Because I noticed -- if I ever needed any time donated to me, Mr. McMillian always gave me time, his time if I needed to be off. And he always be, like, Brown, I'll put it back on you, so.

Q. Okay. Is that a common practice to donate time with the City of Aberdeen amongst employees?

A. Yes, sir.

Q. Okay. So that's not an issue, as far as that is concerned?

A. No, sir.

BY MR. REDDICK: Can we go off the record for a quick second. It won't take long.

(OFF THE RECORD.)

BY MR. REDDICK: I'm going to play some videos, but I'm not going

16

to make it a part of the record, per se. I'm just going to let him listen to it, just to attest to it and whatnot. Loden, these were sent in discovery and whatnot.

(Video played aloud but not reported.)

Q. (Mr. Reddick continued): All right. Mr. McMillian, do you remember that video or audio?

A. Yes, sir.

Q. Who recorded that video or audio?

A. I did.

Q. Is there a reason why you recorded it?

A. So it wouldn't be no confusion or nothing like that or so it won't be no he say/she say said this.

Q. Okay. I have about three more. They are pretty short.

A. Okay.

Q. So you did record this video?

A. Yes, sir.

BY MR. REDDICK: And in discovery I think it's labeled F985EADA/E4DA, that should be enough to identify it.

Q. (Mr. Reddick continued): I'm going to play

17

you another one.

A. Okay.

(Video played aloud but not reported.)

Q. (Mr. Reddick continued): Did you record this? You heard that audio, did you record that?

A. Yes, sir.

Q. Okay. Was that -- who said the statements that, "I'm glad I told the truth," what was that about?

A. When I had told him that I didn't clock Mr. Barry in or whatever, when I was talking to him about the -- we had talked, me and Marcus, that was Marcus right there, that video. We was talking about on that video. Cause I was in there with Charles Scott myself, then that's when Marcus ended up coming in; and at the last minute, he never was in there or whatever, so I went on and told Charles Scott or whatever. And that's when I was talking to Marcus and told him, I'm glad I told the truth because I didn't want to lose my job. But I had ended up still getting deducted by -- with not pay and suspension.

Q. Okay. And you said -- when you said you told the truth, what did you tell them? What did you initially tell Charles Scott?

A. I had told Charles Scott that I didn't clock

18

Mr. Barry in, but I was forced to sign this letter.

Q. When you mean "this letter," what do you mean?

A. This letter right here.

Q. You are looking at Exhibit 21?

A. Yes, sir. And this is what he wrote out, statement, all that.

Q. Okay. So you didn't write that?

A. No, sir.

Q. So he wrote that for you?

A. Yes, sir. The only thing I had to do was write my signature on it.

Q. Okay.

A. He pretty much was telling me what to write. Well, this my handwriting, so he was telling me what to write on my own letter.

BY MR. REDDICK: All right. And just for the record, that's -- this is, for the discovery purpose, not -- I guess we can put it on the record what the Bate is, but it's RP, replay -- underscore, RP_final1701389409.

Q. (Mr. Reddick continued): I have two more to play for you.

19

A. Okay.

(Audio played aloud but not reported.)

Q. (Mr. Reddick continued): All right. There was something mentioned about a camera. Do you know what that was in reference to?

A. That was when he was trying to consider me clocking Mr. Barry McMillian in, and I kept asking him, can I watch the camera. He would never let me watch it.

Q. So there's a camera at the clock-in machine?

A. Yes, sir.

Q. Is there a clock --

A. Right above -- well, it's not right at the clock-in machine, but, you know, it's pointed like towards the clock.

Q. Okay. He said that he did have it on video? Mr. Charles Scott said that?

A. Yes, sir. But when I kept asking for to see the footage of it, he could never show it to me, and he said he wasn't going to show it to me.

Q. Okay. Was there a reason why Mr. Charles Scott said he wasn't going to show you the video?

A. No, sir.

Q. Do you and Mayor Charles Scott have any issues or anything prior to this situation?

20

A. Not to my knowledge, we wasn't supposed to have no issues. You know, he was the mayor, and I mean, you know, I wasn't working for him, you know, so.

Q. Okay. So who did you consider yourself working for?

A. The City of Aberdeen Water Department, under Margaret Collins.

BY MR. REDDICK: Okay. And just for the record that Bates number is RP, replay; underscore, _final1701389744.

Q. (Mr. Reddick continued): This is the last video.

A. All right.

(Video played aloud but not reported.)

Q. (Mr. Reddick continued): All right. Do you remember -- you heard that audio, could you hear it to get the gist of it?

A. Yes.

Q. What do you recall from that video?

A. That was the time when I had Charles Scott -- Mayor Scott at the time, I had told him that all us needed to be down here at the meeting because I didn't want it to be, Ron said this, Ron said that. I

didn't want nothing to be flipped all on me, which I knew would have ended up happening, because I already knew what type of people they were.

Q. By people they were, who are you referring to?

A. Now that mess is right there on that one right there, I remember now. That one right there, that's the second day when Marcus Collins ended up coming in.

Q. Okay. So there were two meetings with Mayor Charles Scott?

A. Yes, sir.

Q. Did he record any of those meetings with you?

A. No, sir, he did not.

Q. Okay. So there's not going to be -- from your recollection, there's not going to be any video or audio recordings between you and Mayor Scott? Is that correct?

A. You said who?

Q. Well, I guess you are saying there is no -- there is not -- there was two interviews with Mayor Scott; correct --

A. Yes, sir.

Q. -- in reference to this matter. And you are saying that to your recollection that he didn't record via audio or video the conversations between you two?

A. No, sir.

Q. So did he ever mention that he was going to record you?

A. No, sir. He just had a talk.

Q. Okay. Did you tell him you were recording him?

A. No, sir.

Q. Okay. But you are saying you did that for your own safety?

A. For my own safety, yes, sir.

BY MR. REDDICK: And just for the record, that's -- that replay is RP, replay; underscore, _final1701390936.

I don't think I have any other questions for Mr. Brown right now.

EXAMINATION BY MR. WALKER:

Q. Mr. Brown, I have a few questions for you. I hope not to take too much of your time today.

A. Okay.

Q. My name is Loden Walker, and I'm one of the attorneys that represents the defendants, the City, who Barry is suing for damages.

A. Yes, sir.

Q. And none of the questions I have to ask you today are meant to embarrass you or humiliate you. We haven't met before, have we?

A. No, sir.

Q. We haven't spoken before?

A. Right.

Q. So don't think that I'm trying to make you mad or anything. The questions that I have written down, I've just prepared because I believe I need to ask you these questions. Do you understand that?

A. Yes, sir.

Q. I want to start just briefly with a few background questions. Did you review any documents or any sort of audio recordings or videos in preparation for today's deposition?

A. No, sir.

Q. Okay. Prior to the deposition, the beginning of the deposition that began at 10 a.m. or so, had you spoken to Mr. McMillian, Barry McMillian, about this deposition?

A. No, sir. Me and him haven't talked since we was working with the City.

Q. Have you spoken to anyone about this deposition?

A. No, sir.

Q. Have you spoken to anyone about the lawsuit that Barry filed against the City?

A. No, sir.

Q. So you haven't sent any text messages to anybody about the lawsuit?

A. No, sir.

Q. You haven't sent any text messages to anybody about the deposition?

A. No, sir.

Q. Okay. What is your -- you mentioned this earlier, but I just didn't have a chance to write it down, so I'm sorry for re-asking. What is your home address?

A. 410 Burnett Street, Aberdeen, Mississippi.

Q. And then the zip for that?

A. 39730.

Q. Is that a residence that you own, or is it rental property?

A. No, it's owned.

Q. And then, who do you live there with?

A. My grandmamma.

Q. And what is her name?

A. Willow, W-I-L-L-O-W.

Q. Willow Garth?

25

A. Yes, sir.

Q. Brown?

A. Just Garth.

Q. Willow Garth?

A. Yes, sir.

Q. Okay. Aside from giving this deposition today, have you ever participated in a deposition before?

A. No, sir.

Q. Okay. Has anyone ever filed a lawsuit against you?

A. No, sir.

Q. Have you ever filed a lawsuit against anybody else?

A. No, sir.

Q. All right. Have you ever participated in a lawsuit in any way?

A. No, sir.

Q. Served on a jury?

A. Jury duty.

Q. You have served jury duty?

A. Yes, sir.

Q. What about served as a witness?

A. No, sir.

Q. Do you have any prior arrests?

26

A. Prior arrests?

Q. Arrests, yeah.

A. No, sir.

Q. So no prior convictions?

A. No, sir.

Q. And then, where are you currently employed?

A. Homes (sic) Stretch, Nettleton, Mississippi.

Q. Homes?

A. Home, H-O-M-E, Stretch, Nettleton, Mississippi. It starts with an "N."

Q. Is that in Aberdeen?

A. No, sir.

Q. Where is that located?

A. Uh --

Q. Your best guess.

A. I can't. What highway that is?

Q. Is it in Monroe County?

A. Yes, sir. It's in Monroe County.

Q. All right. How long have you been employed there?

A. Three months.

Q. And then, where were you employed prior to Home Stretch?

A. Scott and Sons.

Q. At Scott and Sons?

27

A. Yes, sir.

Q. Is that also in Monroe County?

A. Yes, sir.

Q. How long were you at Scott and Sons?

A. Almost a year.

Q. About a year?

A. Yes, sir.

Q. Did you leave Scott and Sons to start a job at Home Stretch?

A. I had a bad four-wheeler wreck.

Q. I'm sorry?

A. I had a bad four-wheeler wreck.

Q. Bad four-wheeler wreck?

A. Yes, sir.

Q. So -- I'm just guessing here -- but was Scott and Sons like a labor intensive job and then you went to something that wasn't as labor intensive at Home Stretch?

A. (Deponent moved head up and down.)

Q. Is that a yes?

A. Yes.

Q. That's just for her to write it down.

A. Okay, okay.

Q. Okay. And then before Scott and Sons, I'm working back to the City.

28

A. Okay. I want to say before I was working with Scott and Sons, I was working with the City.

Q. The City?

A. Yes, sir.

Q. When did you separate from --

A. The City?

Q. Yes.

A. I want to say that I probably stayed probably a couple of months and I quit. I left in 2023 I know -- I think. 2023, no, it couldn't have been '23. I left in '24, I think.

Q. Do you recall what month?

A. I think -- I'd probably say probably about February or March.

Q. Roughly February, March of '24?

A. Yes, sir.

Q. Did you voluntarily leave?

A. I just left because of the pay. The pay wasn't --

Q. It wasn't good?

A. Yes, sir.

Q. Were you terminated?

A. No, sir. I wasn't terminated at that time.

Q. So you separated on your own. You wanted to leave and you left?

29

A. Uh-huh. Yes, sir.

Q. And you left because the pay wasn't good?

A. At that time, yes, sir.

Q. It wasn't anything in relation to Barry's employment?

A. No, sir.

Q. All right. Talk with me briefly about November 27th. That's kind of the date. I'll just represent to you that's kind of the big date in the lawsuit, in Barry's lawsuit. I think you kind of know what's going on. He's saying that he didn't get clocked in. He got wrongfully terminated. I think they said his position was while he was telling Dom that he got clocked in on November 27th.

Did you work on November 27, 2023, at the City?

A. Yes, sir.

Q. You did?

A. Yes, sir.

Q. Did you communicate with Barry at all that day?

A. No, sir.

Q. Okay. What is your phone number?

A. Oh, my phone number now is 662 --

Q. Let me pause for a second. What do you mean

30

by "now"?

A. I don't have the same phone number that I did then.

Q. And why is that?

A. I got a whole new phone.

Q. But why did you get a new number?

A. My phone had tore up. It had tore up, so I had -- I ain't got that number no more.

Q. Okay. So give me your current phone number.

A. 662-436-7735.

Q. 35. And then, who is your provider; Verizon, AT&T?

A. AT&T.

Q. All right. And then when did you get this phone number?

A. I got this phone number last year.

Q. 2025, do you recall what month?

A. Not that I know of. I don't.

Q. The season: spring, summer, or fall?

A. Spring.

Q. All right. And then, before the spring of 2025, what was your phone number?

A. 662-436-7632, I think.

Q. 7632?

A. Yes, sir.

31

Q. All right. And then who was your provider?

A. AT&T.

Q. AT&T. So why did you ask for a new number when you had the same provider?

A. Well, when you get a whole new phone, you have to get your number updated. And I'm under the line with my mother, so she had ended up getting it, like, as a new phone. So I had to end up getting a new number.

Q. Okay. I disagree with you. We are not going to argue or anything like that. I'll just say, my wife joined -- I've always had AT&T, but my wife had Verizon. And she got moved over to AT&T, and she got to keep her number. We've also gotten new phones. We shouldn't be paying for this thing, but it's like we pay 20 bucks a month or something and they give us a new phone every year.

A. But like if you're adding a new line on AT&T, I don't know how no other company works. I know that's, like, how my mama lines -- she got her lines set up, like, if you get a new phone, you've got to get a whole new number because my brother wanted to keep his old number. He couldn't keep his old number, so I know he had to end up getting a new number, so that's how our line worked. When you getting a whole

32

new phone, they don't want to give you the same number back over. That's how my line work. I don't know about nobody else's line, but that's how ours works.

Q. For the 7735 number was that an iPhone? Do you have an iPhone?

A. Yes, sir.

Q. What about the 7632 number?

A. Yes, sir. It was an iPhone as well.

Q. All right. For the 7735 do you know who, like, the primary accountholder's name is?

A. Not that I know, no, sir.

Q. Is it you?

A. No, sir.

Q. Would it be your grandma?

A. My mother.

Q. Your mom. All right. And then what about for the 7632?

A. My mother. I've always been under.

Q. So it's the same account, it's just a different line?

A. Right.

Q. Okay. And then, did you have the 7632 number at the time, like, in November 2023?

A. Uh-huh.

Q. You did?

**33**

A. (Deponent moved head up and down.)

Q. Okay. So you think your cloud still exists for 7632 since you had an iPhone? You haven't deleted it, have you?

A. No, sir. Well, I don't have none of that. I'm just going to be real. I don't even have the pictures, nothing. Like, I don't have nothing from 2023. I mean, I got a whole new phone number, new number, and I don't have no proof or nothing.

Q. Do you have -- you have Apple, so you have the cloud; correct?

A. Uh-huh.

Q. So you have the cloud for 7735, that's set up to an e-mail account. What is the e-mail account that is set up to?

A. Triron, T-R-I-R-O-N, brown16@gmail.com.

Q. Okay. And then, how long have you had that e-mail address?

A. I had that e-mail for a while, a long time, since I've been having an iPhone.

Q. Okay. Did you use that e-mail for the 7632 number?

A. Yes.

Q. Okay. So your cloud would be the same. So it could be backed up meta data on there that might

**34**

have some text messages between you and Barry on there?

A. Not that I recall.

Q. Did you text -- do you have Barry's phone number?

A. I've got his new number. Me or Mr. McMillian don't either have the same number when we was working with the City.

Q. I understand. Did you text him in November 2023?

A. No, sir.

Q. You never texted him?

A. No, sir.

BY MR. WALKER: Okay. Well, let me show you a document real quick, and I'll show you too. DeMoreo, I don't have it printed out, but it's been produced. It's DEF-309 premarked as DEF-309.

I'll just show DeMoreo first, real quick.

(Mr. Walker is showing Mr. Reddick his computer.)

BY MR. REDDICK: Okay. I've seen that document.

**35**

Q. (Mr. Walker continued): I'll give you just a second to look at, and then I'm going to ask you a couple of questions about it.

A. (Computer showed to the witness for review.) Uh-huh.

Q. Have you seen -- do you recognize those text messages?

A. Not that I recall.

Q. I'll just read it for the record real quick. The first one says: "Brown, can you clock me in?" It's dated November 27th, which I presume is 2023.

And it says: "Bet I got u."

"Thank you."

"Any time."

And then it says: "Clock me out right now if you can."

And then a response from whoever's phone this is: "We over here fixing this leak on Vine Street."

A. Uh-huh.

Q. Do you recall fixing a leak on Vine Street on November 27, 2023?

A. Not that I recall.

Q. Then it says (as read): "Okay when you get a chance! Clock me out! Thanks."

**36**

The response is: "Ok bet and u welcome."

A. That's the day I think -- that's the day that I had to go to a funeral, and I know at the time where it's been like that since we were working with the City. I end up -- at the time our time numbers was on top of the clock or whatever, and I know when I had clocked myself out, I was in a rush. I don't know if I messed around and punched Mr. Barry's number in or what. But I know I was just in a rush trying to hurry up and get to a funeral. I know I had to plan a funeral that day.

Q. Okay. Is this potentially your phone right here? These text messages?

A. Yes, sir. That's my number.

Q. That's your number. Is that -- can you recall is that Barry texting you?

A. I mean, it ain't even got no number, I mean. Yeah, that was our text right there.

Q. You and Barry?

A. Uh-huh.

Q. Okay. So these are your texts between you and Barry, you recall, and you said that you accidently may have clocked him in and clocked him out because you were in a rush for a funeral?

A. Yes, sir, but...

37

Q. Go ahead.

A. I mean, I know them my texts, but I know that wasn't what Mr. McMillian -- I don't know.

Q. You mean Barry?

A. Right, right.

Q. You don't know what?

A. I don't think -- well, I know them not our texts. Them not our texts right there.

Q. Well earlier, about two minutes ago you said they were. What's changed?

A. I'm sitting here looking -- cause I had -- all of us used to be in a group chat. It used to be plenty of people that I used to text around that. Text about -- I don't -- I don't know them texts, cause Mr. McMillian was out of town.

Q. Right. But somebody is asking to be clocked in and clocked out. If it's not Barry's, whose are they?

A. I want to say it's my cousin's text message. I don't recall. I don't --

Q. You said it could be your cousin?

A. Yes, sir. Cause me and my cousin was working.

Q. What's your cousin's name?

A. He worked with the City -- Andre Hogan.

38

Q. Where does Andre Hogan live?

A. I'm not sure.

Q. When is the last time you spoke to Mr. Hogan?

A. Shoot. It's been a minute. I ain't even going to lie to you. Ever since I left the City, I ain't -- I'm just going to be real with you, I haven't even had this on my mind to be honest, you know, so.

Q. Yeah. I'm just asking about Andre, though. How is he related to you?

A. We've got the same -- let me see. His grandaddy is my grandaddy's brother.

Q. And he worked for the City?

A. Yes, sir.

Q. What position did he work at the City?

A. Water.

Q. Was he a laborer in the water department, your position?

A. No, sir.

Q. Okay. What was his position?

A. Let me think. I guess, just fixed leaks. That's all he did was fixed leaks. I was a well operator, so we didn't do the same job. So I guess you can put fixed leaks or whatever. I don't know, whatever.

39

Q. Did you clock in Andre on November 27th?

A. Yes, sir.

Q. Did you clock him out?

A. In hitting his -- ended up typing the number -- in looking up -- because I didn't -- we didn't have our time -- we didn't have no time clock or nothing. I mean, we didn't have like no scan, you know, like --

Q. A card?

A. Right, right. So we -- me looking up at the numbers and the numbers and everybody's number was so close together, and me just --

Q. Are you saying you might have done Barry because the numbers are so close?

A. Uh-huh.

Q. You might have clocked Barry in and out?

A. Uh-huh.

Q. But those text messages aren't Barry?

A. Right, right.

Q. Do you have Andre's phone number?

A. No, sir, not in this phone right here I don't. No, sir, I don't.

Q. Do you know who would? Would Barry?

A. No, sir. I don't think. I'm not sure, no, sir.

40

Q. You don't know anybody who would have his phone number?

A. No, sir. I'm not sure for real, for real. I don't know.

Q. Do you know if he has a brother or sister?

A. I know he got a sister.

Q. What's her name?

A. Destiny.

Q. Do you know her last name?

A. Should be Hogan.

Q. But they are from Monroe County?

A. Yes.

Q. Let me show you what's been premarked as DEF-118.

(Showing this on the computer to Mr. Reddick.)

Q. (Mr. Walker continued): Does this document look familiar to you?

A. (Computer turned for the witness to review.) I never got a chance to see that.

Q. Do you know what this document is? I understand that it's Barry McMillian's?

A. Uh-huh.

Q. But just generally what is?

A. Oh, yes, sir.

41

Q. Okay. And what is that document, just generally?

A. A time off for work.

Q. Okay.

A. And vacation or whatever, or a clock-in sheet.

Q. A time sheet?

A. Time sheet, yeah.

Q. Okay. Does this look like -- I think the City has a couple of them, but does this look like the time sheet that is printed out? It's from the electronic software from the time clocking system? You know, it's nothing handwritten in there?

A. Uh-huh.

Q. Does that make sense?

A. Uh-huh.

Q. So when you are saying you would have punched in those numbers, it would have logged in the system and printed it out on a sheet that looked like this?

A. We didn't have no printout.

Q. You could print it out, I guess, and it would look like this; do you know?

A. No, sir, I do not know.

Q. If I represented to you, which I will, this

42

is the time sheet from the time clocking system, and this is Barry McMillian's time clock, and if you look it says, November 27th; do you see that?

A. Uh-huh.

Q. Monday. And it's clocked in at 7 a.m. and then clocked out at 13:30, which I guess is like 1:30 p.m.?

A. Uh-huh.

Q. Is that what you meant -- somebody clocked in Barry. You say you may have accidently clocked him in during that time?

A. Yes, sir.

Q. Who was with you at work on November 27, 2023? Who was in your crew? Can you remember? I know I'm testing your memory.

A. It was a lot of us then, cause the same people ain't even there no more at the job, so.

Q. If you can't remember anybody else that's okay.

A. I don't.

Q. Barry wasn't there?

A. Talking about that Monday?

Q. Uh-huh.

A. No, sir.

Q. What about Marcus Collins?

43

A. I think so -- not from my knowledge, I don't remember.

Q. You can't recall?

A. No, sir.

Q. Johnny McMillian?

A. Yes, sir, he was working back then.

Q. So at least you and Johnny were there?

A. Uh-huh.

Q. Did you clock Barry in on November 27, 2023?

A. If I did, it was by accident.

Q. Did you clock Barry out on November 27, 2023?

A. Uh-huh.

Q. You did?

A. (Deponent moved head up and down.)

Q. Okay. Have you - this is changing the subject. It is the last question that I have.

Have you ever known -- like in your opinion, have you known Mayor Scott to be racist to black individuals?

A. I mean, when he came around, he kind of somewhat had an attitude a lot when it came down to people, you know.

Q. Was he racist, though? Did he hate black people?

44

A. I mean, I really don't know for real, for real. Because, you know, I just was going to work, doing my job, you know.

Q. So you never witnessed him being racist to black people? Personally, you never witnessed him?

A. I have been around him when he was talking like talking crazy or whatever, you know, like say this and that, and, you know, when you have this person saying he saying, she say. This different type of person saying this or that, you know, but I try to get along with everybody so.

But I did know at the times he did have a problem with Mr. McMillian cause it was going around the job, you know. So I know he did have that problem with Mr. McMillian when -- because, I mean, all of us working in the same department.

Q. Right. Was it because Barry is black? Just in your opinion.

A. I guess.

Q. What makes you say that?

A. Cause, I mean, you know, ain't nobody fixing to just be just keep picking on nobody as far as, you know, ain't nobody doing nothing to a person so, you know.

Q. Sure.

45

A. I'm just thinking like, okay, what's the problem. Like what would he have.

Q. Okay. Listen, the only reason -- I know the racist questions are somewhat sensitive and stuff like that, but they are coming up because one of his claims is based on race. So that's why I'm asking you about race. But Mayor Scott is black; correct?

A. Correct.

Q. Was he hateful to you because you are black?

A. He always had an attitude when you would try to talk to him. And just from that day of when he brought me in to sign those papers, like, it was like a forced type thing, you know.

Q. I understand. But I mean like hate you because of your skin color, not because of any other reason? Just based on your skin color.

A. I don't -- I don't -- I don't know.

Q. You don't know?

A. (Deponent moved head from side to side.)

BY MR. WALKER: I'm sorry. I know this isn't the most fun thing.

BY THE WITNESS: Yes, sir.

BY MR. WALKER: Thank you for your time.

BY THE WITNESS: I appreciate

46

it.

BY MR. REDDICK: I've got some follow-up questions, though. Let's mark this as Exhibit 22. This is the same thing you just referenced.

(Text messages were marked as Exhibit No. 22.)

FURTHER EXAMINATION BY MR. REDDICK:

Q. And just for the record, Mr. Brown, just to clarify some things, in reference to November 27, 2023, did Mr. McMillian ask you to clock him in on that day?

A. No.

Q. Okay. You said the answer is "no"?

A. (Deponent moved head from side to side.)

Q. Can you say that for the record?

A. No, sir.

Q. Okay. All right. In reference to your meeting with the mayor, you said that he made you sign this statement on Exhibit 21; correct?

A. Correct.

Q. And earlier you stated that you didn't clock Mr. McMillian in; is that correct or incorrect?

A. Correct.

Q. Okay. So I think now you stated that you

47

may have accidently clocked him in; is that correct?

A. Yes, sir.

Q. Okay. Did you tell Mayor Charles Scott that?

A. Yes.

Q. Okay. So what did you tell him?

A. I had told him the day of, cause all our time numbers was right there close. Me and Mr. McMillian, our time right there under each other. And the day of when he's saying that I had clocked him out or whatever, I was headed to a funeral. And me punching the numbers in, I seen that it had said Barry McMillian, so I didn't never get a chance to talk to anybody, because I was just so in a rush for a funeral or whatever, so I didn't just get a chance to tell Marcus that I had ended up hitting Barry -- Mr. McMillian's number.

Q. Okay. What about the initial clock in, did you clock him in on the initial clock in for that morning in reference to Mr. McMillian?

A. Had to. If that time sheet showed that I had to enter in his number then, and instead of clocking myself out, I ended up hitting his number.

Q. Okay. So you are saying the record will reflect that you weren't working -- that you didn't --

48

well, let me ask you this. Strike that.

Did you clock yourself in and out on that date on November 27, 2023?

A. Well, me thinking that I was hitting my number, I see now that I was hitting Mr. McMillian's number.

Q. Okay. So you are saying probably. Do you know for sure or not that you clocked yourself in and out on November 27th, 2023?

A. Not for sure about clocking myself in.

Q. All right. I'm going to show you Exhibit 22. That's what opposing counsel just showed you. I guess you've already looked at it and whatnot. Is there a phone number on that exhibit? Is there a phone number reference on this Exhibit 22?

A. Uh-uh.

Q. Does it show your phone number?

A. No.

Q. All right. Does it show Mr. McMillian's phone number?

A. No, sir.

Q. So does it show a phone number at all on that Exhibit 22?

A. It doesn't.

Q. All right. Just from your recollection,

49

have you ever seen Marcus Collins or anybody, I guess, text message or anything or change them?

A. Have I ever seen who?

Q. Marcus Collins change text messages or anything? Like, he, I guess I'm giving an example, that he can get a text message and alter it or anything to that nature?

A. Not from my knowledge.

Q. All right. Just for the record, you remember anything else about that on Exhibit 22 who that -- let me ask you this: Is that your text message exchange with anybody?

BY MR. WALKER: Objection, asked and answered.

BY MR. REDDICK: I'm just asking him again. Objection noted.

A. That was my text message with my cousin, Andre.

Q. (Mr. Reddick continued): All right. So that's not a text message exchange between you and Mr. McMillian?

A. No, sir.

Q. All right. Just in reference to the -- you said that Mr. Charles Scott was picking on Mr. McMillian. Do you know the timeframe on when Mr.

50

Charles Scott was picking on Mr. McMillian, what year?

A. Before I got there, you know, city talk, you know, people going to talk, so you know, and then also we had did a lot of talking as well. And I just notice like the little stuff like when we'll be working or something, he always pull our boss to the side, Marcus Collins, or whatever, and be like, why Mr. McMillian not working or whatever, you know, like. And me and Barry had a talk, and I asked Barry, why he always, you know, like saying stuff to you? And he was like, I don't know what's going on. You know, like, I never had a clue, and like Mr. McMillian he never had a clue like what was going on, like I don't know, like.

Q. Okay. Would this have occurred in 2023 this I guess in reference to Charles Scott picking on Mr. McMillian?

A. Yes, sir.

Q. All right. How long were you with the City? Were you with the City in 2022?

A. I ended up -- yes, sir. I came -- yes, sir.

Q. All right. Did you observe Mr. Charles Scott picking on Mr. McMillian in 2022?

A. Yes. As long as I was working there, we was there together, I seen it, yes, sir.

51

BY MR. REDDICK: Okay. All right. I don't have any follow-up questions.

A. And it was always a problem like. Like when -- like with the time when I gave Mr. Barry the hours, the four hours or whatever. It was a problem like, tried to make it as a problem, like it was, you know, like Mr. McMillian couldn't take off for real, for real, and so.

Q. (Mr. Reddick continued): Well, since you mentioned that, I do have one exhibit to show you, then, since you mentioned that. So you said that in reference to time that Mr. Charles Scott would not let -- if you donated time to Mr. McMillian that the mayor -- Mayor Charles Scott wouldn't allow it; is that correct?

A. Correct. And that was just like for certain people. That's what I'm saying like, it was just for like, if I had a gave that time to somebody else, it was cool. He was cool with it. But, it's like I said, it was like a big problem that he had with Mr. McMillian.

Q. Okay. All right. I'm going to show you Exhibit 17. This is a reference to, I guess, a statement you made and whatnot. Can you look back at

52

that and then tell me what that says right there? Can you just read it for the record?

A. Okay. (As read): "I Triron Brown donate Barry McMillian 4 hours sick time."

Q. And that is your signature right there below that statement?

A. Yes, sir.

Q. Okay. And can you just read that what's right below that?

A. Do it say "disapprove"?

Q. Yeah, just to the best of your recollection, what you think it says.

A. Oh. It looks like it say, "Disapproved."

Q. Okay. Can you read what you think it says for the record?

A. Uh, yeah. (As read): "Disapproved" "Mayor Scott, November 29th, 2023."

Q. And what is it essentially saying?

BY MR. WALKER: Object to the to the line of questioning because it's outside the scope of my rebuttal, but you can answer.

Q. (Mr. Reddick continued): Yeah. Can you just state what it's stating?

BY MR. WALKER: Back on

53

direct.

A. Me donating the time.

Q. (Mr. Reddick continued): And did Mr. Charles Scott allow that on that date?

A. Well, he didn't allow it. Our boss, Marcus Collins, he the one that had to sign off on it, like, in the book to approve that. And -- and to approve it, so we had to -- Marcus Collins always had to bring the book up whoever request time off because the time sheet always go in, he had to bring it up to Charles Scott.

Q. Okay. And what is that showing that Charles Scott approved or disapproved that time?

A. Disapproved.

Q. Okay. So he disapproved the amount of time that you tried to provide Mr. McMillian?

A. Right.

Q. Is that in reference to November 27, 2023 date?

A. It say November 29th.

Q. All right. Do you know why it says November 29th? Well, I guess what day is that supposed to be covering?

A. It's supposed to been covering for that date, the 28th. Well, from the text it's supposed to

54

have been for the 27th, but that's when we had that meeting the day of on the 28th.

Q. Okay. All right.

BY MR. REDDICK: I don't have any further questions.

BY MR. WALKER: Just a couple follow ups just since we got into something new here.

FURTHER EXAMINATION BY MR. WALKER:

Q. Why did you want to donate four hours of sick time to Barry?

A. Because I knew that he was out of town, and I know he needed -- so cause if you use your sick time, you'll still get your -- you'll still get paid for it. So whenever he needed time, I help him out; and then like if I needed to be out, he always give me sick time. And that was just for any workers that was in there. It just wasn't for me and Mr. McMillian.

Q. Why sick time, though?

A. You'll get paid still. So instead of using a vacation day.

Q. Was Barry sick on Monday, November 27, 2023?

A. He was out of town.

Q. Was he sick?

A. No.

55

Q. So why were you trying to donate sick time? Is there not another kind of time: annual leave, vacation leave?

A. Not that I know of. That was just the -- that's the day that I chose to give Mr. McMillian the sick time cause I still wanted him, just like anybody else, I would want them to get paid still why they off, and that's how the reference was. If you take your sick time, you'll still get paid. But if you just take a vacation day, you really -- you's not getting it.

Q. Do your understand Barry wasn't sick on the day that you gave him time?

A. Right.

BY MR. WALKER: Thank you. I think that's everything.

BY MR. REDDICK: Well, just one question in reference to the sickness.

FURTHER EXAMINATION BY MR. REDDICK:

Q. So just in reference to the sickness, do you have any documentation that's showing that Mr. McMillian wasn't sick on that date?

BY MR. WALKER: It's all throughout the case that he wasn't

56

sick in the complaint. In your response to our Motion to Dismiss, you said he missed his flight.

BY MR. REDDICK: Right, but it also said that he was also sick in reference to his FMLA trying to take his sick leave.

Q. (Mr. Reddick continued): So but, I'm just asking you: Do you have any of documentation showing that Mr. McMillian was or was not sick on November 27, 2023?

A. No, sir.

Q. Okay. So as far as documentation is concerned, you wouldn't have any documents reflecting that one way or the other?

A. No, sir.

BY MR. REDDICK: All right.

(Deposition concluded at 11:17 a.m.)

C E R T I F I C A T E

I, Valera Knight, Court Reporter and Notary Public within and for the State of Mississippi, do hereby certify that the above and foregoing pages contain a full, true and correct transcript of the proceedings had in the afore-named case at the time and place indicated, which proceedings were recorded by me to the best of my skill and ability.

I also certify that I placed the deponent under oath to tell the truth and that all answers were given under that oath.

I also certify that the deponent has chosen to waive the reading and signing of the deposition.

I further certify that I have no interest, monetary or otherwise, in the outcome of this action.

Witness my hand and seal on this 16th day of March, 2026.

_____

Valera Knight, CCR #1039
My Commission Expires:
March 21, 2029

## #

**#1039** [2] - 1:22, 57:19

## '

**'23** [1] - 28:11
**'24** [2] - 28:11, 28:15

## 1

**1** [1] - 3:3
**1-20** [2] - 1:6, 3:16
**10** [1] - 23:19
**103747** [1] - 2:3
**10:10** [1] - 1:13
**11:17** [1] - 56:19
**125** [1] - 1:11
**13** [3] - 3:18, 10:14, 10:16
**13:30** [1] - 42:6
**16th** [1] - 57:17
**17** [2] - 3:18, 51:24
**1905** [1] - 2:9
**1:24-CV-199-SA-RP** [1] - 1:4
**1:30** [2] - 8:23, 42:7
**1st** [1] - 10:22

## 2

**2** [1] - 3:4
**20** [1] - 31:16
**200** [1] - 2:9
**2022** [2] - 50:20, 50:23
**2023** [24] - 7:4, 7:19, 10:22, 12:15, 13:9, 28:10, 29:15, 32:23, 33:8, 34:10, 35:11, 35:22, 42:14, 43:9, 43:12, 46:11, 48:3, 48:9, 50:15, 52:17, 53:18, 54:22, 56:11
**2025** [2] - 30:17, 30:22
**2026** [2] - 1:12, 57:18
**2029** [1] - 57:20
**21** [7] - 3:14, 8:8, 8:10, 8:11, 18:5, 46:20, 57:20
**22** [8] - 3:7, 3:15, 46:4, 46:7, 48:12, 48:15, 48:23, 49:10
**26** [1] - 1:12
**27** [14] - 7:4, 7:19, 12:15, 13:9, 29:15, 35:22, 42:13, 43:9, 43:11, 46:10, 48:3, 53:18, 54:22, 56:10
**27th** [7] - 29:8, 29:14, 35:11, 39:1, 42:3,

48:9, 54:1
**28th** [2] - 53:25, 54:2
**29th** [3] - 52:17, 53:20, 53:22

## 3

**3** [2] - 3:5, 10:16
**35** [1] - 30:11
**38673** [1] - 1:23
**38860** [1] - 2:4
**39232** [1] - 2:9
**39730** [3] - 1:12, 5:19, 24:17

## 4

**4** [3] - 3:6, 15:2, 52:4
**410** [2] - 5:17, 24:15
**46** [1] - 3:15
**46,55** [1] - 3:8
**465** [1] - 2:3
**4th** [1] - 10:22

## 5

**5** [2] - 3:18, 14:22
**54** [1] - 3:9
**56** [1] - 3:10
**57** [1] - 3:11
**5th** [1] - 10:22

## 6

**601-352-2300** [1] - 2:10
**601-360-9777** [1] - 2:10
**662** [2] - 1:24, 29:24
**662-256-3582** [1] - 2:5
**662-436-4641** [1] - 2:4
**662-436-7632** [1] - 30:23
**662-436-7735** [1] - 30:10

## 7

**7** [1] - 42:5
**7632** [6] - 30:24, 32:7, 32:17, 32:22, 33:3, 33:21
**7735** [3] - 32:4, 32:9, 33:13
**7:00** [1] - 8:23

## 8

**8** [1] - 3:14
**816-9863** [1] - 1:24

**82** [1] - 1:23

## A

**a.m** [3] - 23:19, 42:5, 56:19
**A.M** [1] - 1:13
**Aberdeen** [9] - 5:15, 5:23, 7:3, 7:8, 10:3, 15:15, 20:7, 24:15, 26:11
**ABERDEEN** [4] - 1:2, 1:5, 1:11, 1:12
**ability** [2] - 5:11, 57:9
**accident** [1] - 43:10
**accidently** [3] - 36:23, 42:10, 47:1
**account** [3] - 32:19, 33:14
**accountholder's** [1] - 32:10
**accurate** [1] - 12:22
**action** [1] - 57:16
**ACTION** [1] - 1:4
**adding** [1] - 31:18
**address** [3] - 5:16, 24:14, 33:18
**affect** [1] - 5:11
**afore** [1] - 57:7
**afore-named** [1] - 57:7
**ago** [1] - 37:9
**ahead** [1] - 37:1
**ain't** [8] - 14:8, 30:8, 36:17, 38:5, 38:7, 42:17, 44:21, 44:23
**Alderman** [5] - 10:17, 10:18, 10:23, 10:24
**Alderwoman** [1] - 10:24
**allege** [1] - 12:21
**allow** [3] - 51:15, 53:4, 53:5
**almost** [1] - 27:5
**aloud** [4] - 16:6, 17:3, 19:2, 20:16
**alter** [1] - 49:6
**amount** [1] - 53:15
**AND** [1] - 1:6
**Andre** [5] - 37:25, 38:1, 38:9, 39:1, 49:18
**Andre's** [1] - 39:20
**annual** [1] - 55:2
**answer** [5] - 5:3, 11:13, 46:14, 52:22
**answered** [1] - 49:14
**answers** [1] - 57:11
**APPEARANCES** [2] - 1:16, 2:1
**Appearances............**

**......................** [1] - 3:4
**Apple** [1] - 33:10
**appreciate** [1] - 45:25
**approve** [2] - 53:7
**approved** [1] - 53:13
**APPROXIMATELY** [1] - 1:13
**argue** [1] - 31:11
**arrests** [3] - 25:25, 26:1, 26:2
**aside** [1] - 25:6
**AT** [2] - 1:11, 1:13
**AT&T** [7] - 30:12, 30:13, 31:2, 31:3, 31:12, 31:13, 31:19
**attest** [1] - 16:3
**attitude** [2] - 43:22, 45:10
**attorneys** [1] - 22:24
**audio** [8] - 16:8, 16:10, 17:5, 19:2, 20:18, 21:18, 22:2, 23:15
**aware** [1] - 8:4
**Aye'** [1] - 10:24

## B

**backed** [1] - 33:25
**background** [1] - 23:14
**bad** [3] - 27:10, 27:12, 27:13
**Bank** [1] - 2:9
**Bar** [1] - 2:3
**BARRY** [1] - 1:3
**Barry** [37] - 2:6, 7:7, 8:22, 13:17, 15:1, 17:11, 18:1, 19:7, 22:25, 23:20, 24:3, 29:20, 34:1, 36:16, 36:19, 36:22, 37:4, 39:13, 39:16, 39:18, 39:23, 40:22, 42:2, 42:10, 42:21, 43:9, 43:11, 44:17, 47:12, 47:16, 50:9, 50:10, 51:5, 52:4, 54:11, 54:22, 55:12
**Barry's** [5] - 29:4, 29:10, 34:4, 36:8, 37:17
**based** [2] - 45:6, 45:16
**Bate** [1] - 18:21
**Bates** [1] - 20:10
**Bear** [1] - 6:12
**began** [1] - 23:19
**BEGINNING** [1] - 1:13
**beginning** [1] - 23:19

**below** [3] - 3:17, 52:5, 52:9
**best** [4] - 4:23, 26:15, 52:11, 57:9
**Bet** [1] - 35:12
**bet** [1] - 36:1
**between** [5] - 21:18, 22:2, 34:1, 36:21, 49:20
**big** [2] - 29:9, 51:21
**black** [6] - 43:19, 43:24, 44:5, 44:17, 45:7, 45:9
**board** [2] - 12:20, 13:8
**BOARDROOM** [1] - 1:11
**book** [2] - 53:7, 53:9
**boss** [2] - 50:6, 53:5
**Box** [1] - 2:3
**BOX** [1] - 1:23
**briefly** [2] - 23:13, 29:7
**bring** [2] - 53:8, 53:10
**bringing** [1] - 12:10
**brother** [3] - 31:22, 38:12, 40:5
**brought** [5] - 12:7, 12:8, 12:20, 45:12
**BROWN** [3] - 1:9, 3:2, 4:1
**Brown** [18] - 3:19, 4:4, 4:7, 4:8, 4:10, 4:14, 8:9, 8:11, 10:20, 10:21, 15:1, 15:13, 22:18, 22:20, 25:2, 35:10, 46:9, 52:3
**Brown's** [1] - 8:21
**Brown.....** [1] - 3:14
**brown16@gmail. com** [1] - 33:16
**browns** [1] - 6:10
**Browns** [1] - 6:17
**bucks** [1] - 31:16
**Burnett** [2] - 5:17, 24:15
**but..** [1] - 36:25
**BY** [30] - 4:3, 15:20, 15:24, 16:21, 18:17, 20:9, 22:13, 22:19, 34:14, 34:24, 45:20, 45:22, 45:23, 45:25, 46:2, 46:8, 49:13, 49:15, 51:1, 52:19, 52:25, 54:4, 54:6, 54:9, 55:15, 55:17, 55:20, 55:24, 56:4, 56:17

## C

**Cain** [1] - 10:24
**camera** [3] - 19:4, 19:8, 19:10
**card** [1] - 39:9
**case** [2] - 55:25, 57:7
**CCR** [2] - 1:22, 57:19
**certain** [1] - 51:17
**Certificate.................** [1] - 3:11
**certify** [4] - 57:5, 57:10, 57:13, 57:15
**chance** [7] - 5:2, 24:12, 35:25, 40:20, 47:13, 47:15
**change** [2] - 49:2, 49:4
**changed** [1] - 37:10
**changing** [1] - 43:16
**Charles** [29] - 8:17, 8:19, 9:19, 11:19, 12:2, 12:8, 12:20, 13:10, 13:13, 13:24, 17:14, 17:17, 17:24, 17:25, 19:17, 19:21, 19:24, 20:22, 21:11, 47:3, 49:24, 50:1, 50:16, 50:22, 51:13, 51:15, 53:4, 53:10, 53:12
**chat** [1] - 37:12
**child** [1] - 6:3
**children** [1] - 5:25
**chose** [1] - 55:5
**chosen** [1] - 57:13
**city** [2] - 11:21, 50:2
**CITY** [2] - 1:5, 1:11
**City** [24] - 7:3, 7:8, 10:3, 10:18, 11:5, 15:15, 20:7, 22:24, 23:23, 24:3, 27:25, 28:2, 28:3, 28:6, 29:16, 34:8, 36:5, 37:25, 38:6, 38:13, 38:15, 41:10, 50:19, 50:20
**CIVIL** [1] - 1:4
**claims** [1] - 45:5
**clarify** [2] - 4:19, 46:10
**clerk** [1] - 11:21
**client** [2] - 7:23, 8:3
**clock** [28] - 7:24, 8:2, 12:22, 12:25, 13:9, 17:10, 17:25, 19:10, 19:12, 19:14, 19:15, 35:10, 35:15, 35:25, 36:6, 39:1, 39:3, 39:6, 41:5, 42:2, 43:9, 43:11, 46:11,

46:22, 47:18, 47:19, 48:2
**clock-in** [5] - 7:24, 8:2, 19:10, 19:14, 41:5
**clocked** [18] - 7:23, 8:3, 8:22, 29:12, 29:14, 36:7, 36:23, 37:16, 37:17, 39:16, 42:5, 42:6, 42:9, 42:10, 47:1, 47:10, 48:8
**clocking** [5] - 19:7, 41:12, 42:1, 47:23, 48:10
**close** [3] - 39:12, 39:14, 47:8
**cloud** [4] - 33:2, 33:11, 33:13, 33:24
**clue** [2] - 50:12, 50:13
**co** [1] - 10:4
**co-worker** [1] - 10:4
**code** [1] - 5:18
**Collins** [10] - 12:4, 12:11, 20:8, 21:8, 42:25, 49:1, 49:4, 50:7, 53:6, 53:8
**color** [2] - 45:15, 45:16
**coming** [4] - 12:6, 17:15, 21:9, 45:5
**COMMERCE** [1] - 1:11
**Commission** [1] - 57:20
**common** [1] - 15:14
**communicate** [1] - 29:20
**Community** [1] - 2:9
**company** [1] - 31:19
**complaint** [1] - 56:1
**complete** [1] - 5:3
**Computer** [2] - 35:4, 40:19
**computer** [4] - 3:20, 3:21, 34:23, 40:15
**concerned** [2] - 15:18, 56:14
**concluded** [1] - 56:18
**Concluded.................
..........** [1] - 3:10
**conflict** [2] - 13:16, 13:18
**confusion** [1] - 16:13
**consider** [2] - 19:6, 20:5
**contain** [1] - 57:6
**CONTENTS** [1] - 3:1
**Contents...................
..........** [1] - 3:5
**continued** [14] - 16:7,

16:25, 17:4, 18:24, 19:3, 20:13, 20:17, 35:1, 40:17, 49:19, 51:10, 52:23, 53:3, 56:8
**conversations** [1] - 22:2
**convictions** [1] - 26:4
**cool** [2] - 51:20
**Copy** [1] - 3:15
**correct** [14] - 9:25, 21:19, 21:23, 33:11, 45:7, 45:8, 46:20, 46:21, 46:23, 46:24, 47:1, 51:16, 51:17, 57:6
**counsel** [1] - 48:12
**County** [5] - 6:6, 26:17, 26:18, 27:2, 40:11
**couple** [4] - 28:9, 35:3, 41:10, 54:6
**COURT** [1] - 1:1
**Court** [2] - 3:11, 57:3
**court** [2] - 3:22, 4:22
**cousin** [3] - 37:21, 37:22, 49:17
**cousin's** [2] - 37:19, 37:24
**covering** [2] - 53:23, 53:24
**crazy** [1] - 44:7
**crew** [1] - 42:14
**current** [1] - 30:9

## D

**damages** [1] - 22:25
**data** [1] - 33:25
**date** [9] - 3:22, 12:15, 29:8, 29:9, 48:3, 53:4, 53:19, 53:25, 55:23
**dated** [1] - 35:11
**days** [5] - 10:21, 10:22, 11:4, 11:10
**December** [1] - 10:22
**deducted** [1] - 17:21
**DEF-118** [2] - 3:19, 40:14
**DEF-309** [3] - 3:19, 34:19
**DEFENDANTS** [1] - 1:6
**defendants** [1] - 22:24
**Defendants** [1] - 2:7
**definite** [1] - 11:13
**deleted** [1] - 33:3
**DEMOREO** [1] - 2:2
**DeMoreo** [2] - 34:17,

34:20
**Department** [1] - 20:7
**department** [2] - 38:17, 44:16
**deponent** [2] - 57:10, 57:13
**Deponent** [6] - 4:18, 27:19, 33:1, 43:15, 45:19, 46:15
**DEPONENT** [1] - 3:2
**DEPOSITION** [1] - 1:9
**Deposition** [1] - 3:10
**deposition** [13] - 3:17, 4:16, 5:11, 23:16, 23:18, 23:19, 23:21, 23:25, 24:9, 25:6, 25:7, 56:18, 57:14
**depositions** [2] - 3:16, 3:22
**Destiny** [1] - 40:8
**different** [5] - 14:7, 14:9, 14:10, 32:20, 44:9
**diploma** [1] - 5:22
**direct** [1] - 53:1
**disagree** [1] - 31:10
**disapprove** [1] - 52:10
**Disapproved** [1] - 52:13
**disapproved** [4] - 52:16, 53:13, 53:14, 53:15
**discovery** [3] - 16:5, 16:22, 18:19
**Dismiss** [1] - 56:2
**DISTRICT** [2] - 1:1, 1:1
**DIVISION** [1] - 1:2
**document** [6] - 11:20, 34:15, 34:25, 40:17, 40:21, 41:1
**Document** [3] - 8:13, 9:17, 14:25
**documentation** [3] - 55:22, 56:9, 56:13
**documents** [3] - 7:16, 23:14, 56:14
**DOES** [1] - 1:6
**Dom** [1] - 29:13
**donate** [7] - 12:14, 12:17, 15:1, 15:14, 52:3, 54:10, 55:1
**donated** [3] - 14:6, 15:11, 51:14
**donating** [1] - 53:2
**done** [1] - 39:13
**down** [9] - 14:8, 20:24, 23:10, 24:13, 27:19, 27:22, 33:1, 43:15, 43:22
**duly** [1] - 4:2

**DUNBAR** [1] - 2:8
**during** [3] - 3:16, 3:17, 42:11
**duty** [2] - 25:20, 25:21

## E

**e-mail** [5] - 33:14, 33:18, 33:19, 33:21
**e-mailed** [1] - 3:21
**education** [1] - 5:21
**either** [1] - 34:7
**elaborate** [2] - 8:24, 9:5
**electronic** [1] - 41:12
**embarrass** [1] - 23:3
**emetion** [1] - 8:22
**employed** [3] - 26:6, 26:19, 26:22
**employee** [2] - 10:4, 10:19
**employees** [1] - 15:15
**employment** [1] - 29:5
**end** [3] - 31:8, 31:24, 36:5
**ended** [11] - 12:6, 12:10, 17:15, 17:20, 21:2, 21:8, 31:7, 39:4, 47:16, 47:23, 50:21
**enter** [1] - 47:22
**ERRET** [1] - 6:21
**ESQ** [2] - 2:2, 2:8
**essentially** [1] - 52:18
**EV** [1] - 6:21
**Everett** [1] - 6:19
**EVERETTE** [1] - 6:22
**Examination** [4] - 3:6, 3:7, 3:8, 3:9
**EXAMINATION** [5] - 4:3, 22:19, 46:8, 54:9, 55:20
**example** [1] - 49:5
**except** [1] - 3:21
**exchange** [2] - 49:12, 49:20
**EXHIBIT** [1] - 3:13
**Exhibit** [16] - 3:14, 3:15, 8:8, 8:10, 10:14, 10:16, 14:22, 18:5, 46:4, 46:7, 46:20, 48:12, 48:15, 48:23, 49:10, 51:24
**exhibit** [2] - 48:14, 51:11
**exhibits** [2] - 3:16, 3:21
**Exhibits** [2] - 3:18, 3:19
**exists** [1] - 33:2

**Expires** [1] - 57:20
**explain** [1] - 11:3

**F**

**F985EADA/E4DA** [1] - 16:23
**fair** [1] - 5:8
**fall** [1] - 30:19
**familiar** [1] - 40:18
**far** [3] - 15:17, 44:22, 56:13
**FEBRUARY** [1] - 1:12
**February** [2] - 28:14, 28:15
**few** [2] - 22:20, 23:13
**filed** [3] - 24:3, 25:10, 25:13
**final1701389744** [1] - 20:12
**final1701390936** [1] - 22:16
**first** [4] - 12:13, 14:23, 34:20, 35:10
**five** [1] - 6:4
**fixed** [3] - 38:21, 38:22, 38:24
**fixing** [3] - 35:18, 35:21, 44:21
**flight** [1] - 56:3
**flipped** [1] - 21:1
**Flowood** [1] - 2:9
**FMLA** [1] - 56:6
**folder** [1] - 3:22
**follow** [4] - 9:18, 46:3, 51:2, 54:7
**follow-up** [3] - 9:18, 46:3, 51:2
**follows** [1] - 4:2
**footage** [1] - 19:19
**FOR** [1] - 1:1
**force** [1] - 12:25
**forced** [9] - 8:15, 8:16, 8:20, 8:25, 9:19, 11:20, 13:4, 18:1, 45:13
**foregoing** [1] - 57:5
**four** [6] - 12:17, 27:10, 27:12, 27:13, 51:6, 54:10
**four-wheeler** [3] - 27:10, 27:12, 27:13
**front** [1] - 10:12
**full** [1] - 57:6
**fun** [1] - 45:21
**funeral** [6] - 36:3, 36:10, 36:11, 36:24, 47:11, 47:14
**FURTHER** [3] - 46:8, 54:9, 55:20

**G**

**Garfield** [1] - 6:14
**Garth** [5] - 6:14, 6:16, 24:25, 25:3, 25:4
**Garths** [2] - 6:10, 6:17
**generally** [2] - 40:24, 41:2
**gist** [1] - 20:19
**given** [2] - 4:16, 57:11
**glad** [2] - 17:8, 17:19
**gonna** [2] - 9:7, 9:8
**grandaddy** [1] - 38:12
**grandaddy's** [1] - 38:12
**grandma** [1] - 32:14
**grandmamma** [1] - 24:22
**group** [1] - 37:12
**guess** [27] - 4:19, 7:14, 8:2, 8:25, 9:16, 9:24, 10:5, 10:19, 11:3, 11:5, 12:19, 13:7, 14:15, 18:20, 21:21, 26:15, 38:21, 38:23, 41:22, 42:6, 44:19, 48:13, 49:1, 49:5, 50:16, 51:24, 53:22
**guessing** [1] - 27:15

**H**

**HALL** [1] - 1:11
**hand** [1] - 57:17
**handwriting** [1] - 18:15
**handwritten** [1] - 41:13
**hate** [2] - 43:24, 45:14
**hateful** [1] - 45:9
**Haynes** [2] - 10:18, 10:23
**head** [6] - 4:18, 27:19, 33:1, 43:15, 45:19, 46:15
**headed** [1] - 47:11
**hear** [1] - 20:18
**heard** [2] - 17:5, 20:18
**help** [1] - 54:15
**hereby** [1] - 57:5
**HEREIN** [1] - 1:16
**high** [1] - 5:22
**highest** [1] - 5:20
**highway** [1] - 26:16
**hitting** [5] - 39:4, 47:16, 47:23, 48:4, 48:5
**Hogan** [4] - 37:25, 38:1, 38:4, 40:10

**hold** [1] - 8:1
**hole** [2] - 14:9, 14:12
**Holliday** [2] - 10:18, 10:23
**home** [1] - 24:13
**Home** [4] - 26:9, 26:23, 27:9, 27:18
**HOME** [1] - 26:9
**homes** [2] - 26:7, 26:8
**honest** [1] - 38:8
**hope** [1] - 22:21
**hours** [7] - 12:17, 14:19, 15:2, 51:6, 52:4, 54:10
**humiliate** [1] - 23:3
**hurry** [1] - 36:10

**I**

**identify** [1] - 16:24
**IN** [1] - 1:1
**inaccurate** [1] - 12:23
**Inaccurate** [1] - 12:24
**incorrect** [1] - 46:23
**INDEX** [1] - 3:13
**indicated** [1] - 57:8
**individuals** [1] - 43:20
**information** [1] - 7:12
**initial** [3] - 12:2, 47:18, 47:19
**instead** [2] - 47:22, 54:20
**intensive** [2] - 27:16, 27:17
**interest** [1] - 57:15
**interviewed** [2] - 9:24, 10:5
**interviews** [1] - 21:22
**iPhone** [5] - 32:4, 32:5, 32:8, 33:3, 33:20
**issue** [2] - 7:22, 15:17
**issues** [2] - 19:25, 20:2

**J**

**job** [13] - 9:1, 9:15, 9:22, 10:11, 11:16, 14:4, 17:20, 27:8, 27:16, 38:23, 42:17, 44:3, 44:14
**JOHN** [1] - 1:6
**Johnny** [2] - 43:5, 43:7
**joined** [1] - 31:12
**jury** [3] - 25:19, 25:20, 25:21

**K**

**keep** [4] - 31:14, 31:23, 44:22
**kept** [3] - 9:21, 19:7, 19:18
**kind** [5] - 29:8, 29:9, 29:10, 43:21, 55:2
**KNIGHT** [1] - 1:22
**Knight** [2] - 57:3, 57:19
**knowledge** [3] - 20:1, 43:1, 49:8
**known** [2] - 43:18, 43:19

**L**

**labeled** [1] - 16:22
**labor** [2] - 27:16, 27:17
**laborer** [1] - 38:17
**last** [8] - 6:8, 6:18, 17:16, 20:13, 30:16, 38:3, 40:9, 43:17
**lawsuit** [8] - 7:7, 24:2, 24:6, 25:10, 25:13, 25:17, 29:10
**lead** [1] - 14:15
**leak** [2] - 35:18, 35:21
**leaks** [3] - 38:21, 38:22, 38:24
**least** [1] - 43:7
**leave** [6] - 27:8, 28:17, 28:25, 55:2, 55:3, 56:7
**left** [6] - 28:9, 28:11, 28:18, 28:25, 29:2, 38:6
**letter** [7] - 8:14, 8:15, 8:16, 18:1, 18:2, 18:4, 18:16
**level** [1] - 5:20
**lie** [1] - 38:6
**line** [7] - 31:7, 31:18, 31:25, 32:2, 32:3, 32:20, 52:20
**lines** [2] - 31:20
**listed** [1] - 3:17
**listen** [2] - 16:3, 45:3
**live** [2] - 24:21, 38:1
**LLP** [1] - 2:8
**located** [1] - 26:13
**Loden** [2] - 16:4, 22:23
**loden.walker@ phelps.com** [1] - 2:11
**LOGAN** [1] - 2:8
**logged** [1] - 41:18

**longest** [1] - 13:22
**look** [8] - 8:12, 35:2, 40:18, 41:9, 41:10, 41:23, 42:2, 51:25
**looked** [2] - 41:19, 48:13
**looking** [9] - 7:15, 9:15, 10:14, 10:16, 11:15, 18:5, 37:11, 39:5, 39:10
**looks** [1] - 52:13
**lose** [1] - 17:20
**loud** [1] - 14:22

**M**

**machine** [2] - 19:10, 19:14
**mad** [1] - 23:9
**mail** [5] - 33:14, 33:18, 33:19, 33:21
**mailed** [1] - 3:21
**mama** [1] - 31:20
**March** [4] - 28:14, 28:15, 57:18, 57:20
**Marcus** [14] - 12:4, 12:11, 17:12, 17:15, 17:18, 21:8, 42:25, 47:16, 49:1, 49:4, 50:7, 53:5, 53:8
**Margaret** [1] - 20:8
**mark** [1] - 46:4
**Marked** [1] - 3:13
**marked** [2] - 8:10, 46:6
**matter** [4] - 7:2, 12:5, 14:18, 21:25
**mayor** [6] - 8:17, 10:5, 13:3, 20:2, 46:19, 51:15
**Mayor** [14] - 8:19, 9:19, 11:19, 12:19, 19:24, 20:23, 21:10, 21:18, 21:22, 43:19, 45:7, 47:3, 51:15, 52:16
**MCMILLIAN** [1] - 1:3
**McMillian** [45] - 2:6, 7:7, 8:22, 12:14, 12:21, 12:25, 13:8, 13:21, 14:2, 14:5, 14:7, 14:8, 15:2, 15:11, 16:8, 19:7, 23:20, 34:7, 37:3, 37:15, 43:5, 44:13, 44:15, 46:11, 46:23, 47:9, 47:13, 47:20, 49:21, 49:25, 50:1, 50:8, 50:13, 50:17, 50:23, 51:8, 51:14,

51:22, 52:4, 53:16, 54:18, 55:5, 55:23, 56:10
**McMillian's** [5] - 40:22, 42:2, 47:17, 48:5, 48:19
**mean** [18] - 6:21, 11:13, 13:23, 18:2, 18:3, 20:3, 29:25, 33:8, 36:17, 37:2, 37:4, 39:7, 43:21, 44:1, 44:15, 44:21, 45:14
**meant** [2] - 23:3, 42:9
**medications** [1] - 5:10
**meeting** [3] - 20:24, 46:19, 54:2
**meetings** [2] - 21:10, 21:13
**Melissa** [1] - 11:20
**memory** [1] - 42:15
**mention** [1] - 22:4
**mentioned** [4] - 19:4, 24:11, 51:11, 51:12
**mess** [1] - 21:6
**message** [6] - 37:19, 49:2, 49:6, 49:12, 49:17, 49:20
**messages** [8] - 24:5, 24:8, 34:1, 35:7, 36:13, 39:18, 46:6, 49:4
**Messages.........** [1] - 3:15
**messed** [1] - 36:8
**met** [1] - 23:4
**meta** [1] - 33:25
**might** [3] - 33:25, 39:13, 39:16
**mind** [1] - 38:8
**minute** [3] - 9:10, 17:16, 38:5
**minutes** [1] - 37:9
**mispronounce** [2] - 4:6, 4:11
**missed** [1] - 56:3
**MISSISSIPPI** [2] - 1:1, 1:12
**Mississippi** [5] - 2:9, 24:15, 26:7, 26:10, 57:4
**mom** [1] - 32:16
**Monday** [3] - 42:5, 42:22, 54:22
**monetary** [1] - 57:16
**Monroe** [5] - 6:6, 26:17, 26:18, 27:2, 40:11
**month** [3] - 28:12, 30:17, 31:16

**months** [3] - 6:4, 26:21, 28:9
**Moore** [1] - 11:20
**morning** [1] - 47:20
**most** [1] - 45:21
**mother** [3] - 31:7, 32:15, 32:18
**Motion** [1] - 56:2
**motion** [1] - 10:17
**moved** [7] - 4:18, 27:19, 31:13, 33:1, 43:15, 45:19, 46:15
**MR** [28] - 4:3, 15:20, 15:24, 16:21, 18:17, 20:9, 22:13, 22:19, 34:14, 34:24, 45:20, 45:23, 46:2, 46:8, 49:13, 49:15, 51:1, 52:19, 52:25, 54:4, 54:6, 54:9, 55:15, 55:17, 55:20, 55:24, 56:4, 56:17
**MS** [2] - 1:23, 2:4

## N

**name** [10] - 4:5, 4:6, 10:19, 14:2, 22:23, 24:23, 32:10, 37:24, 40:7, 40:9
**named** [2] - 6:11, 57:7
**names** [2] - 6:9, 6:18
**nature** [1] - 49:7
**need** [1] - 23:10
**needed** [6] - 15:10, 15:12, 20:24, 54:13, 54:15, 54:16
**Nettleton** [2] - 26:7, 26:9
**never** [10] - 17:16, 19:8, 19:19, 34:12, 40:20, 44:4, 44:5, 47:13, 50:12, 50:13
**new** [17] - 30:5, 30:6, 31:3, 31:5, 31:8, 31:9, 31:14, 31:17, 31:18, 31:21, 31:22, 31:24, 32:1, 33:8, 34:6, 54:8
**NO** [1] - 1:4
**nobody** [4] - 32:3, 44:21, 44:22, 44:23
**none** [2] - 23:2, 33:5
**NORTHERN** [1] - 1:1
**Notary** [1] - 57:3
**NOTED** [1] - 1:16
**noted** [1] - 49:16
**nothing** [8] - 16:13, 21:1, 33:7, 33:9, 39:7, 41:13, 44:23

**notice** [1] - 50:5
**noticed** [2] - 13:21, 15:10
**November** [25] - 7:4, 7:19, 12:15, 13:9, 29:8, 29:14, 29:15, 32:23, 34:10, 35:11, 35:22, 39:1, 42:3, 42:13, 43:9, 43:11, 46:10, 48:3, 48:9, 52:17, 53:18, 53:20, 53:22, 54:22, 56:10
**number** [46] - 20:11, 29:23, 29:24, 30:2, 30:6, 30:8, 30:9, 30:15, 30:16, 30:22, 31:3, 31:6, 31:9, 31:14, 31:22, 31:23, 31:24, 32:1, 32:4, 32:7, 32:23, 33:8, 33:9, 33:22, 34:5, 34:6, 34:7, 36:8, 36:14, 36:15, 36:17, 39:5, 39:11, 39:20, 40:2, 47:17, 47:22, 47:23, 48:5, 48:6, 48:14, 48:15, 48:17, 48:20, 48:22
**Number....................
......** [1] - 3:3
**numbers** [7] - 36:5, 39:11, 39:14, 41:18, 47:8, 47:12

## O

**oath** [2] - 57:11, 57:12
**object** [1] - 52:19
**objection** [2] - 49:13, 49:16
**observe** [1] - 50:22
**occurred** [1] - 50:15
**Odom** [1] - 10:24
**OF** [4] - 1:1, 1:5, 1:9, 3:1
**OFF** [1] - 15:23
**office** [1] - 10:12
**Okolona** [1] - 2:4
**old** [2] - 31:23
**oldest** [1] - 6:3
**ON** [1] - 1:12
**one** [18] - 3:22, 6:11, 9:18, 10:13, 14:12, 14:13, 14:18, 14:19, 17:1, 21:6, 21:7, 22:23, 35:10, 45:5, 51:11, 53:6, 55:18, 56:15
**ones** [3] - 3:17, 3:21
**operator** [1] - 38:23

**opinion** [2] - 43:18, 44:18
**opposing** [1] - 48:12
**otherwise** [1] - 57:16
**outcome** [1] - 57:16
**outside** [1] - 52:21
**own** [5] - 18:16, 22:11, 22:12, 24:18, 28:24
**owned** [1] - 24:20

## P

**p.m** [1] - 42:7
**P.O** [2] - 1:23, 2:3
**PAGE** [1] - 3:2
**page** [1] - 10:16
**pages** [1] - 57:5
**paid** [4] - 54:14, 54:20, 55:7, 55:9
**paper** [1] - 9:7
**papers** [1] - 45:12
**part** [1] - 16:1
**participated** [2] - 25:7, 25:16
**passed** [1] - 9:17
**pause** [1] - 29:25
**pay** [7] - 10:21, 11:11, 17:21, 28:18, 29:2, 31:16
**paying** [1] - 31:15
**pdf** [1] - 3:22
**people** [10] - 14:12, 21:3, 21:4, 37:13, 42:17, 43:23, 43:25, 44:5, 50:3, 51:18
**per** [1] - 16:2
**person** [3] - 44:9, 44:10, 44:23
**personally** [1] - 44:5
**PHELPS** [1] - 2:8
**phone** [26] - 29:23, 29:24, 30:2, 30:5, 30:7, 30:9, 30:15, 30:16, 30:22, 31:5, 31:8, 31:17, 31:21, 32:1, 33:8, 34:4, 35:17, 36:12, 39:20, 39:21, 40:2, 48:14, 48:15, 48:17, 48:20, 48:22
**phones** [1] - 31:14
**pick** [1] - 14:1
**picking** [6] - 13:21, 44:22, 49:24, 50:1, 50:16, 50:23
**pictures** [1] - 33:7
**place** [1] - 57:8
**placed** [1] - 57:10
**PLAINTIFF** [1] - 1:3
**Plaintiff** [2] - 2:2, 2:6

**plan** [1] - 36:10
**play** [3] - 15:25, 16:25, 18:25
**played** [4] - 16:6, 17:3, 19:2, 20:16
**plenty** [1] - 37:13
**pointed** [1] - 19:14
**policy** [2] - 9:23, 10:2
**Pooh** [1] - 6:12
**position** [4] - 29:13, 38:15, 38:18, 38:20
**potentially** [1] - 36:12
**practice** [1] - 15:14
**premarked** [6] - 3:16, 8:11, 10:15, 14:21, 34:19, 40:13
**preparation** [1] - 23:15
**prepare** [1] - 7:15
**prepared** [1] - 23:10
**Present** [1] - 2:6
**presume** [1] - 35:11
**pretty** [2] - 16:17, 18:14
**primary** [1] - 32:10
**print** [1] - 41:22
**printed** [3] - 34:17, 41:11, 41:19
**printout** [1] - 41:21
**problem** [7] - 44:13, 44:14, 45:2, 51:4, 51:6, 51:7, 51:21
**proceedings** [2] - 57:7, 57:8
**produced** [1] - 34:18
**pronounce** [1] - 4:5
**proof** [1] - 33:9
**property** [1] - 24:19
**provide** [1] - 53:16
**provider** [3] - 30:11, 31:1, 31:4
**Public** [1] - 57:4
**pull** [1] - 50:6
**punched** [2] - 36:8, 41:18
**punching** [1] - 47:12
**purpose** [1] - 18:19
**push** [1] - 11:9
**put** [4] - 3:22, 15:13, 18:20, 38:24

## Q

**questioning** [1] - 52:20
**questions** [15] - 7:2, 7:11, 11:11, 14:10, 22:18, 22:20, 23:2, 23:9, 23:11, 23:14, 35:3, 45:4, 46:3,

51:3, 54:5
**quick** [4] - 15:21, 34:16, 34:21, 35:9
**quit** [1] - 28:9

## R

**race** [2] - 45:6, 45:7
**racist** [4] - 43:19, 43:24, 44:4, 45:4
**re** [1] - 24:13
**re-asking** [1] - 24:13
**read** [13] - 8:18, 8:21, 9:23, 14:22, 14:23, 15:1, 35:9, 35:24, 52:2, 52:3, 52:8, 52:14, 52:16
**reading** [2] - 10:17, 57:14
**real** [11] - 33:6, 34:15, 34:21, 35:9, 38:7, 40:3, 44:1, 44:2, 51:8, 51:9
**really** [2] - 44:1, 55:10
**reason** [8] - 9:19, 9:20, 12:13, 13:13, 16:12, 19:21, 45:3, 45:16
**rebuttal** [1] - 52:22
**recognize** [1] - 35:6
**recollection** [4] - 21:17, 22:1, 48:25, 52:11
**RECORD** [1] - 15:23
**record** [22] - 4:23, 7:6, 7:18, 15:21, 16:1, 16:19, 17:4, 17:5, 18:18, 18:21, 20:10, 21:13, 22:1, 22:5, 22:14, 35:9, 46:9, 46:16, 47:24, 49:9, 52:2, 52:15
**recorded** [3] - 16:10, 16:12, 57:8
**recording** [1] - 22:7
**recordings** [2] - 21:18, 23:15
**Reddick** [16] - 3:21, 9:17, 16:7, 16:25, 17:4, 18:24, 19:3, 20:13, 20:17, 34:23, 40:16, 49:19, 51:10, 52:23, 53:3, 56:8
**REDDICK** [18] - 2:2, 4:3, 15:20, 15:24, 16:21, 18:17, 20:9, 22:13, 34:24, 46:2, 46:8, 49:15, 51:1, 54:4, 55:17, 55:20, 56:4, 56:17

**Reddick............** [1] - 3:8
**reddick....................** [1] - 3:6
**reddicklawfirm @ yahoo.com** [1] - 2:5
**reference** [21] - 7:2, 10:14, 11:19, 12:19, 14:3, 14:15, 19:5, 21:25, 46:10, 46:18, 47:20, 48:15, 49:23, 50:16, 51:13, 51:24, 53:18, 55:8, 55:18, 55:21, 56:6
**referenced** [1] - 46:5
**referred** [1] - 3:17
**referring** [3] - 11:1, 14:16, 21:4
**reflect** [1] - 47:25
**reflecting** [1] - 56:14
**related** [2] - 13:20, 38:10
**relation** [1] - 29:4
**relatives** [1] - 6:6
**remember** [10] - 7:19, 7:24, 8:14, 16:8, 20:18, 21:7, 42:14, 42:18, 43:2, 49:10
**rental** [1] - 24:19
**rephrase** [1] - 5:5
**replay** [4] - 18:22, 20:11, 22:14, 22:15
**report** [1] - 9:16
**reported** [4] - 16:6, 17:3, 19:2, 20:16
**Reported** [1] - 1:22
**Reporter** [1] - 57:3
**reporter** [2] - 3:22, 4:23
**Reporter's** [1] - 3:11
**represent** [2] - 7:7, 29:9
**represented** [1] - 41:25
**Representing** [2] - 2:2, 2:7
**represents** [1] - 22:24
**reprimand** [1] - 10:6
**request** [1] - 53:9
**reside** [1] - 5:13
**residence** [1] - 24:18
**response** [4] - 4:24, 35:17, 36:1, 56:2
**retained** [1] - 3:21
**review** [5] - 8:14, 15:1, 23:14, 35:4, 40:19
**rid** [1] - 9:8
**roll** [1] - 10:23
**Ron** [2] - 20:25
**room** [1] - 10:9

**roughly** [1] - 28:15
**RP** [3] - 18:22, 20:11, 22:15
**RP_final1701389409** [1] - 18:23
**rush** [4] - 36:7, 36:9, 36:24, 47:14

## S

**safety** [2] - 22:11, 22:12
**say/she** [1] - 16:14
**scan** [1] - 39:7
**school** [1] - 5:22
**scope** [1] - 52:21
**Scott** [43] - 8:17, 8:19, 8:25, 9:19, 11:19, 12:2, 12:8, 12:20, 13:10, 13:13, 13:24, 17:14, 17:17, 17:24, 17:25, 19:17, 19:22, 19:24, 20:23, 21:11, 21:18, 21:23, 26:24, 26:25, 27:4, 27:8, 27:16, 27:24, 28:2, 43:19, 45:7, 47:3, 49:24, 50:1, 50:16, 50:23, 51:13, 51:15, 52:17, 53:4, 53:11, 53:13
**se** [1] - 16:2
**seal** [1] - 57:17
**season** [1] - 30:19
**second** [8] - 10:13, 12:11, 14:18, 14:19, 15:21, 21:8, 29:25, 35:2
**seconded** [1] - 10:18
**see** [7] - 4:22, 9:16, 19:18, 38:11, 40:20, 42:3, 48:5
**sense** [1] - 41:15
**sensitive** [1] - 45:4
**sent** [3] - 16:5, 24:5, 24:8
**separate** [1] - 28:5
**separated** [1] - 28:24
**served** [3] - 25:19, 25:21, 25:23
**set** [3] - 31:21, 33:13, 33:15
**sheet** [8] - 41:6, 41:7, 41:8, 41:11, 41:19, 42:1, 47:21, 53:10
**shoot** [1] - 38:5
**short** [1] - 16:17
**show** [14] - 14:14, 19:19, 19:20, 19:22, 34:15, 34:16, 34:20,

40:13, 48:11, 48:17, 48:19, 48:22, 51:11, 51:23
**showed** [3] - 35:4, 47:21, 48:12
**showing** [5] - 34:22, 40:15, 53:12, 55:22, 56:9
**shown** [1] - 3:19
**sic** [2] - 8:22, 26:7
**sick** [17] - 15:2, 52:4, 54:11, 54:13, 54:17, 54:19, 54:22, 54:24, 55:1, 55:6, 55:9, 55:12, 55:23, 56:1, 56:5, 56:7, 56:10
**sickness** [2] - 55:19, 55:21
**side** [7] - 4:18, 45:19, 46:15, 50:7
**sign** [12] - 8:15, 8:16, 8:20, 8:25, 9:3, 9:7, 9:20, 11:20, 18:1, 45:12, 46:19, 53:6
**signature** [2] - 18:12, 52:5
**signed** [1] - 11:21
**signing** [2] - 8:14, 57:14
**sister** [2] - 40:5, 40:6
**site** [1] - 14:4
**sitting** [3] - 10:11, 10:12, 37:11
**situation** [4] - 7:24, 8:2, 10:6, 19:25
**skill** [1] - 57:9
**skin** [2] - 45:15, 45:16
**software** [1] - 41:12
**someone** [2] - 10:4, 10:8
**somewhat** [2] - 43:22, 45:4
**Sons** [7] - 26:24, 26:25, 27:4, 27:8, 27:16, 27:24, 28:2
**sorry** [3] - 24:13, 27:11, 45:20
**sort** [1] - 23:15
**specific** [1] - 13:13
**spell** [1] - 6:20
**spoken** [4] - 23:6, 23:20, 23:24, 24:2
**spring** [3] - 30:19, 30:20, 30:21
**start** [2] - 23:13, 27:8
**started** [2] - 9:15, 11:15
**starts** [1] - 26:10
**State** [1] - 57:4
**state** [3] - 4:4, 13:4,

52:24
**statement** [16] - 8:12, 8:19, 9:20, 11:22, 11:25, 12:2, 13:3, 14:22, 14:24, 15:3, 15:6, 15:9, 18:7, 46:20, 51:25, 52:6
**Statement** [3] - 3:14, 8:9, 8:21
**statements** [1] - 17:7
**STATES** [1] - 1:1
**stating** [1] - 52:24
**stay** [1] - 5:14
**stayed** [2] - 9:12, 28:8
**still** [8] - 17:20, 33:2, 54:14, 54:20, 55:6, 55:7, 55:9
**STREET** [1] - 1:11
**Street** [4] - 5:17, 24:15, 35:19, 35:21
**Stretch** [5] - 26:7, 26:9, 26:23, 27:9, 27:18
**strike** [1] - 48:1
**stuff** [7] - 11:11, 14:6, 14:7, 14:9, 45:4, 50:5, 50:10
**Style** [1] - 3:3
**subject** [1] - 43:17
**subpoena** [1] - 7:14
**suing** [1] - 22:25
**Suite** [1] - 2:9
**summer** [1] - 30:19
**supposed** [5] - 11:4, 20:1, 53:23, 53:24, 53:25
**suspend** [1] - 10:18
**suspended** [3] - 9:9, 11:4, 11:10
**suspension** [2] - 10:25, 17:21
**sworn** [1] - 4:2
**system** [3] - 41:12, 41:19, 42:1

## T

**TABLE** [1] - 3:1
**Table** [1] - 3:5
**TAKEN** [1] - 1:11
**TAYLOR** [1] - 1:23
**Telecopier** [2] - 2:5, 2:10
**Telephone** [2] - 2:4, 2:10
**tendered** [2] - 8:13, 14:25
**terminated** [3] - 28:22, 28:23, 29:12
**testified** [1] - 4:2

**testing** [1] - 42:15
**text** [19] - 24:5, 24:8, 34:1, 34:4, 34:9, 35:6, 36:13, 36:18, 37:13, 37:14, 37:19, 39:18, 49:2, 49:4, 49:6, 49:11, 49:17, 49:20, 53:25
**Text** [2] - 3:15, 46:6
**texted** [1] - 34:12
**texting** [1] - 36:16
**texts** [5] - 36:21, 37:2, 37:8, 37:14
**THE** [7] - 1:1, 1:1, 1:5, 1:11, 15:23, 45:22, 45:25
**thinking** [2] - 45:1, 48:4
**threaten** [1] - 9:1
**threatening** [1] - 9:22
**three** [6] - 9:13, 10:21, 11:4, 11:6, 16:16, 26:21
**throughout** [2] - 4:13, 55:25
**timeframe** [1] - 49:25
**today** [5] - 5:11, 7:15, 22:21, 23:3, 25:7
**today's** [1] - 23:16
**together** [2] - 39:12, 50:25
**took** [1] - 9:10
**top** [1] - 36:6
**tore** [2] - 30:7
**towards** [1] - 19:15
**town** [4] - 12:18, 37:15, 54:12, 54:23
**transcript** [1] - 57:6
**transpired** [1] - 7:19
**trick** [1] - 7:11
**tried** [4] - 12:20, 12:21, 51:7, 53:16
**Triron** [10] - 3:14, 4:7, 4:8, 8:9, 8:21, 10:20, 10:21, 15:1, 33:16, 52:3
**TRIRON** [4] - 1:9, 3:2, 4:1, 33:16
**true** [1] - 57:6
**truth** [4] - 17:8, 17:19, 17:23, 57:11
**try** [3] - 11:8, 44:10, 45:10
**trying** [9] - 7:12, 11:7, 11:9, 13:11, 19:6, 23:8, 36:9, 55:1, 56:6
**turned** [1] - 40:19
**two** [8] - 9:13, 11:5, 12:7, 18:24, 21:10,

21:22, 22:2, 37:9
**type** [3] - 21:3, 44:9, 45:13
**typing** [1] - 39:4

## U

**under** [6] - 20:7, 31:6, 32:18, 47:9, 57:10, 57:12
**underscore** [3] - 18:22, 20:11, 22:15
**UNITED** [1] - 1:1
**up** [32] - 9:18, 12:6, 12:10, 17:15, 17:20, 21:2, 21:8, 27:19, 30:7, 31:7, 31:8, 31:21, 31:24, 33:1, 33:14, 33:15, 33:25, 36:5, 36:10, 39:4, 39:5, 39:10, 43:15, 45:5, 46:3, 47:16, 47:23, 50:21, 51:2, 53:9, 53:10
**updated** [1] - 31:6
**ups** [1] - 54:7

## V

**vacation** [5] - 12:18, 41:5, 54:21, 55:3, 55:10
**Valera** [2] - 57:3, 57:19
**VALERA** [1] - 1:22
**valeraknight@gmail. com** [1] - 1:24
**verbal** [1] - 4:24
**Verizon** [2] - 30:12, 31:13
**via** [1] - 22:2
**video** [13] - 16:6, 16:8, 16:10, 16:19, 17:13, 17:14, 19:16, 19:22, 20:14, 20:16, 20:21, 21:17, 22:2
**Video** [1] - 17:3
**videos** [2] - 15:25, 23:15
**Vine** [2] - 35:18, 35:21
**voluntarily** [1] - 28:17
**vote** [1] - 10:23
**voted** [1] - 10:24
**VS** [1] - 1:4

## W

**W-I-L-L-O-W** [1] - 24:24
**waive** [1] - 57:14

**Walker** [4] - 22:23, 34:22, 35:1, 40:17
**WALKER** [12] - 2:8, 22:19, 34:14, 45:20, 45:23, 49:13, 52:19, 52:25, 54:6, 54:9, 55:15, 55:24
**Walker's** [2] - 3:20, 3:21
**Walker............** [1] - 3:9
**Walker....................** [1] - 3:7
**watch** [2] - 19:8, 19:9
**water** [2] - 38:16, 38:17
**Water** [1] - 20:7
**ways** [1] - 13:19
**we's** [1] - 9:7
**weeks** [2] - 9:13, 11:6
**welcome** [1] - 36:1
**WEST** [1] - 1:11
**whatnot** [7] - 5:6, 7:12, 7:15, 16:4, 16:5, 48:13, 51:25
**wheeler** [3] - 27:10, 27:12, 27:13
**whoever's** [1] - 35:17
**whole** [5] - 30:5, 31:5, 31:22, 31:25, 33:8
**wife** [2] - 31:12
**Willow** [2] - 24:24, 25:4
**willow** [1] - 24:25
**WITNESS** [2] - 45:22, 45:25
**Witness** [1] - 57:17
**witness** [5] - 8:13, 14:25, 25:23, 35:4, 40:19
**witnessed** [2] - 44:4, 44:5
**worker** [1] - 10:4
**workers** [2] - 14:11, 54:17
**works** [2] - 31:19, 32:3
**wreck** [3] - 27:10, 27:12, 27:13
**write** [10] - 14:24, 15:3, 15:5, 15:8, 18:8, 18:12, 18:14, 18:16, 24:12, 27:22
**written** [1] - 23:9
**wrongfully** [1] - 29:12
**wrote** [2] - 18:6, 18:10

## Y

**year** [5] - 27:5, 27:6, 30:16, 31:17, 50:1

**you's** [1] - 55:10
**yourself** [3] - 20:5, 48:2, 48:8

## Z

**zip** [2] - 5:18, 24:16