**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF MISSISSIPPI ABERDEEN DIVISION**

**BARRY MCMILLIAN**                                                    **PLAINTIFF**

**vs.**                                    **CIVIL ACTION NO.: 1:24-CV-199-GHD-RP**

**CITY OF ABERDEEN, MISSISSIPPI
AND JOHN DOES 1-20**                                              **DEFENDANTS**

### THE PLAINTIFF'S AMENDED MEMORANDUM IN OPPOSITION OF THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The Plaintiff submits this Amended Memorandum in Opposition of the Defendant's Motion for Summary Judgment:

### INTRODUCTION

The Defendant, the City of Aberdeen ("The City"), employed Plaintiff, Barry McMillian ("McMillian"), from October 2021 to December 2023. On March 7, 2022, McMillian submitted an EEOC charge against the City of Aberdeen, alleging race discrimination under Title VII concerning his employment with the City. *See* Exhibit K, McMillian's EEOC charge from 2022. Additionally, around twenty (20) months later, McMillian was terminated by the City for filing his previous EEOC charge that he filed in 2022. *See* Exhibit K, McMillian's EEOC charge; Exhibit II, the City of Aberdeen's Board Minutes from December 5, 2023. The City of Aberdeen board alderwoman member, Carolyn Odom, who voted to terminate McMillian on December 5, 2023, admitted that although neither McMillian or Triron Brown had been in trouble before, she felt McMillian was causing trouble when he filed his EEOC charge in 2022, therefore, she terminated McMillian and only chose to suspend Triron Brown for three days without pay; and Carolyn Odom also confirmed that she was on the City Board on September 28, 2021, and she explained that she joined the City Board in November 2018. *See* Exhibit

1

D, Carolyn Odom's Deposition, pg. 12, 15, 26-27. *See* Exhibit II, the City of Aberdeen's Board Minutes from December 5, 2023. *See* Exhibit K, McMillian's EEOC charge. The City, as a pretext, stated that they terminated McMillian for asking a co-worker to clock him in on a day that he was absent, which Triron Brown stated in his deposition that McMillian never told him to clock in on the day in question, which was November 27, 2023. *See* Exhibit I, Triron Brown's Deposition, pg. 12, 46. The Plaintiff was unaware that he was clocked into work on November 27, 2023 "until he got back" and that the supervisor, Marcus Collins, "wrote him in for eight (8) hours of work, which Marcus Collins admitted in his deposition, which McMillian did not tell him to do, which was admitted to by Marcus Collins. *See* Exhibit B, Marcus Collins dep. at pg. 22-23; Exhibit C, Marcus Collins' Sentencing Order. Additionally, Marcus Collins' credibility is subject to mandatory impeachment under Federal Rule of Evidence 609(a)(2) (See Exhibit B, Marcus Collins' Dep. at 7-8; Exhibit C, Marcus Collins' sentencing order for embezzlement). It must be noted, Marcus Collins explicitly admitted to a prior felony conviction for embezzlement filed on August 18, 2020, resulting in a five-year sentence of supervised probation, meaning he was actively on criminal probation during his tenure as Lead Man (*See* Exhibit B, Marcus Collins Dep. at 7-9; Exhibit C, Marcus Collins sentencing order). Also, because the City relies entirely on Marcus Collins' underlying time-logging investigations to justify McMillian's termination, his conviction for a *crimen falsi* offense injects a profound credibility issue (*See* Exhibit B, Marcus Collins Dep. at 7-9; C, Marcus Collins' sentencing order). The City of Aberdeen Board of Aldermen ("Board") reviewed the alleged violation during a December 5, 2023 board meeting. The Plaintiff stated that the City did not "let him give his side of the story at the board meeting which was a violation of the Plaintiff's due process rights, but let his

coworker, Triron Brown, give his side of the story, which was verified by Edward Haynes and Shea Cain in their deposition. *See* Exhibit A, Plaintiff's Amended Complaint, paragraph 7; Exhibit G, Shea Cain's Deposition, pg. 51-52; *See* Exhibit H, Edward Haynes deposition, pg. 9-10. Upon consideration, the Board voted to suspend Triron Brown for three days and terminate the Plaintiff. Obviously, this action by the Board was done with animus. *See* Exhibit II, the City of Aberdeen Board minutes from December 5, 2023. The City of Aberdeen Board of Alderman and other City of Aberdeen employees terminated the Plaintiff due to retaliation under Title VII. Also, when the City of Aberdeen denied the Plaintiff's sick leave The City of Aberdeen and the City of Aberdeen Board of Aldermen violated the Plaintiff's Family and Medical Leave Act ("FMLA") rights, which also led to the Plaintiff's termination, which the U.S. Department of Labor, Wage and Hour Division ("DOL") gave the City of Aberdeen a violation for not having a proper FMLA policy in place. *See* Exhibit CC, the DOL's Compliance Report. After his termination, McMillian filed a second EEOC charge against the City, alleging retaliatory termination under Title VII, which is one of the claims of this lawsuit.

McMillian sues the City for retaliation under Title VII, § 1981, and the Family Medical Leave Act (FMLA). He also brings a separate claim of FMLA interference. Given the uncontested facts and McMillian's substantial proof against the City of Aberdeen, therefore, the Plaintiff's claims against the City should **not** be dismissed under the Federal Rule of Civil Procedure 56.

### RELEVANT FACTUAL BACKGROUND

This is the second federal employment lawsuit filed by McMillian against the City of Aberdeen, each seeking damages and reinstatement with the City of Aberdeen.

McMillian filed two federal employment lawsuits against the City on October 30, and October 31, 2024.

In the first case, which is not at issue here, McMillian stated that he was racially discriminated against when the City told McMillian that he couldn't begin a job in the electrical department due to budget constraints and offered McMillian employment in the water department at a lower rate of pay instead, which he accepted. Later the City of Aberdeen, hired three white males into the Electric Department even though, as a pretext they told the Plaintiff there was not any money in the budget to give him the job in the electric department during the same budget year. Charles Scott had direct knowledge of this issue because he was the one that told McMillian he would be first in line to get the job in the electric Department when it became available, which did not happen. This Court granted the City's motion for judgment on the pleadings, dismissing all claims. *McMillian v. City of Aberdeen*, No. 1:24-CV-198-GHD-DAS, 2025 WL 1372858 (N.D. Miss. May 12, 2025). The day after filing that lawsuit, McMillian filed his second against the City— the one at issue here, alleging that the City retaliated against him by terminating his employment because he filed an EEOC charge regarding the beginning of his employment. *See* Exhibit K, McMillian's EEOC complaint from 2022. *See* Document [34-1], the Plaintiff's new EEOC charge. The City hired the Plaintiff as a full-time laborer on October 5, 2021.[1] His job duties included assisting operations in the water department and "fix[ing] water leaks."[2] On March 7, 2022, McMillian filed a charge of discrimination with the EEOC, alleging race discrimination under Title VII,

---

[1] Exhibit E, Excerpts of Barry McMillian Depo. Tr, at 32; *See* Document [110-2], September 21, 2021 Board Minutes.

[2] Exhibit E, Barry McMillian Depo. Tr, at 52.

4

arising from the outset of his employment and his reassignment from the electrical department to the water department. *See* Exhibit K, EEOC charge from 2022. The instant case arises from McMillian's termination that was done in retaliation for him filing his previous EEOC charge against the City. *See* Exhibit A, Amended Complaint; *See* Document [34]; *See* Document [34-1]. McMillian contends that the City "falsely accused" him of asking a coworker, Triron Brown, to clock him in and out on November 27, 2023. On that day, McMillian was returning from a trip to Las Vegas. *See* Exhibit E, Barry McMillian's deposition, pg. 68-72. The City did not investigate the matter and they stated they only went off the evidence what was presented to them by former Mayor Charles Scott, which was only a pretext for the Board retaliating against him for filing the EEOC charge in 2022. *See* Exhibit D, Carolyn Odom's Deposition, pg. 9, 31; Exhibit G, Shea Cain's deposition, pg. 7-8; Exhibit H, Edward Haynes Deposition, pg. 14. Triron Brown stated in his deposition that McMillian did not ask him to clock him in and out on November 27, 2023. Triron Brown stated that the reason he told Mayor Charles Scott and the City's Board of Aldermen during executive session at a December 5, 2023 board meeting that Barry McMillian told him to clock him in is because Mayor Charles Scott told him that if he didn't' say that Barry McMillian told him to clock him in November 27, 2023, he would lose his job. *See* Exhibit I, Triron Brown's Deposition, pg. 8-9, 12, 46. Essentially, he felt pressured to tell the Mayor and the Board a false narrative about McMillian telling him to clock him in on November 27, 2023. *See* Exhibit I, Triron Brown's deposition, pg. 8-9, 12-13, 17-18. Following that, the Board of Aldermen voted 3-1-1 (i.e., Alderwoman Lady Garth recused) in favor of terminating McMillian and to

suspend Brown without pay for three days.[3]  It must be noted that McMillian never got to talk to the Mayor Charles Scott about the incident in question or the City Board of Aldermen, which was not logical. *See* Exhibit E, Barry McMillian's deposition, pg. 16-17.  It must be noted that the Mississippi Department of Employment Security ("MDES") asked Mayor Charles Scott in a hearing why Triron Brown and McMillian received two different punishments when they were allegedly in the same matter, which could not be explained by Mayor Charles Scott, which lead to McMillian being awarded his unemployment benefits.  *See* Exhibit U, MDES order of unemployment benefits; pg. 1-2. Six days after termination, McMillian filed a (second) charge of discrimination with the EEOC, this time alleging retaliation under Title VII.[4]  McMillian was terminated because he filed a charge of discrimination with the EEOC approximately 20 months prior to his termination with the City of Aberdeen on December 5, 2023.

## RELEVANT PROCEDURAL HISTORY

On October 31, 2024, McMillian filed the instant lawsuit against the City, claiming age discrimination and retaliation under Title VII, ADEA, and § 1981, FMLA retaliation and interference, and procedural due process violations under § 1983 and the U.S. and Mississippi Constitutions.  Compl. [1].  The City moved for judgment on the pleadings, which was partially granted.  Opinion [30].  Following dismissal, McMillian was permitted to file an Amended Complaint and did so.  *See* Exhibit A, Amended Complaint; Am. Compl. [34].  The only remaining claims are McMillian's retaliation claims under Title VII, § 1981, and FMLA and the FMLA interference claim.  Order [31].

---

[3] Exhibit II, December 5, 2023 Board Minutes.

[4] December 11, 2023 EEOC Charge of Discrimination (No. 423-2024-00292) [34-1].

Discovery ensued. During discovery, McMillian deposed the three board members who voted in favor of termination (Alderman Edward Haynes, Alderman Shea Cain, and Alderwoman Carolyn Odom), as well as Triron Brown (the coworker who admitted that Barry McMillian did not tell him to clock him out on November 27, 2023), City Clerk Melissa Moore, Water Department Supervisor Marcus Collins, and his brother, Water Department Supervisor Johnny McMillian. McMillian did not depose Mayor Charles Scott, who served as Mayor at the time of termination, because he has moved out of state of Mississippi, therefore, McMillian was unable to serve him with process to attend the deposition although he did try to. McMillian did not depose the other two board members (Alderman Nicholas Holliday and Alderwoman Lady Garth). The Plaintiff now asks that that this Court deny the City's motion for summary judgment for all of his claims.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment must be granted if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Celotex v. Cartrett*, 477 U.S. 317, 322–23 (1986). In reviewing the record, the court must "view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in that party's favor." [*Renfroe v. Parker*, 974 F.3d 594, 599 (5th Cir. 2020)]. Crucially, at the summary judgment stage, the court's function is strictly to determine whether there are genuine issues for trial. *See* [*Kariuki v. Tarango*, 709 F.3d 495, 501 (5th Cir. 2013)].

## ARGUMENT AND AUTHORITIES

7

McMillian advances retaliation claims under Title VII, § 1981, and FMLA. He also brings a separate claim of FMLA interference. All of the Plaintiff's claims should **not** be dismissed.

### A. Direct Evidence of Unlawful Retaliation Bars Summary Judgment under Title VII and § 1981

To survive a motion for summary judgment on a retaliation claim under Title VII and 42 U.S.C. § 1981, a plaintiff may establish a triable issue of intentional retaliation through either direct or circumstantial evidence [*Brown v. East Mississippi Electric Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993); *Fabela v. Socorro Independent School Dist.*, 329 F.3d 409, 414-415 (5th Cir. 2003)]. When an employee presents direct evidence that a retaliatory motive was a motivating factor in an adverse employment decision, the traditional, three-step [*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)] burden-shifting framework—which is otherwise required for circumstantial cases—is bypassed entirely. *See Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 415 (5th Cir. 2003). Under that standard framework, a plaintiff must establish a prima facie case, the employer must articulate a legitimate non-retaliatory reason, and the plaintiff must ultimately prove pretext. However, in a direct evidence posture, the plaintiff's production of an admission immediately satisfies his initial evidentiary burden, dismantling the intermediate steps of production. Consequently, the burden shifts directly and heavily to the employer to prove by a preponderance of the evidence that it would have made the identical adverse personnel decision regardless of the retaliatory animus. *See Fabela*, 329 F.3d at 415. Direct evidence can be in the form of oral statements or administrative documentation which, if believed, proves the fact of discriminatory or retaliatory animus without inference,

presumption, or construction. *See* [*Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 415 (5th Cir. 2003); *Vance v. Union Planters Corp.*, 209 F.3d 438, 442 (5th Cir. 2000)].

The record in this matter contains smoking-gun direct and dispositive evidence of retaliation, coming directly from an admission by a member of the final decision-making body, voting Alderwoman Carolyn Odom (Exhibit D, Carolyn Odom's Dep. at pg. 26-27, 29-30). First, Alderwoman Odom solidified this retaliatory intent during her sworn deposition testimony on page 26 by testifying that she explicitly considered the Plaintiff's active participation in federal civil rights frameworks—specifically his protected EEOC Charge of Discrimination (No. 423-2022-00047)—as him "causing trouble". *See* Exhibit D, Carolyn Odom's deposition, at pg. 26. Next, when allowed ample opportunity during her deposition to clarify her reasoning for bypassing progressive discipline to execute immediate termination against McMillian, she confirmed on page 29 that her discharge vote was motivated by the Plaintiff's "previous actions". *See* (Exhibit D, Carolyn Odom's Deposition, pg. 29-30). Finally, on page 30 of the deposition transcript, after being physically presented with and reviewing the underlying 2022 EEOC document, Exhibit 11, **which is filed with this Court as Exhibit K**, the witness directly confirmed her retaliatory animus against the Plaintiff, when she was asked was her characterization of the Plaintiff as "causing trouble" due to the Plaintiff's previous actions connected to this specific filing, by definitively stating under oath "That, I'm sure was", and after that response, the Plaintiff's counsel then asked her is that a yes, which was followed by Carolyn Odom stating, "Yes". *See* (Exhibit D, Carolyn Odom's deposition, pg. 29-30). Under controlling Fifth Circuit law, such unambiguous admissions by an ultimate municipal decision-maker constitute direct evidence that completely obliterates any

pretextual defense and precludes summary judgment. *See Fabela v. Socorro Indep,. Sch. Dist.*, 329 F.3d 409, 415 (5th Cir. 2003). Furthermore, the City's attempt to assert a total lack of causal connection based on an alleged temporal gap between the original filing date and the discharge is legally unsupportable [*Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001)]. Administrative records demonstrate that Plaintiff's original March 7, 2022, EEOC Charge of Discrimination (No. 423-2022-00047) remained an active, open, and heavily contested federal enforcement action under investigation by the United States Department of Justice Civil Rights Division throughout the entirety of 2023 (*See* Exhibit G, Shea Cain's Dep. at pg. 9-10; Exhibit K, McMillian's 2022 EEOC charge; Exhibit II, the City of Aberdeen's Board minutes from December 5, 2023). The formal Notice of Right to Sue letter did not issue until August 7, 2024. *See* Exhibit K, McMillian's 2022 EEOC charge, pg. 2. The record shows that the City cannot escape liability under a theory that its executive leadership was unaware of this protected activity. Former Mayor Charles Scott was officially approved and took office as the Mayor for the City of Aberdeen on April 9, 2021. Also, because Charles Scott was actively serving as the chief executive officer of the municipality during the entire timeline of the dispute, he possessed direct, institutional knowledge of the formal civil rights charge Plaintiff filed against the City on March 7, 2022, as shown in, (Exhibit K, McMillian's EEOC charge).

The Board of Aldermen similarly had active, ongoing knowledge of this open dispute because Shea Cain said in his deposition that he was made privy of McMillian's 2022 EEOC because he was informed of the pending litigation when he came on the board of alderman for the City of Aberdeen in March 2023 (*See* Exhibit G, Shea Cain's

10

Dep. at pg. 9-10, 14). Alderman Shea Cain testified under oath that immediately upon taking office in March 2023, the Board was brought into closed executive sessions where the City Attorney explicitly briefed the council on McMillian's active civil rights claims because the City was going to have to defend against them (*See* Exhibit G, Shea Cain's Dep. at pg. 9-10, 13-14). Where an employer's executive leadership and board members are forced to actively manage and defend against an ongoing administrative dispute, the causal timeline is preserved [*Medina*, 238 F.3d at 684].

This retaliatory campaign escalated significantly in the months preceding termination, manifesting as targeted economic retaliation where the Plaintiff was systematically denied earned wages and overtime pay (*See* Exhibit B, Marcus Collins' Dep. at pg. 28, 40-41; Exhibit O, Time Sheet Number 2 of Mayor Charles Scott taking away hours of pay that McMillian actually worked; Exhibit S, Call out Sheet for Overtime). Water Department Lead Man Marcus Collins admitted in his deposition that he was forced to alter Plaintiff's timesheets to withhold compensation under a direct executive order from Mayor Charles Scott (See Exhibit B, Marcus Collins Dep. at pg. 28, 40-41). Specifically, on Monday, November 20, 2023, an approved entry for eight hours of work was manually crossed out on the master daily sheet and overwritten with the explicit handwritten command: **"No pay per Mayor"** (Exhibit B, Marcus Collins Dep. at pg. 28; Exhibit O, Time Sheet Number 2 of Mayor Charles Scott taking away hours of pay that McMillian actually worked). Under Fifth Circuit standards, an ongoing pattern of adverse, targeted economic actions executed by a knowledgeable supervisor leading up to a discharge cements the causal link between a plaintiff's protected civil rights filings and his ultimate termination [*Medina*, 238 F.3d at 684]. Because an ultimate decision-

**11**

maker explicitly admitted that the Plaintiff's utilization of federal civil rights frameworks factored into her termination vote, the Plaintiff has established direct evidence of liability (*See* Exhibit D, Carolyn Odom's Dep. at pg. 29-30). This direct evidence represents a genuine dispute of material fact that belongs exclusively before a jury [*Fabela v. Socorro Independent School Dist.*, 329 F.3d 409, 415 (5th Cir. 2003); *Vance*, 209 F.3d at 442]. This explicit connection between the Plaintiff's termination and his prior civil rights activity perfectly satisfies the direct evidence framework established by the Fifth Circuit in [*Fabela v. Socorro Independent School Dist.*, 329 F.3d 409, 415 (5th Cir. 2003); *Vance v. Union Planters Corp.*, 209 F.3d 438, 442 (5th Cir. 2000)]. Here, no inferential leaps are required to uncover the City's unlawful motives because a voting member of the ultimate municipal decision-making body explicitly provided smoking gun and dispositive evidence on the record. When Alderwoman Odom definitively stated "Yes" under oath when asked if her termination vote was motivated by the Plaintiff's protected 2022 EEOC Charge of Discrimination, her admission rose far above a mere stray remark (*See* Exhibit D, Carolyn Odom's Dep. at pg. 26, 29–30). Under the binding standard of *Fabela* and *Vance*, when a final decision-maker openly confesses that an employee's utilization of federal civil rights frameworks factored directly into a discharge vote, direct liability is established. This clear administrative documentation creates a monumental dispute of material fact that belongs exclusively before a jury, completely precluding the summary dismissal of the Plaintiff's claims. The City cannot shield itself from liability by pointing to the fact that Alderwoman Odom was only one of three board members who voted in favor of immediate termination (*See* Exhibit II, December 5, 2023 Board Minutes). Under controlling Fifth Circuit precedent, a plaintiff can establish municipal

12

liability in a multi-member board context by proving that a retaliatory or discriminatory animus infected the collective voting body's decision-making process. *See Laxton v. Gap Inc.*, 333 F.3d 572, 584 (5th Cir. 2003). Here, the municipal board minutes explicitly preserve that the final personnel action passed by a narrow 3-1-1 margin, meaning Alderwoman Odom's infected vote was mathematically essential to securing the termination threshold (See Exhibit II, The City's Board Minutes from December 5, 2023). Furthermore, because the remaining voting majority—Alderman Edward Haynes and Alderman Shea Cain—both confessed in their deposition that the Board reviewed zero independent documentation and instead blindly adopted the presentation and findings engineered by the administration, her overt retaliatory intent remains legally attributed to the final collective act (*See* Exhibit H, Edward Haynes Dep. at pg. 16, 26; Exhibit G, Shea Cain Dep. at pg. 16, 31, 33-34, 57-59). When an ultimate municipal decision-making body operates as a direct, passive conduit for a selective enforcement scheme driven by raw retaliatory motives, the causal chain is preserved for the jury. *See Gee v. Principi*, 289 F.3d 342, 346 (5th Cir. 2002). Consequently, summary judgment should be denied.

### B. The Defendant is Liable under the "Cat's Paw" Doctrine Due to a Corrupted Workplace Investigation by a Supervisor

The Defendant moves for summary judgment by claiming that because the collective Board of Aldermen cast the final personnel vote and McMillian cannot prove the majority of the Board had retaliatory animus towards him, which by defaults means retaliatory animus of the former Mayor Charles Scott cannot be imputed to the City (*See* Exhibit H, Edward Haynes' Dep. at pg.16, 26; Exhibit G, Shea Cain's Dep. at pg. 15-16, 57-59). This City misstates controlling Fifth Circuit precedent and [*Gee v. Principi*, 289

F.3d 342, 346 (5th Cir. 2002)] sets the appropriate standard here. Under the "Cat's Paw" theory, an employer is liable for an adverse employment action if a biased supervisor or executive official harbors retaliatory animus and uses the ultimate decision-making body as a passive conduit to finalize an unlawful firing [*Long v. Eastfield College*, 88 F.3d 300, 306-308 (5th Cir. 1996)]; Exhibit W, Letter for the City of Aberdeen's Attorney, Walter Zinn, Jr. to the EEOC]. To establish Cat's Paw liability, a plaintiff must prove that the supervisor's animus proximately caused the adverse action, which occurs when the decision-making board blindly relies on a presentation, review, or inquiry manipulated by that biased supervisor [*Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 653 (5th Cir. 2004)]. The official, written administrative records produced by the City completely establish the Cat's Paw theory of proximate causation (Exhibit W, Letter for the City of Aberdeen's Attorney, Walter Zinn, Jr. to the EEOC). In the City's response to the EEOC's inquires, which was executed by the City's Attorney, Walter H. Zinn, Jr., the City officially admitted to the EEOC that an investigation was only conducted by Mayor Charles Scott and the head of the department and that after his investigation was completed, Mayor Charles Scott, prepared a presentation of records and notes for the upcoming board meeting on December 5, 2023. *See* Exhibit W, the City of Aberdeen's Letter from their attorney, Walter H. Zinn, Jr., in response to the EEOC's inquires, pg. 1-2. Attorney Zinn also stated that after Mayor Charles Scott brought the Board his findings and they listened to his presentation, the Board made the decision to terminate McMillian. *Id*. The discovery record proves that the Mayor Charles Scott's closed-door presentation was entirely corrupted by bad faith, selective evidence management, and witness coercion (*See* Exhibit I, Tiron Brown's Dep. at pg. 8-9, 12-13, 17-18, 49; Exhibit

14

F, Melissa Moore's Dep. at pg. 39-40). The primary investigative witness Triron Brown, during his deposition, recanted his initial written statement under penalty of perjury, testifying that his statement accusing McMillian of fraud was a complete fabrication forced upon him under duress (*See* Exhibit I, Triron Brown's Dep. at pg. 8-9). Triron Brown testified under oath that former Mayor Charles Scott—who maintained continuous executive oversight since his April 9, 2021 approval date —wrote the false narrative and threatened him with immediate termination unless he signed it to frame McMillian (Exhibit I, Triron Brown's Dep. at pg. 8-9, 12-13, 17-18; Exhibit KK-Triron Brown's written statement that was actually drafted by Mayor Charles Scott). The electronic time card for Triron Brown for November 27, 2023, reflects an initial punch at 6:59 A.M. but lacks a corresponding afternoon clock-out, leaving the day marked as "MP" (Missing Punch) (Exhibit LL, Triron Brown's Time Sheet). This record aligns with Triron Brown's deposition testimony, where he stated that he failed to log out properly because he was in a severe rush to plan and attend a funeral, and he further explained that his and McMillian's time clock numbers were located right under each other on top of the machine, which is how he accidentally clocked him in (Exhibit I, Triron Brown's Deposition at pg. 35-36, Exhibit N, Time Sheet 1). Triron Brown testified that he mistakenly entered his coworker's number instead of his own due to him being in a rush and the close proximity of the numbers on the machine (Exhibit I, Triron Brown's Deposition, pg. 36, 39, 47). He further testified that during their later meeting, he explicitly tried to tell Mayor Charles Scott that the time card discrepancy was a hurried, honest mistake related to the funeral, however, he was forced to sign a contradictory statement under threat of termination (Exhibit I, Triron Brown's Dep. at pg. 8-9, 47).

**15**

Also, the City Clerk Melissa Moore, detailed the secret November 30, 2023, meeting inside the Mayor's office where Barry McMillian was excluded (*See* Exhibit F, Melissa Moore's Dep. at pg. 39-40). She testified that when coworker Triron Brown attempted to bring other people in, he stated "Well, if we're going to talk about this, we might as well just bring everybody in because a lot of people are clocking other people in"*,* former Mayor Charles Scott aggressively shut down the inquiry by stating, "the concern now is of you, not anybody else". *See* Exhibit F, Melissa Moore's Dep. at pg. 39-40). Furthermore, the text message log thread that was submitted to the Board as **Exhibit BB** to allege fraud was completely misidentified (*See* Exhibit I, Triron Brown's Dep. at 49; Exhibit BB, a text message to Triron Brown). Triron Brown reviewed the copy of the text message—which features redactions applied by the EEOC for administrative privacy—and testified under oath that the underlying unredacted text exchange had absolutely nothing to do with Barry McMillian (Brown Dep. at pg. 49; Exhibit BB, a text message to Triron Brown). **Also, it must be noted, that Exhibit BB does not have McMillian's name or telephone number at the top of the message**. Instead, Triron Brown verified that the thread logged a routine operational coordination between himself and his cousin, water laborer Andre Hogan (*See* Exhibit I, Triron Brown's Dep. at pg. 37, 49; Exhibit BB). The Mayor weaponized this unrelated document string, presenting it blindly to the Board as direct proof of McMillian's supposed "misconduct." The ultimate decision-makers blindly approved this manufactured file (*See* Exhibit H, Edward Haynes' Dep. at pg. 16, 26; Exhibit G, Shea Cain Dep. at pg. 16, 31, 33; Exhibit D, Carolyn Odom's Dep. at pg. 9, 42). Edward Haynes admitted that Mayor Charles was the one that handled the investigation (*See* Exhibit H, Edward Haynes Dep. at pg. 15-16). Alderman

16

Edward Haynes and Alderman Shea Cain both confessed in their deposition that the Board **reviewed zero physical time cards, text logs, or source documents**, with Edward Haynes exactly stating: "Didn't look at the time sheet. That was the mayor looking, not me." *See* (Exhibit H, Edward Haynes' Dep. at pg. 16, 26; See Exhibit G, Shea Cain's Dep. at pg. 16, 31, 33-34, 57-59). Alderwoman Odom admitted that prior to voting to immediately terminate McMillian, she did not look at any time clock documents, records, or notes, and did not even know about the formal written statement from acting Supervisor Johnny McMillian (*See* Exhibit T, Johnny McMillian's written statement) confirming that McMillian had properly called out on November 27, 2023 existed (*See* Exhibit D, Carolyn Odom's Dep. at pg. 9, 42). Compounding this due process failure, the City's official interoffice memorandum admits that while Triron Brown was brought behind closed doors to testify, the Plaintiff was completely locked out of the room and denied his right to be heard (*See* Document [110-5], Melissa Moore's Interoffice Memorandum). Alderman Haynes testified that the City's Board of Alderman silenced the Plaintiff specifically because he had engaged in protected activity and retained an attorney to sue the City, stating: "City attorney stated that if he had gotten an attorney and he's filed a suit against the City, that we should not entertain a conversation with Mr. McMillian about the situation." *See* (Exhibit H, Edward Haynes Dep. at pg. 9-10). Compounding this profound due process failure, the bad faith and pretext of the investigation is completely exposed by, the December 4, 2023 letter/mandate (Exhibit GG, the Letter from Charles Scott that told McMillian to attend the December 5, 2023 board meeting) executed directly by Mayor Charles Scott. In that formal written notice, then Mayor, Charles Scott, explicitly instructed the Plaintiff that due to the severity of the

situation he was being sent home and specifically ordered him to report to the board meeting on Tuesday, December 5, 2023, to further discuss this matter (*See* Exhibit GG, the Letter from Charles Scott that told McMillian to attend the December 5, 2023 board meeting). Yet, despite this clear municipal directive promising a discussion, the Board completely shifted strategies behind closed doors; they blind-sided the Plaintiff by locking him entirely out of the executive room and silencing him because he had engaged in protected activity. Also, because the final decision-makers acted as a passive rubber stamp for an investigation corrupted by a supervisor, Mayor Charles Scott, who held direct knowledge of Plaintiff's protected civil rights filing/activity (*See* **Exhibit K, McMillian's EEOC charge from 2022**) since his 2021 appointment as mayor, the Defendant cannot sever the causal chain of Cat's Paw liability under Fifth Circuit rules [*Gee*, 289 F.3d at 346; Exhibit H, Edward Haynes Dep. at 9-10, 16, 26; Exhibit II, the City's Board Minutes from December 5, 2023].

### C. Conclusive U.S. Department of Labor, Wage and Hour Division's Citations Preclude Summary Judgment on FMLA Interference

To maintain a claim for FMLA interference, an employee must demonstrate that they were an eligible worker, his employer was subject to FMLA requirements, he was entitled to leave, he gave proper notice of his intention to take FMLA leave; and that his employer denied him the benefits to which he was entitled under the FMLA [*See Caldwell v. KHOU-TV*, 850 F.3d 237, 245 (5th Cir. 2017); Exhibit F, Melissa Moore's Dep. at 34-35; *See* [Document 110-20], The City's FMLA policies]. The Defendant moves for summary judgment by asserting that Plaintiff's travel delay that made him absent from work on November 27, 2023, disqualified him from FMLA leave because he was not sick and the request was not related to his prior gallbladder surgery. This

argument completely ignores the City's systemic compliance failures that directly prejudiced the Plaintiff [*Caldwell*, 850 F.3d at 245; *See* Exhibit F, Melissa Moore's Dep. at 20-21, 34-36; *See* [Document 110-20], the City's FMLA policy]. The record contains conclusive, binding regulatory citations issued by the United States Department of Labor (DOL) Wage and Hour Division under Case ID: 1988735 (*See* Exhibit F, Melissa Moore's Dep. at pg. 34-36; Exhibit CC, U.S. Department of Labor, Wage and Hour Division). Following a comprehensive federal investigation, the DOL issued a formal citation against the City of Aberdeen for **being in violation under 29 C.F.R. § 825.220(c)** (Moore Dep. at 34-36; Exhibit CC, U.S. U.S. Department of Labor, Wage and Hour Division). The Lead Federal Investigator's final conclusion states unequivocally, which was verified by the City Clerk Melissa Moore the following: *"ee (employee) was terminated while on FMLA leave. The er (employer) did not have an FMLA policy for ees to follow; therefore, the ee was termd from employment. EE qual for FMLA for self."* *See* Exhibit F, Melissa Moore Dep. at pg. 34-36; Exhibit CC, pg. 2, U.S. Department of Labor, Wage and Hour Division Compliance Report). City Clerk Melissa Moore verified this federal citation on the record, admitting under oath that the City of Aberdeen **has never maintained a human resources department or updated FMLA infrastructure** (*See* Exhibit F, Melissa Moore's Dep. at pg. 20-21, 34-36). Melissa Moore testified that the City simply chose to operate by having the clerks *"just make it work."* (*See* Exhibit F, Melissa Moore Dep. at pg. 20-21). Alderman Edward Haynes further admitted that the City of Aberdeen's FMLA handbook was completely antiquated and when he was asked would he be surprised if the City's FMLA policy had not been updated since 1998, he stated: "Yeah, I would be, because I thought it was further back than that." Which was

**19**

followed by him stating, "I was in the process of rewriting the handbook and bringing the handbook up to speed. And the last time it was done was also had a lapse of time". *See* Exhibit H, Edward Haynes Dep. at 37-38. The Federal Compliance Framework Sheet details employees' and employers' FMLA rights and responsibilities, explicitly establish the baseline entitlement for employees to twelve weeks of job-protected leave for certain health conditions (Exhibit HH, FMLA employee rights and responsibilities, at pg. 1) and it strictly mandates that employers must inform employees requesting leave whether they are eligible and explicitly outline their rights and responsibilities (Exhibit HH, FMLA employee rights and responsibilities, at pg. 3). Under (Exhibit HH, FMLA employee rights and responsibilities), the failure of an employer to designate leave as FMLA-protected or to maintain a functional compliance policy is recognized as a statutory violation (Exhibit HH at pg. 3). As a direct result of this violation, when McMillian returned to City Hall following his gallbladder surgery that required an overnight stay on September 21, 2023, the City failed to utilize or distribute mandatory Wage and Hour forms to manage his unexhausted 12 weeks of protected leave (*See* Exhibit E, McMillian Dep. at 42-44; Exhibit J, pg. 3, Medical Records stating that he would be off of work due to gallbladder surgery that was performed on September 21, 2023; Exhibit EE, North MS Health Services records that entails McMillian's gallbladder surgery that required an overnight stay). Also, the discovery record contains an explicit clinical assessment (Exhibit EE, pg. 1) from NMMC General Surgery-Tupelo, dated February 16, 2026, confirming that no FMLA paperwork was completed by the City for the Plaintiff from January 2023 to the present, which includes the Plaintiff's gallbladder surgery that he had on September, 21, 2023. This complete lack of documentation proves the City failed to

20

provide mandatory compliance forms, destroying their "theft of time" defense as a legal pretext. This administrative omission occurred despite McMillian's proactive attempts to personally deliver the September 20, 2023, surgical notice from Dr. Pinson directly to City Clerk Melissa Moore at City Hall, alongside requests that his healthcare provider fax relevant documentation to ensure the proper forms were processed (*See* Exhibit E, Barry McMillian's Dep. at pg. 44, Exhibit J, pg. 3, McMillian providing notice that he needs FMLA leave). McMillian personally handed the light-duty medical documentation from Dr. Terry Pinson to City Clerk Melissa Moore, and his doctor attempted to fax supplementary paperwork directly to the City to request formal leave processing, which Moore completely ignored (*See* Exhibit E, Barry McMillian's Dep. at pg. 43-44). Under Fifth Circuit law, an employee is not required to invoke the formal letters "FMLA" to trigger an employer's compliance obligations; they need only provide sufficient factual details to inform the employer of an FMLA-qualifying event [*Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 764 (5th Cir. 1995)]. The physical records prove that the Plaintiff did not engage in "time theft" (*See* Exhibit J, pg. 3, Barry McMillian's Medical Records stating that he would be off of work due to gallbladder surgery that was performed on September 21, 2023; Exhibit E, Barry McMillian's Dep. at pg. 34-35, See Exhibit CC, DOL's Compliance Report). Water Department Lead Man Marcus Collins admitted under oath that when he got back into town on Monday, November 27th, he personally wrote McMillian in for eight hours of work based on his own post-holiday verbal check-in with the department crew (*See* Exhibit B, Marcus Collins Dep. at pg. 22; Exhibit O, Time Sheet No. 2 that was originally written in by Marcus Collins). This entry is fully supported by Exhibit T, the written statement of Acting Supervisor Johnny

21

McMillian, which he reaffirmed under oath during his deposition—confirming: "I, Johnny McMillian was notified by Barry McMillian that he was taking off the 27th of November 2023. He notified me because I was the acting supervisor for the week." *See* Exhibit T, Johnny McMillian's written statement; *See* Exhibit MM, Johnny McMillian Dep. at pg. 8). Telecommunication logs further establish that McMillian placed a proactive call to Collins at 6:24 AM on the morning of the flight delay (Exbibit L, McMillian's call to Marcus Collins). McMillian simultaneously submitted a signed leave donation slip from coworker Triron Brown (*See* Exhibit P), which Triron Brown testified under oath he wrote completely voluntarily to donate four hours of sick time to assist McMillian, which was denied by the Mayor Scott (*See* Exhibit I, Triron Brown Dep. at pg. 14-15; Exhibit P, Triron Brown donating time to Barry McMillian, Exhibit X, Mayor Scott denying donation of time by Triron Brown). Also, on the same day, McMillian filed a request for leave slip for illness on November 28, 2023, but rather than processing this valid form, the physical documents reveal that Mayor Charles Scott personally wrote a direct, retaliatory executive veto across by stating: **"Disapproved Mayor Scott Nov 29, 2023, Failure to follow procedure."** *See* Exhibit R, McMillian's sick leave request; Exhibit V, Mayor Scott denying FMLA leave. This targeted retaliation escalated dramatically five days later on December 4, 2023, when Mayor Scott issued a formal directive stripping the Plaintiff of active duties. Stating that there were discrepancies concerning you following company policy, the Mayor summarily bypassed all progressive discipline structures and ordered that the Plaintiff was being sent home and commanded to appear before the Council the following night [Exhibit AA, the City's Disciplinary policy; Exhibit EE, the Plaintiff's Medical Records showing that his

22

gallbladder surgery required overnight stay; Exhibit, GG; letter from the Mayor to come to the December 5, 2023 board meeting]. The administration completely hand-picked which employees received handbook protections; coworker Triron Brown—the individual who executed the physical clock punches—was spared from discharge, granted a minor 3-day suspension, and was warmly welcomed into the room to address the Board. Meanwhile, the Plaintiff was treated with extreme animus, and was instantly hit with the ultimate industrial penalty of termination via an unevenly enforced scheme fueled by raw retaliatory motives by the Mayor and City Board. The City cannot claim an employee failed to follow procedure when its own administrators admit no functional procedure or infrastructure existed at City Hall (*See* Exhibit F, Melissa Moore Dep. at pg. 20-21; Exhibit H, Edward Haynes Dep. at pg. 37-38). Additionally, because the City failed in its statutory duty to maintain a compliant FMLA framework, causing distinct operational prejudice to the employee (McMillian), it structurally converted a protected medical absence request into an allegation of "theft of time" (Exhibit CC, U.S. Department of Labor, Wage and Hour Division Compliance Report). The DOL's formal finding that the city's nonexistent FMLA policy directly caused the Plaintiff's termination creates an insurmountable issue of material fact that requires a trial on the merits under Fifth Circuit rules. *See Caldwell v. KHOU-TV*, 850 F.3d 237, 245 (5th Cir. 2017); Exhibit CC, Compliance Report by the U.S. Department of Labor and Wage; Exhibit HH, FLMA, employee rights and responsibilities). Also, the City's defense that the FMLA cannot apply because the Plaintiff was out of state is completely blocked by controlling precedent. Under 29 C.F.R. § 825.303(a) and *Satterfield v. Wal-Mart Stores, Inc.*, 135 F.3d 973, 980 (5th Cir. 1998), an employee facing an unforeseen travel emergency must

23

only notify the employer as soon as practicable under the facts and circumstances. Because the Plaintiff placed a proactive call to his supervisor at 6:24 AM on the morning of the delay, he fully satisfied this standard (*See* Exhibit L, McMillian's call to Marcus Collins); under *Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 764 (5th Cir. 1995), he was never required to mention the formal acronym "FMLA" to shift the investigative burden to the City. Ultimately, because the City Clerk admitted the municipality failed to maintain or distribute mandatory FMLA notices (*See* Exhibit F, Melissa Moore's Dep. at pg. 20-21, 34-36), the City is legally barred from penalizing the Plaintiff for retroactive reporting procedures, raising an insurmountable issue of material fact for trial.

### D. Genuine Disputes of Material Fact Preclude Summary Judgment on Plaintiff's FMLA, Title VII, Section 1981 Retaliation Claims

In addition to operational interference, the Defendant is independently liable for unlawful retaliation under the FMLA, Title VII, 42 U.S.C. § 1981 due to an ongoing, calculated effort to strip the Plaintiff of financial compensation and overtime hours. Courts analyze FMLA retaliation claims under the same standard as Title VII retaliation claims. *Norsworthy v. Hous. Indep. Sch. Dist.*, 70 F.4th 332, 336-337 (5th Cir. 2023) ("[FMLA retaliation claims] are analyzed under the same framework as Title VII retaliation claims."). The same is true for § 1981 retaliation claims. *Foley v. Univ. of Hous. Sys.*, 355 F.3d 333, 339-340 (5th Cir. 2003). To survive summary judgment on a retaliation claims under these statutes, an employee must demonstrate that: (1) they engaged in a protected activity; (2) they suffered an adverse employment action—such as a material reduction in compensation or deletion from overtime rotation logs; and (3) a causal link exists between the protected activity and the adverse action [*Richardson v. Monitronics Int'l, Inc., 434 F.3d 327, 332 (5th Cir. 2005)*; *Norsworthy v. Hous. Indep.*

*Sch. Dist., 70 F.4th 332, 336 & n.4 (5th Cir. 2023*]. The Defendant moves for summary dismissal by pointing to raw payroll totals to assert that McMillian continuously received overtime hours during the fall of 2023, noting he received 16 hours in October 2023 and 13 hours in November 2023. Furthermore, the City's statistical argument regarding hours is completely exposed as a pretextual calculation distortion by the active, operational schedules maintained by the City (*See* Exhibit Q-Overtime Calendar; Exhibit S-Overtime Call Out Trouble Calls). A review of the November 2023 Overtime Calendar confirms that while McMillian is explicitly listed as an eligible, active on-call employee with his contact number (662-436-6016) detailed on the roster, his name was completely stripped from every single pre-scheduled rotation block throughout the entire month (*See* Exhibit Q, Overtime Calendar). While coworkers Burton, Johnny, Brown, and Supervisor Collins were systematically assigned to weekend and evening emergency shifts, McMillian was assigned to zero (*See* Exhibit Q). Any overtime he did receive was merely a byproduct of random daytime shifts or spontaneous emergency dispatches which is proven by his 4:05 p.m. dispatch log on November 6, 2023 and November 7, 2023, while the high-paying, pre-scheduled on-call blocks were intentionally withheld to his financial detriment (*See* Exhibit Q, Overtime Calendar; Exhibit S, Call out sheet for overtime; *See* Exhibit B, Marcus Collins Dep. at pg. 29-30, 36-43). The City claims that McMillian was kept off the schedules in October 2023 and early November 2023 purely as a safety accommodation due to his surgical lifting restrictions (*See* Exhibit E, Barry McMillian Dep. at pg. 42-44; Exhibit J-Barry McMillian's Medical records for when he was off due to medical reasons). This explanation is directly disproved by his clinical full-duty work release date of October 11, 2023 (*See* Exhibit E, Barry McMillian Dep. at pg. 42-44;

**25**

Exhibit J-Barry McMillian's Medical records for when he was off due to medical reasons). Despite receiving a clean medical bill of health, a day-by-day visual analysis of the operational calendar shows that the City continued to completely isolate and lock the Plaintiff out of the overtime pool (*See* Exhibit B, Marcus Collins Dep. at pg. 29-30, 39; Exhibit Q, Overtime calendar). Most egregiously, the record contains direct physical proof that the City was actively deleting documented field hours executed by McMillian to prevent him from receiving compensation (*See* Exhibit B, Marcus Collins Dep. at pg. 28; Exhibit O, Time Sheet 2; Exhibit S, Call out Sheet for overtime). On November 6, 2023, the official municipal Overtime Call Out / Trouble Call log records that McMillian was explicitly dispatched to a Water Department emergency at 4:05 PM, with the dispatcher manually writing the name 'Barry McMillian' to verify his execution of the emergency field labor (*See* Exhibit S, Call out Sheet for overtime). Yet, when cross-referenced with the master daily ledger signed by Lead Man Marcus Collins, this entire emergency shift was completely erased and omitted from payroll tracking (*See* Exhibit O, Time Sheet 2; Exhibit S, Call out sheet for overtime; Exhibit B, Marcus Collins Dep. at pg. 28, 40-41). This physical deletion matches Lead Man Collins' admission under oath that Mayor Charles Scott, who held active administrative knowledge of McMillian's 2022 discrimination filing (*See* Exhibit K, McMillians EEOC charge from 2022) and personally signed the documentation flatly denying McMillian's FMLA leave (*See* Exhibit V, Mayor Charles Scott denying McMillin FMLA leave), issued an explicit, ongoing directive to veto McMillian's hours, resulting in the literal "No pay per Mayor" mandate handwritten directly onto the operational logs (*See* Exhibit O, Time Sheet 2; Exhibit V, *See* Exhibit B, Marcus Collins Dep. at pg. 28, 40-41). The concrete economic

26

impact of this systemic exclusion and ultimate termination is explicitly quantified by the U.S. Department of Labor's official investigation, which calculated that McMillian suffered substantial lost wages totaling exactly $15,132.00 as a direct result of the city's unlawful, discriminatory actions (*See* Exhibit CC, U.S. Department of Labor, Wage and Hour Division's Compliance Report, at pg. 17, 19). As detailed on the Wage Transcription and Computation Sheet compiled by federal investigator Valtressia Austin, this compliance loss was calculated across a 27-week period spanning from November 18, 2023, to May 11, 2024, using McMillian's standard hourly pay rate of $13.00 (*See* Exhibit CC, U.S. Department of Labor, Wage and Hour Division's Compliance Report, at pg. 19). The federal calculation mathematically accounts for the city's schedule-stripping and ultimate termination by tracking: (1) 13 weeks of lost regular hours at 40 hours per week, totaling $6,760.00; (2) 14 weeks of lost hours at 44 hours per week, totaling $8,008.00; and (3) a half-time at rate of $6.50 per hour applied directly to the 4 hours of recurring scheduled time across those 14 rotational weeks, adding an additional $364.00 to the back wage liability (*See* Exhibit CC, U.S. Department of Labor, Wage and Hour Division's Compliance Report, at pg. 19).

Under controlling Fifth Circuit precedent, when an employee produces physical, altered business logs proving they executed emergency tasks that were subsequently deleted from payroll files following the exercise of protected rights, a profound jury question of **willful retaliation and pretext** is established [*Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411-412 (5th Cir. 2007); *Ion v. Chevron USA, Inc.*, 731 F.3d 379, 390 (5th Cir. 2013)]. This issue of material fact is rendered insurmountable by (Exhibit CC), which contains the official U.S. Department of Labor,

Wage and Hour Division's findings that the City of Aberdeen rejected administrative settlement or reinstatement remedies (*See* Exhibit CC, U.S. Department of Labor, Wage and Hour Division's Compliance Report, at pg. 1-2, 17).  The federal compliance report explicitly notes that "the ee (employee) was terminated while on FMLA leave" because "the er (employer) did not have an FMLA policy for ees to follow," culminating in a formal, independent agency determination that the city's operational lawlessness directly caused the adverse employment action (*See* Exhibit CC, U.S. Department of Labor, Wage and Hour Division's Compliance Report, at pg. 2).  Therefore, summary judgment must be denied.

### E. The City's Assertion of Uniform Policy Enforcement is Refuted by Findings of Stark Disparate Treatment

The Defendant seeks summary dismissal by claiming that its harsh treatment of the Plaintiff was a uniform, neutral application of its handbook codes (*See* Exhibit G, Cain Dep. at pg. 39).  This assertion is completely disproved by the official administrative rulings issued by the Mississippi Department of Employment Security (MDES) Administrative Law Judge (Exhibit U, MDES Ruling of unemployment benefits).  Following an adversarial evidentiary hearing, the independent state Administrative Law Judge ("ALJ") evaluated the identical time-clock occurrence and issued a formal decision reversing the City's misconduct designation (Exhibit U, MDES ruling of unemployment benefits).  This final administrative holding was subsequently adopted and affirmed in full by the formal **MDES Board of Review Decision** under (**Exhibit U, pg. 1)**. The ALJ and Board of Review explicitly concluded: "The coworker who violated policy received a three-day suspension but was not discharged. The employer has not provided a reasonable explanation for the difference in the level of

28

discipline that was given." *See* Exhibit M, disciplinary report; Exhibit AA, The City of Aberdeen's Progressive disciplinary policy; Exhibit U, MDES's order of unemployment benefits, pg. 1-2. The City's own **handbook texts confirm this lack of uniform enforcement** (Exhibit M, disciplinary report; Exhibit AA, The City of Aberdeen's Progressive disciplinary policy)). The City's own handbook texts confirm its lack of uniform enforcement (Exhibit M, disciplinary report; Exhibit AA, The City of Aberdeen's Progressive disciplinary policy). The City formally admitted that it possesses an adopted Progressive Discipline policy on pages 39–40 of its handbook, requiring step-by-step oral warnings and written reprimands prior to pursuing a discharge (*See* Exhibit Z, Attorney Zinn's response to the EEOC, pg. 2; Exhibit AA, The City of Aberdeen's Progressive Disciplinary policy). The breakdown in uniform enforcement is made clear by the shifting administrative handling of the absence: Johnny McMillian's statement (Exhibit T) which confirms that Barry McMillian properly notified him—as the acting supervisor for the week—that he would be taking off on November 27, 2023 (Exhibit T). The following day, coworker Triron Brown executed a written note donating four hours of sick time to cover the absence (Exhibit P, Triron Brown Donating time to McMillian). However, on November 29, 2023, Mayor Charles Scott formally interceded and wrote a denial directly onto the face of the request, stating it was "Disapproved" for "Failure to follow procedure" and Mayor Scott also wrote the same thing on Barry McMillian's request for medical leave on the same day (*See* Exhibit X, Mayor Scott Denying Triron Brown's donation of time; Exhibit Y, McMillian's request for sick leave). Under cross-examination, Water Department Lead Man Marcus Collins admitted that McMillian had never been written up or disciplined prior to this single event, and that coworker Triron

29

Brown had an equally spotless record (*See* Exhibit C, Marcus Collins Dep. at pg.19–20). Alderman Haynes further admitted under oath that despite the statement on the Disciplinary Report (Exhibit M) claiming McMillian had been "warned on numerous occasions," the City possessed no physical files or records documenting any historical warnings (Exhibit H, Haynes Dep. at pg. 43-44; Exhibit M, McMillian's Disciplinary report). Yet, the record confirms the administration hand-picked which employees received handbook protections (Exhibit AA, the City's Progressive Disciplinary Policy). Coworker Triron Brown—the individual who executed the physical clock punches—was spared from discharge, granted access to address the Board, and issued a minor 3-day suspension, as formally recorded in the municipal minutes from the December 5, 2023 regular board meeting. Alderman Shea Cain admitted under cross-examination that he excused Brown's violation because Brown was simply "doing something his BFF asked him to do," while choosing to completely bypass progressive discipline to immediately fire the Plaintiff (*See* Exhibit G, Shea Cain Dep. at 38-39). Former Alderman Haynes, said that he voted to terminate McMillian because he participated in theft and received monetary funds and Triron Brown just assisted in the theft. *See* Exhibit H, Edward Haynes' Dep. at 10-13. Triron Brown testified that he had been working with the City since 2022 (Exhibit I, Triron Brown Dep. at pg. 50) and that donating leave time was a standard, routine practice between City workers that the administration regularly welcomed (Exhibit I, Triron Brown Dep. at 15). However, Triron Brown made it clear under oath that Mayor Charles Scott strictly barred this accommodation for McMillian because the Mayor explicitly had it out for McMillian and that he held a personal grudge against him and Triron Brown also testified that he didn't know what the Mayor had

against McMillian but that he had noticed that Mayor Charles Scott had been picking with McMillian for the longest. See Exhibit I, Triron Brown Dep. at 13. Triron Brown emphasized that this severe administrative scrutiny was entirely targeted at the Plaintiff, explaining: "it was just for like, if I had a gave that time to somebody else, it was cool. He was cool with it. But, like I said, it was like a big problem that he had with Mr. McMillian." *See* Exhibit I, Triron Brown's Dep. at pg. 51). In the Fifth Circuit, an employer's selective, disparate, or highly inconsistent enforcement of an employee handbook rule between similarly situated workers serves as standard circumstantial proof of intentional pretext [*Turner v. Kansas City S. Ry. Co.*, 675 F.3d 887, 893 (5th Cir. 2012); *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411-412 (5th Cir. 2007)]. It is entirely illogical that Triron Brown—the individual who actually executed the unauthorized timecard punches—escaped with a mere three-day suspension because he was simply helping his friend. Meanwhile, Barry McMillian was immediately subjected to the ultimate industrial penalty of termination by the City, bypassing all progressive discipline protections (*See* Exhibit B, Marcus Collins Dep. at pg.19-20, Exhibit G, Shea Cain's Dep. at pg. 38-39, Exhibit AA, The City of Aberdeen's Progressive Disciplinary Policy). This stark disparity in punishment for the exact same incident is not rational and exposes a deeply flawed, targeted administrative enforcement scheme fueled by the City's retaliatory animus toward the Plaintiff for filing his 2022 EEOC charge (Exhibit K). Moreover, the bad faith nature of the City's actions is exposed by City Attorney Walter Zinn's formal EEOC responses (Exhibit Z, The City's Response to the EEOC). In this official filing, the City made a binding admission confirming both the existence of its progressive discipline policy and the reality that coworker Triron

31

Brown received a minor three-day suspension for the exact same incident (Exhibit Z, the City's response to the EEOC, pg. 2, 5–6).  Also, because a Mississippi state administrative body issued its first ruling finding a lack of uniform enforcement (Exhibit U, MDES original ruling, pg. 1–2), which was later fully adopted and affirmed by its subsequent final affirming order (Exhibit JJ, MDES's Final Order affirming its original order), and the City's own council members confirm that the City's rules were enforced unevenly between Barry McMillian and Triron Brown, a profound jury question of bad faith and pretext exists that precludes the granting of summary judgment (*Turner*, 675 F.3d at 893; *See* Exhibit G, Shea Cain Dep. at pg. 39; Exhibit U, MDE's Order; Exhibit JJ, MDE's Final Order). "Close timing between an employee's protected activity and an adverse employment action can be a sufficient basis for a court to find a causal connection required to make out a prima facie case of retaliation." *Mooney v. Lafayette Cnty. Sch. Dist.*, 538 F. App'x 447, 454 (5th Cir. 2013).  In the present case, the Plaintiff has demonstrated close timing between his filing a 2022 EEOC charge and his ultimate discharge (twenty (20) months). The Defendant has rebutted this prima facie case since it presented evidence that it terminated the Plaintiff not because of the 2022 EEOC charge, but because the Plaintiff was stealing time. However, the Plaintiff being terminated and his counter-part only being suspended for three days is inconsistent punishment for employees that are on the same level of possibly never receiving any written reprimands or receiving other discipline from their employment with the City of Aberdeen.  The City of Aberdeen cannot state why the Plaintiff, Barry McMillian, who was falsely accused of stealing time was terminated, and Triron Brown was not terminated, even though Mr. Brown was allegedly involved in the matter.  Title VII retaliation claims require proof of

32

"but for" causation. *Univ. of Texas Sw. Med.Ctr. v. Nassar*, 570 U.S. 338 (2013). However, but for causation does not mean that the Plaintiff must prove that the protected action (Exhibit K, McMillian's 2022 EEOC charge) was the sole cause for the termination. *Leal v. McHugh*, 731 F.3d 405, 415 (5th Cir. 2013). In regards to motivation and intent, they often involve circumstantial evidence, and the drawing of "complicated inferences from the evidence and are therefore peculiarly within the province of the factfinder." *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 482 (5th Cir. 1989). In this case, a jury may reasonably find that McMillian's filing of the EEOC charge was a but for causation of his termination since it would cost Defendant money to defend the charge and, ultimately, to defend a possible lawsuit. Mr. McMillian was fired approximately twenty (20) months after he executed the 2022 EEOC Charge. Additionally, because the reasons assigned may be found to be pretextual, a jury may infer that the 2022 EEOC charge was the reason for the discharge, especially if the jury does not believe the Defendant when it claims that it terminated the Plaintiff due to him stealing time and not being forthcoming. If a jury does not believe the Defendant is telling the truth, when it claims that they fired the Plaintiff due to him stealing time, then the filing of the 2022 EEOC charge, coupled with proof of pretext, is enough for a jury to determine that the filing of the 2022 EEOC charge was the likely but for cause of the Plaintiff's termination.

> . . . ("[P]roving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination"). In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider party's dishonesty about a material fact as "affirmative evidence of guilt." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000).

Additionally, the record shows that the Plaintiff can adequately plead that a majority of the board had [the requite unlawful] animus. *See Harville v. City of Houston*, 935 F.3d 404, 413 (5th Cir. 2019) (citation omitted). The Plaintiff can prove Mayor Charles Scott, the mayor at the time, Edward Haynes, Carolyn Odom, and Shea Cain harbored retaliatory animus toward him because they all were the ones that either initiated his termination and/or voted to terminate him because of the EEOC Charge that he filed against the City of Aberdeen in 2022. For the aforementioned reasons, summary judgment should be denied on all counts.

## CONCLUSION AND PRAYER FOR RELIEF

Therefore, for the forgoing reasons, the Plaintiff Barry L. McMillian, respectfully requests that this Honorable Court **DENY** the Defendant City of Aberdeen's Motion Summary Judgment in its entirety, allow these claims to remain intact, and set this matter for a trial on the merits.

RESPECTFULLY SUBMITTED, this the 22nd day of June 2026.

By: /s/ DeMoreo Reddick, Esq.
DEMOREO REDDICK, ESQ.
MS BAR NO.: 103747
P.O. BOX 465
OKOLONA, MS 38860
PH: 662-436-4641
FAX: 662-256-3582
**COUNSEL FOR THE PLAINTIFF**

**34**

35

## CERTIFICATE OF SERVICE

I, DeMoreo Reddick, attorney for the Plaintiff, hereby certify that the foregoing document has been delivered to all counsel of record, either by depositing a copy of same in the United States mail, first class postage prepaid, by hand delivery, or electronic delivery, this the 22nd day of June, 2026.

/s/ DeMoreo Reddick, Esq.
DEMOREO REDDICK, ESQ.