UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

BARRY MCMILLIAN PLAINTIFF

V. CIVIL ACTION NO. 1:24-CV-199-GHD-RP

CITY OF ABERDEEN; et al. DEFENDANTS

# MEMORANDUM OPINION

Plaintiff Barry McMillian initiated this action against the City of Aberdeen (the "City") by filing his Complaint [1] on October 31, 2024. On July 16, 2025, McMillian filed his Amended Complaint [34], which is now the operative complaint. The Amended Complaint [34] brings claims against the City under Title VII of the Civil Rights Act, 42 U.S.C. § 1981, and the Family and Medical Leave Act ("FMLA").

Presently before the Court is the City's Motion for Summary Judgment [110]. Through its instant Motion [110], the City seeks dismissal of all claims asserted against it, and McMillian opposes the Motion [110]. After review, the Court finds that the City's Motion [110] should be granted in part and denied in part.

## *I. Factual Background*

In October 2021, McMillian began his employment with the City as an at-will laborer in the water department. Shortly after his hiring, in March 2022, McMillian filed an EEOC charge against the City alleging race discrimination in relation to the commencement of his employment.[1] This lawsuit, however, arises from McMillian's termination on December 5, 2023.

[1] McMillian filed a separate lawsuit related to that EEOC Charge, which this Court dismissed on May 12, 2025. *See McMillian v. City of Aberdeen, Mississippi*, 2025 WL 1372858 (N.D. Miss. May 12, 2025).

Approximately two months prior to his termination, McMillian underwent gallbladder surgery. Resultantly, his physician placed him on light duty restrictions until releasing him to full duty on October 11, 2023. By mid-October 2023, McMillian had exhausted his available sick leave. *See* [110], Ex. 18 at p. 1.

The following month, McMillian went on vacation to Las Vegas, Nevada and was scheduled to return to work on Monday, November 27, 2023. During his deposition, McMillian testified that, on the day prior to his return date, he experienced a delay in his connecting flight and found himself stranded at the airport in Charlotte, North Carolina. On the morning of November 27, 2023, McMillian called his supervisor, Marcus Collins, to inform him that he was unable to make it to work that day. When he was unable to reach Collins, who was out of the office, McMillian called Johnny McMillian, the acting supervisor for the week in Collins' absence, to notify him of the issue.[2] In short, it is undisputed that McMillian did not report to work on November 27, 2023 because he encountered this transportation issue.

The following day, on November 28, 2023, McMillian submitted a request for sick leave. During his deposition, McMillian testified that he submitted this request for retroactive application concerning his absence on November 27, 2023. His request was disapproved by the City's Mayor, Charles Scott, for "failure to follow procedures." [110], Ex. 21.[3]

At some point after Collins returned to work, Mayor Scott informed Collins that McMillian had been clocked in and out on November 27, 2023 by another water department employee, Triron Brown. According to Melissa Moore, the City Clerk, the process for clocking in to work required

[2] Collins denies having any missed call from McMillian on November 27, 2023.

[3] Mayor Scott was not deposed in this case. He is no longer the acting Mayor of the City and, according to Melissa Moore (the City Clerk), he now resides in the State of Nebraska.

an employee to input their assigned employee identification number followed by the last four digits of the employee's social security number.

During his deposition, Brown initially testified that he received a text message from McMillian asking Brown to clock him in on the day McMillian was absent and providing Brown with McMillian's employee identification number. Brown almost immediately retracted that statement, however, and indicated that the subject stream of text messages was not an exchange between he and McMillian after all. He further testified that he may have clocked McMillian in by accident. For his part, McMillian could not recall whether the stream of text messages was between him and Brown, and testified that his phone was in airplane mode at the time the subject messages were sent to Brown. Despite that unclarity, following a meeting between Mayor Scott, Collins, and Brown on November 30, 2023, Brown submitted a written statement to Mayor Scott confirming that he had indeed clocked McMillian in and out on the date in question.

On December 1, 2023, Collins, at the direction of Mayor Scott, filed an Employee Disciplinary Report concerning McMillian for the clock-in incident involving Brown. Following that write-up, Mayor Scott provided written notice to McMillian that he was being suspended from work and asking that he appear at a meeting with the City's Board of Aldermen. That Board meeting was held on December 5, 2023.

The City's Board of Aldermen is comprised of five members namely, Nicholas Holliday, Lady B. Garth, Edward Haynes, Carolyn Odom, and John "Shea" Cain. All members of the Board were present during the meeting on December 5, 2023, as well as Mayor Scott. The Board entered into an executive session to address the matter involving McMillian and Brown. Both McMillian and Brown appeared for the meeting that day, but McMillian was not permitted to address the Board during the executive session. According to Alderman Haynes' deposition testimony, he

informed McMillian that the Board could not talk to him about the matter unless his attorney was present at the board meeting.[4]

Ultimately, it is undisputed that Brown addressed the Board that day, and, concerning November 27, 2023, he indicated to them that, "at Barry [McMillian's] request,... he clocked him in." [114], Ex. 8 at p. 54. Following the executive session, Alderman Cain, seconded by Alderwoman Odom, made a motion to terminate McMillian. Three Board members voted in favor of McMillian's termination and one voted against it.[5] As to Brown, he was suspended for three days for his involvement in the incident.

Following his termination, McMillian filed an EEOC Charge alleging that the City denied him overtime and terminated him in retaliation for his filing of the March 2022 EEOC Charge. He also filed a complaint against the City with the U.S. Department of Labor for alleged violation of his rights under the FMLA. This lawsuit followed.

## *II. Standard of Review*

Summary judgment is warranted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing to establish the existence of an element

[4] During his deposition, McMillian testified that he was not represented by an attorney on the date of the board meeting; however, he also testified that he called an attorney after a disagreement with Mayor Scott during an unrelated October 2023 meeting and that he was represented by an attorney concerning his March 2022 EEOC charge.

[5] Alderwoman Garth recused herself from participating in the executive session due to her kinship to Brown.

essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

The moving party bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record it believes demonstrate the absence of a genuine dispute of material fact. *Id.* at 323. Under Rule 56(a), the burden then shifts to the nonmovant to "go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324; *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001); *Willis v. Roche Biomedical Labs., Inc.*, 61 F.3d 313, 315 (5th Cir. 1995). When the parties dispute the facts, the Court must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal citations omitted). "However, a nonmovant may not overcome the summary judgment standard with conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *McClure v. Boles*, 490 F. App'x 666, 667 (5th Cir. 2012) (per curiam) (citing *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007)).

## *III. Analysis and Discussion*

McMillian brings claims against the City for retaliation under Title VII, 42 U.S.C. § 1981, and the FMLA, as well as an FMLA interference claim. The Court will address the merits of McMillian's claims in turn.

## A. Section 1981 and Title VII Retaliation[6]

"Title VII proscribes discrimination by an employer against an employee because, among other things, the employee 'has made a charge, testified, assisted, or participated in an investigation, proceeding, or hearing' under Title VII." *Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C.*, 547 F. App'x 484, 488 (5th Cir. 2013) (citing 42 U.S.C. § 2000e–3(a)). "A plaintiff's ultimate burden in the retaliation context is to prove that but-for the employer's improper retaliatory motive, the allegedly retaliatory employment action would not have occurred." *Id.* To meet this burden, a plaintiff can present direct or circumstantial evidence of retaliation. *Id.*

"Direct evidence is evidence which, if believed, proves the fact without inference or presumption." *Id.* "Because direct evidence is rare," Plaintiffs typically rely on circumstantial evidence, which is analyzed under the familiar *McDonnell Douglas* burden-shifting framework. *Id.*

McMillian first argues that he has identified direct evidence of retaliation and points to Alderwoman Odom's deposition testimony.[7] Specifically, McMillian contends that Alderwoman Odom characterized McMillian as a "troublemaker" and that she admitted to voting in favor of his termination because, among other things, he filed an EEOC Charge in March of 2022. [115] at p. 9. Though the City argues that McMillian misconstrues Alderwoman Odom's testimony by taking

---

[6] Because the same legal standard applies to retaliation claims under Title VII and Section 1981, the Court will analyze them together. *See Scott v. U.S. Bank Nat'l Ass'n*, 16 F.4th 1204, 1209 (5th Cir. 2021) ("We examine retaliation claims under Section 1981 using the same rubric of analysis as Title VII.").

[7] At the outset, the Court notes that McMillian's Response Memorandum [115] is far from a model of clarity. The only evidence McMillian unequivocally identifies as direct evidence of retaliation is Alderwoman Odom's deposition testimony. *See* [115] at p. 8. McMillian then references other evidence, such as the Board's general awareness of his EEOC charge and Mayor Scott's alleged "retaliatory campaign," which, in the Court's view, are textbook examples of circumstantial evidence requiring inference or presumption. *Id.* at p. 10. This being the case particularly with respect to any alleged actions on the part of Mayor Scott as it is undisputed that he was not a voting member of the Board. Accordingly, the Court will limit its analysis of direct evidence to considering whether Alderwoman Odom's testimony qualifies as direct evidence of retaliation.

selective portions of it out of context, the Court need not scrutinize her testimony to reject McMillian's argument. Even accepting McMillian's interpretation of Alderwoman Odom's reasoning for voting in favor of his termination and assuming *arguendo* that no inferences are required to reach that conclusion, the fact that Odom was not, by herself, the ultimate decisionmaker is determinative of this issue.

Relying on its decision in *Griggs v. Chickasaw Cty., Miss.*, 930 F.3d 696 (5th Cir. 2019), the Fifth Circuit has held, in the context of a Title VII race discrimination case, that evidence of discriminatory animus on the part of a single board member is not automatically imputed upon the entire board. *See Harville v. City of Houston, Mississippi*, 945 F.3d 870, 878 (5th Cir. 2019). In *Harville*, the Fifth Circuit affirmed a district court's dismissal of plaintiff's Title VII race discrimination claim based, in part, on plaintiff's failure to prove that "a majority of the board had the requisite animus." *Id.* (internal quotation marks and citations omitted). In other words, in the context of this case, "even where there is evidence of retaliatory animus by individual board members, 'the dispositive question is simply whether retaliatory animus is also chargeable to the Board itself.'" *Johnson v. Clarksdale Pub. Utilities Comm'n*, 807 F. Supp. 3d 593, 609 (N.D. Miss. 2025) (quoting *Griggs*, 930 F.3d at 704).

Again, McMillian bears the burden of proving that "but-for the employer's improper retaliatory motive, the allegedly retaliatory employment action would not have occurred." *Etienne*, 547 F. App'x at 488. There is no dispute in this case that the Board of Aldermen, as a collective body, made the decision to terminate McMillian and that Odom was only one of three Board members who voted in favor of termination. McMillian does not argue, much less provide any

proof, that Odom exerted any influence over the other members of the board.[8] Though he contends that Odom's "retaliatory… animus infected the collective voting body's decision-making process[,]" he points to no evidence in the record that supports that assertion. [115] at p. 12. Like the plaintiff in *Harville*, he fails to point to any direct evidence that the *majority* of the Board harbored retaliatory animus for his filing of the March 2022 EEOC Charge. McMillian's argument that direct evidence of retaliation exists is therefore rejected. The Court will consider his remaining arguments pertaining to Board's general awareness of his EEOC Charge in analyzing his proffered circumstantial evidence.

In the absence of direct evidence of retaliation, the Court applies the *McDonnell Douglas* burden-shifting framework. *Etienne*, 547 F. App'x at 488. "Under that framework, the plaintiff bears the initial burden of establishing a prima facie case of retaliation." *Huggins v. Keytronic Corp.*, 2024 WL 1337191, at *5 (N.D. Miss. Mar. 28, 2024) (citing *Harville*, 945 F.3d at 874). "To do so, the plaintiff must show that: 1) [he] engaged in a protected activity; 2) [he] suffered an adverse employment action; and 3) there is a causal connection between the two." *Id.* (internal quotation marks and citations omitted). "If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id.* If the employer does so, "the plaintiff must demonstrate that the employer's proffered reason is a pretext for retaliation." *Id.*

In its Memorandum [111], the City does not appear to contest that McMillian can establish a prima facie case of retaliation arguing that "[his] prima facie case is pencil thin." [111] at p. 9. Instead, the City focuses its arguments on pretext. In light of that concession, and because the

---

[8] McMillian does not point to Odom's testimony to support a cat's paw theory of liability. Instead, he relies on alleged actions by Mayor Scott in arguing that theory. The Court will address those arguments later in this opinion.

parties do not dispute that the City has put forth a legitimate, non-retaliatory reason for terminating McMillian, the Court moves on to pretext. *See Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 835 (5th Cir. 2022).

"Pretext can be proven by any evidence that casts doubt on the credence of the employer's proffered justification for the adverse employment action." *Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 578 (5th Cir. 2020). To prove pretext, McMillian must show that his protected activity was a but-for cause of his termination. *Owens*, 33 F.4th at 835 (citing *Long v. Eastfield Coll.*, 88 F.3d 300, 305 n.4 (5th Cir. 1996)). "This inquiry requires a greater showing than mere causal connection. It requires that the plaintiff show that the protected conduct was *the* reason for the adverse action." *Id.* (emphasis in original). "In other words, even if a plaintiff's protected conduct is a substantial element in a defendant's decision to terminate an employee, no liability for unlawful retaliation arises if the employee would have been terminated even in the absence of the protected conduct." *Id.* (quoting *Long*, 88 F.3d at 305 n.4) (internal quotation marks omitted).

McMillian relies on the following evidence to demonstrate but-for causation: 1) Alderwoman Odom's deposition testimony; 2) the City's alleged failure to follow its progressive discipline policy; 3) the difference in disciplinary action taken against him versus Brown; 4) the City's disallowance of his presence during the executive session; 5) the Board's awareness of his EEOC filing; and 6) Mayor Scott's alleged "retaliatory campaign" against him.[9]

The Court is compelled to note that the City does not address three of these categories of evidence in its Reply [127]. Specifically, the Court is referring to the City's progressive discipline policy, the difference in disciplinary action taken against McMillian and Brown, and the City's

[9] The Court has already addressed McMillian's arguments with respect to Alderwoman Odom's deposition testimony in its analysis of direct evidence. It need not restate those findings here.

disallowance of McMillian's presence during the executive session. The Court will address McMillian's arguments relative to these categories of evidence first before addressing the others.

*i. The Policy*

The Fifth Circuit has "repeatedly held that an employer's failure to follow its internal protocols in terminating an employee or in reviewing the employee before termination can be evidence of pretext." *Sears v. Zions Bancorporation NA*, 2022 WL 1800779, at *4 (5th Cir. June 2, 2022) (citing *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 477 (5th Cir. 2015)) (additional citations omitted). "The failure to follow even non-mandatory policies can give rise to an inference of pretext." *Id.* McMillian argues that the City bypassed its progressive discipline policy in electing to terminate him despite the fact he had no disciplinary record. In this regard, the City's progressive discipline policy provides that termination is an appropriate disciplinary measure after two occurrences where an employee fails to meet the City's standards of behavior or performance. *See* [114], Ex. 27 at p. 2. It further provides, in pertinent part:

> (4) In cases involving serious misconduct, or any time the Department Head determines it is necessary, such as a major breach of policy or violation of law, the procedures contained in Comment (2), above, may be disregarded. The Department Head should suspend the employee immediately and, if appropriate, recommend termination of the employee.

*Id.*

During his deposition, Collins, who again was McMillian's direct supervisor, testified that McMillian had never been written up for having someone clock him in other than the write-up on December 1, 2023 for the November 27, 2023 incident. *See id.*, Ex. 2 at p. 5. Thus, to warrant bypassing its progressive discipline procedures, the City must have considered McMillian's request for Brown to clock him in on November 27, 2023 (which he denies) as a case of serious misconduct to warrant recommending his termination to the Board. *See* [114], Ex. 27 at p. 2.

It is undisputed that Mayor Scott conducted an investigation into the clock-in incident. As noted above, Mayor Scott was not deposed in this case. However, his written notice to McMillian on December 4, 2023 relays the potential seriousness of the misconduct stating as follows:

> It has come to my attention regarding the discrepancies concerning you following company policy as it relates to employee clocking in and out at the time clock. Due to concerns with employee hours and *the severity of the situation*, you're being sent home and asked to meet with the Board of Aldermen on Tuesday, December 5, 2023 to further discuss this matter.

*Id.*, Ex. 33 at p. 1 (emphasis added).

Notably, pertaining to the company policy Mayor Scott's written notice appears to reference, the City provides with its Motion [110] a copy of its Employee Behavior Policy, which provides that an employee may be discharged for "[f]alsifying an employee's timecard or *punching another employee's timecard.*" [110], Ex. 12 at p. 1 (emphasis added). As McMillian argues, it is undisputed that Brown also partook in the alleged misconduct by clocking McMillian in, yet he was retained by the City. In the Court's view, this evidence undermines Mayor Scott's classification of the misconduct as serious enough to warrant termination and raises a question of fact pertaining to whether the City complied with its internal protocols for terminating employees.

Additionally, though McMillian does not raise the issue, the Court notes that McMillian's write-up for the subject clock-in incident reflects the "[a]ction to be taken" against McMillian as a "warning" rather than suspension or dismissal. [114], Ex. 13 at p. 1. That Disciplinary Report is signed by Marcus Collins, who testified that he was the head of the City's water department during the relevant time frame. *See id.*, Ex. 2 at p. 11. Viewing this evidence in light most favorable to McMillian, a jury could conclude that Collins, as head of the City's water department, did not consider McMillian's alleged misconduct to be a terminable offense. The Court finds that this

evidence, combined with the evidence pertaining to the City's policies, casts doubt on the City's reason for terminating McMillian.

*ii. Disparate Treatment*

The Court next considers McMillian's arguments concerning disparate treatment in more detail. Again, McMillian emphasizes the fact that Brown was involved in clocking him in on the date in question but was nonetheless retained. Specifically, he argues that "Triron Brown—the individual who executed the physical clock punches—was spared from discharge, granted access to address the Board, and issued a minor 3-day suspension, as formally recorded in the municipal minutes from the December 5, 2023 regular board meeting." [115] at p. 29.

A plaintiff may show pretext through evidence of disparate treatment. *See Huggins*, 2024 WL 1337191 at *5 (citing *Harville*, 945 F.3d at 879). "Typically, a plaintiff who proffers the treatment of a fellow employee must show that the plaintiff's termination was taken under nearly identical circumstances as those faced by the comparator." *Brown*, 969 F.3d at 580 (internal quotation marks and citations omitted). "Employees are similarly situated when they hold the same job responsibilities, share the same supervisor or have their employment status determined by the same person, and have essentially comparable violation histories." *Id.*

McMillian's argument as to disparate treatment is two-fold. First, he contends he was treated differently than Brown with respect to the disciplinary action taken against each of them. Second, McMillian points to the fact that Brown was permitted to address the Board during the executive session concerning the clock-in incident but he was not allowed to be present.

There is no dispute in this case that Brown is a proper comparator because he and McMillian held the same job position and shared the same supervisor. As to their violation histories, Collins testified that, like McMillian, Brown had not received any type of disciplinary

action for clocking another employee in prior to the November 2023 incident. *See* [114], Ex. 2 at p. 5. Thus, it is undisputed that McMillian and Brown were both first time offenders as it pertains to the misconduct at issue in this case, yet they received different treatment. When asked about the reason why McMillian was fired and Brown was retained for a similar violation, all three alderpersons who voted in favor of McMillian's termination gave varying explanations. For example, Alderwoman Odom stated as follows during her deposition:

> Q. Okay. And can you tell me why Mr. McMillian was terminated and Mr. Brown was not?
>
> A. Well, I felt like that he was embezzling time from the City.
>
> . . .
>
> Q. Right. I guess the question is: If Mr. Brown assisted Mr. McMillian in stealing time, is there a particular reason why Mr. Brown wasn't terminated?
>
> A. Because he hadn't --- that was first offense, and the first time he had been brought up.

*Id.*, Ex. 4 at p. 9, 14.

Again, despite Alderwoman Odom's explanation to the contrary, it is undisputed that the clock-in incident at issue was the first offense for both McMillian and Brown. For his part, Alderman Cain testified that he voted in favor of McMillian's termination based on the reports he received during the executive session; however, when asked to elaborate on the reason Brown was only suspended and not terminated, he stated that he simply could not elaborate and that "[he] felt as though Mr. McMillian needed to be fired." *Id.*, Ex. 7 at p. 5. In short, he did not provide a concrete reason for the difference in treatment. Similarly, Alderman Haynes, the third alderperson who voted in favor of McMillian's termination, initially testified that there was no reason for the difference in treatment between McMillian and Brown. *See* [114], Ex. 8 at p. 11. However, he

subsequently clarified that "[w]ell, one received payment and one didn't." *Id.* In that regard, McMillian testified that he did not receive payment for any time on November 27, 2023. Again, the City does not address McMillian's proffered evidence of disparate treatment in its Reply [127], and the Court has considered the Alderpersons' respective explanations on its own accord.[10] Overall, the Court finds that the difference in treatment between McMillian and Brown is strong evidence of pretext. *See Brown*, 969 F.3d at 580 (explaining that evidence of disparate treatment of less similarly situated comparators is less probative than that of more similarly situated comparators).

McMillian's second argument leads the Court to consider an issue that McMillian fails to explicitly mention in his Response Memorandum [115]. In essence, McMillian is arguing that he was not allowed to provide an explanation of the subject incident prior to the Board deciding to terminate him.

In that regard, "[t]he Fifth Circuit has held that an employer's investigatory choices, depending on the facts of a particular case, can be suspicious in a way that renders the 'defendant's explanation… unworthy of credence and permits an inference of [retaliation].]" *Green v. Univ. of Mississippi*, 2025 WL 3539292, at *9 (N.D. Miss. Dec. 10, 2025) (quoting *Owens*, 33 F.4th at 828-29). For example, "an employer's failure to give an employee a chance to explain [his] conduct can create a jury issue of pretext." *Id.* (citing *Laxton v. Gap Inc.*, 333 F. 3d 572, 581 (5th Cir. 2003).

McMillian first points out that Brown was allowed to speak before the Board during the executive session while he was not. That fact is not in dispute; however, as noted previously, Alderman Haynes testified that McMillian was not allowed to be present during the Board's

[10] The Court notes that the City passingly references the "the board members[']" explanation for the difference in treatment in a footnote in the facts section of its Memorandum [111]; however, it cites only Alderman Haynes testimony. *See* [111] at p. 4.

executive session based on advice of the City's board attorney. *See* [114], Ex. 8 at p. 10. Specifically, Alderman Haynes testified that the "City attorney stated that if he had gotten an attorney and he's filed a suit against the City, that we should not entertain a conversation with Mr. McMillian about the situation." *Id.* In that regard, McMillian testified that he was not represented by counsel concerning the subject of the December 5, 2023 board meeting (i.e. his impending termination). *See id.*, Ex. 5 at p. 84. It is unclear from the record whether the Board as a whole believed McMillian was represented by counsel as further testimony in that regard was not elicited from those deposed. However, the Court finds noteworthy Alderman Cain's response when asked why McMillian was not allowed to speak to the Board during the executive session:

> Q. And from my understanding, Triron Brown actually did get to speak with the board on -- in fact, Attorney Zinn actually wrote something that that -- actually stated that Zinn did -- not Zinn but Triron Brown did get to speak with the board.
>
> Is there a reason why Mr. Brown would get to speak to the board about this matter and Mr. McMillian would not be able to speak to the board about this matter?
>
> A. I'm pretty sure, Counselor, that it's probably just a situation where *we didn't need to hear anything from Mr. McMillian.* I think -- that's what I remember happening. And as I told you, sir, I don't recall Mr. Brown. Like I said, that's quite possibly – if Mr. Zinn presented that information, then I would certainly agree with Mr. Zinn.

[114], Ex. 7 at p. 13 (emphasis added).

Viewing this evidence in light most favorable to McMillian, the Court finds that a jury could conclude that the Board had no legitimate reason for excluding McMillian from the executive session, during which the clock-in incident would be discussed, and consider his exclusion suspicious. In addition to the evidence the Court has discussed, it also finds noteworthy McMillian's testimony concerning the investigation leading up to the board meeting.

During his deposition, McMillian testified that he was not given the opportunity to give his version of events to Mayor Scott before he recommended McMillian's termination to the Board:

> Q. Okay. So you don't recall meeting with Mayor Scott in late November?
>
> A. No, sir. I got a letter from the city, told me that Mayor Scott wanted to see me. I ended up coming to the city hall, and they end up giving me the letter telling me that I need to come to the board meeting. And what -- I never did meet with Charles Scott dealing with this or clocking in or nothing like that.

*Id.*, Ex. 5 at p. 16.

When asked whether there was ever a meeting between Mayor Scott, McMillian, Brown, Moore, and himself, Collins testified "no, not about the time clock situation. Not all of us." *Id.*, Ex. 2 at p. 7. The Court is cognizant that Moore testified that Mayor Scott attempted to meet with McMillian but that McMillian decided to leave the meeting over a dispute concerning the Mayor's decision to record their conversation. *See id.*, Ex. 6 at p. 10-11. Nonetheless, McMillian's testimony that Mayor Scott's investigation did not include allowing him the opportunity to explain his alleged conduct also raises a question as to pretext. *See Owens*, 33 F.4th at 829. In so finding, it is not the Court's intent to measure the sufficiency of the City's investigatory practices, but, instead, considering McMillian's testimony together with the other evidence the Court has discussed, it finds that a jury could make a rational inference that the City's proffered reason for McMillian's termination is not credible. *See id.*

*iii. The Board's Knowledge*

Next, McMillian points to the Board's general awareness of his March 2022 EEOC Charge in arguing that questions of fact remain as to but-for causation. There is no dispute in this case that the Board was aware that McMillian had filed the EEOC Charge at the time it decided to terminate his employment. For its part, the City argues that "[t]he Board of Aldermen's mere knowledge of

McMillian's EEOC charge 'suggests, by itself, no causality at all' because [the charge] was filed on March 7, 2022, i.e., twenty-one months before his December 5, 2023 termination." [127] at p. 3.

"To establish the causation prong of a retaliation claim, the employee should demonstrate that the employer knew about the employee's protected activity." *Huggins*, 2024 WL 1337191 at *7 (quoting *E.E.O.C. v. EmCare, Inc.*, 857 F.3d 678, 683 (5th Cir. 2017)) (internal quotation marks omitted). "Generally, this requires some showing that the decisionmaker—the individual who actually made the decision or caused the decision to be made—was aware of the activity." *Id.* (citations omitted). The Court finds that McMillian has made such a showing for purposes of summary judgment. While cognizant of the City's argument that McMillian filed his EEOC charge nearly two years prior to his termination; the Court notes that McMillian does not rely solely on the Board's general knowledge but also points to evidence of pretext, which the Court has discussed above, and therefore the Court considers the Board's knowledge "in the circumstantial evidentiary mix." *Green*, 2025 WL 3539292 at *8.

In sum, having considered all of McMillian's evidence of pretext, the Court must decide whether a reasonable jury could find that his filing of the March 2022 EEOC charge was the but-for cause of his termination. *See Huggins*, 2024 WL 1337191 at *6. Though it is a close call, the Court finds that, considering the cumulative evidence in light most favorable to McMillian, a jury could reach that conclusion in this case.

"Indeed, in an appropriate case, a factfinder may infer the ultimate fact of retaliation from the falsity of the employer's explanation." *Id.* (quoting *Jan. v. City of Huntsville*, 74 F.4th 646, 654 (5th Cir. 2023); *see also Owens*, 33 F.4th at 828-29. Here, in addition to the Board's knowledge of McMillian's EEOC charge, the record contains substantial evidence of pretext, including disparate

treatment and the City's questionable investigatory choices prior to rendering its decision. Additionally, a question of fact exists as to whether the City followed its internal policies in terminating McMillian. The Court finds that there exists a "conflict in substantial evidence" on the question of whether the City would not have terminated McMillian but-for his March 2022 EEOC Charge. *Huggins*, 2024 WL 1337191 at *5 (citing *Brown*, 969 F.3d at 577).

*iv. Cat's Paw/ Mayor Scott's alleged retaliatory campaign*

As a final matter, the Court addresses McMillian's arguments that he can prove his Title VII claim under a cat's paw theory of liability. In his Response Memorandum [115], McMillian argues that Mayor Scott harbored retaliatory animus against him and that the Board blindly adopted his recommendation for McMillian's termination. In its Reply [127], the City argues, among other things, that "McMillian is procedurally barred from involving a cat's paw theory at this stage of the game." [127] at p. 6. The Court agrees.

The "cat's paw" doctrine is a theory of liability that a plaintiff may rely on "when they cannot show that the decisionmaker—the person who took the adverse employment action—harbored any discriminatory or retaliatory animus." *Higgins v. Lufkin Indus., Inc.*, 633 F. App'x 229, 233 (5th Cir. 2015); *see also Zamora v. City Of Houston*, 798 F.3d 326, 331 (5th Cir. 2015). In other words, it's an alternative theory from claiming that the Board itself acted with retaliatory animus. *See id.*

In *Schaeffer v. Warren Cnty., Mississippi*, 2016 WL 411221 (S.D. Miss. Feb. 2, 2016), the United States District Court for the Southern District of Mississippi held that plaintiff's attempt to prove his ADEA claim via a cat's paw theory of liability was procedurally barred because he raised that theory of liability for the first time in response to a motion for summary judgment. Relying on *Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005), the court

explained that "district courts do not abuse their discretion when they disregard claims *or theories of liability* not present in the complaint and raised first in a motion opposing summary judgment." *Id.* at *4 (emphasis in original).

This Court finds that McMillian's proposed cat's paw theory of liability is likewise not properly before the Court. Upon review of McMillian's Amended Complaint [34], the Court notes that McMillian does not mention cat's paw liability. *See generally* [34]. The Amended Complaint [34] does not otherwise assert facts that would establish the elements of a Title VII retaliation claim based on a cat's paw theory of liability and, therefore, it did not place the City on notice of a claim based on that theory. *See Zamora*, 798 F.3d at 333. Because McMillian first raises this theory in his summary judgment response, the Court need not consider it. *Cutrera.*, 429 F.3d at 113.[11]

**B. FMLA Retaliation**

The Court next addresses McMillian's FMLA retaliation claim. This claim is analyzed under the same framework as his Title VII claim. *See Watkins v. Tregre*, 997 F.3d 275, 283-84 (5th Cir. 2021).

To establish a prima facie case of FMLA retaliation, McMillian must show that: "(1) [he] engaged in FMLA-protected activity, (2) [the City] discharged [him], and (3) a causal link between

[11] Before addressing McMillian's remaining claims, the Court notes that the City seeks dismissal of any Title VII retaliation claim based on McMillian's allegation that he was denied overtime in October and November 2023, which McMillian appears to allege in his Amended Complaint [34]. *See* [34] at p. 5. However, in his Response Memorandum [115], McMillian appears to advance that claim under both Title VII and the FMLA. *See* [115] at p. 23. The Court finds that any claim based on a denial of overtime is nonetheless easily disposed of. "There is no precedential authority in the Fifth Circuit establishing whether a denial of overtime constitutes an adverse employment action." *Saunders v. Houston Foam Plastics*, 2023 WL 3313118, at *4 (W.D. Tex. May 5, 2023). Even if there was, McMillian conceded during his deposition that he did receive overtime in November 2023. *See* [114], Ex. 5 at p. 95. He also conceded that he was not scheduled for overtime hours in October 2023 "because of the gallbladder surgery." *Id.* at 93. Thus, any retaliation claim on the basis of denial of overtime is factually unsupported by the record.

the protected activity and the discharge." *Id.* at 284. The City argues that this claim fails because McMillian cannot establish the third element of his claim. The Court agrees.

"Although the plaintiff's burden at the prima facie stage is not onerous, the plaintiff must produce at least some evidence that the decisionmakers had knowledge of his protected activity." *Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 883 n.6 (5th Cir. 2003). It follows that "[i]f the decisionmakers were completely unaware of the plaintiff's protected activity, then it could not be said (even as an initial matter) that the decisionmakers might have been retaliating against the plaintiff for having engaged in that activity." *Id.*

In this regard, the City points out that Alderman Cain testified that he was not aware that McMillian had allegedly requested and been denied FMLA benefits. *See* [114], Ex. 7 at p. 32. Similarly, Alderwoman Odom testified during her deposition that she was unaware that McMillian had allegedly tried to obtain FMLA benefits. *See id.*, Ex. 4 at p. 47. Regarding Alderman Haynes, he testified that he had never seen McMillian's request for sick leave, which McMillian construes as his request for FMLA benefits. *See id.*, Ex. 8 at p. 32. McMillian does not otherwise provide any proof that Alderman Haynes was aware that he had sought FMLA benefits prior to his termination.

In short, McMillian fails to prove that the board members who voted in favor of his termination had any knowledge that he had engaged (or attempted to engage) in any FMLA-protected activity at the time they voted in favor of his termination. His FMLA retaliation claim is due to be dismissed for this reason alone. *See Manning*, 332 F.3d at 883 (quoting *Chaney v. New Orleans Pub. Facility Mgmt., Inc.*, 179 F.3d 164, 168 (5th Cir.1999)) ("If an employer is unaware of an employee's protected conduct at the time of the adverse employment action, the employer plainly could not have retaliated against the employee based on that conduct.").

**C. FMLA Interference**

Finally, the Court reaches McMillian's FMLA interference claim. "It is unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under the FMLA." *Hester v. Bell-Textron, Inc.*, 11 F.4th 301, 306 (5th Cir. 2021) (quoting 29 U.S.C. § 2615(a)(1)) (internal quotation marks omitted). "To make a prima facie case of [FMLA] interference, a plaintiff must demonstrate that (1) he was an eligible employee; (2) his employer was subject to FMLA requirements; (3) he was entitled to leave; (4) he gave proper notice of his intention to take FMLA leave; and (5) his employer denied him the benefits to which he was entitled under the FMLA." *Tatum v. S. Co. Servs., Inc.*, 930 F.3d 709, 713 (5th Cir. 2019).

Before addressing the parties' argument, the Court first clarifies McMillian's basis for this claim. According to the Amended Complaint [34], McMillian claims that the City inferred with his FMLA rights by denying him FMLA benefits that would have excused his absence on November 27, 2023. *See* [34] at p. 10. He argues that the City did not have an adequate FMLA policy in place and that this resulted in the denial of those benefits. During his deposition, McMillian testified as follows when asked about the reason for his absence on the date in question:

> Q. Okay. But [the absence] wasn't because of your gallbladder? I mean, I was just asking. That's what the Complaint says. It was because your flight was delayed?
>
> A. My flight was delayed, and I was just going to use one of my FMLAs days up.

[114], Ex. 5 at p. 99.

The City argues that McMillian's FMLA interference claim fails based on the third element. With respect to the third element, "[a]n eligible employee is entitled to FMLA leave for, *inter alia*, 'a serious health condition that makes the employee unable to perform he functions of the position of such employee.'" *Harris v. Home Care PCA, LLC*, 2023 WL 6259968, at *5 (M.D. La. Sept.

26, 2023) (quoting 29 U.S.C. § 2612(a)(1)(D)). There is no dispute that McMillian was absent on November 27, 2023 due to a flight delay and not due to illness. Additionally, it is undisputed that McMillian was released to full duty by his physician (following his gallbladder surgery) effective October 11, 2023. *See* [114], Ex. 10 at p. 2. Thus, based on these undisputed facts, the Court finds that he was not entitled to FMLA leave on November 27, 2023 even if, in hindsight, he had availed himself of those benefits prior to his absence. His claim is due to be dismissed for this reason alone.

### *Conclusion*[12]

For the foregoing reasons, the Court finds the City's Motion for Summary Judgment [110] should be GRANTED IN PART and DENIED IN PART.

McMillian's FMLA retaliation and interference claims are hereby dismissed *with prejudice*. His retaliation claims based on denial of overtime pursuant to the FMLA and Title VII are hereby dismissed *with prejudice*. McMillian will be permitted to proceed to trial on his Title VII and Section 1981 retaliation claims, which are based on his termination.

An order in accordance with this opinion shall issue this day.

THIS, the 15th day of September, 2026.

SENIOR U.S. DISTRICT JUDGE

[12] To the extent the Court has not specifically addressed the parties' remaining arguments, it has considered them and determined that they would not alter the result.